Robert D. Albergotti
State Bar No. 00969800
Stephen Pezanosky
State Bar No. 15881850
Ian T. Peck
State Bar No. 24013306
**HAYNES AND BOONE, LLP**
2323 Victory Avenue, Suite 700
Dallas, Texas 75219
Telephone: (214) 651-5000
Facsimile: (214) 651-5940

**PROPOSED ATTORNEYS FOR**
**THE DEBTORS-IN-POSSESSION**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | Chapter 11 |
| | § | |
| GUARANTY FINANCIAL GROUP INC. | § | CASE NO. 09-35582-bjh |
| | § | |
| GUARANTY GROUP VENTURES INC. | § | CASE NO. 09-35583-hdh |
| | § | |
| GUARANTY HOLDINGS INC. I | § | CASE NO. 09-35584-bjh |
| | § | |
| GUARANTY GROUP CAPITAL INC. | § | CASE NO. 09-35586-hdh |
| | § | |
| DEBTORS. | § | MOTION FOR JOINT |
| | § | ADMINISTRATION PENDING |

**STATEMENT OF BACKGROUND INFORMATION**
**IN SUPPORT OF THE DEBTORS' CHAPTER 11 PETITIONS**

Guaranty Financial Group Inc. ("GFG"), Guaranty Group Ventures Inc. ("GGVI"),

Guaranty Holdings Inc. I ("GHI"), and Guaranty Group Capital Inc. ("GGCI") (collectively, the

"Debtors"), as debtors-in-possession, submit this Statement of Background Information in

Support of the Debtors' Chapter 11 Petition and respectfully represent:

1.      On this date (the "Petition Date"), each of the Debtors filed a voluntary petition

for relief under Chapter 11 of the Bankruptcy Code.  The Debtors continue to manage and

operate their business as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

2.     This Statement is submitted to assist the Court and other parties-in-interest in understanding the circumstances that compelled the commencement of these Chapter 11 cases and in support of (i) the Debtors' voluntary petitions for relief under Chapter 11 of the Bankruptcy Code filed on the Petition Date, and (ii) the relief, in the form of motions, that the Debtors have requested of the Court (the "First-Day Motions"). Any capitalized term not expressly defined herein shall have the meaning ascribed to that term in the relevant First-Day Motion.

## I.     The Debtors' Operations

### A.     GFG

3.     GFG is a publicly-traded Delaware corporation that owns 100% of the common stock of GGVI, GHI, and GGCI.    GFG is a "grandfathered" unitary thrift holding company.[1] This qualification permits GFG to own a single savings and loan association while conducting other non-banking business operations but also requires GFG to make significant investments in residential mortgages or mortgaged-backed securities, among other assets.  As a thrift holding company, GFG is regulated by the Office of Thrift Supervision ("OTS").

4.     GFG's pre-petition, non-banking business operations include acting as a broker, through licensed representatives, for GFG entities engaged in real estate transactions.  In addition, GFG formerly operated one of the largest independent insurance agencies in the country through its subsidiary, Guaranty Insurance Services, Inc. ("GIS").  GIS provided a full array of insurance services, emphasizing property and casualty insurance as well as fixed

---

[1] After May 1999, the federal government barred new unitary thrift holding companies, but permitted continued operations of existing unitary thrift holding companies, referred to as "grandfathered" holding companies.

annuities.  Effective December 31, 2008, GFG sold GIS to JLT Insurance Agency Holdings, Inc. for a purchase price of approximately $40 million.

5.     Historically, GFG's principal sources of funds have been cash dividends from subsidiaries, investment income, and borrowings

### B.     GHI and Guaranty Bank

6.     GHI is a Delaware corporation that serves as the holding company for GFG's investment in Guaranty Bank.  GHI owns 100% of the common stock of Guaranty Bank.  Like GFG, GHI is a grandfathered unitary thrift holding company.  GHI has no other operations.

7.     Guaranty Bank is a federally-chartered savings bank that began operations in 1988.  Guaranty Bank conducts consumer and business banking operations through a network of over 150 bank branches located in Texas and California.  Guaranty Bank provides commercial banking products and services to diverse geographic markets throughout the United States. As of December 31, 2007, Guaranty Bank had consolidated total assets in excess of $16 billion and was one of the largest financial institutions headquartered in Texas.  Guaranty Bank is regulated by the OTS and the Federal Deposit Insurance Corporation ("FDIC").

### C.     GGVI and GGCI

8.     GGVI was formed to hold certain real estate assets and engage in non-banking activities, including real estate development.  Currently, GGVI has no operations.

9.     GGCI was formed to enter into financing arrangements outside of Guaranty Bank. GGCI's only ongoing activities relate to record-keeping associated with subordinated debt that was redeemed in 2007.

10.     A chart demonstrating the organizational structure of GFG and its subsidiaries is attached hereto as *Exhibit A*.

## II.    Debtors' Debt Structure

11.    GFG's primary debt obligations relate to trust preferred securities ("TRPS"), which have an outstanding principal amount of $305 million and are held by various parties that are not affiliated with the Debtors (the "TRPS Holders"). The TRPS were issued by a statutory trust (the "Trust") owned by GFG, with Wilmington Trust Company as trustee (the "Trustee"). In connection with the issuance of the TRPS, GFG issued debt securities to the Trust, which are nominally subordinate to various other forms of GFG's debt, although no significant senior debt is currently outstanding (the "Debt Securities"). In addition, GFG guaranteed certain payments due to the TRPS Holders pursuant to the TRPS. The Debt Securities have a 30-year term and variable interest rates, payable quarterly. GFG has suspended interest payments in connection with the Debt Securities.

12.    In addition, GFG owes amounts to various current and former employees of Guaranty Bank pursuant to GFG's Supplemental Executive Retirement Plan, Stock Incentive Plan, and severance policy. GFG estimates that its liability is connection with such plans and policies to be in excess of $4 million.

## III.    The Temple-Inland Spin Off

13.    In late 1988, Temple-Inland Inc. ("Temple-Inland") formed Guaranty Bank by acquiring three institutions, including what was then Guaranty Federal Savings and Loan Association. At that time, Temple-Inland's existing insurance operations, which began in the late 1950s, were combined with the banking operations to create a financial services group as a part of Temple-Inland. These banking and insurance agency operations continued to grow during the last two decades through numerous acquisitions.

14.    On February 25, 2007, Temple-Inland's board of directors preliminarily approved a plan to separate Temple-Inland into three focused, stand-alone, public companies. On

November 29, 2007, Temple-Inland Inc. announced that its board of directors had approved the distribution to its stockholders of all of the shares of common stock of GFG. At the close of business on December 28, 2007, the distribution was completed, and GFG became a stand-alone, public company focused on the financial services business.

## IV.    The Debtors' Financial Crisis

### A.    *Losses on Mortgage Backed Securities*

15.    Beginning in 2007, volatility in the credit and residential housing markets resulted in extensive impairment of existing mortgage-backed securities held by GFG and its subsidiaries. Declining real estate values and other economic conditions led to a substantial increase of defaults on loans underlying those mortgage-backed securities, thereby dramatically reducing the value of GFG's investments. In addition, an increase in number of non-performing loans issued by Guaranty Bank contributed to the Debtors' financial crisis.

16.    For the quarter ending March 31, 2009, GFG's preliminary financial statements reflected a loss of approximately $256 million, compared to a loss of $10 million for the quarter ending March 31, 2008. Additionally, in the second quarter of 2008, GFG recorded $99 million in provision for credit losses, compared to an insignificant net provision expense in the second quarter of 2008. Similarly, GFG recorded $157 million in provision for credit losses in the first six months of 2008, compared to a $2 million credit provision in the first six months of 2007. Based partially on the significant declines in the financial condition and liquidity of GFG's homebuilder portfolio customers, losses reported by GFG continued to increase.

### B.    *Failure to Maintain Capital Ratios*

17.    As a result of increasing losses, on June 8, 2008, Guaranty Bank's Board of Directors adopted a resolution, at the request of OTS, confirming that Guaranty Bank would maintain certain core and risk-based capital ratios. As of March 31, 2009, however, Guaranty

Bank was unable to comply with the agreed-upon capital ratios. On April 6, 2009, GFG and Guaranty Bank consented to the issuance of an Order to Cease and Desist by OTS that placed numerous restrictions and consent requirements on GFG related to dividends, incurrence of debt, debt payments, executive compensation, asset increases, and brokered deposits.

### C.   *Amended Financial Reporting*

18.   On July 17, 2009, at the direction of the OTS, Guaranty Bank filed an amended Thrift Financial Report ("TFR") as of and for the three months ended March 31, 2009. The amended TFR reflected (i) an adjustment to write down the value of certain non-agency mortgage-backed securities that resulted in an impairment charge in the amount of $1.45 billion and (ii) an adjustment to write off goodwill in the amount of $106.6 million. Based on these adjustments, GFG disclosed that, as of March 31, 2009, Guaranty Bank had negative core capital and total risk based capital ratios and that Guaranty Bank was considered "critically under-capitalized."

### D.   *Attempts to Solve Financial Crisis*

19.   The Debtors and Guaranty Bank took an array of actions to address their financial crisis. Most notably, during 2008, GFG raised $600 million in capital through the sale of equity and debt securities. This capital infusion took the form of (i) a $38.4 million purchase of common stock by a single institutional investor; (ii) a $286.6 million purchase of mandatory convertible preferred stock by several institutional investors; and (iii) a $275 million purchase of subordinated notes of Guaranty Bank and mandatory convertible preferred stock by several institutional investors.

20.   In addition to other extensive efforts to raise capital, Guaranty Bank applied to the FDIC for "open bank assistance" pursuant to the Federal Deposit Insurance Corporation

Improvement Act. The write downs included in the July 17, 2009 TFR foreclosed the possibility of open bank assistance.

### E. FDIC Receivership

21. On August 21, 2009, the OTS appointed the Federal Deposit Insurance Corporation (the "FDIC") as receiver for Guaranty Bank (the "Receivership"). The OTS order appointing the FDIC as receiver is attached hereto as **Exhibit B**. The FDIC entered into a purchase and assumption agreement with BBVA Compass, Birmingham, Alabama, to assume all of the deposits of Guaranty Bank, excluding approximately $344 million in brokered deposits. In addition to assuming all of the deposits of Guaranty Bank, BBVA Compass agreed to purchase $12 billion of Guaranty Bank's assets. The FDIC will retain the remaining assets for later disposition.

22. Going forward, GFG continues to cooperate with the OTS and the FDIC as they work to transition the assets of Guaranty Bank to BBVA Compass.

## V. Employees and Insurance

23. None of the Debtors have current employees. The pre-petition operations of the Debtors were performed by employees of Guaranty Bank and its subsidiaries. In consideration of such services, GFG paid an allocated share of salaries and operational expenses.

24. Prior to the Receivership, several benefit programs were available to the employees of Guaranty Bank. These programs included medical, dental, vision, life, accidental death and dismemberment, and disability insurance. The employees could also take advantage of a 401(k) plan, health savings and flexible spending accounts, tuition reimbursement and, for certain employees, a Supplemental Executive Retirement Plan, and Stock Incentive Plan.

25. With the exception of the Supplemental Executive Retirement Plan, Stock Incentive Plan, and severance policy, all other programs available to Guaranty Bank employees

were funded and accounted for by Guaranty Bank and administered by unrelated third parties under the direction of Guaranty Bank (the "Third-Party Benefit Programs"). Guaranty Bank directed appropriate paycheck deductions and employee contributions and remitted all administrative fees in connection with the Third-Party Benefit Programs. However, virtually all of the Third-Party Benefit Programs are based on documents executed in the name of GFG.

26. In preparation for the Receivership, and in order to assist with the transition of Guaranty Bank's assets to BBVA Compass, GFG assigned all but one of the Third-Party Benefit Programs to Guaranty Bank. The only Third-Party Benefit Program that has not yet been assigned is a group health plan (the "Kaiser Plan") that is administered by Kaiser Foundation Health Plan, Inc. ("Kaiser") and benefits 132 Guaranty Bank employees and 6 COBRA participants. The Debtors understand that BBVA Compass has applied with Kaiser to replace GFG as the administrator of the Kaiser Plan but such transition has not yet been finalized. The costs of premiums for the Kaiser Plan is approximately $60,000 per month.

27. The Debtors are covered by various insurance policies, including a workers compensation and liability policy, a directors and officers liability policy and excess policy, and a management liability and company reimbursement insurance policy, among others (collectively, the "Insurance Policies"). There are no outstanding obligations to pay premiums in connection with the Insurance Policies.

## VI. Equity and Board of Directors

28. As of June 30, 2009, the number of shares of outstanding common stock of GFG totaled approximately 108,937,501. Previously, GFG's common stock was traded on the New York Stock Exchange (the "NYSE") under the symbol "GFG." On August 24, 2009, the NYSE notified GFG that it had suspended the listing of GFG's common stock effective immediately.

GFG does not intend to request a review of the NYSE action. GFG's common stock is currently traded over the counter under the symbol "GFGF."

29.     Subsequent to the filing of the bankruptcy petitions, the members of the Board of Directors of each of the Debtors resigned, and Dennis Faulkner was elected as the sole director of each of the Debtors.

Dated: August 27, 2009.

HAYNES AND BOONE, LLP


By: */s/  Ian T. Peck*

Robert D. Albergotti
State Bar No. 00969800
Stephen M. Pezanosky
State Bar No. 15881850
Ian T. Peck
State Bar No. 24013306
2323 Victory Avenue, Suite 700
Dallas, Texas  75219
Telephone: 214-651-5000
Facsimile:  214-651-5940

**PROPOSED ATTORNEYS FOR
THE DEBTORS-IN-POSSESSION**

# EXHIBIT "A"



**Guaranty Financial Group Inc.**
*Delaware*
74-2421034

**Guaranty Group Capital Inc.**
*Delaware*
74-2555146

**Guaranty Group Ventures Inc.**
*Delaware*
74-2366105

**Guaranty Holdings Inc. I**
*Delaware*
75-2244180

**Guaranty Bank**
*Federally Chartered Savings Bank*
74-2511478

**RWHC, Inc.**
*Nevada*
74-2829168

**TMF Holding Inc.**
*Delaware*
75-2816428

**Guaranty Business Credit Corporation**
*Delaware*
75-2820595

**GFIS Holdings Inc.**
*Texas*
26-2202529

**Guaranty Financial Insurance Solutions Inc.**
*Delaware*
26-2203343

**American Finance Group, Inc.**
*Delaware*
94-3226128

**Guaranty Plus Holding Company**
*Nevada*
20-0349464

**Guaranty Plus Properties Inc. - I**
*Delaware*
20-0349556

**Guaranty Plus Properties LLC - 2**
*Texas*
26-2484538

**Guaranty Plus Properties LLC - 3**
*Texas*
26-2484678

**Guaranty Plus Properties LLC - 4**
*Texas*
26-2484865

**Guaranty Plus Properties LLC - 5**
*Texas*
26-2484908

**Guaranty Plus Properties LLC - 6**
*Texas*

**Guaranty Plus Properties LLC - 7**
*Texas*

**Guaranty Plus Properties LLC - 8**
*Texas*

**Guaranty Plus Properties LLC - 9**
*Texas*

GFG Organization Chart as of 1/14/2009

All subsidiaries are wholly owned. Non-affiliated entities are shown on the next page.

**Non-Affiliated Entities**

Charitable non-profit entity that is funded by Guaranty Bank

Guaranty Foundation

The group has no ownership in these entities -- they are non-profit entities to which the bank provided low interest loans:

Accion Texas, Inc.

Austin Community Development Corporation

Business Investment Growth-BIG

Community Development Loan Fund

Community Investment Corporation of Riverside County

The group has equity holdings in these entities (percentage ownership shown). The holding entities are shown in gray:



Guaranty Bank
*Federally Chartered Savings Bank*
74-2511478

TMF Holding Inc.
*Delaware*
75-2816428

14.37%

Third Coast Community Development Corporation

10.57%

Clearinghouse Community Development Financial Institution

70.41%

Texas Mezzanine Fund Inc.

# EXHIBIT "B"

# OFFICE OF THRIFT SUPERVISION

## Receivership of a Federal Savings Bank

Date:       August 21, 2009
Order No.:   2009-44
Docket No.:  08534

The Acting Director of the Office of Thrift Supervision (OTS), or his designee, in cooperation with the Federal Deposit Insurance Corporation (FDIC), has determined to appoint the FDIC as receiver of Guaranty Bank, Austin, Texas (Savings Bank).

## GROUNDS FOR APPOINTMENT OF FDIC AS RECEIVER FOR THE SAVINGS BANK

The Acting Director, or his designee, based on the administrative record finds and determines the following:

(i)      The Savings Bank's assets are less than the Savings Bank's obligations to its creditors and others;

(ii)     The Savings Bank is in an unsafe and unsound condition to transact business;

(iii)    The Savings Bank is critically undercapitalized; and

(iv)    The Savings Bank has substantially insufficient capital.

The Savings Bank is a Federally-chartered savings bank, the accounts of which are insured by the Deposit Insurance Fund (DIF). The Savings Bank's home office is in Austin, Texas. As of June 30, 2009, the Savings Bank reported in its amended Thrift Financial Report (TFR) that it had approximately $13.464 billion in assets, $13.845 billion in liabilities, negative $381 million in stockholders' equity, and a net loss for the six months ended June 30, 2009, of approximately $1.983 billion. At June 30, 2009, the Institution reported tangible, tier one (core), tier one risk-based, and total risk-based capital of negative 7.11 percent, negative 7.11 percent, negative 7.35 percent, and negative 7.36 percent, respectively. The Savings Bank's June 30, 2009, Thrift Financial Report indicates that the Institution is "critically undercapitalized." The Savings Bank experienced a net loss for the fiscal year ended December 31, 2008, of approximately $427.07 million. The Savings Bank is indirectly wholly owned by Guaranty Financial Group, Inc. (Holding Company). The Holding Company wholly owns all of the outstanding common stock of Guaranty Holdings, Inc., which directly owns the Savings Bank.

## DISCUSSION OF GROUNDS FOR APPOINTMENT
## OF A RECEIVER FOR THE SAVINGS BANK

Section 5(d)(2)(A) of the Home Owners` Loan Act (HOLA), 12 U.S.C. § 1464(d)(2)(A), provides that OTS may appoint a receiver for any insured savings association if OTS determines that one or more grounds specified in section 11(c)(5) of the Federal Deposit Insurance Act (FDIA), 12 U.S.C. § 1821(c)(5), exist.

Assets Insufficient for Obligations

Under section 11(c)(5)(A) of the FDIA, OTS may appoint a receiver if a savings association's assets are less than its obligations to its creditors and others.

As of June 30, 2009, the Savings Bank reported negative equity capital of $381 million. Thus, the Savings Bank's liabilities exceed its assets, and the Savings Bank is unable to meet all of its obligations to its creditors and others.

Therefore, the Acting Director, or his designee, concludes that the Savings Bank's assets are less than its obligations to its creditors and others.

Unsafe or Unsound Condition to Transact Business

Under section 11(c)(5)(C) of the FDIA, OTS may appoint a receiver for a savings association if a savings association is in an unsafe and unsound condition to transact business.

At June 30, 2009, the Savings Bank reported tangible, tier one (core), tier one risk-based, and total risk-based capital of negative 7.11 percent, negative 7.11 percent, negative 7.35 percent, and negative 7.36 percent, respectively. The Savings Bank's June 30, 2009, TFR indicates that the Savings Bank is "critically undercapitalized." The Savings Bank experienced a net loss for the fiscal year ended December 31, 2008, of approximately $427.07 million, and additional losses of $1.983 billion in the first and second quarters of 2009, which losses have depleted its equity and regulatory capital.

The Savings Bank's operations have suffered due to the declining values of its loan portfolio, due to loan delinquencies that required significant provisions for loan losses. Provisions for loan loss totaled $514 million for fiscal 2008. First and second quarter 2009 losses included $84 million in additional loss provisions.

Declining values of its non-agency mortgage backed securities (MBS) due to delinquencies in the underlying mortgages have required the Institution to recognize other than temporary impairments (OTTI) of these securities. The Savings Bank has recorded OTTI loss provisions of approximately $194 million in fiscal 2008 and $2.418 billion in the first and second quarters of 2009. The Savings Bank invested in a significant amount of MBS of which approximately 70 percent of the underlying mortgages are Option adjustable rate mortgages (Option ARM) on California residences resulting in an inappropriate regional concentration of

MBS investment. In addition, many of the underlying mortgages were made on the basis of stated income or reduced documentation.

Therefore, the Acting Director, or his designee, concludes that the Savings Bank is in an unsafe and unsound condition to transact business.

## Critically Undercapitalized

Under section 11(c)(5)(L)(i) of the FDIA, OTS may appoint a receiver for a savings association if it is critically undercapitalized, as defined in 12 U.S.C. § 1831o(b). Under section 1831o(b), an institution is critically undercapitalized if it fails to meet any level of capital specified under section 1831o(c)(3)(A) of the FDIA. Section 1831o(c)(3)(A) provides for the appropriate banking agency to set a ratio of tangible equity to total assets at which an institution is critically undercapitalized. OTS has promulgated 12 C.F.R. § 565.4(b)(5), which defines an institution as critically undercapitalized if it has a ratio of tangible equity to total assets that is equal to or less than two percent. As of June 30, 2009, the Savings Bank reported a tangible capital ratio of negative 7.11 percent. Thus, the Acting Director, or his designee, concludes that the Savings Bank is critically undercapitalized.

## Substantially Insufficient Capital

Under section 11(c)(5)(L)(ii) of the FDIA, OTS may appoint a receiver for a savings association if it has substantially insufficient capital. Pursuant to the authority granted in sections 5(t)(1)(A)(i) and 5(t)(2)(A) of the HOLA, OTS has promulgated 12 C.F.R. Part 567 requiring all savings associations that are not "one" rated to maintain a leverage capital ratio of 4 percent and all savings associations to maintain a minimum risk-based capital ratio of 8 percent of the institution's risk-based assets, as defined. OTS has concluded that failure to maintain at least two-thirds of any capital required by 12 C.F.R. Part 567 constitutes a substantial capital insufficiency within the meaning of the 12 U.S.C. § 1821(c)(5)(L)(ii).

The Savings Bank is not "one" rated and has a leverage capital ratio of negative 7.35 percent. The Savings Bank's risk-based capital is negative 7.36 percent. Accordingly, the Savings Bank's leverage capital ratio and risk-based capital ratio both are less than two-thirds of the applicable capital requirements. Accordingly, the Acting Director, or his designee, concludes that the Savings Bank has substantially insufficient capital.

The Acting Director, or his designee, therefore, has determined that grounds for the appointment for a receiver for the Savings Bank exist under section 5(d)(2) of the HOLA, and sections 11(c)(5)(A), (C), (L)(i) and (L)(ii) of the FDIA, 12 U.S.C. §§ 1821(c)(5)(A), (C), (L)(i) and (L)(ii).

## ACTIONS ORDERED OR APPROVED

**Appointment of a Receiver**

The Acting Director, or his designee, hereby appoints the FDIC as receiver for the Savings Bank, for the purpose of liquidation or winding up the affairs of the Savings Bank, pursuant to section 5(d)(2) of the HOLA, 12 U.S.C. § 1464(d)(2), and section 11(c)(6)(B) of the FDIA, 12 U.S.C. § 182l(c)(6)(B).

## DELEGATION OF AUTHORITY TO ACT FOR OTS

The Acting Director, or his designee, hereby authorizes the OTS Western Regional Director, or his designee, and the Assistant Chief Counsel in the Business Transactions Division of the Chief Counsel's Office, or his designee, to: (1) certify orders; (2) sign, execute, attest or certify other documents of OTS issued or authorized by this Order; (3) designate the person or entity that will give notice of the appointment of a receiver for the Savings Bank and serve the Savings Bank with a copy of this Order pursuant to 12 C.F.R. § 558.2; and (4) perform such other actions of OTS necessary or appropriate for the implementation of such Orders. All documents to be issued under the authority of this Order must be first approved, in form and content, by the Chief Counsel's Office. Further, the Acting Director, or his designee, authorizes the Assistant Chief Counsel in the Business Transactions Division, or his designee, to make any subsequent technical corrections, that might be necessary, to this Order, or any documents issued under the authority of this Order.

By Order of the Acting Director of OTS, or his designee, effective immediately upon service of this Order on the Savings Bank this 21st day of August, 2009.

John E. Bowman
Acting Director