## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | (Chapter 11) |
| | § | |
| **GUARANTY FINANCIAL GROUP INC.** | § | Case No. 09-35582 |
| **GUARANTY GROUP VENTURES INC.** | § | Case No. 09-35583 |
| **GUARANTY HOLDINGS INC. I** | § | Case No. 09-35584 |
| **GUARANTY GROUP CAPITAL INC.** | § | Case No. 09-35586 |
| | § | |
| **Debtors.** | § | (Jointly Administered |
| | § | under Case No. 09-35582-bjh) |

---

## DISCLOSURE STATEMENT UNDER 11 U.S.C. § 1125 IN SUPPORT OF THE JOINT PLAN OF LIQUIDATION OF GUARANTY FINANCIAL GROUP INC., ET AL.

---

### IMPORTANT DATES

- Date and time by which Ballots must be received (Voting Deadline): _____, 2011 at 5:00 p.m. (Central Time)

- Date by which objections to confirmation of the Plan must be filed and served (Plan Objection Deadline): ____, 2011

- Hearing on confirmation of the Plan: _____, 2011 at _____ __.m. (Central Time)

**Dated December 20, 2010**

**HAYNES AND BOONE, LLP**
Robert D. Albergotti
Texas Bar No. 00969800
Ian T. Peck
Texas Bar No. 24013306
Autumn D. Highsmith
Texas Bar No. 24048806
2323 Victory Ave.
Dallas, Texas  75219
Telephone:     (214) 651-5000
Facsimile:     (214) 651-5940

**ATTORNEYS FOR THE DEBTORS-IN-POSSESSION**

# TABLE OF CONTENTS

**ARTICLE 1 INTRODUCTION** ................................................................ **1**

    **A.**    **Distributions under the Plan**......................................................... **1**
    **B.**    **Filing of the Debtors' Bankruptcy Cases**.................................... **2**
    **C.**    **Purpose of Disclosure Statement** ................................................ **2**
    **D.**    **Hearing on Confirmation of the Plan**......................................... **3**
    **E.**    **Sources of Information** ................................................................. **3**

**ARTICLE 2 EXPLANATION OF CHAPTER 11**.................................. **3**

    **A.**    **Overview of Chapter 11**............................................................... **3**
    **B.**    **Plan of Reorganization** ............................................................... **3**

**ARTICLE 3 VOTING PROCEDURES AND CONFIRMATION REQUIREMENTS** ........ **4**

    **A.**    **Ballots and Voting Deadline**....................................................... **4**
    **B.**    **Holders of Claims and Interests Entitled to Vote** ...................... **5**
    **C.**    **Bar Dates for Filing Proofs of Claim**......................................... **5**
    **D.**    **Classes Impaired Under the Plan** ............................................... **5**
    **E.**    **Information on Voting and Ballots**.............................................. **5**
        **1.**    **Ballot Tabulation Procedures** ....................................... **5**
        **2.**    **Execution of Ballots by Representatives** ....................... **6**
        **3.**    **Defects and Other Irregularities Regarding Ballots**.................. **7**
        **4.**    **Withdrawal of Ballots and Revocation** ......................... **7**
    **F.**    **Confirmation of Plan** .................................................................. **7**
        **1.**    **Solicitation of Acceptances** ........................................... **7**
        **2.**    **Requirements for Confirmation of the Plan**................. **8**
        **3.**    **Acceptances Necessary to Confirm the Plan** ................ **9**
        **4.**    **Cramdown** ..................................................................... **10**

**ARTICLE 4 BACKGROUND OF THE DEBTORS** ........................... **11**

    **A.**    **Background and Corporate Structure of the Debtors** ........................................... **11**
        **1.**    **GFG**................................................................................ **11**
        **2.**    **GHI and Guaranty Bank**............................................... **11**
        **3.**    **GGVI and GGCI**.......................................................... **11**
        **4.**    **Employees** ..................................................................... **12**
    **B.**    **Principal Pre-Petition Assets of the Debtors** ........................... **12**
    **C.**    **Principal Liabilities of the Debtors on the Petition Date**......... **12**
    **D.**    **Preference and Other Avoidance Litigation**.............................. **13**

**ARTICLE 5 EVENTS LEADING TO BANKRUPTCY**..................... **14**

    **A.**    **Losses on Guaranty Bank's Investment in Mortgage Backed Securities** ........... **14**

| | | |
|---|---|---|
| B. | Guaranty Bank's Failure to Maintain Capital Ratios | 14 |
| C. | Amended Financial Reporting | 15 |
| D. | Attempts to Solve Financial Crisis | 15 |
| E. | Transfer of RWHC Preferred Stock | 15 |
| F. | The Receivership | 16 |
| G. | The Bankruptcy Filings | 16 |
| H. | Equity and Board of Directors | 16 |

**ARTICLE 6 SIGNIFICANT POST-BANKRUPTCY EVENTS** ......... 17

| | | | |
|---|---|---|---|
| A. | | First Day Motions | 17 |
| B. | | First Meeting of Creditors | 18 |
| C. | | Official Committee of Unsecured Creditors | 18 |
| D. | | Schedules and Statements of Financial Affairs | 18 |
| E. | | Significant Post-Bankruptcy Disputes | 18 |
| | 1. | Preliminary Discussions and Agreements with the FDIC-Receiver and Wilmington Trust | 18 |
| | 2. | OTS Correspondence | 19 |
| | 3. | FDIC Claims and Motion for Relief from Stay | 20 |
| | 4. | GFG and GHI Claims Against FDIC-Receiver | 21 |
| | 5. | Settlement Discussions with the FDIC-Receiver and Wilmington Trust | 21 |
| | 6. | Settlement with GIS | 22 |
| F. | | Professional Fees and Expenses | 22 |
| | 1. | Professionals employed by the Debtors | 22 |
| | 2. | Payments to Professionals | 23 |
| G. | | Rejection of Executory Contracts | 24 |
| H. | | Potential Claims of the Debtors Against Third Parties | 24 |
| | 1. | Temple-Inland Spin-Off | 24 |
| | 2. | Officers and Directors | 25 |
| | 3. | Other Individuals | 26 |

**ARTICLE 7 DESCRIPTION OF THE PLAN** ......... 26

| | | | |
|---|---|---|---|
| A. | | Introduction | 26 |
| B. | | Settlement with FDIC-Receiver | 27 |
| C. | | Designation of Claims and Interests | 28 |
| D. | | Treatment of Unclassified Claims | 30 |
| | 1. | Administrative Claims | 30 |
| | 2. | Allowed Priority Tax Claims. | 32 |
| | 3. | Ordinary Course Liabilities. | 32 |
| E. | | Treatment of Classified Claims and Interests | 32 |
| | 1. | Treatment of Class 1 Allowed Secured Claims | 32 |
| | 2. | Treatment of Classes 2A, 2B, 2C and 2D – Allowed Priority Non-Tax Claims | 33 |
| | 3. | Treatment of Class 3 – Allowed FDIC-Receiver Claims | 34 |

ii

4.        Treatment of Classes 4A, 4B, 4C and 4D – Allowed General
          Unsecured Claims ................................................................................ 36
5.        Treatment of Classes 5A, 5B, 5C and 5D – Interests. ............................... 36
F.    Treatment of Executory Contracts ....................................................................... 36
1.        Rejection of Executory Contract .................................................................. 36
2.        Claims Based on Rejection of Executory Contracts ..................................... 37
3.        Reservation of Rights .................................................................................... 37
G.    Preservation of Rights of Action .......................................................................... 37
H.    Exculpation and Release of Certain Parties in Interest ........................................ 37

ARTICLE 8 MEANS FOR EXECUTION AND IMPLEMENTATION OF THE
PLAN .......................................................................................................................... 39

A.    Substantive Consolidation of the Debtors ............................................................ 39
1.        Merger and Consolidation ............................................................................ 39
2.        Effect of Substantive Consolidation ............................................................ 39
3.        Treatment of Guarantees and Multiple-Debtor Claims ................................ 39
B.    Cancellation of Interests ....................................................................................... 39
C.    Continued Corporate Existence of Reorganized GFG ......................................... 40
D.    Dissolution of the Debtors .................................................................................... 40
E.    Sources of Cash for Plan Distributions ................................................................ 40
F.    Corporate Action .................................................................................................. 40
G.    Allowed Claim of Wilmington Trust .................................................................... 41
H.    Liquidation Trust .................................................................................................. 41
1.        Creation of the Liquidation Trust and Appointment of the
          Liquidation Trustee ...................................................................................... 41
2.        Property of the Liquidation Trust ................................................................. 41
3.        Creation of Professional Fee Reserve and Appointment of the Special
          Purpose Liquidation Agent ........................................................................... 42
4.        Officers, Directors, and Shareholders .......................................................... 42
5.        Liquidation Trustee ....................................................................................... 43

ARTICLE 9 RECOVERY ANALYSIS, FEASIBILITY AND RISKS ........................ 46
A.    Recovery Analysis and Feasibility ....................................................................... 46
B.    Risks Associated with the Plan ............................................................................. 46

ARTICLE 10 ALTERNATIVES TO PLAN ................................................................ 47

ARTICLE 11 CERTAIN UNITED STATES FEDERAL INCOME TAX
CONSEQUENCES OF THE PLAN ............................................................................ 48

A.    Introduction ........................................................................................................... 48
B.    Material Tax Consequences to the Debtors ........................................................... 48
C.    Material Tax Consequences to Creditors .............................................................. 48
D.    Information Reporting and Backup Withholding ................................................... 49

**ARTICLE 12 CONCLUSION** ................................................................................................ **49**

## EXHIBITS

**Plan** ..................................................................................................................................... **1**
**Organization Structure** ...................................................................................................... **2**
**Pre-Petition Transfers** ........................................................................................................ **3**
**Plan Support Agreement** .................................................................................................... **4**
**Wilmington Trust Support Letter** ..................................................................................... **5**

# ARTICLE 1
## INTRODUCTION

Guaranty Financial Group Inc. ("GFG"), Guaranty Group Ventures Inc. ("GGVI"), Guaranty Holdings Inc. I ("GHI"), and Guaranty Group Capital Inc. ("GGCI"), debtors-in-possession in the above-referenced Bankruptcy Cases (collectively, the "Debtors," and each individual a "Debtor"), submit this Disclosure Statement Under 11 U.S.C. § 1125 in Support of the Joint Plan of Liquidation for Guaranty Financial Group Inc., et al. (the "Disclosure Statement") for use in the solicitation of votes on the Joint Plan of Liquidation for Guaranty Financial Group Inc., et al., Under Chapter 11 of the United States Bankruptcy Code (the "Plan"). A copy of the Plan is annexed as <u>Exhibit</u> "<u>1</u>" to this Disclosure Statement.[1]

This Disclosure Statement sets forth certain relevant information regarding the Debtors' prepetition operations and financial history, the need to seek Chapter 11 protection, significant events that have occurred during the Chapter 11 Cases, an analysis of the expected return to the Debtors' creditors and shareholders and the anticipated procedures for liquidating the Debtors' remaining assets. This Disclosure Statement also describes terms and provisions of the Plan, including certain alternatives to the Plan, certain effects of confirmation of the Plan, certain risk factors associated with the Plan, and the manner in which Distributions will be made under the Plan. Additionally, this Disclosure Statement discusses the confirmation process and the voting procedures that holders of Claims must follow for their votes to be counted.

## A.    Distributions under the Plan

The Plan provides for the liquidation of the Debtors' remaining assets and the distribution of the Debtors' assets to creditors, pursuant to the priority provisions of the Bankruptcy Code. Under the Plan, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, and Allowed Secured Claims will be paid in full to the extent that any such Claims exist. The FDIC-Receiver Claims will be satisfied through the comprehensive FDIC-Receiver Settlement negotiated among the Debtors, Wilmington Trust (as Indenture Trustee for the GFG bondholders) and the FDIC-Receiver described in detail in Article 7.B herein. All Estate assets that remain after satisfaction of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Claims, and the FDIC-Receiver Claims will be distributed to the Holders of General Unsecured Claims through a Liquidation Trust.

Holders of Interests will not receive any distribution under the Plan, and all Interests in the Debtors will be canceled and extinguished.

---

[1] Except as otherwise provided in this Disclosure Statement, capitalized terms herein have the meanings ascribed to them in the Plan. Any capitalized term used herein that is not defined in the Plan shall have the meaning ascribed to that term in the Bankruptcy Code or Bankruptcy Rules, whichever is applicable.

### B.        Filing of the Debtors' Bankruptcy Cases

The Debtors filed their voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court on August 27, 2009.  Since the Petition Date, the Debtors have continued to manage their properties and assets as debtors-in-possession pursuant to Bankruptcy Code §§ 1107 and 1108.

### C.        Purpose of Disclosure Statement

Bankruptcy Code § 1125 requires the Debtors to prepare and obtain court approval of a Disclosure Statement as a prerequisite to soliciting votes on the Debtors' Plan.  The purpose of the Disclosure Statement is to provide information to Creditors and Interest Holders (shareholders) that will assist them in deciding how to vote on the Plan.

This Disclosure Statement was approved by the Bankruptcy Court on _____.  Such approval does not constitute a judgment by the Bankruptcy Court as to the desirability of the Plan or as to the value or suitability of any consideration offered thereunder.  The Court's approval does indicate, however, that the Bankruptcy Court has determined that the Disclosure Statement contains adequate information to permit you to make an informed judgment regarding acceptance or rejection of the Plan.

**THE APPROVAL BY THE BANKRUPTCY COURT OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE PLAN OR A GUARANTEE OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN. THE MATERIAL CONTAINED HEREIN IS INTENDED SOLELY FOR THE USE OF CREDITORS AND INTEREST HOLDERS OF THE DEBTORS IN EVALUATING THE PLAN AND VOTING TO ACCEPT OR REJECT THE PLAN AND, ACCORDINGLY, MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN THE DETERMINATION OF HOW TO VOTE ON, OR WHETHER TO OBJECT TO, THE PLAN.**

**THE DEBTORS BELIEVE THAT THE PLAN AND THE TREATMENT OF CLAIMS AND INTERESTS THEREUNDER IS IN THE BEST INTERESTS OF CLAIMHOLDERS AND INTEREST HOLDERS AND URGE THAT YOU VOTE TO ACCEPT THE PLAN. ADDITIONALLY, WILMINGTON TRUST, AS INDENTURE TRUSTEE FOR BONDHOLDERS AND WHO HAS FILED THE WILMINGTON TRUST PROOFS OF CLAIM FOR AN AMOUNT IN EXCESS OF $318.5 MILLION, HAS INDICATED ITS SUPPORT FOR THE PLAN IN WILMINGTON TRUST SUPPORT LETTER WHICH IS ATTACHED TO THIS DISCLOSURE STATEMENT AS <u>EXHIBIT "5."</u>**

**THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, NOR HAS THE COMMISSION PASSED ON THE**

**ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL. THE PLAN SHOULD BE REVIEWED CAREFULLY.**

### D.     Hearing on Confirmation of the Plan

The Bankruptcy Court has set_____ __.m. Central Time, as the time and date for the Confirmation Hearing to determine whether the Plan has been accepted by the requisite number of Creditors and whether the other standards for Confirmation of the Plan have been satisfied. Once commenced, the Confirmation Hearing may be adjourned or continued by announcement in open court with no further notice.

### E.     Sources of Information

Except as otherwise expressly indicated, the portions of this Disclosure Statement describing the Debtors, their business, properties and management, and the Plan have been prepared from information furnished by former directors, officers, and employees of the Debtors. The statements contained in this Disclosure Statement are made as of the date hereof unless another time is specified.

## ARTICLE 2
## EXPLANATION OF CHAPTER 11

### A.     Overview of Chapter 11

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code. Under Chapter 11, a debtor-in-possession may seek to reorganize its business or to sell the business for the benefit of the debtor's creditors and other interested parties.

The commencement of a Chapter 11 case creates an estate comprising all of the debtors' legal and equitable interests in property as of the date the petition is filed. Unless the bankruptcy court orders the appointment of a trustee, a Chapter 11 debtor may continue to operate its business and control the assets of its estate as a "debtor-in-possession," as the Debtors have done in the Chapter 11 Cases since the Petition Date.

Formulation of a plan of reorganization is the principal purpose of a Chapter 11 case. The plan sets forth the means for satisfying the claims of creditors against, and interests of equity security holders in, the debtor.

### B.     Plan of Reorganization

Although usually referred to as a plan of reorganization, a plan may simply provide for an orderly liquidation of a debtor's property and assets. As described in more detail in Article 4 herein, the vast majority of the Debtors' assets previously consisted of equity interests in certain subsidiaries, including Guaranty Bank, which now have little or no value. As of the Petition Date, the chief remaining assets of these Debtors are cash of approximately $21.6 million and Rights of Action. Additionally, the Debtors have asserted an interest in certain tax and insurance

premium refunds, ownership of which is disputed by the FDIC-Receiver.  A resolution of the competing claims to these assets is included as part of the Plan.  The Plan provides for the use of these remaining assets to satisfy claims against the Debtors pursuant to the priority provisions of the Bankruptcy Code.

After the plan has been filed, the holders of claims against, or interests in, a debtor are generally permitted to vote on whether to accept or reject the plan.  Chapter 11 does not require that each holder of a claim against, or interest in, a debtor vote in favor of a plan in order for the plan to be confirmed.  At a minimum, however, a plan must be accepted by a majority in number and two-thirds in amount of those claims actually voting from at least one class of claims Impaired under the plan, or two-thirds in amount of those interests actually voting from at least one class of interests Unimpaired under the plan.

Classes of claims or interests that are not Impaired under a plan of reorganization are conclusively presumed to have accepted the plan and therefore are not entitled to vote.  A class is Impaired if the plan modifies the legal, equitable, or contractual rights attaching to the claims or interests of that class.  Classes of claims or interests that receive or retain **no property** under a plan of reorganization are conclusively presumed to have rejected the plan and therefore are not entitled to vote.

## ARTICLE 3
## VOTING PROCEDURES AND CONFIRMATION REQUIREMENTS

### A.    Ballots and Voting Deadline

A Ballot for voting to accept or reject the Plan is enclosed with this Disclosure Statement, and has been mailed to Creditors (or their authorized representatives) entitled to vote.  After carefully reviewing the Disclosure Statement, including all exhibits, each Creditor (or its authorized representative) entitled to vote should indicate its vote on the enclosed Ballot.  All Creditors (or their authorized representatives) entitled to vote must (i) carefully review the Ballot and instructions thereon, (ii) execute the Ballot, and (iii) return it to the address indicated on the Ballot by the deadline (the "Voting Deadline") for the Ballot to be considered.

The Bankruptcy Court has directed that, in order to be counted for voting purposes, Ballots for the acceptance or rejection of the Plan must be received no later than _____, 2011 at 5:00 p.m. Central Time, at the following address:

HAYNES AND BOONE, LLP
Attn:  Kim Morzak
2323 VICTORY AVENUE, SUITE 700
DALLAS, TEXAS 75219

**BALLOTS MUST BE RECEIVED AT THE ABOVE ADDRESS NO LATER THAN _____, 2011 at 5:00 P.M. CENTRAL TIME.  ANY BALLOTS RECEIVED AFTER THAT DEADLINE WILL NOT BE COUNTED.**

B.      **Holders of Claims and Interests Entitled to Vote**

Any Creditor whose Claim is Impaired under the Plan is entitled to vote if either (i) the Claim has been listed in the Schedules (and the Claim is not scheduled as disputed, contingent, or unliquidated) or (ii) the Creditor has filed a Proof of Claim on or before any deadline set by the Bankruptcy Court for such filings.

**Any Holder of a Claim as to which an objection has been filed (and such objection is still pending) is not entitled to vote, unless the Bankruptcy Court (on motion by a party whose Claim is subject to an objection) temporarily allows the Claim in an amount that it deems proper for the purpose of accepting or rejecting the Plan.  Such motion must be heard and determined by the Bankruptcy Court on or before the first date set by the Bankruptcy Court for the Confirmation Hearing on the Plan.**

In addition, a vote may be disregarded if the Bankruptcy Court determines that the acceptance or rejection was not solicited or procured in good faith or in accordance with the applicable provisions of the Bankruptcy Code.

C.      **Bar Dates for Filing Proofs of Claim**

The Bankruptcy Court established December 29, 2009 as the deadline to file Proofs of Claim in the Chapter 11 Cases.  The Bankruptcy Court established February 23, 2010 as the deadline for Governmental Units to file Proofs of Claim

D.      **Classes Impaired Under the Plan**

Holders of Claims in Classes 1 and 2 are Unimpaired and may not vote on the Plan.

Holders of Claims Classes 3 and 4 are Impaired under the Plan and are eligible to vote to accept or reject the Plan.

Holders of Interests in Class 5 are conclusively presumed to have rejected the Plan and, therefore, are not entitled to vote to accept or reject the Plan.

E.      **Information on Voting and Ballots**

1.      **Ballot Tabulation Procedures**

For purposes of voting on the Plan, the amount and classification of a Claim and the procedures that will be used to tabulate acceptances and rejections of the Plan shall be exclusively as follows:

(a)     If no Proof of Claim has been timely filed, the voted amount of a Claim shall be equal to the amount listed for the particular Claim in the Schedules, as and if amended, to the extent such Claim is not listed as contingent, unliquidated, or disputed, and the Claim shall be placed in the appropriate Class based on the Debtors' records and consistent with the Schedules;

(b)    If a Proof of Claim has been timely filed, and has not been objected to before the expiration of the Voting Deadline, the voted amount of that Claim shall be as specified in the Proof of Claim filed with the Clerk;

(c)    Subject to subparagraph (d) below, a Claim that is the subject of an objection filed before the Voting Deadline shall be disallowed for voting purposes, except to the extent and in the manner that the Debtors indicated in any objection or other pleading that the Claim should be allowed for voting or other purposes;

(d)    If a Claim has been estimated or otherwise allowed for voting purposes by order of the Bankruptcy Court, the voted amount and classification shall be that set by the Bankruptcy Court;

(e)    If a Creditor or its authorized representative did not use the Ballot provided by the Debtors, the official ballot form authorized under the Federal Rules of Bankruptcy Procedure, such Ballot will not be counted;

(f)    If the Ballot is not received by counsel for the Debtors on or before the Voting Deadline at the place fixed by the Bankruptcy Court, the Ballot will not be counted;

(g)    If the Ballot is not signed by the Creditor or its authorized representative, the Ballot will not be counted;

(h)    If the individual or institution casting the Ballot (whether directly or as a representative) was not the Holder of a Claim on the Record Date, or in the case of the Wilmington Trust Proofs of Claim, a beneficial Holder of a Claim, the Ballot will not be counted;

(i)    If the Creditor or its authorized representative did not check one of the boxes indicating acceptance or rejection of the Plan, or checked both such boxes, the Ballot will not be counted;

(j)    Whenever a Creditor (or its authorized representative) submits more than one Ballot voting the same Claim(s) before the Voting Deadline, except as otherwise directed by the Bankruptcy Court after notice and a hearing, the last such Ballot shall be deemed to reflect the Creditor's intent and shall supersede any prior Ballots.

**2.    Execution of Ballots by Representatives**

If a Ballot is signed by trustees, executors, administrators, guardians, attorneys-in-fact, officers of corporations, or others acting in a fiduciary or representative capacity, such persons must indicate their capacity when signing and, at the Debtors' request, must submit proper evidence satisfactory to the Debtors of their authority to so act.

### 3. Defects and Other Irregularities Regarding Ballots

All questions concerning the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawal of Ballots will be resolved by the Court, and all parties' rights are reserved with respect thereto.

### 4. Withdrawal of Ballots and Revocation

Any holder of a Claim (or its authorized representative) in an impaired Class who has delivered a valid Ballot for the acceptance or rejection of the Plan may withdraw such acceptance or rejection by delivering a written notice of withdrawal to counsel for Debtors at any time before the Voting Deadline.

To be valid, a notice of withdrawal must:

- contain a description of the Claim(s) to which it relates and the aggregate principal amount represented by such Claim(s);

- be signed by the Creditor (or its authorized representative) in the same manner as the Ballot; and

- be received by counsel for Debtors in a timely manner at the addresses set forth in this Disclosure Statement for the submission of Ballots.

The Debtors expressly reserve the right to contest the validity of any such withdrawals of Ballots.

Unless otherwise directed by the Bankruptcy Court, a purported notice of withdrawal of Ballots that is not received in a timely manner by the Debtors will not be effective to withdraw a previously furnished Ballot.

Any Creditor (or its authorized representative) who has previously submitted a properly completed Ballot before the Voting Deadline may revoke such Ballot and change its vote by submitting before the Voting Deadline a subsequent, properly completed Ballot for acceptance or rejection of the Plan.

### F. Confirmation of Plan

### 1. Solicitation of Acceptances

The Debtors are soliciting your vote. The Debtors will bear the cost of any solicitation by the Debtors. No other additional compensation shall be received by any party for any solicitation other than as disclosed to the Bankruptcy Court.

**NO REPRESENTATIONS OR ASSURANCES, IF ANY, CONCERNING THE DEBTORS OR THE PLAN ARE AUTHORIZED BY THE DEBTORS OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.**

**ANY REPRESENTATIONS OR INDUCEMENTS MADE BY ANY PERSON TO SECURE YOUR VOTE OTHER THAN THOSE CONTAINED IN OR ACCOMPANYING THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED ON BY YOU IN ARRIVING AT YOUR DECISION, AND SUCH ADDITIONAL REPRESENTATIONS OR INDUCEMENTS SHOULD BE REPORTED TO COUNSEL FOR THE DEBTORS FOR SUCH ACTION AS MAY BE DEEMED APPROPRIATE.**

**THIS IS A SOLICITATION SOLELY BY THE DEBTORS AND IS NOT A SOLICITATION BY ANY SHAREHOLDER, ATTORNEY, OR ACCOUNTANT FOR THE DEBTORS. THE REPRESENTATIONS, IF ANY, MADE HEREIN ARE THOSE OF THE DEBTORS AND NOT OF SUCH SHAREHOLDERS, ATTORNEYS, OR ACCOUNTANTS, EXCEPT AS MAY BE OTHERWISE SPECIFICALLY AND EXPRESSLY INDICATED. WILMINGTON TRUST HAS INDICATED ITS SUPPORT OF THE PLAN, HOWEVER, IN THE WILMINGTON TRUST SUPPORT LETTER, WHICH IS ATTACHED TO THIS DISCLOSURE STATEMENT AS EXHIBIT 5.**

Under the Bankruptcy Code, a vote for acceptance or rejection of a plan may not be solicited unless the claimant or interest holder has received a copy of a disclosure statement approved by the bankruptcy court prior to, or concurrently with, such solicitation. This solicitation of votes on the Plan is governed by Bankruptcy Code § 1125(b). Violation of Bankruptcy Code § 1125(b) may result in sanctions by the Bankruptcy Court, including disallowance of any improperly solicited vote.

### 2. Requirements for Confirmation of the Plan

At the Confirmation Hearing, the Bankruptcy Court shall determine whether the requirements of Bankruptcy Code § 1129 have been satisfied, in which event the Bankruptcy Court shall enter an order confirming the Plan. For the Plan to be confirmed, Bankruptcy Code § 1129 requires that:

(i)   The Plan comply with the applicable provisions of the Bankruptcy Code;

(ii)   The Debtors have complied with the applicable provisions of the Bankruptcy Code;

(iii)   The Plan has been proposed in good faith and not by any means forbidden by law;

(iv)   Any payment or Distribution made or promised by the Debtors or by a person issuing securities or acquiring property under the Plan for services or for costs and expense in connection with the Plan has been disclosed to the Bankruptcy Court, and any such payment made before the Confirmation of the Plan is reasonable, or if such payment is to be fixed after Confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable;

(v)    The Debtors have disclosed the identity and affiliation of any individual proposed to serve, after Confirmation of the Plan, as a director, officer or voting trustee of the Debtors, an affiliate of the Debtors participating in a joint plan with the Debtors, or a successor to the Debtors under the Plan; the appointment to, or continuance in, such office of such individual is consistent with the interests of Creditors and Interest Holders and with public policy; and the Debtors have disclosed the identity of any insider that will be employed or retained by the Reorganized GFG and the nature of any compensation for such insider;

(vi)    Any government regulatory commission with jurisdiction (after confirmation of the Plan) over the rates of the Debtors has approved any rate change provided for in the Plan, or such rate change is expressly conditioned on such approval;

(vii)    With respect to each Impaired Class of Claims, either each Holder of a Claim of the Class has accepted the Plan, or will receive or retain under the Plan on account of that Claim, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would so receive or retain if the Debtors were liquidated on such date under Chapter 7 of the Bankruptcy Code.  If Bankruptcy Code §1111(b)(2) applies to the Claims of a Class, each holder of a Claim of that Class will receive or retain under the Plan on account of that Claim property of a value, as of the Effective Date, that is not less than the value of that Holder's interest in the Debtors' interest in the property that secures that Claim;

(viii)    Each Class of Claims or Interests has either accepted the Plan or is not Impaired under the Plan;

(ix)    Except to the extent that the Holder of a particular Administrative Claim or Priority Non-Tax Claim has agreed to a different treatment of its Claim, the Plan provides that Administrative Claims and Priority Non-Tax Claims shall be paid in full on the Effective Date or the Allowance Date;

(x)    If a Class of Claims or Interests is Impaired under the Plan, at least one such Class of Claims or Interests has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim or Interest of that Class; and

(xi)    Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.

The Debtors believe that the Plan satisfies all of the statutory requirements of the Bankruptcy Code for Confirmation and that the Plan was proposed in good faith.  The Debtors believe they have complied, or will have complied, with all the requirements of the Bankruptcy Code governing Confirmation of the Plan.

### 3.    Acceptances Necessary to Confirm the Plan

Voting on the Plan by each Creditor (or its authorized representative) is important. Chapter 11 of the Bankruptcy Code does not require that each Creditor vote in favor of the Plan in order for the Bankruptcy Court to confirm the Plan.  Generally, to be confirmed under the

acceptance provisions of Bankruptcy Code § 1126(a), the Plan must be accepted by each Class of Claims that is Impaired under the Plan by parties holding at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims of such Class actually voting in connection with the Plan.  With respect to each Class of Interests that is impaired under the Plan, the Plan must be accepted by parties holding at least two-thirds in amount of the Allowed Interests of such Class actually voting in connection with the Plan.  Even if all Classes of Claims and Interests accept the Plan, the Bankruptcy Court may refuse to confirm the Plan.

### 4.    Cramdown

In the event that any impaired Class of Claims or Interests does not accept the Plan, the Bankruptcy Court may still "cramdown" and confirm the Plan at the request of the Debtors if, as to each impaired Class that has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable."  A plan of reorganization does not discriminate unfairly within the meaning of the Bankruptcy Code if no Class receives more than it is legally entitled to receive for its claims or Interests.  "Fair and equitable" has different meanings for holders of secured and unsecured claims and Interests.

With respect to a secured claim, "fair and equitable" means either (i) the impaired secured creditor retains its liens to the extent of its allowed claim and receives deferred cash payments at least equal to the allowed amount of its claims with a present value as of the effective date of the plan at least equal to the value of such creditor's interest in the property securing its liens, (ii) property subject to the lien of the impaired secured creditor is sold free and clear of that lien, with that lien  attaching to the proceeds of sale, and such lien proceeds must be treated in accordance with clauses (i) and (iii) hereof; or (iii) the impaired secured creditor realizes the "indubitable equivalent" of its claim under the plan.

With respect to an unsecured claim, "fair and equitable" means either (i) each impaired creditor receives or retains property of a value equal to the amount of its allowed claim or (ii) the holders of claims and Interests that are junior to the claims of the dissenting class will not receive any property under the plan.

With respect to Interests, "fair and equitable" means either (i) each impaired Interest receives or retains, on account of that Interest, property of a value equal to the greater of the allowed amount of any fixed liquidation preference to which the holder is entitled, any fixed redemption price to which the holder is entitled, or the value of the Interest; or (ii) the holder of any Interest that is junior to the Interest of that class will not receive or retain under the plan, on account of that junior Interest, any property.

In the event at least one Class of impaired Claims or Interests rejects or is deemed to have rejected the Plan, the Bankruptcy Court will determine at the Confirmation Hearing whether the Plan is fair and equitable and does not discriminate unfairly against any rejecting impaired Class of Claims or Interests.

The Debtors believe that the Plan does not discriminate unfairly and is fair and equitable with respect to each impaired Class of Claims and Interests.

## ARTICLE 4
## BACKGROUND OF THE DEBTORS

### A.    Background and Corporate Structure of the Debtors

### 1.    GFG

GFG is a publicly-traded Delaware corporation that owns 100% of the common stock of GGVI, GHI, and GGCI.   GFG is a "grandfathered" unitary thrift holding company.   This qualification permits GFG to own a single savings and loan association while conducting other non-banking business operations but also requires GFG to make significant investments in residential mortgages or mortgaged-backed securities, among other assets.   As a thrift holding company, GFG is regulated by the OTS and the FDIC.

GFG's pre-petition, non-banking business operations include acting as a broker, through licensed representatives, for GFG entities engaged in real estate transactions.

Historically, GFG's principal sources of funds have been cash dividends from subsidiaries, investment income, and borrowings.

### 2.    GHI and Guaranty Bank

GHI is a Delaware corporation that serves as the holding company for GFG's investment in Guaranty Bank.  GHI owns 100% of the common stock of Guaranty Bank.  Like GFG, GHI is a grandfathered unitary thrift holding company.  GHI has no other operations.

Guaranty Bank is a federally-chartered savings bank that began operations in 1988. Guaranty Bank conducted consumer and business banking operations through a network of over 150 bank branches located in Texas and California.  As of December 31, 2007, Guaranty Bank had consolidated total assets in excess of $16 billion and was one of the largest financial institutions headquartered in Texas.  Guaranty Bank is regulated by the OTS and the FDIC.

In addition to its banking operations, Guaranty Bank formerly owned one of the largest independent insurance agencies in the country through its subsidiary, GIS. GIS provided a full array of insurance services, emphasizing property and casualty insurance as well as fixed annuities.  Effective December 31, 2008, Guaranty Bank sold GIS to JLT Insurance Agency Holdings, Inc. for a purchase price of approximately $40 million.

### 3.    GGVI and GGCI

GGVI was formed to hold certain real estate assets and engage in non-banking activities, including real estate development.  As of the Petition Date, GGVI had no operations.

GGCI was formed to enter into financing arrangements outside of Guaranty Bank. GGCI's only ongoing activities as of the Petition Date related to record-keeping associated with subordinated debt that was redeemed in 2007.

A chart demonstrating the organizational structure of GFG and its subsidiaries is attached hereto as <u>Exhibit</u> "<u>2</u>".

### 4.    Employees

None of the Debtors had employees on the Petition Date.  The pre-petition operations of the Debtors were performed by employees of Guaranty Bank and its subsidiaries.  In consideration of such services, GFG paid an allocated share of salaries and operational expenses.

### B.    Principal Pre-Petition Assets of the Debtors

The Debtors' principal assets as of the Petition Date consisted of (i) Cash held by GFG of approximately $11.1 million; (ii) Cash held by GGVI, GHI, GGCI of approximately $10.4 million; (iii) pre-paid, unearned premiums for certain insurance policies; (iv) an unpaid federal tax refund for the tax year 2008 in the amount of approximately $1.29 million; (v) an unpaid tax refund from the state of California in the amount of approximately $2.2 million and (vi) certain Rights of Action.  In addition, GFG holds Interests in its wholly owned subsidiaries GGVI, GHI, GGCI and 305,000 shares of preferred stock of Guaranty Bank.

As set forth in more detail in Article 6 below, the FDIC-Receiver asserts an ownership interest in all of the assets described in this Article.

### C.    Principal Liabilities of the Debtors on the Petition Date

GFG's primary debt obligations relate to trust preferred securities ("TRPS"), which have an outstanding principal amount of $305 million and are held by various parties that are not affiliated with the Debtors.  The TRPS were issued by a statutory trust owned by GFG, with Wilmington Trust as trustee.  In connection with the issuance of the TRPS, GFG issued TRPS Related Debt Securities to the TRPS Trust, which are nominally subordinate to various other forms of GFG's debt, although no significant senior debt is currently outstanding.  In addition, GFG guaranteed certain payments due to the TRPS Holders pursuant to the TRPS.  The TRPS Related Debt Securities have a 30-year term and variable interest rates, payable quarterly.  Prior to the Petition Date, GFG has suspended interest payments in connection with the TRPS Related Debt Securities.  As of the Petition Date, the claims of the TRPS Holders totaled approximately $318.5 million as detailed in the Wilmington Trust Proofs of Claim.

In addition, various current and former employees of Guaranty Bank assert claims against GFG pursuant to GFG's Supplemental Executive Retirement Plan, Stock Incentive Plan, and severance policy.  Although the covered employees worked for Guaranty Bank, GFG provided these benefits.  Priority and General Unsecured Claims filed and scheduled in connection with such plans and policies total approximately $20.1 million.

On January 28, 2010, the FDIC-Receiver filed Proof of Claim No. 143 against GFG asserting a claim in an amount in excess of $1.977 billion based upon, among other things, an alleged obligation of GFG to contribute capital to Guaranty Bank and the FDIC-Receiver's alleged ownership interest in the cash and other assets of GFG.  The FDIC-Receiver filed similar claims against GGVI, GHI, and GGCI.  GFG disputes the FDIC-Receiver Claims in all respects,

including the alleged priority of the FDIC-Receiver Claims. A more detailed description of the FDIC-Receiver's position in connection with the FDIC-Receiver Claims is set forth in Article 6.E.3 herein.

The Debtors believe that GGVI,[2] GHI, and GGCI had no liabilities as of the Petition Date. However, Wilmington Trust, on behalf of the TRPS Holders, and the FDIC-Receiver have asserted the full amount of their claims against GFG and each of the other Debtors.

### D.    Preference and Other Avoidance Litigation

During the 90-day period immediately preceding the Petition Date, while insolvent, the Debtors made various payments and other transfers to Creditors on account of antecedent debts. In addition, during the one-year period before the Petition Date, the Debtors made certain transfers to, or for the benefit of, certain Insider Creditors. A summary of the transfers to Creditors within the 90-day period prior to the Petition Date and to Insider Creditors within the one-year period prior to the Petition date is attached hereto as <u>Exhibit</u> "<u>3</u>". Some of those payments may be subject to avoidance and recovery by the Debtors' Estates as preferential and/or fraudulent transfers pursuant to Bankruptcy Code §§ 544, 547, 548, 549 and 550. With the exception any Rights of Action assigned to the FDIC-Receiver pursuant to Article IV.C of the Plan, the Liquidation Trust will hold all claims, Rights of Action, and other legal and equitable rights that the Debtors had (or had power to assert) immediately prior to Confirmation of the Plan, including Avoidance Actions, and the Liquidation Trustee, on behalf of the Debtors, may commence or continue any suit or other proceeding for the enforcement of such actions in any appropriate court or tribunal.

The Schedules identify Creditors whose Claims are disputed, and the Debtors' Statements of Financial Affairs and Exhibit 3 hereto identify the parties who received payments and transfers from the Debtors, which payments and transfers may be avoidable under the Bankruptcy Code. Moreover, the Debtors and Wilmington Trust continue to investigate Rights of Action they may have against third parties. The Debtors and Wilmington Trust have not completed their investigation of potential objections to Claims and Rights of Action; therefore, the Debtors are unable to provide any meaningful estimate of amounts that could be recovered. **THE PLAN DOES NOT, AND IS NOT INTENDED TO, RELEASE ANY SUCH RIGHTS OF ACTION OR OBJECTIONS TO PROOFS OF CLAIM. ALL SUCH RIGHTS ARE SPECIFICALLY RESERVED IN FAVOR OF THE DEBTORS AND THE LIQUIDATION TRUST.**

Creditors should understand that Rights of Action the Debtors may have against them, if any exist, are retained under the Plan for prosecution unless a specific order of the Bankruptcy Court authorizes the Debtors to release such claims. As such, Creditors are cautioned not to rely on (i) the absence of the listing of any legal right, claim or Right of Action against a particular

---

[2] GGVI's Schedules included a disputed, contingent, and unliquidated unsecured claim owing to the City of San Antonio, Texas in the amount of $371,185. The City of San Antonio did not file a proof of claim. In addition, Fulbright and Jaworski L.L.P. filed an unsecured claim against GGVI in the amount of $39,624. The Debtors believe that the Fulbright and Jaworski claim was improperly filed against GGVI and is a liability of GFG.

Creditor in the Disclosure Statement, Plan, or Schedules or (ii) the absence of litigation or demand prior to the Effective Date of the Plan as any indication that the Debtors do not possess or do not intend to prosecute a particular right, claim or Right of Action if a particular Creditor votes to accept the Plan.   Unless otherwise specifically provided for in the Plan, it is the expressed intention of the Plan to preserve rights, claims, and Rights of Action of the Debtors, whether now known or unknown, for the benefit of the Debtors' Estates and their Creditors.

## ARTICLE 5
## EVENTS LEADING TO BANKRUPTCY

### A.      Losses on Guaranty Bank's Investment in Mortgage Backed Securities

Beginning in 2007, volatility in the credit and residential housing markets resulted in extensive impairment of existing mortgage-backed securities held by GFG's subsidiary, Guaranty Bank.  Declining real estate values and other economic conditions led to a substantial increase of defaults on loans underlying those mortgage-backed securities, thereby dramatically reducing the value of GFG's investments in Guaranty Bank.  In addition, an increase in number of non-performing loans issued by Guaranty Bank contributed to the Debtors' financial crisis.

For the quarter ending March 31, 2009, GFG's preliminary financial statements reflected a loss of approximately $256 million, compared to a loss of $10 million for the quarter ending March 31, 2008.   Additionally, in the second quarter of 2008, GFG recorded $99 million in provision for credit losses, compared to an insignificant net provision expense in the second quarter of 2008.  Similarly, GFG recorded $157 million in provision for credit losses in the first six months of 2008, compared to a $2 million credit provision in the first six months of 2007. Based partially on the significant declines in the financial condition and liquidity of GFG's homebuilder portfolio customers, losses reported by GFG continued to increase through the Petition Date.

Due to the volatility of GFG's finances during 2008 and 2009, GFG's auditors were unable to complete their audit of GFG's finances.   However, on September 15, 2010, GFG filed the tax return for tax year 2009 for GFG's consolidated tax group, which includes the Debtors and all of their non-Debtor subsidiaries (including Guaranty Bank).  In the 2009 tax return, the Debtors identified losses during 2009 for the consolidated tax group in excess of $1.558 billion.

### B.      Guaranty Bank's Failure to Maintain Capital Ratios

As a result of increasing losses, on June 8, 2008, Guaranty Bank's Board of Directors adopted a resolution, at the request of OTS, confirming that Guaranty Bank would maintain certain core and risk-based capital ratios. As of March 31, 2009, however, Guaranty Bank was unable to comply with the agreed-upon capital ratios.  Effective as of April 6, 2009, GFG and Guaranty Bank each consented to the issuance of an Order to Cease and Desist by OTS that placed numerous restrictions and consent requirements on GFG related to dividends, incurrence of debt, debt payments, executive compensation, asset increases, and brokered deposits.

### C.      Amended Financial Reporting

On July 17, 2009, at the direction of the OTS, Guaranty Bank filed an amended Thrift Financial Report ("TFR") as of and for the three months ended March 31, 2009.  The amended TFR reflected (i) an adjustment to write down the value of certain non-agency mortgage-backed securities that resulted in an impairment charge in the amount of $1.45 billion and (ii) an adjustment to write off goodwill in the amount of $106.6 million.  Based on these adjustments, GFG disclosed that, as of March 31, 2009, Guaranty Bank had negative core capital and total risk based capital ratios and that Guaranty Bank was considered "critically under-capitalized." Guaranty Bank became unable to achieve the capital rations required in the April 6, 2009 Order to Cease and Desist.

### D.      Attempts to Solve Financial Crisis

The Debtors and Guaranty Bank took an array of actions to address their financial crisis. Most notably, during 2008, GFG raised $600 million in capital through the sale of equity and debt securities.  This capital infusion took the form of (i) a $38.4 million purchase of common stock by a single institutional investor; (ii) a $286.6 million purchase of mandatory convertible preferred stock by several institutional investors; and (iii) a $275 million purchase of subordinated notes of Guaranty Bank and mandatory convertible preferred stock by several institutional investors.

In addition to other extensive efforts to raise capital, Guaranty Bank applied to the FDIC for "open bank assistance" pursuant to the Federal Deposit Insurance Corporation Improvement Act.  However, the write downs included in the July 17, 2009 TFR foreclosed the possibility of open bank assistance.

### E.      Transfer of RWHC Preferred Stock

Prior to the Receivership, GFG owned 100% of the RWHC Preferred Stock.  RWHC, Inc. was a wholly-owned subsidiary of Guaranty Bank.  The RWHC Preferred Stock had a face value of $305 million and entitled GFG to quarterly interest payments.  Shortly before the Petition Date, the RWHC Preferred Stock was converted into preferred stock of Guaranty Bank. The basis for conversion of the RWHC Preferred Stock was prior representations by GFG to the OTS and FDIC that a mandatory conversion would occur in the event that Guaranty Bank was deemed undercapitalized by the OTS, although such requirement was not included in the RWHC, Inc. corporate formation documents.  The Debtors believe that the preferred stock of Guaranty Bank has no value.

In the FDIC-Receiver Litigation, GFG and GHI assert that the conversion of RWHC Preferred Stock to preferred stock of Guaranty Bank is an avoidable fraudulent transfer pursuant to 11 U.S.C. § 548(a)(1)(B) because it (i) occurred in the two years prior to the Petition Date, (ii) occurred at a time when GFG was likely insolvent, and (iii) was not a transfer for reasonably equivalent value.  GFG and GHI seek damages in the FDIC-Receiver Litigation from the FDIC-Receiver because the transfer was made for the benefit of the FDIC-Receiver under 11 U.S.C. § 550(a).  In addition, GFG and GHI may have claims against other parties in connection with the conversion of the RWHC Preferred Stock, including Compass Bank, as the purchaser of the

assets of Guaranty Bank.  The FDIC-Receiver disagrees with GFG and GHI's characterization of the conversion as a fraudulent transfer and opposes all of the relief requested in the FDIC-Receiver Litigation.  As discussed in more detail in Article 7.B herein, the Debtors are releasing any and all claims against the FDIC-Receiver and Compass Bank in connection with the conversion of the RWHC Preferred Stock as part of the FDIC-Receiver Settlement.

### F.      The Receivership

On August 21, 2009, the OTS appointed the FDIC-Receiver as receiver for Guaranty Bank.  The FDIC-Receiver entered into a Purchase and Assumption Agreement with Compass Bank to assume all of the deposits of Guaranty Bank, excluding approximately $344 million in brokered deposits.  In addition to assuming all of the deposits of Guaranty Bank, Compass Bank agreed to purchase $12 billion of Guaranty Bank's assets.

Prior to the Receivership, several benefit programs were available to the employees of Guaranty Bank.  These programs included medical, dental, vision, life, accidental death and dismemberment, and disability insurance.  The employees could also take advantage of a 401(k) plan, health savings and flexible spending accounts, tuition reimbursement and, for certain employees, a Supplemental Executive Retirement Plan, and Stock Incentive Plan.

With the exception of the Supplemental Executive Retirement Plan, Stock Incentive Plan, and severance policy, all other programs available to Guaranty Bank employees were funded and accounted for by Guaranty Bank and administered by unrelated third parties under the direction of Guaranty Bank.  Guaranty Bank directed appropriate paycheck deductions and employee contributions and remitted all administrative fees in connection with these programs.  However, virtually all of these programs are based on documents executed in the name of GFG.  In preparation for the Receivership, and in order to assist with the transition of Guaranty Bank's assets to Compass Bank, GFG assigned all of the benefit programs with the exception of the Supplemental Executive Retirement Plan, the Stock Incentive Plan, and the severance policy to Guaranty Bank.

### G.      The Bankruptcy Filings

As of the Petition Date, the primary purpose of GFG and GHI was to hold and administer their investment in Guaranty Bank.  GGVI and GGCI conducted no operations as of the Petition Date.  After the commencement of the Receivership, the continued operations of the Debtors provided no business purpose.  Moreover, the Debtors had insufficient assets to satisfy the claims of their Creditors.  For these reasons, the Debtors filed the Chapter 11 Cases on the Petition Date.

### H.      Equity and Board of Directors

As of June 30, 2009, the number of shares of outstanding common stock of GFG totaled approximately 108,937,501.  Previously, GFG's common stock was traded on the NYSE under the symbol "GFG."  On August 24, 2009, the NYSE notified GFG that it had suspended the listing of GFG's common stock effective immediately.  GFG does not intend to request a review of the NYSE action.  GFG's common stock is currently traded over the counter under the symbol "GFGF."

On the Petition Date, subsequent to the filing of the bankruptcy petitions, the members of the Board of Directors of each of the Debtors resigned.  In addition, on the Petition Date all of the pre-petition officers of the Debtors either resigned or were terminated.  For these reasons, it was necessary for the successful prosecution of the Chapter 11 Cases to secure the services of a Chief Restructuring Officer who was qualified to administer the orderly liquidation of the Debtors' Estates and was willing to serve as the sole director of the Debtors.  The Debtors identified Dennis Faulkner, a principal of the bankruptcy advisory firm Lain, Faulkner & Co., as a qualified candidate to serve in such capacity.  Mr. Faulkner was elected as the sole Director of each of the Debtors on the Petition Date and subsequently approved as Chief Restructuring Officer pursuant to the CRO Order described in Article 6.A below.

## ARTICLE 6
## SIGNIFICANT POST-BANKRUPTCY EVENTS

### A.    First Day Motions

On or shortly after the Petition Date, the Debtors filed a number of motions designed to allow them to continue as going concerns and minimize the disruption caused by the bankruptcy filings.  Pursuant to those motions, the Bankruptcy Court entered the following orders:

Order Granting Complex Chapter 11 Bankruptcy Case Treatment [Docket No. 45];

Order (I) Establishing Omnibus Hearing Dates; (II) Establishing Procedures for Electronic Service; (III) Authorizing the Filing of a Consolidated List of the Twenty Largest General Unsecured Creditors; and (IV) Establishing a Uniform Schedule for the Filing and Service of Responses and Objections to Contested Motions [Docket No. 46];

Order (I) Authorizing the Mailing of Notices; (II) Establishing a Bar Date for Filing Certain Proofs of Claim; (III) Establishing Ramifications for Failure to Timely File Claims Therewith; (IV) Approving Consolidated Notice of (A) Case Commencement, (B) Bar Date, and (C) First Meeting of Creditors Under Section 341(a) of the Bankruptcy Code; and (V) Approving Notice Procedures [Docket No. 50];

Order Granting Extension of Time to File Schedule of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs [Docket No. 51]; and

Order Authorizing the Employment and Retention of Haynes and Boone, LLP, as Attorneys for the Debtors Effective as of the Petition Date [Docket No. 91].

On the Petition Date, the Debtors filed the CRO Motion, seeking, among other things, to retain Dennis Faulkner as Chief Restructuring Officer and Lain Faulkner & Co, P.C.  On November 20, 2009, after the Debtors, the FDIC-Receiver, and Wilmington Trust reached an agreement regarding the relief sought in the  CRO Motion, the Bankruptcy Court entered the CRO Order.  As discussed in Article 5.H above, the retention of a CRO was necessary as a result of the resignation of the Debtors' boards of directors and the cessation of services of the Debtors' officers.

On the Petition Date, the Debtors filed the Section 345 Motion in which they sought authority to transfer all Estate cash previously on deposit at Guaranty Bank to newly-established DIP accounts at Bank of America.  On September 3, 2009, after the Debtors, FDIC-Receiver, and Wilmington Trust reached an agreement regarding the relief sought in the Section 345 Motion, the Bankruptcy Court entered the Section 345 Order, which permitted the transfer of all Estate cash to Bank of America.  Pursuant to the Section 345 Order, the FDIC-Receiver reserved its rights to assert claims of setoff and recoupment or to assert ownership rights in the Estate cash.  The Section 345 Order required the FDIC-Receiver to pursue claims and rights in the Estate cash within an agreed-upon time period.  The FDIC-Receivership timely asserted such rights by filing the FDIC-Receiver Motion for Relief from Stay.

**B.    First Meeting of Creditors**

The first meeting of creditors required under Bankruptcy Code § 341 was held and concluded on September 30, 2009.

**C.    Official Committee of Unsecured Creditors**

No Official Committee of Unsecured Creditors was appointed in these Chapter 11 Cases. Wilmington Trust, as indenture trustee for the TRPS Trust, has actively participated in the bankruptcy proceedings.  Wilmington Trust was involved in both the negotiation and drafting of multiple stipulations in these Chapter 11 Cases as described in detail in Article 6.E of this Disclosure Statement, the Plan Support Agreement and the Plan.

**D.    Schedules and Statements of Financial Affairs**

The Debtors filed their Schedules and Statements of Financial Affairs on September 29, 2009.  GFG amended its Schedule B on October 16, 2009 and its Schedule E on March 19, 2010. The Schedules and Statements of Financial Affairs are available at www.haynesboone.com/gfg.

**E.    Significant Post-Bankruptcy Disputes**

Since the Petition Date, the Debtors have continued to manage their properties as debtors-in-possession.

**1.    Preliminary Discussions and Agreements with the FDIC-Receiver and Wilmington Trust**

Immediately after commencement of the Chapter 11 Cases, the Debtors entered into discussions with the FDIC-Receiver and Wilmington Trust regarding critical case issues, including information sharing, the ownership of assets of the Estates, the appropriate timing for filing a plan, the general framework of a plan, and the appropriate procedures for the investigation and prosecution of Rights of Action, including issues related to standing and the timing of pursuit of such Rights of Action.  These discussions were complicated by, among other things, the uncertainty in the ownership of claims and liabilities as between the Debtors and the FDIC-Receiver and Wilmington Trust's concerns regarding standing to pursue the prosecution of certain Rights of Action.

Negotiations among the Debtors, the FDIC-Receiver, and Wilmington Trust resulted in the Court's approval of five critical agreements.  The first two of these agreements are embodied in the Document Access Stipulation and the Reserve Stipulation.  The Document Access Stipulation provided a framework for information sharing between the Debtors, the FDIC-Receiver, and Wilmington Trust, while protecting confidential and privileged information.  The Reserve Stipulation created the Reserve Account, into which funds that were the subject of ownership disputes between the Debtors and the FDIC-Receiver were deposited.  Both the Document Access Stipulation and the Reserve Stipulation preserved estate funds by minimizing contested discovery disputes and unnecessary litigation over the ownership of funds that were received by the Estates.  The Reserve Stipulation was particularly beneficial in that it enabled the Debtors to access cash, which has been a significant roadblock in other bank holding company bankruptcy cases.  The third agreement is embodied in the CRO Order.  The resolution of the issues related to the CRO Order was a crucial step in providing the FDIC-Receiver and Wilmington Trust with the comfort necessary to support the Debtors' overall strategy for their plan to exit Chapter 11.  The final agreement, the Claims Investigation Stipulation, has allowed the Debtors, in conjunction with the FDIC-Receiver and Wilmington Trust, to proceed with the investigation of claims and causes of action owned by the estates with minimal delay and expense.

Finally, the Debtors, the FDIC-Receiver, and Wilmington Trust were able to reach an agreement regarding terms for the Plan, which were embodied in the Plan Support Agreement attached hereto as <u>Exhibit</u> "<u>4</u>".[3]

## 2.    OTS Correspondence

On November 13, 2009, the OTS sent a letter to GFG stating, among other things, that Dennis Faulkner was required to complete application documents to be approved by the OTS to act in his capacity as Chief Restructuring Officer of GFG.  The forms that the OTS requested Mr. Faulkner complete as a part of the application process required, among other things, the disclosure of personal biographical and financial information and Mr. Faulkner's authorization to obtain his credit report.

On January 8, 2010, Haynes and Boone responded to the OTS by requesting a waiver of the application requirements.  This request for waiver was based in part on the Bankruptcy Court's order approving the retention of Mr. Faulkner as Chief Restructuring Officer and the OTS' failure to object to such retention.  Haynes and Boone also detailed the equities supporting waiver of the application requirements, including the emergency circumstances under which Mr. Faulkner agreed to act as Chief Restructuring Officer, Mr. Faulkner's lack of financial interest in GFG, the close supervision of the Bankruptcy Court of these Chapter 11 Cases, the short duration of Mr. Faulkner's retention, and the limited purpose of GFG's continued existence, including the fact that GFG conducted no operations after the Petition Date that required OTS supervision.

---

[3] In the case of a conflict between the Plan Support Agreement and the Plan, the Plan shall control.

On February 9, 2010, the OTS declined GFG's request for waiver.  On April 30, 2010, Haynes and Boone sent a letter requesting that the OTS reconsider waiving the application requirements.  Haynes and Boone urged the OTS to consider, among other things, that Mr. Faulkner is qualified with the Office of the U.S. Trustee as a member of the panel of private bankruptcy trustees, that Mr. Faulkner's retention is supported by the FDIC-Receiver, and that Mr. Faulkner obtained a $25 million performance bond to ensure the faithful performance of his official duties as Chief Restructuring Officer.  The OTS has not responded to this request for reconsideration.

### 3.        FDIC Claims and Motion for Relief from Stay

During the Bankruptcy Case, the FDIC-Receiver filed the FDIC-Receiver Claims against each of the Debtors.  In the FDIC-Receiver Claims, the FDIC-Receiver claims entitlement to amounts for (i) capital maintenance commitments by GFG for the benefit of Guaranty Bank; (ii) tax refunds; (iii) intercompany debts; (iv) insurance policy proceeds and premium refunds; (v) fraudulent conveyances; and (vi) various other litigation-based claims.  The FDIC-Receiver indicated that, although the FDIC-Receiver Claims are not completely liquidated, the amount of each of the FDIC-Receiver Claims likely exceeds $1.97 billion.  The FDIC-Receiver asserts that portions of the FDIC-Receiver Claims are entitled to (i) superiority status pursuant to 12 U.S.C. § 1821(d)(17); (ii) administrative claim status pursuant to Bankruptcy Code § 365(o); and/or (iii) priority status pursuant to Bankruptcy Code § 507(a)(9).  The FDIC-Receiver has asserted that each of the Debtors may be jointly and severally liable for the amounts allegedly owed to the FDIC-Receiver by GFG.

On January 28, 2010, the FDIC-Receiver filed the FDIC-Receiver Motion for Relief From Stay.  In the FDIC-Receiver Motion for Relief from Stay, the FDIC-Receiver requests authority to exercise alleged rights of setoff under Bankruptcy Code § 553 against all Cash of the Estates formerly on deposit at Guaranty Bank.  The basis for the exercise of the FDIC-Receiver's alleged right of setoff is the alleged mutual obligations between the Debtors and the FDIC-Receiver; more specifically, (i) the Debtors' claims against the FDIC-Receiver for the return of Cash of the Estates formerly on deposit at Guaranty Bank[4] and (ii) the FDIC-Receiver's claims against the Debtors as set forth in the FDIC-Receiver Claims.

On February 26, 2010, the Debtors filed the Debtors' Stay Response.  In the Debtors' Stay Response, the Debtors make several arguments in opposition to the relief sought in the FDIC-Receiver Motion for Relief from Stay, including, among others: (i) the FDIC-Receiver has no valid claims against GFG under Bankruptcy Code § 365(o) because GFG made no commitment to a federal depository institutions regulatory agency; (ii) GFG was neither contractually nor statutorily obligated to maintain the capital of Guaranty Bank; (iii) the FDIC-Receiver lacks standing to pursue the requested relief; (iv) the FDIC-Receiver has no setoff rights because the deposits at issue were transferred to Compass Bank prior to the Petition Date; and (v) the FDIC-Receiver does not have valid claims against GHI, GGVI, and GGCI.

---

[4] The FDIC-Receiver reserved its setoff rights despite the transfer of the funds to debtor-in-possession accounts at Bank of America pursuant to the Section 345 Order.

Also on February 26, 2010, Wilmington Trust filed the Wilmington Trust Stay Response. In the Wilmington Trust Stay Response, Wilmington Trust opposes the FDIC-Receiver Motion for Relief from Stay on grounds similar to those included in the Debtors' Stay Response, with a particular focus on the argument that the FDIC has no setoff rights because there is no mutuality of obligations between the Debtors and the FDIC-Receiver.

### 4.        GFG and GHI Claims Against FDIC-Receiver

Pursuant to 12 U.S.C. § 1821, the FDIC-Receiver set November 25, 2009 as the last day to file claims in the Receivership.  As described in detail below, GFG and GHI asserted claims in the Receivership by filing the Debtor Receivership Proofs of Claim on November 25, 2009 with the FDIC-Receiver.

As explained in more detail in the Debtor Receivership Proofs of Claim, GFG and GHI specifically reserved their rights to assert certain enumerated claims, including:

   a.   claims related to the sale of Guaranty Bank's assets to Compass Bank and other parties during the Receivership;

   b.   claims for ownership of all or portions of assets claimed by the FDIC-Receiver, including but not limited to tax refunds, insurance premium refunds, or other insurance recoveries (including potential recoveries under officer and director liability policies); and

   c.   claims related to the conversion of the RWHC Preferred Stock into shares of preferred stock of Guaranty Bank and other actions and matters related to such conversion.

Additionally, GFG and GHI reserved their rights to assert that certain capital maintenance obligations that the FDIC-Receiver alleges were incurred by GFG and GHI prior to the Receivership are voidable as fraudulent transfers under 11 U.S.C. § 548(a)(1)(B).

On March 15, 2010, the FDIC-Receiver provided GFG and GHI notices that the Debtor Receivership Proofs of Claim had been disallowed.  The FDIC-Receiver stated that the Debtor Receivership Proofs of Claim were disallowed because of an alleged lack of support.

In order to prosecute the Debtor Receivership Proofs of Claim, pursuant to the FDIA, on May 14, 2010, GFG and GHI filed the FDIC-Receiver Litigation.  The FDIC-Receiver Litigation is currently stayed pursuant to an order in the FDIC-Receiver Litigation and by agreement of the Debtors and the FDIC-Receiver.

### 5.        Settlement Discussions with the FDIC-Receiver and Wilmington Trust

Subsequent to the filing of the FDIC-Receiver Motion for Relief from Stay, the Debtors, Wilmington Trust, and the FDIC-Receiver engaged in extensive settlement discussions regarding the relief sought in the FDIC-Receiver Motion for Relief from Stay, the FDIC-Receiver Claims,

the Debtor Receivership Proofs of Claims, and the terms of a plan of liquidation for the Debtors. The parties' settlement discussions took place over a period in excess of seven months and included an in-person settlement conference with the parties and their counsel, numerous written proposals and counterproposals, and several telephone conferences. The settlement discussions resulted in the FDIC-Receiver Settlement, which is a global agreement regarding the treatment of the FDIC-Receiver Claims and the General Unsecured Claims as set forth in Article IV of the Plan, as well as all other material terms of the Plan. The Debtors, the FDIC-Receiver, and Wilmington Trust each agreed to the terms of the FDIC-Receiver Settlement as well as the process and other procedures for filing the Plan in the Plan Support Agreement attached hereto as Exhibit 4.

### 6.      Settlement with GIS

After the Petition Date, the Debtors cancelled several unexpired insurance policies that were no longer necessary due to the Debtors' cessation of business operations. In connection with such cancellation, the Debtors and the FDIC-Receiver jointly requested that any unused premiums be returned to the Debtors through delivery of the premium refunds to the Debtors' Chief Restructuring Officer for deposit in the Reserve Account. Certain of the Debtors' insurance carriers, rather than send the premium refunds to the Chief Restructuring Officer, returned them to GIS, in its capacity as the Debtors' pre-petition insurance broker.

GIS filed several claims against the Debtors, primarily arising from a dispute regarding the allocation of amounts paid by GFG's consolidated tax group for 2008 franchise taxes owed to the State of Texas. GIS asserts that certain taxes paid by GFG for the 2008 tax year should be applied to reduce GIS's tax liability. Based on GIS's claims, GIS asserts the right to offset the insurance premium refunds against amounts allegedly owed to GIS by the Debtors. The Debtors and the FDIC-Receiver, who also claims ownership of the insurance premium refunds, assert that GIS has no valid setoff rights.

After a lengthy negotiation among the Debtors, the FDIC-Receiver, and GIS, on October 15, 2010 the Debtors filed their Motion for Approval of Settlement With Guaranty Insurance Services, Inc. Pursuant to Federal Rule of Bankruptcy Procedure 9019 [Docket No. 286]. The proposed settlement, which is supported by the FDIC-Receiver and Wilmington Trust, provides that (i) the Debtors will file an amended franchise tax report for the 2008 calendar year that modifies the allocation of 2008 franchise tax payments; (ii) GIS will agree to release any and all claims against the Debtors, including any claims to premium refunds on deposit in the Reserve Account, and reduce its franchise tax-related claim against the FDIC-Receiver; and (iii) GIS will turn over any and all insurance premiums in its possession to the Debtors. The deadline for objections to the proposed settlement is November 8, 2010.

### F.      Professional Fees and Expenses

### 1.      Professionals employed by the Debtors

Pursuant to orders entered by the Bankruptcy Court, the Debtors have retained certain professionals to represent their interests in the Bankruptcy Cases. In particular, the Debtors retained Haynes and Boone, LLP to serve as general bankruptcy counsel; Lain, Faulkner & Co.

to provide a Chief Restructuring Officer and additional personnel to provide financial advisory services to the Debtors; and Pope Shamsie to serve as tax accountants.

Wilmington Trust, as indenture trustee, engaged Foley Larder LLP (and Baker & Hostetler LLP as predecessor-counsel) and certain local counsel to represent its interest in these Chapter 11 Cases. Wilmington Trust anticipates that it and its counsel will file Administrative Claims for the reimbursement of unpaid fees and expenses under Bankruptcy Code § 503(b)(3), (b)(4), and/or (b)(5).

## 2.    Payments to Professionals

On December 29, 2009, the Bankruptcy Court entered its (i) Order Granting First Interim Application of Haynes and Boone, LLP for Allowance of Compensation and Reimbursement of Expenses Advanced (for the period August 27, 2009 through November 30, 2009) [Docket No. 162], awarding Haynes and Boone $272,283.00 in fees and $13,005.58 in expenses on an interim basis and (ii) Order Approving First Interim Application of Dennis Faulkner and Lain, Faulkner & Co., P.C., Chief Restructuring Officer and Additional Personnel for the Debtors, for Allowance of Compensation and Reimbursement of Expenses [Docket No. 144], awarding Dennis Faulkner and Lain, Faulkner & Co., P.C. $126,178.25 and expenses in the amount of $1,153.11 on an interim basis. On July 21, 2010, the Bankruptcy Court entered its (i) Order Granting Second Interim Application of Haynes and Boone, LLP for Allowance of Compensation and Reimbursement of Expenses Advanced (for the period December 1, 2009 through March 31, 2010) [Docket No. 232], awarding Haynes and Boone $216,864.00 in fees and $5,647.45 in expenses on an interim basis and (ii) Order Approving Second Interim Application of Dennis Faulkner and Lain, Faulkner & Co., P.C., Chief Restructuring Officer and Additional Personnel for the Debtors, for Allowance of Compensation and Reimbursement of Expenses [Docket No. 264], awarding Dennis Faulkner and Lain, Faulkner & Co., P.C. $51,569.50 and expenses in the amount of $242.94 on an interim basis. The Debtors remitted all of the fees and expenses described in this paragraph, subject to the FDIC-Receiver Reservation of Rights.

On October 28, 2010, Haynes and Boone, LLP filed its Third Interim Application of Haynes and Boone, LLP, Counsel for the Debtors, for Allowance of Compensation and Reimbursement of Expenses Advanced [Docket No. 292] requesting $168,946.00 in fees and $10,018.06 in expenses (for the period April 1, 2010 through September 30, 2010). Also on October 28, 2010, Lain, Faulkner & Co. filed its Third Interim Application of Dennis Faulkner and Lain, Faulkner & Co., P.C., Chief Restructuring Officer and Additional Personnel for the Debtors, for Allowance of Compensation and Reimbursement of Expenses [Docket No. 293] requesting $87,494.25 in fees and $4,958.25 in expenses (for the period April 1, 2010 through September 30, 2010). The third interim fee applications are set for hearing on December 21, 2010.

Pursuant to the Pope Shamsie Retention Order, the Debtors have remitted $245,000 for Pope Shamsie's tax return services. Pursuant to the Pope Retention Order and Article IV.C of the Plan, 50% of the professional fees paid to Pope Shamsie will be paid by the FDIC-Receiver through a deduction to the distribution to the FDIC-Receiver pursuant to the Plan.

Haynes and Boone, LLP, Lain, Faulkner & Co., P.C., and Pope Shamsie have performed additional services for the Debtors for which they have not been compensated, for which they will file Professional Fee Claims pursuant to the Plan.

## G.    Rejection of Executory Contracts

The Debtors no longer require the benefits of their executory contracts.  The Plan provides that any executory contracts and unexpired leases are rejected as of the Confirmation Date.  The bar date for filing claims for damages related to the rejection of all executory contracts and unexpired leases, whether rejected pursuant to the Confirmation Order or prior order of the Bankruptcy Court, will be thirty (30) days after the Effective Date or such earlier time period as the Bankruptcy Court may establish by order.

## H.    Potential Claims of the Debtors Against Third Parties

The Debtors possess a number of potential claims against third parties.  The discussion in this section supplements any claims discussed elsewhere in this Disclosure Statement including, but not limited to, Article 4.D, entitled "Preference and Other Avoidance Litigation."  As described in Article 7.G herein, entitled "Preservation of Rights of Action," pursuant to Article X of the Plan, the Reorganized Debtors shall retain and shall have the exclusive right to enforce these and any claims, rights, and causes of action that the Debtors or the Estates hold against any entity.

### 1.    Temple-Inland Spin-Off

In late 1988, Temple-Inland formed Guaranty Bank by acquiring three institutions, including what was then Guaranty Federal Savings and Loan Association.  At that time, Temple-Inland's existing insurance operations, which began in the late 1950s, were combined with the banking operations to create a financial services group as a part of Temple-Inland.  These banking and insurance agency operations continued to grow during the last two decades through numerous acquisitions.

On February 25, 2007, Temple-Inland's board of directors preliminarily approved a plan to separate Temple-Inland into three focused, stand-alone, public companies.  On November 29, 2007, Temple-Inland Inc. announced that its board of directors had approved the distribution to its stockholders of all of the shares of common stock of GFG.  At the close of business on December 28, 2007, the distribution was completed, and GFG became a stand-alone, public company focused on the financial services business.

In connection with the spin-off of GFG, Temple-Inland and GFG executed several agreements, including the (i) Separation and Distribution Agreement by and among Temple-Inland Inc., Forestar Real Estate Group Inc. and Guaranty Financial Group Inc.; (ii) Master Transition Services Agreement between Temple Inland, Inc. and Forestar Real Estate Group Inc. and Guaranty Financial Group Inc.; (iii) Employee Matters Agreement by and among Temple-Inland Inc., Guaranty Financial Group Inc., and Forestar Real Estate Group Inc.; and (iv) Tax Matters Agreement by and among Temple-Inland Inc., Forestar Real Estate Group Inc. and

Guaranty Financial Group Inc.  It is unclear whether GFG had independent legal advice in connection with the negotiation of these agreements.

As described in Article 5 above, during 2008, the year immediately following the spin-off, the Debtors began to encounter severe financial difficulties.  After initial concerns by the OTS and FDIC during 2008 that Guaranty Bank could not maintain certain capital ratios, Guaranty Bank was eventually deemed critically undercapitalized as of March 31, 2009, only fifteen months after the spin-off.

The Debtors and Wilmington Trust have begun, but not yet completed, a review of the facts and circumstances leading to the spin-off from Temple-Inland and the subsequent failure of Guaranty Bank and insolvency of the Debtors.  The Debtors may have claims against (i) Temple-Inland; (ii) certain current and former officers and directors of Temple-Inland; and (iii) professional firms that advised Temple-Inland, GFG, or both in connection with the spin-off, for fraudulent transfer, preferential transfer, breach of fiduciary duty, conversion, conspiracy, participation in a breach of fiduciary duty, breach of contract, fraud, negligence, and other similar claims in connection with the spin-off of GFG from Temple-Inland.  The Debtors may have grounds for disallowance or equitable subordination of any claims filed against the Debtors by the persons identified in the preceding sentence.  The Debtors may also assert that Temple-Inland is the alter ego of GFG and seek damages based upon debts imposed on GFG because of Temple-Inland's actions.

Pursuant to the FDIC-Receiver Settlement, the Liquidation Agent shall have the right to pursue claims against Temple-Inland on behalf of the Estates for the benefit of the beneficiaries of the Liquidating Trust.  The Liquidation Agent shall not have the right to pursue claims against Temple-Inland that are derivative of the claims of the FDIC-Receiver, Guaranty Bank, or its shareholders, which are reserved for the FDIC-Receiver pursuant to the FDIC-Receiver Settlement.

## 2.     Officers and Directors

### a.     Claims to be Pursued by FDIC-Receiver

The Debtors may have claims against the officers and directors of the Debtors arising out of the individual's employment by one or more of the Debtors or service on one more of the Debtors' boards of directors.

The precise basis and potential targets for claims relating to the Debtors' prepetition officers and directors are not fully developed at this time; however such claims may be based on acts, errors, omissions, misstatements, misleading statements, neglect and/or breaches of duty, including but not limited to (i) failure to mitigate the risk of impairment of Guaranty Bank's investments (particularly non-agency mortgage backed securities); (ii) improper management of investment risk and credit risk, including Guaranty Bank's concentration of loans related to real estate and home building; (iii) the failure to raise capital necessary to obtain federal governmental assistance or otherwise avoid the undercapitalization that led to the Receivership and these Chapter 11 Cases; and (iv) execution of the transactions related to GFG's spin-off from its former parent, Temple-Inland, on or about December 28, 2007, approximately 19 months

before the submission of the TFR announcing that Guaranty Bank was critically undercapitalized.

Further, certain persons may have served as officers, directors, or in management roles for more than one related entity, including GFG, GGV, GHI, GGC, RWHC and/or Guaranty Bank. Claims may be asserted against these persons based in whole or in part on action taken or events occurring during their service in these concurrent leadership roles.

Prior to the Petition Date, the Debtors maintained directors and officers liability insurance which covered directors and officers of the Debtors and Guaranty Bank and its subsidiaries for corporate liability, employment practices liability, fiduciary liability, and outside directorship liability. The aggregate limit of liability under that policy is $35 million.

To the extent that these claims are derivative of Guaranty Bank, the FDIC-Receiver asserts that it has the exclusive right to assert such claims pursuant to 12 U.S.C. § 1821(d)(2)(A)(8). Moreover, to the extent that the Debtors have an interest in D&O claims, the Debtors have agreed to transfer such interest to the FDIC-Receiver pursuant to the FDIC-Receiver Settlement. As described in Article 7.E.3 herein, the Liquidation Trustee may pursue such claims in the event that the FDIC-Receiver elects not to pursue such claims.

### b.      Claims to be pursued by Liquidation Trust

In addition, claims may exist against former officers, directors, and employees of the Debtors for various transfers made prior to the Petition Date arguably while the Debtors were insolvent including, but not limited to payments to made within the one-year period prior to the Bankruptcy. All such transfers are identified on the schedule attached hereto as Exhibit 3. All Insider and Employee Avoidance Actions are being retained by the Debtors for prosecution by the Liquidation Trust.

### 3.      Other Individuals

The Debtors or the Liquidating Trustee may discover claims against other individuals or entities or additional claims against the parties identified in the course of prosecuting the claims discussed herein and obtaining documents from the related individuals and entities. Pursuant to the FDIC-Receiver Settlement, the Liquidation Agent shall have the right to pursue claims against third parties on behalf of the Estates for the benefit of the beneficiaries of the Liquidating Trust. The Liquidation Agent shall not have the right to pursue claims against third parties that are derivative of the claims of the FDIC-Receiver, Guaranty Bank, or its shareholders, which are reserved for the FDIC-Receiver pursuant to the FDIC-Receiver Settlement.

## ARTICLE 7
## DESCRIPTION OF THE PLAN

### A.      Introduction

A summary of the principal provisions of the Plan and the treatment of Classes of Allowed Claims and Interests is set out below. This Disclosure Statement is only a summary of

the terms of the Plan and is entirely qualified by the Plan; it is the Plan and not the Disclosure Statement that governs the rights and obligations of the parties.

The Plan seeks to distribute all value in the Debtors' Estates to Creditors according to the priority scheme established by the Bankruptcy Code.

### B.     Settlement with FDIC-Receiver

The Plan is premised upon the FDIC-Receiver Settlement, which is a global settlement between and among the Debtors, the FDIC-Receiver, and Wilmington Trust regarding the FDIC-Receiver Motion for Relief from Stay, the FDIC-Receiver Claims, the Debtor Receivership Proofs of Claim, the FDIC-Receivership Litigation, and the terms of the Plan.  The terms of the settlement are embodied in the treatment of the FDIC-Receiver Claim as set forth in Article IV.C of the Plan as well as certain other provisions in the Plan, including the Release provision in Aricle IX. D of the Plan.

The Debtors, with the support and concurrence of Wilmington Trust, submit that the settlement is fair and equitable and in the best interests of the Estates.  The Debtors believe that the factors typically considered by a court in determining whether or not to approve a compromise, including (a) the probability of success in litigating the controversies involved, with due consideration for uncertainties in fact and law; (b) the complexity and likely duration of the litigation and related expenses, inconvenience, and delay; (c) the difficulties, if any, to be encountered in collecting on any judgment which might be obtained; and (d) the paramount interest of creditors and the estate, support approval of the compromise and settlement with the FDIC-Receiver.

### 1.     The probability of success in litigating the controversies involved, with due consideration for uncertainties in fact and law

Although the Debtors believe that they have significant arguments in opposition to the FDIC-Receiver Motion for Relief from Stay and the FDIC-Receiver Claims, given the complexity of the factual issues and the legal uncertainties inherent in the interaction between and among the Bankruptcy Code, the FDIA, and common law of setoff, there is a substantial risk that the FDIC-Receiver will prevail in its assertion that the FDIC-Receiver Claims are valid secured, administrative, and/or priority claims.  It is also unclear whether the Debtors would succeed in establishing that the conversion of the RWHC Preferred Stock was a fraudulent transfer.

Absent settlement, the Court would be faced with a complex legal and factual dispute regarding the effect of several actions taken by the Debtors leading up to the Receivership and whether such actions created on obligation by the Debtors to contribute assets to maintain Guaranty Bank's capital.  The outcome of litigation on these subjects is extremely difficult to predict.  More importantly, if the FDIC-Receiver succeeds in asserting its position in the FDIC-Receiver Motion for Relief from Stay and the FDIC-Receiver Claims, the FDIC-Receiver would be entitled to all of the assets of the Estates, either as a secured, administrative, or priority creditor prior to there being any assets available for distribution to General Unsecured Creditors.

**2.     The complexity and likely duration of the litigation and related expenses, inconvenience, and delay**

Substantial discovery will be required to litigation these matters to conclusion. Moreover, the scope of the disputes will prevent a swift resolution of the litigation, and the Estates will incur significant resources in litigating with the FDIC-Receiver.  As a result, the Estates would be forced to spend both time and money in defending its position, with a definite possibility that the Court will ultimately agree with the FDIC-Receiver's arguments and order the transfer of all Estate property to the FDIC-Receiver.

**3.     The difficulties, if any, to be encountered in collecting on any judgment which might be obtained**

The collectability of any judgment is not a strong factor either for or against approval of the settlement.  To the extent that the Debtors prevailed in the FDIC-Receiver Litigation by establishing that the conversion of the RWHC preferred stock into preferred stock of Guaranty Bank was a fraudulent transfer, (i) the Debtors would likely only be entitled to an unsecured claim in the Receivership and (ii) any litigation proceeds would be redistributed to the FDIC-Receiver if the FDIC-Receiver Claims were allowed in the Chapter 11 Cases.

**4.     The paramount interest of creditors and the estate**

It is in the best interest of the creditors and the estate to settle the disputes with the FDIC-Receiver.  As discussed above, there is a great risk of delay and expense to the Estates involved with litigation against the FDIC-Receiver, and a significant risk to the Estate that the expense may only result in a loss of all of the Estates' assets.  The FDIC-Receiver Settlement preserves significant assets for distribution to General Unsecured Creditors.

**C.     Designation of Claims and Interests**

The following is a designation of the classes of Claims and Interests under the Plan. Pursuant to Bankruptcy Code § 1122, a Claim or Interest is placed in a particular Class for purposes of voting on the Plan and receiving Distributions under the Plan only to the extent (i) the Claim or Interest qualifies within the description of that Class; (ii) the Claim or Interest is an Allowed Claim or Allowed Interest in that Class; and (iii) the Claim or Interest has not been paid, released, or otherwise compromised before the Effective Date.   In accordance with Bankruptcy Code § 1123(a)(1), all Claims and Interests except Administrative Claims and Priority Tax Claims are classified in the Classes set forth below.

1.     <u>Class 1 – Allowed Secured Claims</u>:  Class 1 shall consist of all Allowed Secured Claims.  Each Allowed Secured Claim is assigned to a separate subclass.

2. <u>Class 2 –Allowed Priority Non-Tax Claims</u>: Class 2 consists of four subclasses, Class 2A, Class 2B, Class 2C, and Class 2D.

    a. <u>Class 2A – GFG Allowed Priority Non-Tax Claims</u>: Class 2A consists of all Allowed Priority Non-Tax Claims against GFG except for the FDIC-Receiver Claims.

    b. <u>Class 2B – GGCI Allowed Priority Non-Tax Claims</u>: Class 2B consists of all Allowed Priority Non-Tax Claims against GGCI except for the FDIC-Receiver Claims.

    c. <u>Class 2C – GGVI Allowed Priority Non-Tax Claims</u>: Class 2C consists of all Allowed Priority Non-Tax Claims against GGVI except for the FDIC-Receiver Claims.

    d. <u>Class 2D – GHI Allowed Priority Non-Tax Claims</u>: Class 2D consists of all Allowed Priority Non-Tax Claims against GHI except for the FDIC-Receiver Claims.

3. <u>Class 3 – Allowed FDIC-Receiver Claims</u>: Class 3 consists of the Allowed Claims filed by the FDIC-Receiver on behalf of Guaranty Bank against GFG, GGCI, GGVI, and GHI.

4. <u>Class 4 – Allowed General Unsecured Claims</u>: Class 4 consists of four subclasses, Class 4A, Class 4B, Class 4C, and Class 4D.

    a. <u>Class 4A – GFG Allowed General Unsecured Claims</u>: Class 4A consists of all Allowed General Unsecured Claims against GFG.

    b. <u>Class 4B – GGCI Allowed General Unsecured Claims</u>: Class 4B consists of all Allowed General Unsecured Claims against GGCI.

    c. <u>Class 4C – GGVI Allowed General Unsecured Claims</u>: Class 4C consists of all Allowed General Unsecured Claims against GGVI.

    d. <u>Class 4D – GHI Allowed General Unsecured Claims</u>: Class 4D consists of all Allowed General Unsecured Claims against GHI.

5. <u>Class 5 – Interests</u>: Class 5 consists of four subclasses, Class 5A, Class 5B, Class 5C, and Class 5D.

    a. <u>Class 5A – Interests in GFG</u>: Class 5A consists of all Interests in GFG.

    b. <u>Class 5B – Interests in GGCI</u>: Class 5B consists of all Interests in GGCI.

    c. <u>Class 5C – Interests in GGVI</u>: Class 5C consists of all Interests in GGVI.

    d. <u>Class 5D – Interests in GHI</u>: Class 5D consists of Interests in GHI.

**D.      Treatment of Unclassified Claims**

In accordance with Bankruptcy Code § 1123(a)(1), Administrative Claims and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims set forth in the Plan.

**1.      Administrative Claims**

(a)      <u>General</u>:  Subject to the Administrative Claim Bar Date provisions herein and unless otherwise provided for in the Plan or an order of the Bankruptcy Court, each Holder of an Allowed Administrative Claim due and payable on or prior to the Effective Date shall receive in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Administrative Claim within ten (10) Business Days after the later of (a) the Effective Date, (b) the Allowance Date, and (c) such date as is mutually agreed upon by the Liquidation Agent (or the Special Purpose Liquidation Agent for Professional Fee Claims) and the Holder of such Allowed Administrative Claim, either Cash equal to the unpaid amount of such Allowed Administrative Claim or such other less favorable treatment as to which the Liquidation Agent (or the Special Purpose Liquidation Agent for Professional Fee Claims) and the Holder of such Allowed Administrative Claim shall have agreed upon in writing.

(b)      <u>Payment of Statutory Fees</u>:  All fees payable pursuant to 28 U.S.C. § 1930 shall be paid in Cash equal to the amount of such Administrative Claim when due.

(c)      <u>Bar Date for Administrative Claims</u>:

**Deadline**:  Except as otherwise provided in this section of the Plan, requests for payment of Administrative Claims for which no bar date has otherwise been previously established must be included in a motion or application and filed and served on the Post-Confirmation Service List no later than the Administrative Claim Bar Date.  Holders of Administrative Claims that are required to file requests for payment of such Administrative Claims and that do not file such requests by the Administrative Claim Bar Date are forever barred from asserting such Administrative Claims against the Debtors, the Liquidation Trust, the Special Purpose Liquidation Agent, the Professional Fee Claim Reserve, or their property.  Objections to Administrative Claims must be filed and served on the Liquidation Trustee and the Holder of the Administrative Claim that is the subject of such objection no later than the Administrative Claim Objection Deadline.

**Form**:  Requests for payment of Administrative Claims included in a Proof of Claim are of no force and effect, and are Disallowed in their entirety as of the Confirmation Date unless such Administrative Claim is subsequently filed by timely motion or application as provided herein.  However, to the extent a Governmental Unit is not required to file a request for payment of an Administrative Claim pursuant to Bankruptcy Code § 503(b)(1)(D), a Proof of Claim filed by such Governmental Unit prior to the applicable bar date set forth in the Plan for filing a request for payment of such Administrative Claim shall fulfill the requirements of this section of the Plan.

**Professionals**:  All Professionals shall file and serve on the Post-Confirmation Service List an application for final allowance of any Professional Fee Claim no later than the Professional Fee Claim Bar Date.  Objections to Professional Fee Claims must be filed and served on the Special Purpose Liquidation Agent and the Professional to whose application the objections are addressed no later than the Professional Fee Claim Objection Deadline.  Any Professional that does not file an application for final allowance of any Professional Fee Claim by the Professional Fee Claim Bar Date is forever barred from asserting any such Professional Fee Claim against the Debtors, the Liquidation Trustee, or their property.  Any professional fees and reimbursements for expenses incurred by the Liquidation Trustee or the Special Purpose Liquidation Agent after the Effective Date may be paid without application to the Bankruptcy Court.  Professional fees of the Special Purpose Liquidation Agent shall be satisfied from the Professional Fee Claim Reserve.

**Post-Petition Tax Claims**:  Requests for payment of Post-Petition Tax Claims for which no bar date has otherwise been previously established must be filed on or before the Post-Petition Tax Claim Bar Date.  A Holder of any Post-Petition Tax Claim that is required to file a request for payment of such taxes and does not file and serve such request on the Post-Confirmation Service List by the Post-Petition Tax Claim Bar Date is forever barred from asserting any such Post-Petition Tax Claim against the Debtors, the Liquidation Trustee, or their property, whether any such Post-Petition Tax Claim is deemed to arise prior to, on, or subsequent to the Effective Date.  To the extent that the Holder of an Post-Petition Tax Claim holds a Lien to secure its Post-Petition Tax Claim under applicable state law, the Holder of such Post-Petition Tax Claim shall retain its Lien until its Allowed Post-Petition Tax Claim has been paid in full.  Objections to Post-Petition Tax Claims must be filed and served on the Liquidation Trustee and the Holder of the Post-Petition Tax Claim that is the subject of such objection no later than the Post-Petition Tax Claim Objection Deadline.

(d)    Projected Administrative Claims:  Administrative Claims consist primarily of Professional Fee Claims.  The Debtors anticipate that their Professionals will assert final unpaid Professional Fee Claims in the amount of $535,000.[5]  The Debtors also anticipate that Wilmington Trust will file an Administrative Claim for the payment of its attorney and accountant fees and expenses under Bankruptcy Code § 503(b)(3)(D).  Based on information provided by Wilmington Trust, the Debtors anticipate that this claim will total approximately $400,000 through December 15, 2010, excluding fees and expenses of Wilmington Trust that have yet to be estimated.  In addition, two Creditors, Dell Marketing, L.P. and Hartford Fire Insurance Company purport to assert Administrative Claims against GFG in the total amount of $12,255.23.  The Debtors do not believe that either of these Administrative Claims qualify as or will ultimately be Allowed Administrative Claims.

---

[5] This amount does not include the approximately $275,000 of fees and expenses included in the Third Interim Fee Applications filed by the Debtors' Professionals.  For the purpose of this Disclosure Statement, the Debtors assume that these fees and expenses will be paid prior to the Effective Date of the Plan.

### 2. Allowed Priority Tax Claims.

Unless otherwise provided for pursuant to an order of the Bankruptcy Court, each Holder of an Allowed Priority Tax Claim due and payable on or prior to the Effective Date shall receive in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Tax Claim within ten (10) Business Days after the later of (a) the Effective Date, (b) the Allowance Date, or (c) such date as is mutually agreed upon by the Liquidation Agent and the Holder of such Allowed Priority Tax Claim, either Cash equal to the unpaid amount of such Allowed Priority Tax Claim or such other less favorable treatment as to which the Liquidation Agent and the Holder of such Allowed Priority Tax Claim shall have agreed upon in writing.

On September 9, 2009, the IRS filed Proof of Claim Number 7 against GFG in the amount of $25,000,000 for estimated federal tax liability.  GFG has retained Pope Shamsie to assist in negotiations to settle the IRS' Proof of Claim and to defend against an audit being conducted by the IRS.  Based on the losses in the Debtors' 2009 federal tax returns, the Debtors believe that the IRS' Proof of Claim ultimately will be Disallowed or withdrawn.  To the extent that the IRS' Proof of Claim is not withdrawn, Disallowed, Allowed in an amount less than $4 million, or amended to an amount less than $4 million, the Effective Date of the Plan will not occur unless this condition is waived by the Debtors, the FDIC-Receiver and Wilmington Trust.  In the event that such condition is waived, the Special Purpose Liquidation Agent shall, pending allowance of the IRS' Claim, withhold from the distribution otherwise payable to the FDIC-Receiver pursuant to Article IV.C.1 of the Plan an amount equal to fifty-percent (50%) of the estimated Allowed Claims of the IRS as agreed to by the Debtors, the FDIC-Receiver, and Wilmington Trust.  To the extent that the IRS reduces its Claim to an amount under $4 million, but the Claim has not yet been Allowed or Disallowed, the Special Purpose Liquidation Agent shall, pending allowance or disallowance of the IRS' Claim, withhold from the Distribution otherwise payable to the FDIC-Receiver pursuant to Article IV.C.1 of the Plan an amount equal to fifty-percent (50%) of the total amount of the Claims filed by the IRS.  Any amount withheld pursuant to this provision will be placed into a segregated account and distributed by the Special Purpose Liquidation Agent to the FDIC-Receiver in accordance with Article IV.C.1 of the Plan as soon as practical after the Claims filed by the IRS are Disallowed or Allowed.

### 3. Ordinary Course Liabilities.

The Liquidation Agent shall pay each Ordinary Course Liability pursuant to the payment terms and conditions of the particular transaction giving rise to the Ordinary Course Liability. Holders of an Ordinary Course Liability will not be required to file or serve any request for payment of the Ordinary Course Liability.  The Debtors anticipate that unpaid Ordinary Course Liabilities will not exceed $100,000, not including the cost of soliciting votes on the Plan.

### E. Treatment of Classified Claims and Interests

### 1. Treatment of Class 1 Allowed Secured Claims

(a)    Subclasses:  If there is more than one Allowed Secured Claim, then each Allowed Secured Claim shall be classified in a separate subclass.

(b)    Treatment:    Unless otherwise provided for pursuant to an order of the Bankruptcy Court, each Holder of an Allowed Secured Claim shall receive in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Secured Claim within ten (10) Business Days after the later of (a) the Effective Date, (b) the Allowance Date, and (c) such date as is mutually agreed upon by the Liquidation Agent and the Holder of an Allowed Secured Claim, either Cash equal to the unpaid portion of such Allowed Secured Claim or such other treatment as may be agreed to by the Liquidation Trustee, as applicable, and the Holder of such Allowed Secured Claim.    The Holder of a Secured Claim shall retain its Liens on applicable collateral to the same extent and priority previously held, notwithstanding the transfer of such collateral into the Liquidation Trust, until either (i) its Secured Claim has been Allowed and treated in accordance with this provision of the Plan, or (ii) its Secured Claim has been Disallowed.    The Holder of a Secured Claim shall not be entitled to foreclose such Lien absent further order of the Bankruptcy Court.

In addition to the FDIC-Receiver Claims, approximately twenty-six (26) Creditors filed Secured Claims against GFG.    Other than the FDIC-Receiver Claims, no Secured Claims were filed against GGVI, GGCI, or GHI.

The Secured Claims against GFG include: (i) two (2) unliquidated Claims filed by pre-petition insurers of the Debtors based on potential liability under certain insurance programs and indemnification obligations; (ii) ten (10) Claims in various amounts filed by equity holders of the Debtors based on their equity holdings; and (iii) fourteen (14) Claims totaling approximately $1.9 million based on alleged tax liability of the Debtors.[6]    The Debtors do not believe that any of the Secured Claims filed against GFG will become Allowed Secured Claims because either the Claims are invalid or the Creditors have no valid security interest in property of the Debtors.

## 2.    Treatment of Classes 2A, 2B, 2C and 2D – Allowed Priority Non-Tax Claims

Unless otherwise provided for pursuant to an order of the Bankruptcy Court, each Holder of an Allowed Priority Non-Tax Claim shall receive in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Non-Tax Claim within ten (10) Business Days after the later of (a) the Effective Date, (b) the Allowance Date, and (c) such date as is mutually agreed upon by the Liquidation Trustee and the Holder of such Allowed Priority Non-Tax Claim, either Cash equal to the unpaid amount of such Allowed Priority Non-Tax Claim or such other less favorable treatment as to which the Liquidation Agent and the Holder of such Allowed Priority Non-Tax Claims shall have agreed upon in writing.

Fourteen (14) Creditors  have asserted Priority Non-Tax Claims under Bankruptcy Code § 507(a)(5)(B) against GFG in the total amount of approximately $1.625 million.    Most of the Claims include amounts allegedly due under the Senior Executive Retirement Program

---

[6] These Claims include a Secured Claim in the amount of $1.567 million filed by the Franchise Tax Board of the State of California.    Based on the Debtors' 2008 California tax return, the Debtors believe that this Secured Claim will be Disallowed.

administered by GFG. These Claims, if Allowed, will be limited by the cap set forth in Bankruptcy Code § 507(a)(5)(B).[7]

Twenty-two (22) Creditors have asserted Priority Non-Tax Claims under Bankruptcy Code § 507(a)(4) against GFG in the total amount of approximately $314,000. Most of the Claims include amounts allegedly due under the Senior Executive Retirement Program or other severance obligations of GFG. The Debtors do not believe that these Claims are entitled to priority.[8]

### 3.        Treatment of Class 3 – Allowed FDIC-Receiver Claims

The FDIC-Receiver shall receive in full and final satisfaction, settlement, release, and discharge of and in exchange for the FDIC-Receiver Claims:

(a)        The FDIC-Receiver shall receive within ten (10) Business Days after the Effective Date, Cash equal to: (a) the sum of (i) eight-five percent (85%) of the Cash contained in the GFG Bank Accounts on the Effective Date, (ii) thirty percent (30%) of the Cash contained in the Affiliate Debtor Bank Accounts on the Effective Date, (iii) an amount equal to eight-five percent (85%) of all Allowed Administrative Claims, including the Allowed Professional Fee Claims of Lain, Faulkner & Co. and Haynes and Boone, LLP incurred on or after February 1, 2010 to the extent such claims have been paid from the GFG Bank Accounts prior to the Effective Date minus (b) the sum of (i) $475,000, (ii) fifty percent (50%) of the Allowed Professional Fee Claim of Pope Shamsie, and (iii) fifty-percent (50%) of the total amount of any Allowed Claim of the IRS, not to exceed $2 million unless agreed to in writing by the FDIC-Receiver. The Debtors estimate that the FDIC-Receiver will be paid Cash in the approximate amount of $10 million to $12 million under this provision.

(b)        The FDIC-Receiver shall receive (a) one-hundred percent (100%) of the Tax Refunds within ten (10) Business Days after the Debtors' or the Special Purpose Liquidation Agent's receipt of the Tax Refunds and (b) all Insurance Premium Refund Amounts (i) within ten (10) Business Days after the Effective Date or, if received by a Debtor after the Effective Date, (ii) within ten (10) Business Days after a Debtor's receipt of any Insurance Premium Refund Amounts or such date as mutually agreed upon by the Special Purpose Liquidation Agent and the FDIC-Receiver. The Debtors anticipate that the amount of the Tax Refunds will be approximately $3.49 million. To date, the Debtors have received Insurance Premium Refund Amounts totaling $680,035.53.

(c)        The Debtors shall assign any interest the Debtors may hold in the D&O Claims to the FDIC-Receiver, which assignment shall be deemed to have been made without any

---

[7] The Debtors estimate that the Senior Executive Retirement Program covers approximately seventy (70) individuals. Therefore, Bankruptcy Code § 507(a)(5) would limit the aggregate liability of the Debtors, if any, under the Senior Executive Retirement Program to $766,500.

[8] There are two (2) additional Priority Non-Tax Claims that the Debtors believe will be reclassified. One was filed in the amount of $5,600.00 and the other is unliquidated.

further action or document by or from the Debtors, on the Effective Date.  The FDIC-Receiver shall have the sole right and responsibility for the prosecution of the D&O Claims and complete discretion as to whether to commence, settle or dismiss the D&O Claims.  In the event the FDIC-Receiver chooses to prosecute any D&O Claim, the FDIC-Receiver shall retain 100% of the any recovery from such prosecution.  On or after the one (1) year anniversary of the Effective Date, and every six (6) months thereafter as necessary, the Liquidation Trustee may make a written inquiry to the FDIC-Receiver to determine if the FDIC-Receiver has decided to pursue the D&O Claims.  Upon written response by the FDIC-Receiver that the FDIC-Receiver does not intend to pursue a D&O Claim, which will be provided as soon as possible in good faith, such D&O Claim will be deemed assigned by the FDIC-Receiver to the Liquidation Trust and thereafter may be pursued by the Liquidation Trustee on behalf of the Estates.

(d)     The FDIC-Receiver shall retain and have the sole right and discretion to prosecute, continue, settle, or dismiss the FDIC-Receiver/GIS Causes of Action.  The FDIC-Receiver shall provide updates to the Liquidation Trustee as to the status of the FDIC-Receiver/GIS Causes of Action as soon as practical upon request, but in no event will the FDIC-Receiver be required to disclose privileged or confidential information.  The FDIC-Receiver shall pay thirty percent (30%) of any net recovery from the prosecution of the FDIC-Receiver/GIS Causes of Action to the Liquidation Trustee for distribution to beneficiaries of the Liquidation Trust.

The FDIC-Receiver/GIS Causes of Action involve a dispute between JLT and Guaranty Bank regarding the purchase of 100% of the outstanding shares of stock of Guaranty Insurance.  JLT has asserted claims against the FDIC-Receiver in the United States District Court for the Northern District of Texas, Civil Action No. 3:10-CV-00298-B, in an amount in excess of $19 million dollars based on various legal theories including breach of contract, intentional misrepresentation, common law fraud, and fraud in the inducement related to the sale. The FDIC-Receiver denies the claims asserted by JLT and asserts a counterclaim against JLT for almost $6 million based upon a working capital adjustment required as a condition to the sale.

(e)     The FDIC-Receiver shall assign and release any interest it might hold in the Insider and Employee Avoidance Actions to the Liquidation Trust, which assignment shall be deemed to have been made without any further action or document by or from the FDIC-Receiver, upon the FDIC-Receiver's receipt of the Cash required to be paid pursuant to Article IV.C.1 of the Plan.  The FDIC-Receiver shall retain no interest in or right to any net recoveries from the prosecution of the Insider and Employee Avoidance Actions.  A description of the Insider and Employee Avoidance Actions is provided in Article 6.H.2 herein.

(f)     Except as otherwise provided herein, Administrative Claims incurred after January 31, 2010 that have not been paid prior to the Effective Date, including Allowed Professional Fee Claims, shall be satisfied by the Liquidation Agent from the Cash remaining in the Estates or the Liquidation Trust after the satisfaction of the FDIC-Receiver Claims.

(g)     As soon as practicable after the FDIC-Receiver's receipt of the Cash required to be paid pursuant to Article IV.C.1 of the Plan, the FDIC-Receiver will withdraw the FDIC-Receiver Reservations of Rights and the FDIC-Receiver Motion for Relief from Stay with

prejudice.  Simultaneously, the Debtors shall file appropriate pleadings seeking the dismissal of the FDIC-Receiver Litigation, with prejudice.

(h)    The FDIC-Receiver will not receive any Distributions under the Plan except as set forth in Article IV.C of the Plan.

### 4.    Treatment of Classes 4A, 4B, 4C and 4D – Allowed General Unsecured Claims

Unless otherwise provided for pursuant to an order of the Bankruptcy Court, each Holder of an Allowed General Unsecured Claim shall receive in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed General Unsecured Claim, a beneficial interest in the Liquidation Trust as set forth in Article V of the Plan entitling such Holder to receive on account of such Claims, on or as soon as practicable after the later of (a) the Effective Date, (b) the Allowance Date, (c) the initial Distribution Date and on each periodic Distribution Date thereafter, and (d) such date as is mutually agreed upon by the Liquidation Agent and the Holder of an Allowed General Unsecured Claim, their Pro Rata Share of any Cash distribution from the Liquidation Trust to Holders of Allowed General Unsecured Claims in accordance with Article V of the Plan.  Each Holder of Allowed General Unsecured Claims shall receive such Distributions in accordance with the provisions set forth in Article V of the Plan. Notwithstanding the foregoing, the Holder of an Allowed General Unsecured Claim may receive such other less favorable treatment as may be agreed to by such Holder and the Liquidation Agent.  General Unsecured Claims, excluding the FDIC-Receiver Proofs of Claim and the Wilmington Trust Proofs of Claim, have been filed in the total amount of $62,887,793.06. Included in this total is a partially contingent and partially unliquidated General Unsecured Claim filed by Temple-Inland in the amount of $35,632,839.29.[9]  In addition, the Plan provides that Wilmington Trust shall have an Allowed General Unsecured Claim in the amount of $318,526,546.96, plus amounts presently unliquidated for additional fees and costs as agreed to by the Special Purpose Liquidation Agent and Wilmington Trust or pursuant to further order of the Court.  The Debtors believe that Allowed General Unsecured Claims will not exceed a total of $382 million.

### 5.    Treatment of Classes 5A, 5B, 5C and 5D – Interests.

On the Effective Date, all Interests in Class 5 shall be canceled and extinguished and Interest Holders shall not be entitled to receive any Distributions on account of such Interests.

### F.    Treatment of Executory Contracts

### 1.    Rejection of Executory Contract

Unless rejected or assumed by prior order of the Bankruptcy Court, each Executory Contract and Unexpired Lease shall be rejected as of the Confirmation Date (which rejection shall be effective on the Effective Date), and such rejected Executory Contracts and Unexpired

---

[9] The Debtors believe that Temple-Inland's Claim will be Disallowed or significantly reduced.

Leases shall no longer represent binding obligations of the Debtors or the Liquidation Trust after the Effective Date.  Entry of the Confirmation Order shall constitute approval of such rejections under Bankruptcy Code §§ 365 and 1123.

### 2.      Claims Based on Rejection of Executory Contracts

Any Claim arising out of the rejection of an Executory Contract or Unexpired Lease pursuant to the Confirmation Order or prior order of the Bankruptcy Court must be filed with the Bankruptcy Court on or before the Rejection Claim Bar Date, and must be served on counsel for the Liquidation Trustee.  Any such Claims not filed by the Rejection Claim Bar Date is discharged and forever barred.  Each Allowed Claim arising from the rejection of an Executory Contract shall be treated as an Allowed General Unsecured Claim.  The Bankruptcy Court shall determine the amount, if any, of the Claim of any Entity seeking damages by reason of the rejection of any Executory Contract or Unexpired Lease.

### 3.      Reservation of Rights

Neither the exclusion nor inclusion of any contract or lease by the Debtors on their Schedules, nor anything contained in the Plan, will constitute an admission by the Debtors or the Liquidation Trust that any such contract or lease is or is not in fact an Executory Contract or Unexpired Lease or that any Debtor or the Liquidation Trustee has any liability under any such contract or lease.  Nothing in the Plan will waive, excuse, limit, diminish, or otherwise alter any of the defenses, Claims, Rights of Action, or other rights of the Debtors or the Liquidation Trust under any Executory Contract or non-Executory Contract or any Unexpired Lease or expired lease.  Nothing in the Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors or the Liquidation Trustee under any Executory Contract or non-Executory Contract or any Unexpired Lease or expired lease.

### G.      Preservation of Rights of Action

Article X of the Plan provides that, except as otherwise provided in the Plan, or in any contract, instrument, release, or other agreement entered into in connection with the Plan, in accordance with Bankruptcy Code § 1123(b), the Liquidation Trustee shall retain and shall have the exclusive right to enforce any claims, rights and causes of action that the Debtors or the Estates may hold against any entity, including, without limitation, any claims, rights or causes of action arising under Chapter 5 of the Bankruptcy Code or any similar provisions of state law, or any other statute or legal theory.

### H.      Exculpation and Release of Certain Parties in Interest

Article IX.E of the Plan provides as follows:

Exculpation of the Debtors:  The Debtors and any of their respective officers, directors, employees, agents, advisors, or professionals shall not have or incur any liability to any Holder of a Claim or Interest for any act, event, or omission from the Petition Date to the Effective Date relating to, connected with, or arising out of the Chapter 11 Cases, the Confirmation of the Plan, the consummation of the

Plan, the administration of the Plan, or the assets and property to be distributed pursuant to the Plan and the Plan Documents, unless such Entity's action constitutes bad faith, gross negligence, willful misconduct, or actual fraud.

Article V.H.7 of the Plan provides as follows:

<u>Exculpation of the Liquidation Trustee and Special Purpose Liquidation Agent</u>: From and after the Effective Date, the Liquidation Trustee, the Special Purpose Liquidation Agent, and their professionals shall be exculpated by the Estates and all Holders of Claims or Interests from any and all claims or causes of action and assertions of liability arising out of their performance of the duties conferred upon them by the Plan, the Liquidation Trust Agreement, or any orders of the Bankruptcy Court, except to the extent an act constitutes bad faith, gross negligence, willful misconduct, or actual fraud.  No holder of a Claim or Interest or representative thereof shall have or pursue any claim or cause of action against the Liquidation Trustee, the Special Purpose Liquidation Agent, or their professionals for taking any action in accordance with the Plan, the Liquidation Trust Agreement, or to implement the provisions of the Plan or any order of the Bankruptcy Court.  Nothing in this provision shall be deemed to alter the provisions of the Liquidation Trust Agreement.

If the Plan is confirmed with this provision, parties in interest will lose whatever rights they may currently have to sue the identified parties for negligent acts occurring between the Petition Date and the Effective Date of the Plan.  The Plan does not exculpate the identified parties for actions occurring prior to the Petition Date.

Article IX of the Plan provides as follows:

D.      <u>Release</u>:  Except as otherwise provided for in the Plan, the Release Parties shall be deemed to have released each of the other Release Parties from (i) any and all claims, causes of actions, and other liabilities arising before the Effective Date, and (ii) any and all claims, causes of action, and other liabilities arising from the actions taken or not taken in connection with the Plan and the Chapter 11 Cases unless such conduct amounts to gross negligence, willful misconduct, or actual fraud.  For the sake of clarity, this provision does not release any (i) D&O Claim or Insider and Employee Avoidance Actions, (ii) claims that the FDIC-Receiver has the statutory or common law right to pursue under, inter alia, title 12 of the United States Code, against any party, person, or entity other than Claims against the Debtors or the Estates or (iii) claims that either the FDIC-Receiver or Compass Bank may have against the other.

This release is part of the FDIC-Receiver Settlement and Holders and Claims and Interests should carefully review the release in connection with the Plan.

# ARTICLE 8
# MEANS FOR EXECUTION AND IMPLEMENTATION
# OF THE PLAN

**A.      Substantive Consolidation of the Debtors**

### 1.      Merger and Consolidation

Unless otherwise provided in the Plan, on the Effective Date all assets and liabilities of GGVI, GHI, and GGCI shall be merged into or treated as if they were merged with the assets and liabilities of GFG, and the Debtors shall be substantively consolidated into Reorganized GFG.

### 2.      Effect of Substantive Consolidation

In connection with, and as a result of, the substantive consolidation of the Debtors' Estates and the Chapter 11 Cases, on the Confirmation Date or such other date as may be set by an order of the Bankruptcy Court, but subject to the occurrence of the Effective Date: (1) all Intercompany Claims (including such Claims arising from the rejection of any Executory Contract or Unexpired Lease) will either be eliminated or shall remain in place but shall not be entitled to any Distributions under the Plan, (2) any obligation of any of the Debtors and all guarantees thereof executed by any of the Debtors will be deemed to be an obligation of each of the Debtors, (3) any Claim filed or asserted against any of the Debtors will be deemed a Claim against each of the Debtors, (4) for purposes of determining the availability of any right of setoff under Bankruptcy Code § 553, the Debtors will be treated as one Entity so that (subject to the other provisions of Bankruptcy Code § 553) debts due to any of the Debtors may be offset against the debts owed by any of the Debtors, and (5) the Chapter 11 cases of GGVI, GHI, and GGCI shall be closed, following which any and all proceedings that were or could have been brought or otherwise commenced in the Chapter 11 cases of GGVI, GHI, or GGCI, whether or not actually brought or commenced, may be continued, brought or otherwise commenced in GFG's Chapter 11 case.

### 3.      Treatment of Guarantees and Multiple-Debtor Claims

On the Effective Date, except as otherwise provided for in the Plan, all Claims based on guarantees of collection, payment, or performance made by any Debtor concerning the obligations of another Debtor shall be discharged, released, and without further force or effect. Additionally, Holders of Allowed Claims who assert identical Claims against multiple Debtors shall be entitled to a single satisfaction of such Claims.

**B.      Cancellation of Interests**

On the Effective Date, except as otherwise specifically provided for in the Plan (including Article V.C of the Plan): (i) all Interests in the Debtors shall be canceled and (ii) the obligations of, Claims against, and Interests in the Debtors arising under, evidenced by, or relating to any agreements, contracts, indentures, certificates of designation, bylaws, certificates or articles of incorporation, or similar documents governing the Interests shall be released and discharged.

### C.      Continued Corporate Existence of Reorganized GFG

GFG shall continue to exist as Reorganized GFG after the Effective Date in accordance with the laws of Delaware and pursuant to the Amended Charter and By-laws to be filed with the Plan Supplement.  The charter and by-laws of GFG shall be amended and restated as necessary to satisfy the provisions of the Plan, the Bankruptcy Code, and applicable Delaware law, and shall be amended to, among other things: (i) authorize one share of common stock, ownership of which shall be restricted to the Liquidation Trustee; (ii) provide, pursuant to Bankruptcy Code § 1123(a)(6), for a provision prohibiting the issuance of nonvoting equity securities, and (iii) limit the activities of Reorganized GFG to matters related to the implementation of the Plan.

### D.      Dissolution of the Debtors

Pursuant to the substantive consolidation provisions in the Plan, on the Effective Date, all assets and liabilities of GGVI, GHI, and GGCI shall be merged into GFG and GGVI, GHI, and GGCI shall cease to exist.  As soon as practicable after the Liquidation Trustee exhausts the assets of the Debtors' Estates by making the final Distribution under the Plan, Reorganized GFG shall be dissolved without any further action by the former Interest holders, officers, or directors of the Debtors.

The Liquidation Trustee may, in his or her discretion, file all necessary certificates of dissolution and take any other actions necessary or appropriate to reflect the dissolutions of each of the Debtors under applicable state law where the respective Debtors were incorporated or organized, including filing appropriate papers with the Office of Thrift Supervision to deregister GFG or GHI as unitary thrift holding companies.  All applicable regulatory or governmental agencies shall accept any certificates of dissolution or other papers filed by the Liquidation Trustee on behalf of the Debtors and shall take all steps necessary to allow and reflect the prompt dissolution of the Debtors as provided herein, without the payment of any fee, tax, or charge and without need for the filing of reports or certificates, except as the Liquidation Trustee may determine in his or her sole discretion.

### E.      Sources of Cash for Plan Distributions

All Cash necessary for the Liquidation Trustee to make Distributions under the Plan shall be obtained from the Debtors' existing Cash balances or the liquidation of property of the Estates by the Liquidation Trustee.

### F.      Corporate Action

The entry of the Confirmation Order shall constitute authorization for the Liquidation Agent to take or cause to be taken all corporate actions necessary or appropriate to implement all provisions of, and to consummate, the Plan prior to, on and after the Effective Date and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court without further approval, act or action under any applicable law, order, rule or regulation, including, without limitation, any action required by the Interest holders, officers, or directors of the Debtors, including, among other things, (1) the cancellation of the Interests in the Debtors; (2) all transfers of assets that are to occur pursuant to the Plan; (3) the incurrence of all

obligations contemplated by the Plan and the making of Distributions; (4) the implementation of all settlements and compromises as set forth in or contemplated by the Plan; and (5) the execution of the Amended Charter and By-laws. As of the Effective Date, the Liquidation Trustee is authorized and directed to do all things and to execute and deliver all agreements, documents, instruments, notices and certificates as are contemplated by the Plan and to take all necessary actions required in connection therewith, in the name of and on behalf of the Debtors and the Liquidation Trustee, as applicable.

### G.      Allowed Claim of Wilmington Trust

Wilmington Trust shall receive in full and final satisfaction, settlement, release, and discharge of and in exchange for the Wilmington Trust Proofs of Claim an Allowed Claim in these Chapter 11 Cases in the aggregate amount of $318,526,546.96, plus amounts presently unliquidated for additional fees and costs as agreed to by the Special Purpose Liquidation Agent and Wilmington Trust or pursuant to further order of the Court.

### H.      Liquidation Trust

#### 1.      Creation of the Liquidation Trust and Appointment of the Liquidation Trustee

On the Effective Date, the Liquidation Trust shall be created pursuant to the Liquidation Trust Agreement, and into which trust all assets of the Debtors and Estates existing as of the Effective Date, other than the assets to be delivered to the FDIC-Receiver pursuant to Article IV.C of the Plan and the Professional Fee Reserve, shall be transferred and become vested pursuant to and in accordance with the terms of the Plan. The Liquidation Trust shall operate under the provisions of the Liquidation Trust Agreement. The Liquidation Trust shall be administered by the Liquidation Trustee. Wilmington Trust shall be and is appointed as the initial Liquidation Trustee on the Effective Date and shall be compensated and otherwise bound by the terms of the Liquidation Trust Agreement without further order of the Bankruptcy Court. The Plan will be administered and actions will be taken in the name of the Debtors or Liquidation Trust, as appropriate, through the Liquidation Trustee, irrespective of whether any of the Debtors have been dissolved. The Liquidation Trust Agreement shall be deemed approved and effective on the Effective Date subject to execution by Wilmington Trust and the Debtors. The Liquidation Trust Agreement is attached to the Plan as Exhibit C.

#### 2.      Property of the Liquidation Trust

On the Effective Date, the Debtors and Estates shall be deemed to have transferred and/or assigned any and all assets of the Debtors and the Estates as of the Effective Date, other than the assets to be delivered to the FDIC-Receiver pursuant to Article IV.C of the Plan and the Professional Fee Reserve, including, without limitation and except as otherwise provided in the Plan, (i) Cash and accounts, including, without limitation, any and all Cash held in any general, escrow or segregated separate accounts during the pendency of these Chapter 11 Cases, including the GFG Bank Accounts, the Affiliate Debtor Bank Accounts, or the Reserve Accounts that are not being transferred to the FDIC-Receiver pursuant to Article IV.C of the Plan and any and all Cash held in escrow or separate segregated accounts during the pendency of the Chapter

11 Cases, (ii) unless otherwise provided for in the Plan, all Rights of Action, including Insider and Employee Avoidance Actions and other Avoidance Actions, (iii) all other property interests, rights, claims, defenses and causes of action of the Debtors or Estates, to the beneficiaries of the Liquidation Trust followed by a deemed transfer by such beneficiaries to the Liquidation Trust, and such transferred assets shall be held by the Liquidation Trust free and clear of all Claims, Liens and contractually imposed restrictions, except for the rights to Distribution and the retention of Liens afforded to certain Holders of Allowed Secured Claims, solely to the extent and priority of any such Allowed Secured Claim under the Plan.

### 3. Creation of Professional Fee Reserve and Appointment of the Special Purpose Liquidation Agent

On the Effective Date, the Debtors will place into a segregated account Cash in the amount of $1,360,000 to create the Professional Fee Reserve. The Professional Fee Reserve shall be used solely for distributions to Holders of Allowed Professional Fee Claims. In addition, amounts necessary for distribution to the FDIC-Receiver pursuant to Article IV.C of the Plan will be held by the Special Purpose Liquidation Agent until such Distributions are completed.

On the Effective Date, Dennis Faulkner will be appointed as the Special Purpose Liquidation Agent. The sole responsibilities of the Special Purpose Liquidation Agent shall be: (i) maintaining the Professional Fee Reserve; (ii) making Distributions to Holders of Allowed Professional Fee Claims pursuant to Article II.A of the Plan; (iii) managing the defense of the Debtors in the pending IRS audit and in negotiations regarding the settlement of the Claims filed by the IRS; (iv) receiving the Tax Refunds and (v) making Distributions to the FDIC-Receiver pursuant to Article IV.C of the Plan, including distribution of the Tax Refunds to the FDIC-Receiver pursuant to Article IV.C.2 of the Plan. To the extent necessary, the Special Purpose Liquidation Agent may, upon request of the FDIC-Receiver, assign the FDIC-Receiver the right to file documents or take other actions in regard to the Tax Refunds.

Within ten (10) days after completion of all Distributions to Holders of Professional Fee Claims and payment of any fees and expenses of the Special Purpose Liquidation Agent and his professionals, the Special Purpose Liquidation Agent shall return any unused portion of the Professional Fee Reserve to the Liquidation Trustee to be administered in accordance with the Liquidation Trust Agreement and Article V.H of the Plan. Upon completion of the responsibilities enumerated in this paragraph, the Special Purpose Liquidation Agent shall be relieved from further duty.

### 4. Officers, Directors, and Shareholders

a. Directors, Officers, and Employees: On the Effective Date, the authority, power and incumbency of Dennis Faulkner, as director and officer of each of the Debtors, shall be terminated and cease and Dennis Faulkner shall be deemed to have resigned.

b. Succession by Liquidation Trustee: On the Effective Date, the Liquidation Trustee succeeds to such powers as would have been applicable to the Debtors' officers, directors and shareholders except for the powers reserved for the Special Purpose Liquidation

Agent.  Dennis Faulkner shall, however, reasonably cooperate with transition of documents and records to the Liquidation Trustee.

### 5.      Liquidation Trustee

The salient terms of the Liquidation Trustee's employment, including the Liquidation Trustee's duties and compensation, to the extent not set forth in the Plan, are set forth in the Liquidation Trust Agreement.  In general, the Liquidation Trustee shall be the exclusive trustee of the Liquidation Trust for the purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estates appointed pursuant to § 1123(b)(3)(B) of the Bankruptcy Code.  The Liquidation Trustee shall have fiduciary duties to beneficiaries of the Liquidation Trust in the same manner that members of an official committee of creditors appointed pursuant to § 1102 of the Bankruptcy Code have fiduciary duties to the creditor constituents represented by such a committee.  The Liquidation Trust Agreement specifies the terms and conditions of the Liquidation Trustee's compensation, responsibilities and powers.

1.      More details regarding the terms of service of the Liquidation Trustee, including the duties and powers of the Liquidation Trustee, exculpation of the Liquidation Trustee, and other information are set forth in Article  V.H of the Plan and the Liquidation Trust Agreement.  The duties and powers of the Liquidation Trustee, shall generally include, without limitation, the following:[1]

a.      To exercise all power and authority that may be or could have been exercised, commence all proceedings that may be or could have been commenced and take all actions that may be or could have been taken by any officer, director or shareholder of the Debtors with like effect as if authorized, exercised and taken by unanimous action of such officers, directors and shareholders; including, without limitation, amendment of the certificates of incorporation and by-laws of the Debtors, merger of any Debtor into another Debtor and the dissolution of any Debtor;

b.      To maintain escrows and other accounts, make Distributions and take other actions consistent with the Plan and the implementation hereof, including the establishment, re-evaluation, adjustment and maintenance of appropriate reserves, in the name of Reorganized GFG or the Liquidation Trustee, even in the event of the dissolution of Reorganized GFG;

c.      Subject to the applicable provisions of the Plan, to collect and liquidate all assets of the Estates pursuant to the Plan and to administer the winding-up of the affairs of the Debtors;

d.      To object to, defend, compromise, and/or settle any Claims (Disputed or otherwise) as discussed in Article VII of the Plan, without the necessity of

---

[1] In the case of a conflict between the Liquidation Trust Agreement and the Plan, the Liquidation Trust Agreement shall control.

approval of the Bankruptcy Court, and/or to seek Court approval for any Claims settlement to the extent thought appropriate by the Litigation Trustee or to the extent such approval is required by prior order of the Bankruptcy Court;

e.    Unless otherwise ordered by the Bankruptcy Court, to defend, compromise and/or settle any Rights of Action transferred to the Liquidation Trust in the Plan by filing a notice of compromise and settlement with the Bankruptcy Court, which shall be deemed approved if no objection is filed within 23-days after the date of filing, and which shall be subject to approval of the Bankruptcy Court to the extent an objection is filed;

f.    To make decisions, without further Court approval, regarding the retention or engagement of professionals, employees and consultants by the Liquidation Trust and to pay, from the Wind-Down Reserve, the charges incurred by the Liquidation Trust on or after the Effective Date for services of professionals, disbursements, expenses or related support services relating to the winding down of the Debtors and implementation of the Plan, without application to the Bankruptcy Court;

g.    Except for the powers reserved for the Special Purpose Liquidation Agent or the FDIC-Receiver in Article V.H.3 of the Plan, cause, on behalf of the Liquidation Trust, the Debtors and the Estates, all necessary tax returns and all other appropriate or necessary documents related to municipal, State, Federal or other tax law to be prepared or filed timely;

h.    With the exception of the Distributions to the FDIC-Receiver and Holders of Professional Fee Claims, to make all Distributions to holders of Allowed Claims provided for or contemplated by the Plan;

i.    To invest Cash in accordance with § 345 of the Bankruptcy Code or as otherwise permitted by a Final Order of the Bankruptcy Court and as deemed appropriate by the Liquidation Trustee;

j.    To collect any accounts receivable or other claims and assets of the Debtors or the Estates not otherwise disposed of pursuant to the Plan;

k.    To enter into any agreement or execute any document required by or consistent with the Plan and perform all of the obligations of the Debtors or the Liquidation Trustee thereunder;

l.    To abandon in any commercially reasonable manner, including abandonment or donation to a charitable organization at the discretion of the Liquidation Trustee, any assets that the Liquidation Trustee concludes are of inconsequential benefit to creditors of the Estates or, at the conclusion of the Chapter 11 Cases, are determined to be too impractical to distribute;

m.     To investigate, prosecute and/or settle Rights of Action, including, but not limited to, Insider and Employee Avoidance Actions and other Avoidance Actions, unless released or transferred to the FDIC-Receiver under the Plan, participate in or initiate any proceeding before the Bankruptcy Court or any other court of appropriate jurisdiction, participate as a party or otherwise in any administrative, arbitrative or other non-judicial proceeding, litigate or settle such Rights of Action on behalf of the Liquidation Trust and pursue to settlement or judgment such actions;

n.     To utilize trust assets to purchase or create and carry all appropriate new insurance policies and pay all insurance premiums and costs it deems necessary or advisable to insure the acts and omissions of the Liquidation Trustee;

o.     To implement and/or enforce all provisions of the Plan;

p.     To maintain appropriate books and records (including financial books and records);

q.     To collect and liquidate all assets of the Estates pursuant to the Plan and administer the winding-up of the affairs of the Debtors including, but not limited to, closing the Chapter 11 Cases;

r.     To pay fees incurred pursuant to 28 U.S.C. § 1930(a)(6) and to file with the Bankruptcy Court and serve on the United States Trustee monthly financial reports until such time as such reports are no longer required, a Final Decree is entered closing these Cases or the Cases are converted or dismissed, or the Bankruptcy Court orders otherwise;

s.     To file with the Bankruptcy Court and serve upon the Post-Confirmation Service List, within twenty-five (25) days after the end of each month, a monthly report setting forth (i) the receipt and disposition by the Liquidation Trustee of property of the Estates or the Debtors during the prior month, including the disposition of funds in the Liquidation Trust, the Wind-down Reserve and Distribution Fund; (ii) all Disputed Claims resolved by the Liquidation Trustee during such period and all remaining Disputed Claims; (iii) all known material non-Cash assets of the Debtors remaining to be disposed of; (iv) the status of Rights of Action; (v) an itemization of all expenses the Liquidation Trustee anticipates will become due and payable within the subsequent three months; and (vi) the Liquidation Trustee's forecast of cash receipts and expenses for the subsequent three months; and

t.     To do all other acts or things consistent with the provisions of the Plan that the Liquidation Trustee deems reasonably necessary or desirable with respect to implementing the Plan.

## ARTICLE 9
## RECOVERY ANALYSIS, FEASIBILITY AND RISKS

### A.    Recovery Analysis and Feasibility

Recoveries to holders of General Unsecured Claims are subject to many variables at this point.  As of the time of this Disclosure Statement, and due to these numerous variables, the Debtors cannot accurately predict the recovery for holders of General Unsecured Claims.

Under the Plan, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, and Allowed Secured Claims to the extent they exist will be paid in full.  Important variables affecting the amount of funds available for distribution include (i) the total amount of Allowed General Unsecured Claims; (ii) the total amount of Allowed Claims entitled to payment before payments to holders of General Unsecured Claims, and (iii) the outcome of the Rights of Action retained by the Litigation Trust pursuant to Article X of the Plan.

Under the Plan, Holders of Allowed General Unsecured Claims will each receive a beneficial interest in the Liquidation Trust.  The Liquidation Trust will receive the Liquidation Trust Assets, which include all assets of the Estate not transferred to the FDIC-Receiver pursuant to the FDIC-Receiver Settlement or otherwise set aside in the Professional Fee Reserve, including Estate Cash of between approximate $7 million and $9 million and certain Rights of Action.  As noted above, the Debtors believe that Allowed General Unsecured Claims will not exceed $382 million.  There is no guarantee, however, that the Liquidating Trust will succeed in reducing the General Unsecured Claims to this level.

The Debtors anticipate that the recovery to the Holders of Allowed General Unsecured Claims may range from 1% to 3% and may increase if the Liquidation Trustee is successful in pursing Rights of Action transferred to the Liquidation Trust.

### B.    Risks Associated with the Plan

Both the confirmation and consummation of the Plan are subject to a number of risks.  Specifically, if certain standards set forth in the Bankruptcy Code are not met, the Bankruptcy Court will not confirm the Plan even if Holders of Claims accept the Plan.  Although the Debtors believe that the Plan meets such standards, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  If the Bankruptcy Court were to determine that such requirements were not met, it could require the Debtors to re-solicit acceptances, which could delay and/or jeopardize confirmation of the Plan.  The Debtors believe that the solicitation of votes on the Plan will comply with Bankruptcy Code § 1126(b) and that the Bankruptcy Court will confirm the Plan.  The Debtors, however, can provide no assurance that modifications of the Plan will not be required to obtain confirmation of the Plan, or that such modifications will not require a re-solicitation of acceptances.

# ARTICLE 10
## ALTERNATIVES TO PLAN

If the Plan is not confirmed, it is likely that the Debtors' Bankruptcy Cases will be converted to a case under Chapter 7 of the Bankruptcy Code, in which case a trustee would be elected or appointed to liquidate the assets of the Debtors for Distribution to Creditors in accordance with the priorities established by the Bankruptcy Code. Whether a bankruptcy case is one under Chapter 7 or Chapter 11, holders of Secured Claims, Administrative Claims and Priority Claims are entitled to be paid in Cash and in full before holders of General Unsecured Claims receive any funds, and holders of General Unsecured Claims are entitled to be paid in full before holders of Interests receive any funds.

The Plan incorporates the terms of the FDIC-Receiver Settlement. Pursuant to the FDIC-Receiver Settlement, the FDIC-Receiver has agreed to accept certain Estate assets in full and final satisfaction of the FDIC-Receiver Proofs of Claim. Absent such settlement or a complete victory in claims litigation against the FDIC-Receiver, it is possible that the Holders of Administrative Claims, Priority Claims, and General Unsecured Creditors will not receive any return in respect of their Claims. The conversion of the Chapter 11 Cases to Chapter 7 may eliminate or reduce the likelihood of a possibility of a settlement with the FDIC-Receiver regarding the FDIC-Receiver Claims, although a permanent Chapter 7 Trustee would likely be elected by the FDIC-Receiver and Wilmington Trust, both of whom have agreed to seek to cause the Chapter 7 Trustee to proceed with FDIC-Receiver Settlement. In this event, the FDIC-Receiver Settlement would proceed, but the distributions to General Unsecured Creditors would be reduced by the fees and commissions of the Chapter 7 Trustee and his counsel as discussed below. If the Chapter 7 trustee does not reach a settlement with the FDIC-Receiver or succeed in disallowing or reducing the FDIC-Receiver Claims, the FDIC-Receiver will have an Allowed priority claim in the approximate amount of $1.977 billion under Bankruptcy Code § 507(a)(9) against each of the Debtors, which could give the FDIC-Receiver set-off rights with respect to all of the Cash in the Debtors' Estates. Any unpaid portion of such Claim would be higher in priority than General Unsecured Claims and could prevent any distribution to General Unsecured Creditors in a Chapter 7 case from the proceeds of any non-Cash assets.

Further, if the Chapter 11 Cases are converted to Chapter 7, the present Administrative Claims may have a priority lower than Priority Claims generated by the Chapter 7 case, such as the Chapter 7 trustee's fees or the fees of attorneys, accountants and other professionals engaged by the trustee. The Debtors believe that conversion to Chapter 7 is likely to result in higher costs of administration than confirmation of the Plan. First, the Chapter 7 Trustee will receive a percentage of the money distributed to holders of Allowed Claims as compensation. Like the Liquidation Trustee, the Chapter 7 Trustee will have to retain attorneys to pursue litigation claims of the Estates as well as to pursue Claims objections. The Debtors' business relationships were complicated and if new professionals are required to familiarize themselves with the Debtors' past operations to be able to prosecute the litigation claims and Claims objections, it could result in additional expense to the Estates. Like the Liquidation Trustee, the Chapter 7 Trustee will also have to retain accountants in connection with making claim reconciliations, filing necessary tax returns and otherwise closing the Estates.

## ARTICLE 11
## CERTAIN UNITED STATES FEDERAL INCOME TAX
## CONSEQUENCES OF THE PLAN

### A.      Introduction

The following discussion summarizes certain material U.S. federal income tax consequences of the implementation of the Plan to the Debtors and Holders of Claims.  This discussion is based on the Internal Revenue Code of 1986, as amended, Treasury regulations, judicial decisions, and published rulings and pronouncements of the IRS in effect on the date of this Disclosure Statement.  Changes in those rules, or new interpretations of those rules, may have retroactive effect and could significantly affect the federal income tax consequences described below.

The Debtors have not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan.  In addition, the Plan does not address state, local or foreign tax consequences of the Plan, and it does not purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as foreign taxpayers, broker-dealers, banks, insurance companies, financial institutions, small business investment corporations, regulated investment companies, tax-exempt organizations, or investors in pass through entities).

**THE FOLLOWING SUMMARY OF CERTAIN MATERIAL U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED ON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A PARTICULAR CLAIMHOLDER OR INTEREST HOLDER.  ALL CLAIMHOLDERS AND INTEREST HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS IN DETERMINING THE U.S. FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES TO THEM UNDER THE PLAN.**

### B.      Material Tax Consequences to the Debtors

Generally, under the terms of the Plan, all Claims will be released except to the extent that the Debtors have cash available to satisfy all or a portion of such Claims.  Any income resulting from the satisfaction of any Claim at a discount will not constitute taxable income to the Debtors because the debt forgiveness arises in connection with a bankruptcy case under Title 11 of the United States Code.

### C.      Material Tax Consequences to Creditors

*In General*.  The federal income tax consequences of the implementation of the Plan to a Creditor will depend, among other things, on (a) whether the Creditor receives consideration in more than one tax year, (b) whether the Creditor is a resident of the United States, (c) whether all of the consideration by the Creditor is deemed to be received by that Creditor as part of an integrated transaction, (d) whether the Creditor reports income using the accrual or cash method

of accounting, and (e) whether the Creditor has previously taken a bad debt deduction or worthless security deduction with respect to the Claim.

*Gain or Loss on Exchange*.  Generally, a Creditor will realize a gain or loss on the exchange under the Plan of its Claim for cash in an amount equal to the difference between (i) the cash received by the Creditor (other than any cash attributable to accrued but unpaid interest on the Claim), and (ii) the Creditor's adjusted basis in the Claim exchanged therefor (other than basis attributable to accrued but unpaid interest previously included in the holder's taxable income).  Any gain or loss recognized will be a capital gain or loss if the Claim was a capital asset in the hand of the Creditor, and such gain or loss will be a long-term capital gain or loss if the Creditor's holding period for the Claim surrendered exceeds one (1) year at the time of the exchange.

*Payments Attributable to Interest*.  A Creditor not previously required to include in its taxable income any accrued but unpaid interest on a Claim may be treated as receiving taxable interest, to the extent the cash it receives pursuant to the Plan is allocable to such accrued but unpaid interest.  A Creditor previously required to include in its taxable income any accrued but unpaid interest on a Claim may be entitled to recognize a deductible loss, to the extent the amount of interest actually received by the Creditor is less than the amount of interest taken into income by the Creditor.

## D.       Information Reporting and Backup Withholding

Under the backup withholding rules of the Internal Revenue Code, Creditors may be subject to backup withholding at the rate of twenty-eight percent (28%) with respect to payments made pursuant to the Plan unless such Creditor (i) is a corporation or comes within certain other exempt categories and, when required, demonstrates this fact or (ii) provides a correct taxpayer identification number and certifies under penalties of perjury that the taxpayer identification number is correct and that the holder is not subject to backup withholding because of a failure to report all dividends and interest income.  Any amount withheld under these rules will be credited against the Creditor's federal income tax liability.  Creditors may be required to establish exemption from backup withholding or to make arrangements with respect to the payment of backup withholding.

## ARTICLE 12
## CONCLUSION

This Disclosure Statement has attempted to provide information regarding the Debtors' consolidated bankruptcy estate and the potential benefits that might accrue to holders of Claims against and Interests in the Debtors under the Plan as proposed.  The Plan provides for the orderly liquidation of the Debtors' remaining assets and the distribution of the proceeds in accordance with the priority scheme established by the Bankruptcy Code.  The Debtors urge interested parties to vote in favor of the Plan.

DATED:  December 20, 2010

**DEBTORS AND DEBTORS-IN-POSSESSION**

/s/ *Dennis Faulkner*
By:    Dennis Faulkner
Their:  Chief Restructuring Officer


- and -

**HAYNES AND BOONE, LLP**
2323 Victory Avenue
Suite 700
Dallas, Texas 75219
Telephone (214) 651-5000
Facsimile (214) 651-5940

/s/ *Ian T. Peck*
Robert D. Albergotti
State Bar No. 00969800
Ian T. Peck
State Bar No. 24013306
Autumn D. Highsmith
State Bar No. 24048806

**COUNSEL TO THE DEBTORS AND
THE DEBTORS-IN-POSSESSION**

**EXHIBIT "1"**
**THE PLAN**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** | § | (Chapter 11) |
| | § | |
| **GUARANTY FINANCIAL GROUP INC.** | § | Case No. 09-35582 |
| **GUARANTY GROUP VENTURES INC.** | § | Case No. 09-35583 |
| **GUARANTY HOLDINGS INC. I** | § | Case No. 09-35584 |
| **GUARANTY GROUP CAPITAL INC.** | § | Case No. 09-35586 |
| | § | |
| **Debtors.** | § | (Jointly Administered |
| | § | under Case No. 09-35582-bjh) |

---

**JOINT PLAN OF LIQUIDATION FOR GUARANTY FINANCIAL GROUP INC.,
ET AL., UNDER CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE**

---

**Dated December 20, 2010**

**HAYNES AND BOONE, LLP**
Robert D. Albergotti
Texas Bar No. 00969800
Ian T. Peck
Texas Bar No. 24013306
Autumn D. Highsmith
Texas Bar No. 24048806
2323 Victory Ave.
Dallas, Texas 75219
Telephone:    (214) 651-5000
Facsimile:    (214) 651-5940

**ATTORNEYS FOR THE
DEBTORS-IN-POSSESSION**

# <u>TABLE OF CONTENTS</u>

INTRODUCTION.................................................................................................................... 1

**ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, CONSTRUCTION
OF TERMS, COMPUTATION OF TIME AND GOVERNING LAW** .................................. 1

    A.  Defined Terms ............................................................................................. 1
    B.  Rules of Interpretation and Construction of Terms .......................................... 1
    C.  Computation of Time .................................................................................... 2
    D.  Reference to Monetary Figures....................................................................... 2
    E.  Governing Law ............................................................................................. 2

**ARTICLE II.  TREATMENT OF UNCLASSIFIED ADMINISTRATIVE AND
PRIORITY CLAIMS**.......................................................................................................... 2

    A.  Allowed Administrative Claims ..................................................................... 2
    B.  Allowed Priority Tax Claims ......................................................................... 4
    C.  Ordinary Course Liabilities............................................................................ 4

**ARTICLE III.  CLASSIFICATION OF CLAIMS AND INTERESTS** ................................. 4

    A.  Classification of Claims and Interests............................................................. 4
    B.  Identification of Classes................................................................................ 5
    C.  Unimpaired Classes ..................................................................................... 6
    D.  Impaired, Voting Classes .............................................................................. 6
    E.  Impaired, Non-Voting Classes....................................................................... 6
    F.  Acceptance or Rejection of the Plan ............................................................... 6
    G.  Elimination of Classes for Voting Purposes .................................................... 7
    H.  Controversy Concerning Classification, Impairment or Voting Rights............... 7

**ARTICLE IV. TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS** .................. 7

    A.  Treatment of Class 1 – Allowed Secured Claims ............................................. 7
    B.  Treatment of Classes 2A, 2B, 2C and 2D – Allowed Priority Non-Tax Claims ... 7
    C.  Treatment of Class 3 – Allowed FDIC-Receiver Claims .................................. 8
    D.  Treatment of Classes 4A, 4B, 4C and 4D – Allowed General Unsecured Claims ............. 9
    E.  Treatment of Classes 5A, 5B, 5C and 5D – Interests ..................................... 10

**ARTICLE V.  MEANS FOR IMPLEMENTATION OF THE PLAN** ................................. 10

    A.  Substantive Consolidation of the Debtors...................................................... 10
    B.  Cancellation of Interests ............................................................................. 10
    C.  Continued Corporate Existence of Reorganized GFG...................................... 11
    D.  Dissolution of the Debtors .......................................................................... 11
    E.  Sources of Cash for Plan Distributions.......................................................... 11

F.   Corporate Action..................................................................................... 11
G.   Allowed Claim of Wilmington Trust ........................................................ 12
H.   Liquidation Trust ..................................................................................... 12
I.   Discovery Protocols ................................................................................. 19

**ARTICLE VI.  TREATMENT OF EXECUTORY CONTRACT AND UNEXPIRED
LEASES** .................................................................................................................... 19

A.   Rejection of Executory Contracts and Unexpired Leases.............................. 19
B.   Rejection Claim Bar Date .............................................................................. 19
C.   Reservation of Rights..................................................................................... 19

**ARTICLE VII.  OBJECTIONS TO AND PROCEDURES FOR RESOLVING DISPUTES
REGARDING CLAIMS AND INTERESTS**.................................................................. 20

A.   Objections to Claims and Interests ............................................................... 20
B.   Claims Filed After Objection Deadline ........................................................ 20
C.   Claims Listed as Contingent, Unliquidated, or Disputed in Schedules ........... 20
D.   Retention of Claims and Defenses ................................................................ 20
E.   Claims Administration Responsibilities ....................................................... 20
F.   Adjustment to Claims Without Objection...................................................... 21
G.   Disallowance of Claims or Interests ............................................................. 21
H.   Offer of Judgment ......................................................................................... 21

**ARTICLE VIII.  PROVISIONS GOVERNING DISTRIBUTIONS OF PROPERTY
UNDER THE PLAN** .................................................................................................. 21

A.   General........................................................................................................... 21
B.   Delivery of Distributions .............................................................................. 21
C.   Rounding of Fractional Distributions ........................................................... 22
D.   Unclaimed Distributions ............................................................................... 22
E.   Uncashed Checks ........................................................................................... 22
F.   Compliance with Tax Requirements.............................................................. 22
G.   De Minimus Distributions ............................................................................ 22

**ARTICLE IX.  EFFECT OF CONFIRMATION OF THE PLAN** ................................... 22

A.   Legally Binding Effect................................................................................... 22
B.   Vesting of Property in the Reorganized Debtor............................................. 22
C.   Derivative Litigation Claims......................................................................... 22
D.   Release .......................................................................................................... 23
E.   Exculpation of the Debtors ........................................................................... 23

**ARTICLE X.  RETENTION OF RIGHTS OF ACTION**.................................................. 23

A.   Liquidation Trustee's Preservation, Retention and Maintenance of Rights of Action ..... 23

  B.  Preservation of All Rights of Action Not Expressly Settled or Released ........................ 24
  C.  Creditors' Right to Pursue Certain Rights of Action ........................................... 24

## ARTICLE XI.  MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ............................................................................................................. 24

  A.  Modification or Amendment of the Plan ......................................................... 24
  B.  Revocation or Withdrawal of the Plan ............................................................ 24

## ARTICLE XII.  RETENTION OF JURISDICTION ............................................. 24

  A.  Bankruptcy Court Jurisdiction ....................................................................... 24
  B.  Limitation on Jurisdiction .............................................................................. 26

## ARTICLE XIII.  EVENTS OF DEFAULT ............................................................ 26

  A.  Events of Default ........................................................................................... 26
  B.  Notice of Event of Default ............................................................................. 26

## ARTICLE XIV.  MISCELLANEOUS PROVISIONS ........................................... 26

  A.  Conditions to Effectiveness ........................................................................... 26
  B.  Due Authorization by Claim and Interest Holders ......................................... 27
  C.  Filing of Additional Documentation .............................................................. 27
  D.  Further Authorizations ................................................................................... 27
  E.  Post Confirmation Service List ...................................................................... 27
  F.  Successors and Assigns .................................................................................. 28
  G.  Transfer of Claims ......................................................................................... 28
  H.  Exemption from Transfer Tax ........................................................................ 28
  I.  Notices .......................................................................................................... 28
  J.  U.S. Trustee Fees .......................................................................................... 28
  K.  Implementation .............................................................................................. 28
  L.  Operations Between the Confirmation Date and the Effective Date ............... 28
  M.  No Admissions ............................................................................................... 28
  N.  Substantial Consummation ............................................................................. 29
  O.  Good Faith ..................................................................................................... 29
  P.  Final Decree .................................................................................................. 29

## EXHIBITS

  Glossary of Defined Terms ....................................................................................... A
  Insurance Policies .................................................................................................... B
  Liquidation Trust Agreement .................................................................................... C

## INTRODUCTION

Guaranty Financial Group Inc., Guaranty Group Ventures Inc., Guaranty Holdings Inc. I, and Guaranty Group Capital Inc., debtors-in-possession in the Chapter 11 Cases (collectively, the "Debtors," and each individually a "Debtor"), respectfully submit this Joint Plan of Liquidation for Guaranty Financial Group Inc., et al., Under Chapter 11 of the United States Bankruptcy Code (the "Plan") pursuant to 11 U.S.C. § 1121(a) of the Bankruptcy Code for the resolution of the Debtors' outstanding creditor claims.  Reference is made to the Disclosure Statement Under 11 U.S.C. § 1125 in Support of the Joint Plan of Liquidation of Guaranty Financial Group Inc., et al. (the "Disclosure Statement"), filed contemporaneously with the Plan, for a summary and description of the Plan and certain related matters.

The Plan memorializes a global settlement reached between the major constituents in the Chapter 11 Cases – the Debtors, the FDIC-Receiver, and Wilmington Trust.  The Plan contemplates the creation of a Liquidation Trust to liquidate the remaining assets of the Debtors' Estates and to coordinate distribution of the Cash in the Estates and any other proceeds of liquidation in furtherance of the settlement memorialized in the Plan.

ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  No materials, other than the Disclosure Statement and any exhibits and schedules attached thereto or referenced therein, have been approved by the Debtors for use in soliciting acceptances or rejections of the Plan.

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION, CONSTRUCTION OF TERMS, COMPUTATION OF TIME AND GOVERNING LAW

A.    <u>Defined Terms</u>:  All capitalized terms not defined elsewhere in the Plan shall have the meaning assigned to them in the Glossary of Defined Terms attached hereto as <u>Exhibit A</u>.   Any capitalized term used in the Plan and not defined herein, but that is defined in the Bankruptcy Code, has the meaning assigned to that term in the Bankruptcy Code.  Any capitalized term used in this Plan and not defined herein or in the Bankruptcy Code, but that is defined in the Bankruptcy Rules, has the meaning assigned to that term in the Bankruptcy Rules.

B.    <u>Rules of Interpretation and Construction of Terms</u>:

1.    For the purposes of the Plan, any reference in the Plan to an existing document or exhibit filed or to be filed means that document or exhibit as it may have been or may be amended, supplemented, or otherwise modified.

2.    The words "herein," "hereof," and "hereunder" and other words of similar import refer to the Plan as a whole and not to any particular article, section, subsection or clause contained in the Plan, unless the context requires otherwise.

- 1 -

3.      Whenever from the context it appears appropriate, each term stated in either the singular or the plural includes the singular and the plural, and pronouns stated in the masculine, feminine, or neuter form include the masculine, feminine, and neuter form.

4.      Captions and headings to articles, sections, and exhibits are inserted for convenience of reference only and are not intended to be part of or to affect the meaning or interpretation of the Plan.

5.      The rules of construction set forth in Bankruptcy Code § 102 shall apply.

6.      All exhibits to the Plan are incorporated into the Plan by this reference and are a part of the Plan as if set forth fully herein.  The Plan Supplement shall be filed with the Bankruptcy Court not less than fifteen (15) days prior to the commencement of the Confirmation Hearing.  Holders of Claims and Interests may obtain a copy of all Plan Documents, once filed, at www.haynesboone.com/gfg or by written request sent to Haynes and Boone, LLP, Attn: Kim Morzak, 2323 Victory Ave., Suite 700, Dallas, Texas 75219-7673.

C.      <u>Computation of Time</u>:  In computing any period of time, date, or deadline prescribed or allowed in the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.  If the date on which a transaction may or must occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

D.      <u>Reference to Monetary Figures</u>:  All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

E.      <u>Governing Law</u>:  Except to the extent the Bankruptcy Code or the Bankruptcy Rules are applicable, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Texas without giving effect to the principles of conflicts of law thereof.

## ARTICLE II.
## TREATMENT OF UNCLASSIFIED
## ADMINISTRATIVE AND PRIORITY CLAIMS

In accordance with Bankruptcy Code § 1123(a)(1), Administrative Claims and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims set forth in the Plan.

A.      <u>Allowed Administrative Claims</u>:

1.      <u>General</u>:  Subject to the Administrative Claim Bar Date provisions herein and unless otherwise provided for in the Plan or an order of the Bankruptcy Court, each Holder of an Allowed Administrative Claim due and payable on or prior to the Effective Date shall receive in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Administrative Claim within ten (10) Business Days after the later of (a) the Effective Date, (b) the Allowance Date, and (c) such date as is mutually agreed upon by the Liquidation Agent (or the Special Purpose Liquidation Agent for

Professional Fee Claims) and the Holder of such Allowed Administrative Claim, either Cash equal to the unpaid amount of such Allowed Administrative Claim or such other less favorable treatment as to which the Liquidation Agent (or the Special Purpose Liquidation Agent for Professional Fee Claims) and the Holder of such Allowed Administrative Claim shall have agreed upon in writing.

2.      <u>Payment of Statutory Fees</u>:  All fees payable pursuant to 28 U.S.C. § 1930 shall be paid in Cash equal to the amount of such Administrative Claim when due.

3.      <u>Administrative Claim Bar Dates and Objection Deadlines</u>:

        a.      <u>Deadline</u>:  Except as otherwise provided in this section of the Plan, requests for payment of Administrative Claims for which no bar date has otherwise been previously established must be included in a motion or application and filed and served on the Post-Confirmation Service List no later than the Administrative Claim Bar Date.  Holders of Administrative Claims that are required to file requests for payment of such Administrative Claims and that do not file such requests by the Administrative Claim Bar Date are forever barred from asserting such Administrative Claims against the Debtors, the Liquidation Trust, the Special Purpose Liquidation Agent, the Professional Fee Reserve, or their property.  Objections to Administrative Claims must be filed and served on the Liquidation Trustee and the Holder of the Administrative Claim that is the subject of such objection no later than the Administrative Claim Objection Deadline.

        b.      <u>Form</u>:  Requests for payment of Administrative Claims included in a Proof of Claim are of no force and effect, and are Disallowed in their entirety as of the Confirmation Date unless such Administrative Claim is subsequently filed by timely motion or application as provided herein.  However, to the extent a Governmental Unit is not required to file a request for payment of an Administrative Claim pursuant to Bankruptcy Code § 503(b)(1)(D), a Proof of Claim filed by such Governmental Unit prior to the applicable bar date set forth in the Plan for filing a request for payment of such Administrative Claim shall fulfill the requirements of this section of the Plan.

        c.      <u>Professionals</u>:  All Professionals shall file and serve on the Post-Confirmation Service List an application for final allowance of any Professional Fee Claim no later than the Professional Fee Claim Bar Date.  Objections to Professional Fee Claims must be filed and served on the Special Purpose Liquidation Agent and the Professional to whose application the objections are addressed no later than the Professional Fee Claim Objection Deadline.  Any Professional that does not file an application for final allowance of any Professional Fee Claim by the Professional Fee Claim Bar Date is forever barred from asserting any such Professional Fee Claim against the Debtors, the Liquidation Trustee, or their property.  Any professional fees and reimbursements for expenses incurred by the Liquidation Trustee or the Special Purpose Liquidation Agent after the Effective Date may be paid without application to the

Bankruptcy Court.  Professional fees of the Special Purpose Liquidation Agent shall be satisfied from the Professional Fee Reserve.

d.    Post-Petition Tax Claims:  Requests for payment of Post-Petition Tax Claims for which no bar date has otherwise been previously established must be filed on or before the Post-Petition Tax Claim Bar Date.  A Holder of any Post-Petition Tax Claim that is required to file a request for payment of such taxes and does not file and serve such request on the Post-Confirmation Service List by the Post-Petition Tax Claim Bar Date is forever barred from asserting any such Post-Petition Tax Claim against the Debtors, the Liquidation Trustee, or their property, whether any such Post-Petition Tax Claim is deemed to arise prior to, on, or subsequent to the Effective Date.  To the extent that the Holder of an Post-Petition Tax Claim holds a Lien to secure its Post-Petition Tax Claim under applicable state law, the Holder of such Post-Petition Tax Claim shall retain its Lien until its Allowed Post-Petition Tax Claim has been paid in full.  Objections to Post-Petition Tax Claims must be filed and served on the Liquidation Trustee and the Holder of the Post-Petition Tax Claim that is the subject of such objection no later than the Post-Petition Tax Claim Objection Deadline.

B.    Allowed Priority Tax Claims:  Unless otherwise provided for pursuant to an order of the Bankruptcy Court, each Holder of an Allowed Priority Tax Claim due and payable on or prior to the Effective Date shall receive in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Tax Claim within ten (10) Business Days after the later of (a) the Effective Date, (b) the Allowance Date, or (c) such date as is mutually agreed upon by the Liquidation Agent and the Holder of such Allowed Priority Tax Claim, either Cash equal to the unpaid amount of such Allowed Priority Tax Claim or such other less favorable treatment as to which the Liquidation Agent and the Holder of such Allowed Priority Tax Claim shall have agreed upon in writing.

C.    Ordinary Course Liabilities:  The Liquidation Agent shall pay each Ordinary Course Liability pursuant to the payment terms and conditions of the particular transaction giving rise to the Ordinary Course Liability.  Holders of an Ordinary Course Liability will not be required to file or serve any request for payment of the Ordinary Course Liability.

**ARTICLE III.**
**CLASSIFICATION OF CLAIMS AND INTERESTS**

A.    Classification of Claims and Interests:  Pursuant to Bankruptcy Code § 1122, a Claim or Interest is placed in a particular Class for purposes of voting on the Plan and receiving Distributions under the Plan only to the extent (i) the Claim or Interest qualifies within the description of that Class; (ii) the Claim or Interest is an Allowed Claim or Allowed Interest in that Class; and (iii) the Claim or Interest has not been paid, released, or otherwise compromised before the Effective Date.  In accordance with Bankruptcy Code § 1123(a)(1), all Claims and Interests except Administrative Claims and Priority Tax Claims are classified in the Classes set forth below.

B.   <u>Identification of Classes</u>:

1.   <u>Class 1 – Allowed Secured Claims</u>:  Class 1 shall consist of all Allowed Secured Claims.  Each Allowed Secured Claim is assigned to a separate subclass.

2.   <u>Class 2 –Allowed Priority Non-Tax Claims</u>: Class 2 consists of four subclasses, Class 2A, Class 2B, Class 2C, and Class 2D.

a.   <u>Class 2A – GFG Allowed Priority Non-Tax Claims</u>:  Class 2A consists of all Allowed Priority Non-Tax Claims against GFG except for the FDIC-Receiver Claims.

b.   <u>Class 2B – GGCI Allowed Priority Non-Tax Claims</u>:  Class 2B consists of all Allowed Priority Non-Tax Claims against GGCI except for the FDIC-Receiver Claims.

c.   <u>Class 2C – GGVI Allowed Priority Non-Tax Claims</u>:  Class 2C consists of all Allowed Priority Non-Tax Claims against GGVI except for the FDIC-Receiver Claims.

d.   <u>Class 2D – GHI Allowed Priority Non-Tax Claims</u>:  Class 2D consists of all Allowed Priority Non-Tax Claims against GHI except for the FDIC-Receiver Claims.

3.   <u>Class 3 – Allowed FDIC-Receiver Claims</u>:  Class 3 consists of the Allowed Claims filed by the FDIC-Receiver on behalf of Guaranty Bank against GFG, GGCI, GGVI and GHI.

4.   <u>Class 4 – Allowed General Unsecured Claims</u>:  Class 4 consists of four subclasses, Class 4A, Class 4B, Class 4C, and Class 4D.

a.   <u>Class 4A – GFG Allowed General Unsecured Claims</u>:  Class 4A consists of all Allowed General Unsecured Claims against GFG.

b.   <u>Class 4B – GGCI Allowed General Unsecured Claims</u>:  Class 4B consists of all Allowed General Unsecured Claims against GGCI.

c.   <u>Class 4C – GGVI Allowed General Unsecured Claims</u>:  Class 4C consists of all Allowed General Unsecured Claims against GGVI.

d.   <u>Class 4D – GHI Allowed General Unsecured Claims</u>:  Class 4D consists of all Allowed General Unsecured Claims against GHI.

5.   <u>Class 5 – Interests</u>:  Class 5 consists of four subclasses, Class 5A, Class 5B, Class 5C, and Class 5D.

a.   <u>Class 5A – Interests in GFG</u>:  Class 5A consists of all Interests in GFG.

     b.     <u>Class 5B – Interests in GGCI</u>:  Class 5B consists of all Interests in GGCI.

     c.     <u>Class 5C – Interests in GGVI</u>:  Class 5C consists of all Interests in GGVI.

     d.     <u>Class 5D – Interests in GHI</u>:  Class 5D consists of Interests in GHI.

C.    <u>Unimpaired Classes</u>:  Classes 1 and 2 are Unimpaired under the Plan.  Under Bankruptcy Code § 1126(f), holders of Claims in Classes 1 and 2 are conclusively presumed to have accepted the Plan and are therefore not entitled to vote to accept or reject the Plan.

D.    <u>Impaired, Voting Classes</u>:   Classes 3 and 4 are Impaired under the Plan.   Under Bankruptcy Code § 1126(a), holders of Claims and Interests in Classes 3 and 4 are entitled to vote to accept or reject the Plan.

E.    <u>Impaired, Non-Voting Classes</u>:  Class 5 is Impaired under the Plan.  Holders of Interests in Class 5 will not retain their Interests under the Plan, and no Distributions on account of such Interests will be made.  Under Bankruptcy Code § 1126(g), Holders of Interests in Class 5 are conclusively presumed to have rejected the Plan, and therefore the Debtors will not solicit their votes.

F.    <u>Acceptance or Rejection of the Plan</u>.

    1.    <u>Voting and Acceptance by Impaired Classes of Claims</u>:  Each Impaired, Voting Class is entitled to vote separately to accept or reject the Plan.  An Impaired, Voting Class of Claims has accepted the Plan if the Holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims in such Class actually voting have voted to accept the Plan.

    2.    <u>Voting of Disputed Claims and Interests</u>:  A Holder of a Disputed Claim that has not been temporarily allowed for purposes of voting on the Plan may vote only such Disputed Claim in an amount equal to the portion, if any, of such Claim shown as fixed, liquidated, and undisputed in the Schedules.

    3.    <u>Cramdown</u>:  If the Bankruptcy Court determines that all applicable requirements of Bankruptcy Code § 1129(a) are met with the exception of Bankruptcy Code § 1129(a)(8), the Plan shall be treated as a request by the Debtors for Confirmation of the Plan in accordance with Bankruptcy Code § 1129(b), notwithstanding the failure to satisfy the requirements of Bankruptcy Code § 1129(a)(8), on the basis that the Plan is fair and equitable and does not discriminate unfairly with respect to each Class of Claims or Interests that is impaired under, and has not accepted, the Plan.

    4.    <u>Confirmation of Separate Cases</u>: Although styled a "Joint Plan," the Plan as drafted consists of four (4) separate plans – one for each Debtor.  Votes on the Plan will be tabulated separately for each Debtor.  The Debtors reserve the right to withdraw the Plan from consideration for Confirmation as to any or all Debtors if the Plan is not confirmed as to all Debtors.  Upon the occurrence of the Effective Date, the Estates of the Debtors will be substantively consolidated.

G.    Elimination of Classes for Voting Purposes:  Any Class that is not occupied as of the date of the commencement of the Confirmation Hearing by an Allowed Claim, an Allowed Interest, or a Claim or Interest temporarily allowed under Bankruptcy Rule 3018 or as to which no vote is cast shall be deemed deleted from the Plan for purposes of voting on acceptance or rejection of the Plan by such Class under Bankruptcy Code § 1129(a)(8).

H.    Controversy Concerning Classification, Impairment or Voting Rights:   In the event a controversy or dispute should arise involving issues related to the classification, impairment or voting rights of any Holder of a Claim or Interest under the Plan, whether before or after the Confirmation Date, the Bankruptcy Court may, after notice and a hearing, determine such controversy.  Without limiting the foregoing, the Bankruptcy Court may estimate for voting purposes (i) the amount of any contingent or unliquidated Claim the fixing or liquidation of which, as the case may be, would unduly delay the administration of the Chapter 11 Cases and (ii) any right to payment arising from an equitable remedy for breach of performance.   In addition, the Bankruptcy Court may, in accordance with Bankruptcy Code § 506(b), conduct valuation hearings to determine the Allowed Amount of any Secured Claim.

## ARTICLE IV.
## TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

A.    Treatment of Class 1 – Allowed Secured Claims:

1.    Subclasses:  If there is more than one Allowed Secured Claim, then each Allowed Secured Claim shall be classified in a separate subclass.

2.    Treatment:  Unless otherwise provided for pursuant to an order of the Bankruptcy Court, each Holder of an Allowed Secured Claim shall receive in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Secured Claim within ten (10) Business Days after the later of (a) the Effective Date, (b) the Allowance Date, and (c) such date as is mutually agreed upon by the Liquidation Trustee and the Holder of an Allowed Secured Claim, either Cash equal to the unpaid portion of such Allowed Secured Claim or such other treatment as may be agreed to by the Liquidation Trustee, as applicable, and the Holder of such Allowed Secured Claim.  The Holder of a Secured Claim shall retain its Liens on applicable collateral to the same extent and priority previously held, notwithstanding the transfer of such collateral into the Liquidation Trust, until either (i) its Secured Claim has been Allowed and treated in accordance with this provision of the Plan, or (ii) its Secured Claim has been Disallowed. The Holder of a Secured Claim shall not be entitled to foreclose such Lien absent further order of the Bankruptcy Court.

B.    Treatment of Classes 2A, 2B, 2C and 2D – Allowed Priority Non-Tax Claims:  Unless otherwise provided for pursuant to an order of the Bankruptcy Court, each Holder of an Allowed Priority Non-Tax Claim shall receive in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Non-Tax Claim within ten (10) Business Days after the later of (a) the Effective Date, (b) the Allowance Date, and (c) such date as is mutually agreed upon by the Liquidation Trustee and the Holder of such Allowed Priority Non-Tax Claim, either Cash equal to the unpaid amount of such Allowed Priority Non-Tax Claim or such other

less favorable treatment as to which the Liquidation Agent and the Holder of such Allowed Priority Non-Tax Claims shall have agreed upon in writing.

C.    Treatment of Class 3 – Allowed FDIC-Receiver Claims:   The FDIC-Receiver shall receive in full and final satisfaction, settlement, release, and discharge of and in exchange for the FDIC-Receiver Claims:

1.    The FDIC-Receiver shall receive within ten (10) Business Days after the Effective Date, Cash equal to: (a) the sum of (i) eight-five percent (85%) of the Cash contained in the GFG Bank Accounts on the Effective Date, (ii) thirty percent (30%) of the Cash contained in the Affiliate Debtor Bank Accounts on the Effective Date, (iii) an amount equal to eight-five percent (85%) of all Allowed Administrative Claims, including the Allowed Professional Fee Claims of Lain, Faulkner & Co. and Haynes and Boone, LLP incurred on or after February 1, 2010 to the extent such claims have been paid from the GFG Bank Accounts prior to the Effective Date minus (b) the sum of (i) $475,000, (ii) fifty percent (50%) of the Allowed Professional Fee Claim of Pope Shamsie, and (iii) fifty-percent (50%) of the total amount of any Allowed Claim of the IRS, not to exceed $2 million unless agreed to in writing by the FDIC-Receiver.

2.    The FDIC-Receiver shall receive (a) one-hundred percent (100%) of the Tax Refunds within ten (10) Business Days after the Debtors' or the Special Purpose Liquidation Agent's receipt of the Tax Refunds and (b) all Insurance Premium Refund Amounts (i) within ten (10) Business Days after the Effective Date or, if received by a Debtor after the Effective Date, (ii) within ten (10) Business Days after a Debtor's receipt of any Insurance Premium Refund Amounts or such date as mutually agreed upon by the Special Purpose Liquidation Agent and the FDIC-Receiver.

3.    The Debtors shall assign any interest the Debtors may hold in the D&O Claims to the FDIC-Receiver, which assignment shall be deemed to have been made without any further action or document by or from the Debtors, on the Effective Date.   The FDIC-Receiver shall have the sole right and responsibility for the prosecution of the D&O Claims and complete discretion as to whether to commence, settle or dismiss the D&O Claims.   In the event the FDIC-Receiver chooses to prosecute any D&O Claim, the FDIC-Receiver shall retain 100% of the any recovery from such prosecution.   On or after the one (1) year anniversary of the Effective Date, and every six (6) months thereafter as necessary, the Liquidation Trustee may make a written inquiry to the FDIC-Receiver to determine if the FDIC-Receiver has decided to pursue the D&O Claims.   Upon written response by the FDIC-Receiver that the FDIC-Receiver does not intend to pursue a D&O Claim, which will be provided as soon as possible in good faith, such D&O Claim will be deemed assigned by the FDIC-Receiver to the Liquidation Trust and thereafter may be pursued by the Liquidation Trustee on behalf of the Estates.

4.      The FDIC-Receiver shall retain and have the sole right and discretion to prosecute, continue, settle, or dismiss the FDIC-Receiver/GIS Causes of Action. The FDIC-Receiver shall provide updates to the Liquidation Trustee as to the status of the FDIC-Receiver/GIS Causes of Action as soon as practical upon request, but in no event will the FDIC-Receiver be required to disclose privileged or confidential information. The FDIC-Receiver shall pay thirty percent (30%) of any net recovery from the prosecution of the FDIC-Receiver/GIS Causes of Action to the Liquidation Trustee for distribution to beneficiaries of the Liquidation Trust.

5.      The FDIC-Receiver shall assign and release any interest it might hold in the Insider and Employee Avoidance Actions to the Liquidation Trust, which assignment shall be deemed to have been made without any further action or document by or from the FDIC-Receiver, upon the FDIC-Receiver's receipt of the Cash required to be paid pursuant to Article IV.C.1 of this Plan. The FDIC-Receiver shall retain no interest in or right to any net recoveries from the prosecution of the Insider and Employee Avoidance Actions.

6.      Except as otherwise provided herein, Administrative Claims incurred after January 31, 2010 that have not been paid prior to the Effective Date, including Allowed Professional Fee Claims, shall be satisfied by the Liquidation Agent or the Special Purpose Liquidation Agent from the Cash remaining in the Professional Fee Reserve, the Estates or the Liquidation Trust after the satisfaction of the FDIC-Receiver Claims.

7.      As soon as practicable after the FDIC-Receiver's receipt of the Cash required to be paid pursuant to Article IV.C.1 of this Plan, the FDIC-Receiver will withdraw the FDIC-Receiver Reservations of Rights and the FDIC-Receiver Motion for Relief from Stay with prejudice. Simultaneously, the Debtors shall file appropriate pleadings seeking the dismissal of the FDIC-Receiver Litigation, with prejudice.

8.      The FDIC-Receiver will not receive any Distributions under the Plan except as set forth in section C. herein.

9.      The FDIC-Receiver shall vote as Class 3 in each of the Chapter 11 Cases.

D.      Treatment of Classes 4A, 4B, 4C and 4D – Allowed General Unsecured Claims: Unless otherwise provided for pursuant to an order of the Bankruptcy Court, each Holder of an Allowed General Unsecured Claim shall receive in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed General Unsecured Claim, a beneficial interest in the Liquidation Trust as set forth in Article V hereof entitling such Holder to receive on account of such Claims, on or as soon as practicable after the later of (a) the Effective Date, (b) the Allowance Date, (c) the initial Distribution Date and on each periodic Distribution Date thereafter, and (d) such date as is mutually agreed upon by the Liquidation Agent and the Holder of an Allowed General Unsecured Claim, their Pro Rata Share of any Cash distribution from the Liquidation Trust to Holders of Allowed General Unsecured Claims in accordance with

Article V of this Plan.  Each Holder of Allowed General Unsecured Claims shall receive such Distributions in accordance with the provisions set forth in Article V.  Notwithstanding the foregoing, the Holder of an Allowed General Unsecured Claim may receive such other less favorable treatment as may be agreed to by such Holder and the Liquidation Agent.

E.     Treatment of Classes 5A, 5B, 5C and 5D – Interests:  On the Effective Date, all Interests in Class 5 shall be canceled and extinguished and Interest Holders shall not be entitled to receive any Distributions on account of such Interests.

**ARTICLE V.**
**MEANS FOR IMPLEMENTATION OF THE PLAN**

A.     Substantive Consolidation of the Debtors:

1.     Merger and Consolidation:  Unless otherwise provided in the Plan, on the Effective Date all assets and liabilities of GGVI, GHI, and GGCI shall be merged into or treated as if they were merged with the assets and liabilities of GFG, and the Debtors shall be substantively consolidated into Reorganized GFG.

2.     Effect of Substantive Consolidation:  In connection with, and as a result of, the substantive consolidation of the Debtors' Estates and the Chapter 11 Cases, on the Confirmation Date or such other date as may be set by an order of the Bankruptcy Court, but subject to the occurrence of the Effective Date: (1) all Intercompany Claims (including such Claims arising from the rejection of any Executory Contract or Unexpired Lease) will either be eliminated or shall remain in place but shall not be entitled to any Distributions under the Plan, (2) any obligation of any of the Debtors and all guarantees thereof executed by any of the Debtors will be deemed to be an obligation of each of the Debtors, (3) any Claim filed or asserted against any of the Debtors will be deemed a Claim against each of the Debtors, (4) for purposes of determining the availability of any right of setoff under Bankruptcy Code § 553, the Debtors will be treated as one Entity so that (subject to the other provisions of Bankruptcy Code § 553) debts due to any of the Debtors may be offset against the debts owed by any of the Debtors, and (5) the Chapter 11 cases of GGVI, GHI, and GGCI shall be closed, following which any and all proceedings that were or could have been brought or otherwise commenced in the Chapter 11 cases of GGVI, GHI, or GGCI, whether or not actually brought or commenced, may be continued, brought or otherwise commenced in GFG's Chapter 11 case.

3.     Treatment of Guarantees and Multiple-Debtor Claims:  On the Effective Date, except as otherwise provided for in the Plan, all Claims based on guarantees of collection, payment, or performance made by any Debtor concerning the obligations of another Debtor shall be discharged, released, and without further force or effect.  Additionally, Holders of Allowed Claims who assert identical Claims against multiple Debtors shall be entitled to a single satisfaction of such Claims.

B.     Cancellation of Interests:  On the Effective Date, except as otherwise specifically provided for in the Plan (including Articles V.C below): (i) all Interests in the Debtors shall be

canceled and (ii) the obligations of, Claims against, and Interests in the Debtors arising under, evidenced by, or relating to any agreements, contracts, indentures, certificates of designation, bylaws, certificates or articles of incorporation, or similar documents governing the Interests shall be released and discharged.

C.      Continued Corporate Existence of Reorganized GFG:  GFG shall continue to exist as Reorganized GFG after the Effective Date in accordance with the laws of Delaware and pursuant to the Amended Charter and By-laws to be filed with the Plan Supplement.  The charter and by-laws of GFG shall be amended and restated as necessary to satisfy the provisions of this Plan, the Bankruptcy Code, and applicable Delaware law, and shall be amended to, among other things: (i) authorize one share of common stock, ownership of which shall be restricted to the Liquidation Trustee; (ii) provide, pursuant to Bankruptcy Code § 1123(a)(6), for a provision prohibiting the issuance of nonvoting equity securities, and (iii) limit the activities of Reorganized GFG to matters related to the implementation of this Plan.

D.      Dissolution of the Debtors:  Pursuant to the substantive consolidation provisions herein on the Effective Date, all assets and liabilities of GGVI, GHI, and GGCI shall be merged into GFG and GGVI, GHI, and GGCI shall cease to exist.  As soon as practicable after the Liquidation Trustee exhausts the assets of the Debtors' Estates by making the final Distribution under this Plan, Reorganized GFG shall be dissolved without any further action by the former Interest holders, officers, or directors of the Debtors.

        The Liquidation Trustee may, in his or her discretion, file all necessary certificates of dissolution and take any other actions necessary or appropriate to reflect the dissolutions of each of the Debtors under applicable state law where the respective Debtors were incorporated or organized, including filing appropriate papers with the Office of Thrift Supervision to deregister GFG or GHI as unitary thrift holding companies.  All applicable regulatory or governmental agencies shall accept any certificates of dissolution or other papers filed by the Liquidation Trustee on behalf of the Debtors and shall take all steps necessary to allow and reflect the prompt dissolution of the Debtors as provided herein, without the payment of any fee, tax, or charge and without need for the filing of reports or certificates, except as the Liquidation Trustee may determine in his or her sole discretion.

E.      Sources of Cash for Plan Distributions:  All Cash necessary for the Liquidation Trustee to make Distributions under the Plan shall be obtained from the Debtors' existing Cash balances or the liquidation of property of the Estates by the Liquidation Trustee.

F.      Corporate Action:  The entry of the Confirmation Order shall constitute authorization for the Liquidation Agent to take or cause to be taken all corporate actions necessary or appropriate to implement all provisions of, and to consummate, the Plan prior to, on and after the Effective Date and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court without further approval, act or action under any applicable law, order, rule or regulation, including, without limitation, any action required by the Interest holders, officers, or directors of the Debtors, including, among other things, (1) the cancellation of the Interests in the Debtors; (2) all transfers of assets that are to occur pursuant to the Plan; (3) the incurrence of all obligations contemplated by the Plan and the making of Distributions; (4) the implementation of all settlements and compromises as set forth in or

- 11 -

contemplated by the Plan; and (5) the execution of the Amended Charter and By-laws.  As of the Effective Date, the Liquidation Trustee is authorized and directed to do all things and to execute and deliver all agreements, documents, instruments, notices and certificates as are contemplated by the Plan and to take all necessary actions required in connection therewith, in the name of and on behalf of the Debtors and the Liquidation Trustee, as applicable.

G.     Allowed Claim of Wilmington Trust:  Wilmington Trust shall receive in full and final satisfaction, settlement, release, and discharge of and in exchange for the Wilmington Trust Proofs of Claim an Allowed Claim in these Chapter 11 Cases in the aggregate amount of $318,526,546.96, plus amounts presently unliquidated for additional fees and costs as agreed to by the Special Purpose Liquidation Agent and Wilmington Trust or pursuant to further order of the Court.

H.     Liquidation Trust:

    1.     Creation of the Liquidation Trust and Appointment of the Liquidation Trustee:  On the Effective Date, the Liquidation Trust shall be created pursuant to the Liquidation Trust Agreement, and into which trust all assets of the Debtors and Estates existing as of the Effective Date, other than the assets to be delivered to the FDIC-Receiver pursuant to Article IV.C of this Plan and the Professional Fee Reserve, shall be transferred and become vested pursuant to and in accordance with the terms of this Plan.  The Liquidation Trust shall operate under the provisions of the Liquidation Trust Agreement.  The Liquidation Trust shall be administered by the Liquidation Trustee.  Wilmington Trust shall be and is appointed as the initial Liquidation Trustee on the Effective Date and shall be compensated and otherwise bound by the terms of the Liquidation Trust Agreement without further order of the Bankruptcy Court.  The Plan will be administered and actions will be taken in the name of the Debtors or Liquidation Trust, as appropriate, through the Liquidation Trustee, irrespective of whether any of the Debtors have been dissolved.  The Liquidation Trust Agreement shall be deemed approved and effective on the Effective Date subject to execution by Wilmington Trust and the Debtors.  The Liquidation Trust Agreement is attached hereto as Exhibit C.

    2.     Property of the Liquidation Trust:  On the Effective Date, the Debtors and Estates shall be deemed to have transferred and/or assigned any and all assets of the Debtors and the Estates as of the Effective Date, other than the assets to be delivered to the FDIC-Receiver pursuant to Article IV.C of this Plan and the Professional Fee Reserve, including, without limitation and except as otherwise provided in the Plan, (i) Cash and accounts, including, without limitation, any and all Cash held in any general, escrow or segregated separate accounts during the pendency of the Chapter 11 Cases, including the GFG Bank Accounts, the Affiliate Debtor Bank Accounts, or the Reserve Accounts that are not being transferred to the FDIC-Receiver pursuant to Article IV.C of the Plan, (ii) unless otherwise provided for in the Plan, all Rights of Action, including Insider and Employee Avoidance Actions and other Avoidance Actions, (iii) all other property interests, rights, claims, defenses and causes of action of the Debtors or Estates, to the beneficiaries of the Liquidation Trust followed by a deemed transfer by such beneficiaries to the Liquidation Trust, and such transferred assets shall be held by the Liquidation Trust free and clear of all Claims, Liens and contractually imposed

restrictions, except for the rights to Distribution and the retention of Liens afforded to certain Holders of Allowed Secured Claims, solely to the extent and priority of any such Allowed Secured Claim under the Plan.

3.      Creation of Professional Fee Reserve and Appointment of the Special Purpose Liquidation Agent.  On the Effective Date, the Debtors will place into a segregated account Cash from that portion of the Debtors' Cash that is not payable to the FDIC-Receiver pursuant to Article IV.C of the Plan, in the amount of $1,360,000 to create the Professional Fee Reserve.  The Professional Fee Reserve shall be used solely for distributions to Holders of Allowed Professional Fee Claims.  In addition, amounts necessary for distribution to the FDIC-Receiver pursuant to Article IV.C of the Plan will be held by the Special Purpose Liquidation Agent until such Distributions are completed.

On the Effective Date, Dennis Faulkner will be appointed as the Special Purpose Liquidation Agent.  The sole responsibilities of the Special Purpose Liquidation Agent shall be: (i) maintaining the Professional Fee Reserve; (ii) making Distributions to Holders of Allowed Professional Fee Claims pursuant to Article II.A of the Plan; (iii) managing the defense of the Debtors in the pending IRS audit and in negotiations regarding the settlement of the Claims filed by the IRS; (iv) receiving the Tax Refunds and (v) making Distributions to the FDIC-Receiver pursuant to Article IV.C of the Plan, including distribution of the Tax Refunds to the FDIC-Receiver pursuant to Article IV.C.2 of the Plan.  The Special Purpose Liquidation Agent shall, upon request of the FDIC-Receiver, assign the FDIC-Receiver the right to file documents or take other actions in regard to the Tax Refunds.

Within ten (10) days after completion of all Distributions to Holders of Professional Fee Claims and payment of any fees and expenses of the Special Purpose Liquidation Agent and his professionals, the Special Purpose Liquidation Agent shall return any unused portion of the Professional Fee Reserve to the Liquidation Trustee to be administered in accordance with the Liquidation Trust Agreement and Article V.H of the Plan.  Upon completion of the responsibilities enumerated in this paragraph, the Special Purpose Liquidation Agent shall be relieved from further duty.

4.      Officers, Directors, and Shareholders:

        a.      Directors, Officers, and Employees:  On the Effective Date, the authority, power and incumbency of Dennis Faulkner, as director and officer of each of the Debtors, shall be terminated and cease and Dennis Faulkner shall be deemed to have resigned.  Dennis Faulkner shall, however, reasonably cooperate with transition of documents and records to the Liquidation Trustee.

        b.      Succession by Liquidation Trustee:  On the Effective Date, the Liquidation Trustee succeeds to such powers as would have been applicable to the Debtors' officers, directors and shareholders except for the powers reserved for the Special Purpose Liquidation Agent.

5.      Liquidation Trustee:  The salient terms of the Liquidation Trustee's employment, including the Liquidation Trustee's duties and compensation, to the extent not set forth in the Plan, shall be set forth in the Liquidation Trust Agreement.  In general, the Liquidation Trustee shall be the exclusive trustee of the Liquidation Trust for the purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estates appointed pursuant to § 1123(b)(3)(B) of the Bankruptcy Code.  The Liquidation Trustee shall have fiduciary duties to beneficiaries of the Liquidation Trust in the same manner that members of an official committee of creditors appointed pursuant to § 1102 of the Bankruptcy Code have fiduciary duties to the creditor constituents represented by such a committee.  The Liquidation Trust Agreement shall specify the terms and conditions of the Liquidation Trustee's compensation, responsibilities and powers.  The duties and powers of the Liquidation Trustee, shall generally include, without limitation, the following:[1]

a.      To exercise all power and authority that may be or could have been exercised, commence all proceedings that may be or could have been commenced and take all actions that may be or could have been taken by any officer, director or shareholder of the Debtors with like effect as if authorized, exercised and taken by unanimous action of such officers, directors and shareholders; including, without limitation, amendment of the certificates of incorporation and by-laws of the Debtors, merger of any Debtor into another Debtor and the dissolution of any Debtor;

b.      To maintain escrows and other accounts, make Distributions and take other actions consistent with the Plan and the implementation hereof, including the establishment, re-evaluation, adjustment and maintenance of appropriate reserves, in the name of Reorganized GFG or the Liquidation Trustee, even in the event of the dissolution of Reorganized GFG;

c.      Subject to the applicable provisions of the Plan, to collect and liquidate all assets of the Estates pursuant to the Plan and to administer the winding-up of the affairs of the Debtors;

d.      To object to, defend, compromise, and/or settle any Claims (Disputed or otherwise) as discussed in Article VII hereof without the necessity of approval of the Bankruptcy Court and/or to seek Court approval for any Claims settlement to the extent thought appropriate by the Litigation Trustee or to the extent such approval is required by prior order of the Bankruptcy Court;

e.      Unless otherwise ordered by the Bankruptcy Court, to defend, compromise and/or settle any Rights of Action transferred to the Liquidation Trust in this Plan by filing a notice of compromise and settlement with the Bankruptcy Court, which shall be deemed approved if no objection is filed within

---

[1] In the case of a conflict between the Liquidation Trust Agreement and the Plan, the Liquidation Trust Agreement shall control.

23-days after the date of filing, and which shall be subject to approval of the Bankruptcy Court to the extent an objection is filed;

f.      To make decisions, without further Court approval, regarding the retention or engagement of professionals, employees and consultants by the Liquidation Trust and to pay, from the Wind-Down Reserve, the charges incurred by the Liquidation Trust on or after the Effective Date for services of professionals, disbursements, expenses or related support services relating to the winding down of the Debtors and implementation of the Plan, without application to the Bankruptcy Court;

g.      Except for the powers reserved for the Special Purpose Liquidation Agent or the FDIC-Receiver in Article V.H.3 of the Plan, to cause, on behalf of the Liquidation Trust, the Debtors and the Estates, all necessary tax returns and all other appropriate or necessary documents related to municipal, State, Federal or other tax law to be prepared or filed timely;

h.      With the exception of the Distributions to the FDIC-Receiver and Holders of Professional Fee Claims, to make all Distributions to holders of Allowed Claims provided for or contemplated by the Plan;

i.      To invest Cash in accordance with § 345 of the Bankruptcy Code or as otherwise permitted by a Final Order of the Bankruptcy Court and as deemed appropriate by the Liquidation Trustee;

j.      To collect any accounts receivable or other claims and assets of the Debtors or the Estates not otherwise disposed of pursuant to the Plan;

k.      To enter into any agreement or execute any document required by or consistent with the Plan and perform all of the obligations of the Debtors or the Liquidation Trustee thereunder;

l.      To abandon in any commercially reasonable manner, including abandonment or donation to a charitable organization at the discretion of the Liquidation Trustee, any assets that the Liquidation Trustee concludes are of inconsequential benefit to creditors of the Estates or, at the conclusion of the Chapter 11 Cases, are determined to be too impractical to distribute;

m.      To investigate, prosecute and/or settle Rights of Action, including, but not limited to, Insider and Employee Avoidance Actions and other Avoidance Actions, unless otherwise released or transferred to the FDIC-Receiver herein, participate in or initiate any proceeding before the Bankruptcy Court or any other court of appropriate jurisdiction, participate as a party or otherwise in any administrative, arbitrative or other non-judicial proceeding, litigate or settle such Rights of Action on behalf of the Liquidation Trust and pursue to settlement or judgment such actions;

- 15 -

n.      To utilize trust assets to purchase or create and carry all appropriate new insurance policies and pay all insurance premiums and costs it deems necessary or advisable to insure the acts and omissions of the Liquidation Trustee;

o.      To implement and/or enforce all provisions of the Plan;

p.      To maintain appropriate books and records (including financial books and records);

q.      To collect and liquidate all assets of the Estates pursuant to the Plan and administer the winding-up of the affairs of the Debtors including, but not limited to, closing the Chapter 11 Cases;

r.      To pay fees incurred pursuant to 28 U.S.C. § 1930(a)(6) and to file with the Bankruptcy Court and serve on the United States Trustee monthly financial reports until such time as such reports are no longer required, a Final Decree is entered closing these Cases or the Cases are converted or dismissed, or the Bankruptcy Court orders otherwise;

s.      To file with the Bankruptcy Court and serve upon the Post-Confirmation Service List, within twenty-five (25) days after the end of each month, a monthly report setting forth (i) the receipt and disposition by the Liquidation Trustee of property of the Estates or the Debtors during the prior month, including the disposition of funds in the Liquidation Trust, the Wind-down Reserve and Distribution Fund; (ii) all Disputed Claims resolved by the Liquidation Trustee during such period and all remaining Disputed Claims; (iii) all known material non-Cash assets of the Debtors remaining to be disposed of; (iv) the status of Rights of Action; (v) an itemization of all expenses the Liquidation Trustee anticipates will become due and payable within the subsequent three months; and (vi) the Liquidation Trustee's forecast of cash receipts and expenses for the subsequent three months; and

t.      To do all other acts or things consistent with the provisions of the Plan that the Liquidation Trustee deems reasonably necessary or desirable with respect to implementing the Plan.

6.      <u>Resignation, Death, or Removal of the Liquidation Trustee</u>:  The Liquidation Trustee may resign at any time upon 30 days' written notice to the Post-Confirmation Service List provided that a successor Liquidation Trustee is appointed pursuant to the Liquidation Trust Agreement.  No successor Liquidation Trustee shall in any event have any liability or responsibility for the acts or omissions of any of his or her predecessors. Every successor Liquidation Trustee shall execute, acknowledge and file with the Bankruptcy Court and deliver to the Post-Confirmation Service List an instrument in writing accepting such appointment hereunder, and thereupon such successor Liquidation Trustee, without any further act, shall become fully vested with all of the rights, powers, duties and obligations of his or her predecessor.

7.      Exculpation of the Liquidation Trustee and Special Purpose Liquidation Agent: **From and after the Effective Date, the Liquidation Trustee, the Special Purpose Liquidation Agent, and their professionals shall be exculpated by the Estates and all Holders of Claims or Interests from any and all claims or causes of action and assertions of liability arising out of their performance of the duties conferred upon them by the Plan, the Liquidation Trust Agreement, or any orders of the Bankruptcy Court, except to the extent an act constitutes bad faith, gross negligence, willful misconduct, or actual fraud.  No holder of a Claim or Interest or representative thereof shall have or pursue any claim or cause of action against the Liquidation Trustee, the Special Purpose Liquidation Agent, or their professionals for taking any action in accordance with the Plan, the Liquidation Trust Agreement, or to implement the provisions of the Plan or any order of the Bankruptcy Court. Nothing in this provision shall be deemed to alter the provisions of the Liquidation Trust Agreement.**

8.      **INJUNCTION:  EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN AND EXCEPT IN CONNECTION WITH THE ENFORCEMENT OF THE TERMS OF THIS PLAN OR ANY DOCUMENTS PROVIDED FOR UNDER THIS PLAN, ALL ENTITIES THAT HAVE, HOLD, OR MAY HOLD CLAIMS AGAINST OR INTERESTS IN THE DEBTORS OR THE ESTATES THAT AROSE PRIOR TO THE EFFECTIVE DATE ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY ACTION OR OTHER PROCEEDING OF ANY KIND AGAINST THE LIQUIDATING TRUSTEE, LIQUIDATING TRUST, AND THE ESTATES, WITH RESPECT TO ANY SUCH CLAIM OR INTEREST, INCLUDING BUT NOT LIMITED TO THE ENFORCEMENT, ATTACHMENT, COLLECTION OR RECOVERY BY ANY MANNER OR MEANS, DIRECTLY OR INDIRECTLY, OF ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST THE LIQUIDATING TRUSTEE, LIQUIDATING TRUST, OR THE ESTATES, OR ANY PROPERTY OF THE LIQUIDATING TRUSTEE OR THE ESTATES, WITH RESPECT TO ANY SUCH CLAIM OR INTEREST, CREATING, PERFECTING OR ENFORCING, DIRECTLY OR INDIRECTLY, ANY LIEN OR ENCUMBRANCE OR ANY KIND AGAINST THE LIQUIDATING TRUSTEE, LIQUIDATING TRUST OR THE ESTATES, OR ANY PROPERTY OF THE DEBTORS, THE LIQUIDATING TRUSTEE OR THE ESTATES, WITH RESPECT TO ANY SUCH CLAIM OR INTEREST; AND ANY ACT, IN ANY MANNER, IN ANY PLACE WHATSOEVER, THAT DOES NOT CONFORM TO OR COMPLY WITH THE PROVISIONS OF THE PLAN WITH RESPECT TO SUCH CLAIM OR INTEREST.**

9.      Reliance by the Liquidation Trustee and Special Purpose Liquidation Agent:  The Liquidation Trustee and Special Purpose Liquidation Agent may rely, and shall be fully protected in acting or refraining from acting, upon any resolution, statement, certificate, instrument, opinion, report, notice, request, consent, order or other instrument or document which it reasonably believes to be genuine and to have been signed or presented by the proper party or parties, and the Liquidation Trustee and Special Purpose

Liquidation Agent may conclusively rely as to the truth of the statements and correctness of the opinions expressed therein.

10.    <u>Tax Treatment of Liquidation Trust</u>:  The Debtors intend that the Liquidation Trust will be treated as a "liquidating trust" within the meaning of Section 301.7701-4(d) of the Treasury Regulations.   Accordingly, the Liquidation Trustee shall, in an expeditious but orderly manner, liquidate and convert to Cash any non-Cash assets, make timely distributions to the beneficiaries of the Liquidation Trust, and not unduly prolong its duration.   The transfer of the Debtors' and the Estates' remaining assets to the Liquidation Trust shall be treated as a transfer to the beneficiaries of the Liquidation Trust for all purposes of the Internal Revenue Code (e.g., sections 61(a)(12), 483, 1001, 1012 and 1274) followed by a deemed transfer by such beneficiaries to the Liquidation Trust.  The Liquidation Trust shall be considered a "grantor" trust, and the beneficiaries of the Liquidation Trust shall be treated as the grantors and deemed owners of the Liquidation Trust.  To the extent valuation of the transferred property to the Liquidation Trust is required under applicable law, the Liquidation Trustee shall value the transferred property and notify in writing the beneficiaries of the Liquidation Trust of such valuations.  The assets transferred to the Liquidation Trust shall be valued consistently by the Liquidation Trustee and the Trust beneficiaries, and these valuations will be used for all federal income tax purposes.

11.    <u>Liquidation Trust Interests</u>:  Liquidation Trust Interests shall not be represented by certificates and shall be transferable subject, as applicable, to Bankruptcy Rule 3001(e) and any other provision of law.

12.    <u>Wind-Down Reserve</u>:   On the Effective Date, or as soon thereafter as is reasonably practicable, the Liquidation Trustee shall create the Wind-Down Reserve and shall place an appropriate amount of Cash into such reserve to cover the costs of the Liquidation Trustee, including the actual and estimated costs of the Liquidation Trustee and its professionals in connection with the performance of its duties and obligations under this Plan and the Liquidation Trust Agreement.  The Liquidation Trustee shall pay Plan administration costs, costs of holding and liquidating any non-Cash property, and costs of prosecution of any and all Rights of Action held by the Liquidation Trust, including but not limited to taxes and professional fees, from the Wind-Down Reserve. To the extent that the Liquidation Trustee determines that the funds allocated to the Wind-Down Reserve are insufficient for such purposes, additional amounts of Cash, to the extent necessary for such purposes, may be allocated to the Wind-Down Reserve. After all costs associated with the Wind-Down Reserve have been paid, and/or upon the reasonable determination of the Liquidation Trustee that the funds in the Wind-Down Reserve exceed the amounts necessary to pay the expenses for which such fund is established, the remaining or excess funds, as applicable, shall be made available for Distribution under the Plan.

13.    <u>Distribution Fund</u>:  After the payment of all Allowed Administration Claims, Allowed Professional Fee Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, and Allowed Secured Claims, and the funding of a reserve for Disputed Claims, the remaining Cash not otherwise allocated to the Wind-Down Reserve will be

placed in a Distribution Fund to be distributed to the holders of Allowed General Unsecured Claims. Distributions to Holders of Allowed General Unsecured Claims shall be made at the discretion of the Liquidation Trustee through the exercise of its business judgment.

14.    Reserves:  To the extent not otherwise provided for herein or ordered by the Bankruptcy Court, the Liquidation Trustee shall estimate appropriate reserves of Cash to be set aside in order to pay or reserve for accrued expenses and for the payment of prospective expenses and liabilities of the Estates and the Liquidation Trust after the Effective Date. Without limitation, these reserves shall include funds for the Wind-Down Reserve, Professional Fee Claims, if any, not payable from the Professional Fee Reserve, Administrative Claims, Priority Tax Claims, Priority Non-Tax Claims, Secured Claims, and Disputed Claims. Notwithstanding any contrary provision contained herein, the Liquidation Trustee shall not be obligated to physically segregate and maintain separate accounts for reserves or for the Distribution Fund. Separate reserves and funds may be merely bookkeeping entries or accounting methodologies, which may be revised from time to time, to enable the Liquidation Trustee to determine Cash available for Distributions, reserves and amounts to be paid to parties-in-interest.

I.    Discovery Protocols:  On the Effective Date, the Liquidation Trust will be deemed to be a party to and bound by the Document Access Stipulation and the Claims Investigation Stipulation.

## ARTICLE VI.
## TREATMENT OF EXECUTORY CONTRACT AND UNEXPIRED LEASES

A.    Rejection of Executory Contracts and Unexpired Leases:  Unless rejected or assumed by prior order of the Bankruptcy Court, each Executory Contract and Unexpired Lease shall be rejected as of the Confirmation Date (which rejection shall be effective on the Effective Date), and such rejected Executory Contracts and Unexpired Leases shall no longer represent binding obligations of the Debtors or the Liquidation Trust after the Effective Date. Entry of the Confirmation Order shall constitute approval of such rejections under Bankruptcy Code §§ 365 and 1123.

B.    Rejection Claim Bar Date:  Any Claim arising out of the rejection of an Executory Contract or Unexpired Lease pursuant to the Confirmation Order or prior order of the Bankruptcy Court must be filed with the Bankruptcy Court on or before the Rejection Claim Bar Date, and must be served on counsel for the Liquidation Trustee. Any such Claims not filed by the Rejection Claim Bar Date is discharged and forever barred. Each Allowed Claim arising from the rejection of an Executory Contract shall be treated as an Allowed General Unsecured Claim. The Bankruptcy Court shall determine the amount, if any, of the Claim of any Entity seeking damages by reason of the rejection of any Executory Contract or Unexpired Lease.

C.    Reservation of Rights:  Neither the exclusion nor inclusion of any contract or lease by the Debtors on their Schedules, nor anything contained in the Plan, will constitute an admission by the Debtors or the Liquidation Trust that any such contract or lease is or is not in fact an Executory Contract or Unexpired Lease or that any Debtor or the Liquidation Trustee has any liability under any such contract or lease. Nothing in the Plan will waive, excuse, limit,

diminish, or otherwise alter any of the defenses, Claims, Rights of Action, or other rights of the Debtors or the Liquidation Trust under any Executory Contract or non-Executory Contract or any Unexpired Lease or expired lease. Nothing in the Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors or the Liquidation Trustee under any Executory Contract or non-Executory Contract or any Unexpired Lease or expired lease.

## ARTICLE VII.
## OBJECTIONS TO AND PROCEDURES FOR RESOLVING DISPUTES REGARDING CLAIMS AND INTERESTS

A.    <u>Objections to Claims and Interests</u>:  Unless otherwise provided herein or as otherwise ordered by the Bankruptcy Court after notice and a hearing, objections to Claims shall be filed with the Bankruptcy Court and served upon the Holders of each of the Claims to which objections are made as soon as practicable, but in no event by the later of 365 days after the Effective Date.  All parties-in-interest shall retain the right to file such objections.  The deadline to object to Claims can be extended automatically for an additional ninety (90) days by the Liquidation Trustee filing a notice with the Bankruptcy Court.  Further extensions to the deadline to object to Claims may be granted by the Bankruptcy Court upon motion of the Liquidation Trustee or other party-in-interest without notice or a hearing.

B.    <u>Claims Filed After Objection Deadline</u>:  Unless the Bankruptcy Court otherwise directs or unless otherwise provided herein, any Claim filed later than 180 days after the Effective Date shall be Disallowed in full without further order of the Bankruptcy Court.  Claims filed or identified in the Schedules may be amended or reconsidered only as provided in the Bankruptcy Code and Bankruptcy Rules.

C.    <u>Claims Listed as Contingent, Unliquidated, or Disputed in Schedules</u>:  **ANY CLAIM THAT HAS BEEN OR IS HEREAFTER LISTED IN THE SCHEDULES AS CONTINGENT, UNLIQUIDATED OR DISPUTED, AND FOR WHICH NO PROOF OF CLAIM HAS BEEN TIMELY FILED IS CONSIDERED DISALLOWED ON THE EFFECTIVE DATE WITHOUT FURTHER ACTION BY THE DEBTORS OR THE LIQUIDATION TRUST AND WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT.**

D.    <u>Retention of Claims and Defenses</u>:  After the Effective Date, except as released in the Plan or by Bankruptcy Court order, the Liquidation Trustee shall have and retain any and all rights and defenses the Debtors had with respect to any Claims and Rights of Action immediately prior to the Effective Date.

E.    <u>Claims Administration Responsibilities</u>:  Except as otherwise specifically provided in the Plan, after the Effective Date, the Liquidation Trustee shall have the authority: (1) to file, withdraw, or litigate to judgment any objections to Claims; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

F.      Adjustment to Claims Without Objection:  Any Claim that has been paid or satisfied or any Claim that has been amended or superseded may be adjusted for Distribution purposes by the Liquidation Trustee without any further notice to or action, order, or approval of the Bankruptcy Court.

G.      Disallowance of Claims or Interests:  Any Claims held by Entities from which property is recoverable under Bankruptcy Code §§ 542, 543, 550, or 553 or that is a transferee of a transfer avoidable under Bankruptcy Code §§ 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a), shall be deemed Disallowed pursuant to Bankruptcy Code § 502(d), and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Rights of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Estates by that Entity have been turned over or paid to the Liquidation Trustee.

H.      Offer of Judgment:  The Liquidation Trustee is authorized to serve upon a Holder of a Claim an offer to allow judgment to be taken on account of such Holder's Claim, and, pursuant to Bankruptcy Rules 7068 and 9014, Federal Rule of Civil Procedure 68 shall apply to such offer of judgment.  To the extent the Holder of a Claim must pay the costs incurred by the Liquidation Trustee after the Liquidation Trustee makes such offer, the Liquidation Trustee, as applicable, is entitled to set off such amounts against the amount of any distribution to be paid to such Holder without any further notice to or action, order, or approval of the Bankruptcy Court.

## ARTICLE VIII.
## PROVISIONS GOVERNING DISTRIBUTIONS OF
## PROPERTY UNDER THE PLAN

A.      General:  Except as otherwise specified herein, the Liquidation Agent shall make all Distributions required under the Plan.  In addition, Wilmington Trust, as indenture trustee, will receive all Distributions made on account of the Wilmington Trust Proofs of Claim, as Allowed in Article V.G. of the Plan, and shall distribute such Distributions appropriately to TRPS Holders under the TRPS Trust.

B.      Delivery of Distributions:  Subject to Bankruptcy Rule 9010, Distributions to Holders of Allowed Claims will be made by mail (1) at the address of each such Holder as set forth on the Proof of Claim filed by such Holder, (2) at the address set forth in any written notice of address change delivered after the date of any related Proof of Claim to the Liquidation Agent, or (3) at the address reflected in the Schedules filed by the Debtors if no Proof of Claim is filed and the Liquidation Agent has not received a written notice of address change.

If any Distribution to the Holder of an Allowed Claim is returned as undeliverable, the Liquidation Agent shall use reasonable efforts to determine such Holder's then-current address. After reasonable efforts, if the Liquidation Agent still cannot determine such Holder's then-current address, no further Distributions shall be made to such Holder unless and until the Liquidation Agent is notified of such Holder's then-current address.

Undeliverable distributions shall be set aside and held in a segregated account in the name of the Liquidation Agent.  If the Liquidation Agent is able to determine or is notified of

such Holder's then-current address, then such Distribution, together with any interest earned thereon and proceeds thereof shall be paid or distributed to such Holder within ten (10) Business Days of the date the Liquidation Agent determines the Holder's then-current address. If the Liquidation Agent cannot determine, or is not notified of, a Holder's then-current address by the later of six (6) months after the Distribution Date or six (6) months after the date of the first Distribution to such Holder, the Distribution reserved for such Holder shall be deemed an unclaimed Distribution to which section D of this Article shall apply.

C.      Rounding of Fractional Distributions:  Notwithstanding any other provision of the Plan, the Liquidation Agent shall not be required to make any Distributions or payment of fractional cents. Whenever any payment of Cash of a fraction of a cent would otherwise be required under the Plan, the actual payment may reflect a rounding of such fraction (up or down) to the nearest whole cent, with half cents or less being rounded down.

D.      Unclaimed Distributions:  If the current address of a Holder of an Allowed Claim entitled to a Distribution has not been determined by the later of six (6) months after the Distribution Date or six (6) months after the date of the first Distribution to such Holder, then such Holder shall be deemed to have released such Allowed Claim. If such Holder was entitled to a pro-rata Distribution as a Holder of an Allowed Claim, then that Holder's Distribution(s) shall revert back to the Liquidation Trust to be further administered pursuant to the provisions of the Plan.

E.      Uncashed Checks:  Checks issued in respect of Allowed Claims will be null and void if not negotiated within ninety days after the date of issuance thereof. In no event shall any funds escheat to a Governmental Unit.

F.      Compliance with Tax Requirements:  In connection with the Plan and to the extent applicable, the Liquidation Agent shall comply with all withholding and reporting requirements imposed on it by any Governmental Unit, and all Distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.

G.      De Minimus Distributions:  Ratable Distributions to Holders of Allowed Claims will not be made if such Distribution will result in a Distribution amount of less than $10.00.

## ARTICLE IX.
## EFFECT OF CONFIRMATION OF THE PLAN

A.      Legally Binding Effect:  Provisions of this Plan shall bind all Claim and Interest Holders, whether or not they accept this Plan. On and after the Effective Date, all Claim and Interest Holders shall be precluded and enjoined from asserting any Claim or Interest against the Debtors or Liquidation Trust or their assets or properties based on any transaction or other activity of any kind that occurred prior to the Confirmation Date except as permitted under the Plan.

B.      Vesting of Property in the Reorganized Debtor:  On the Effective Date, except as otherwise expressly provided in the Plan, title to all Estate property shall vest in the Liquidation Trust free and clear of all Liens of any kind.

C.      Derivative Litigation Claims:  Claims or causes of action derivative of or from the Debtors are Estate property under Bankruptcy Code § 541. On and after the Effective Date, all

such Derivative Litigation Claims, regardless of whether pending on the Petition Date, will be retained by, vest in, and/or become property of the Liquidation Trust. All named plaintiffs (including certified and uncertified classes of plaintiffs) in any actions pending on the Effective Date relating to any Derivative Litigation Claims and their respective servants, agents, attorneys, and representatives shall, on and after the Effective Date, be permanently enjoined, stayed, and restrained from pursuing or prosecuting any Derivative Litigation Claim.

D.      Release:  **Except as otherwise provided for in the Plan, the Release Parties shall be deemed to have released each of the other Release Parties from (i) any and all claims, causes of actions, and other liabilities arising before the Effective Date, and (ii) any and all claims, causes of action, and other liabilities arising from the actions taken or not taken in connection with the Plan and the Chapter 11 Cases unless such conduct amounts to gross negligence, willful misconduct, or actual fraud.  For the sake of clarity, this provision does not release any (i) D&O Claim or Insider and Employee Avoidance Actions, (ii) claims that the FDIC-Receiver has the statutory or common law right to pursue under, inter alia, title 12 of the United States Code, against any party, person, or entity other than Claims against the Debtors or the Estates or (iii) claims that either the FDIC-Receiver or Compass Bank may have against the other.**

E.      Exculpation of the Debtors:  **The Debtors and any of their respective officers, directors, employees, agents, advisors, or professionals shall not have or incur any liability to any Holder of a Claim or Interest for any act, event, or omission from the Petition Date to the Effective Date relating to, connected with, or arising out of the Chapter 11 Cases, the Confirmation of the Plan, the consummation of the Plan, the administration of the Plan, or the assets and property to be distributed pursuant to the Plan and the Plan Documents, unless such Entity's action constitutes bad faith, gross negligence, willful misconduct, or actual fraud.**

## ARTICLE X.
## RETENTION OF RIGHTS OF ACTION

A.      Liquidation Trustee's Preservation, Retention and Maintenance of Rights of Action: Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement entered into in connection with the Plan, in accordance with Bankruptcy Code § 1123(b)(3), the Liquidation Trustee shall retain and shall have the exclusive right, authority, and discretion (without further order of the Bankruptcy Court) to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw, or litigate to judgment any and all Rights of Action that the Debtors or the Estates may hold against any Entity, whether arising before or after the Petition Date, and the powers and duties of a trustee under the Bankruptcy Code with respect to such Rights of Action. The Debtors reserve and shall retain the foregoing Rights of Action for the Liquidation Trust notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases.

The Rights of Action retained by the Liquidation Trustee under Bankruptcy Code § 1123(b)(3) specifically include, but are not limited to, all Rights of Action the Debtors or their Estates may hold against Temple-Inland or its former officers and directors, with the exception of claims against Temple-Inland that are derivative of claims of the FDIC-Receiver or Guaranty

Bank or its shareholders, Insider and Employee Avoidance Actions, and other Avoidance Actions.  Claims that are reserved or reserved and assigned by the Debtors have been specifically set forth in the Disclosure Statement.

B.     Preservation of All Rights of Action Not Expressly Settled or Released:  Unless a Right of Action is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order, the Debtors expressly reserve such Right of Action (including any counterclaims) for later adjudication by the Liquidation Trustee.  Therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such Rights of Action (including counterclaims) on or after the Confirmation of the Plan.

C.     Creditors' Right to Pursue Certain Rights of Action:  The Plan does not preclude the rights, if any, of any Holder of a Claim to seek authority from the Bankruptcy Court to bring claims of the Estates if not pursued by the Liquidation Trustee by forty-five (45) days prior to the expiration of the statute of limitations for such Right of Action.

## ARTICLE XI.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.     Modification or Amendment of the Plan:  This Plan may be amended or modified by the Liquidation Agent as provided in Bankruptcy Code § 1127 and Bankruptcy Rule 3019.

B.     Revocation or Withdrawal of the Plan:  The Debtors reserve the right to revoke or withdraw this Plan at any time prior to the Confirmation Date and to file subsequent plans.  If the Debtors revoke or withdraw this Plan prior to the Confirmation Date, or if the Confirmation Date or the Effective Date does not occur, then (i) this Plan shall be deemed null and void in all respects; (ii) any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void in all respects; and (iii) nothing contained in the Plan shall be deemed to constitute an admission, waiver or release of any claims by or against the Debtors or any other Entity, or to prejudice in any manner the rights of the Debtors, the Estates or any Entity in any further proceedings involving the Debtors.

## ARTICLE XII.
## RETENTION OF JURISDICTION

A.     Bankruptcy Court Jurisdiction:  Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court, even after the Chapter 11 Cases have been closed, shall have jurisdiction over all matters arising under, arising in, or relating to the Chapter 11 Cases, including proceedings to:

1.     Ensure that the Plan is fully consummated and implemented;

2.     Enter such orders that may be necessary or appropriate to implement, consummate, or enforce the provisions of the Plan and all contracts, instruments, releases,

indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

3.      Consider any modification of the Plan under Bankruptcy Code § 1127;

4.      Hear and determine all Claims, controversies, suits, and disputes against the Debtors or the Liquidation Trustee to the full extent permitted under 28 U.S.C. §§ 157 and 1334;

5.      Allow, disallow, determine, liquidate, classify, estimate, or establish the priority or secured or unsecured status of any Claim, including the resolution of any and all objections to the allowance or priority of Claims;

6.      Hear, determine, and adjudicate any litigation involving the Rights of Action or other claims or causes of action constituting Estate property or property of the Liquidation Trust;

7.      Decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any motions or applications involving the Debtors or the Liquidation Trustee that are pending on or commenced after the Effective Date;

8.      Resolve any cases, controversies, suits, or disputes that may arise in connection with the consummation, interpretation, or enforcement of the Plan, or any entity's obligations incurred in connection with the Plan, or any other agreements governing, instruments evidencing, or documents relating to any of the foregoing, including the interpretation or enforcement of any rights, remedies, or obligations under any of the foregoing;

9.      Hear and determine all controversies, suits, and disputes that may arise out of or in connection with the enforcement of any subordination and similar agreements among Creditors under Bankruptcy Code section 510;

10.     Hear and determine all requests for compensation and/or reimbursement of expenses that may be made for fees and expenses incurred before the Effective Date;

11.     Enforce any Final Order, the Confirmation Order, the Final Decree, and all injunctions contained in those orders;

12.     Enter an order concluding and terminating the Chapter 11 Cases;

13.     Correct any defect, cure any omission, or reconcile any inconsistency in the Plan, or the Confirmation Order, or any other document or instruments created or entered into in connection with the Plan;

14.     Determine all questions and disputes regarding title to the Estate property;

15.     Classify the Claims of any Creditor and the treatment of those Claims under the Plan, re-examine Claims that may have been allowed for purposes of voting, and determine objections that may be filed to any Claims;

16.     Take any action described in the Plan involving the Debtors or the Liquidation Trustee;

17.     Enter and implement such orders that are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

18.     Hear, determine and adjudicate any motions, contested or litigated motions brought pursuant to Bankruptcy Code § 1112;

19.     Hear, determine, and adjudicate all matters the Bankruptcy Court has authority to determine under Bankruptcy Code § 505, including determining the amount of any unpaid liability of the Debtors or the Estate for any tax incurred or accrued during the calendar year in which the Plan is confirmed;

20.     Enter a Final Decree as contemplated by Bankruptcy Rule 3022; and

21.     Hear, determine, and adjudicate any and all claims brought under the Plan.

B.     <u>Limitation on Jurisdiction</u>:  In no event shall the provisions of this Plan be deemed to confer in the Bankruptcy Court jurisdiction greater than that established by the provisions of 28 U.S.C. §§ 157 and 1334.

## ARTICLE XIII.
## EVENTS OF DEFAULT

A.     <u>Events of Default</u>:  An event of default shall have occurred if the Liquidation Trustee or any other Entity takes any action prevented by the Plan or fails to take any action required by the Plan or as otherwise set forth in the Plan.

B.     <u>Notice of Event of Default</u>:  Subject to Bankruptcy Code § 1112, should an event of default occur by the Liquidation Trustee or any other Entity, at least one party-in-interest must provide written notice of the default to the alleged defaulting party and serve copies of the notice to all parties identified in the Post-Confirmation Service List.   The alleged defaulting party shall have thirty (30) days to cure any alleged event of default under the Plan prior to the non-defaulting party instituting litigation.

## ARTICLE XIV.
## MISCELLANEOUS PROVISIONS

A.     <u>Conditions to Effectiveness</u>:  The Plan will not be effective unless:

1.     The Confirmation Order becomes a Final Order.  This condition may be waived at the sole discretion of the Debtors.

2.      All Plan Documents and other applicable corporate documents necessary or appropriate to the implementation of the Plan have been executed, delivered, and where applicable, filed with the appropriate governmental authorities, including, but not limited to, the execution of the Liquidation Trust Agreement in the form attached hereto as Exhibit C.  This condition may be waived at the sole discretion of the Debtors.

3.      Claims filed by the IRS have been either (i) Disallowed or Allowed in an amount of $4 million or less or (ii) amended by the IRS to reflect a claim of $4 million or less.  If neither (i) nor (ii) has occurred, this condition may be waived upon written agreement of the Debtors, Wilmington Trust, and the FDIC-Receiver.  In the event of such a waiver, the Special Purpose Liquidation Agent shall, pending allowance or disallowance of Claims filed by the IRS, withhold from the Distribution otherwise payable to the FDIC-Receiver pursuant to Article IV.C.1 herein an amount equal to fifty-percent (50%) of the estimated Allowed Claims of the IRS as agreed to in writing by the Debtors, the FDIC-Receiver, and Wilmington Trust.  If (ii) above has occurred, but (i) above has not occurred, the Special Purpose Liquidation Agent shall, pending allowance or disallowance of Claims filed by the IRS, withhold from the Distribution otherwise payable to the FDIC-Receiver pursuant to Article IV.C.1 herein an amount equal to fifty-percent (50%) of the total amount of the Claims filed by the IRS.  Any amount withheld pursuant to this provision will be placed into a segregated account and distributed by the Special Purpose Liquidation Agent to the FDIC-Receiver in accordance with Article IV.C.1 as soon as practical after the Claims filed by the IRS are Disallowed or Allowed.

B.      <u>Due Authorization by Claim and Interest Holders</u>:  Each and every Creditor who elects to participate in the Distributions provided for herein warrants that the Creditor is authorized to accept in consideration of its Claim against the Debtors the Distributions provided for in this Plan and that there are no outstanding commitments, agreements, or understandings, express or implied, that may or can in any way defeat or modify the rights conveyed or obligations undertaken by the Creditor under this Plan.

C.      <u>Filing of Additional Documentation</u>:  On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be reasonably necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan.

D.      <u>Further Authorizations</u>:  The Liquidation Trustee may seek such orders, judgments, injunctions, and rulings as he or she may deem necessary to further carry out the intentions and purposes of, and give full effect to the provisions of, the Plan.

E.      <u>Post Confirmation Service List</u>:  Any Entity that desires to receive notices or other documents required to be served under the Plan after the Confirmation Date must request that the Liquidation Agent add such Entity to the Post-Confirmation Service List to be maintained by the Liquidation Agent.  Entities not on the Post-Confirmation Service List shall not receive notices or other documents required to be served under the Plan after the Confirmation Date.  Any Entity that provides an e-mail address may be served by e-mail after the Confirmation Date.  The Liquidation Agent shall file the Post-Confirmation Service List with the Bankruptcy Court and amend the Post-Service Confirmation List from time to time.

F.      Successors and Assigns:  The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

G.      Transfer of Claims:  Any transfer of beneficial interests in the Liquidation Trust shall be in accordance with Bankruptcy Rule 3001(e).  Notice of any such transfer shall be forwarded to the Liquidation Trustee and counsel of record for the Liquidation Trustee by registered or certified mail.  Both the transferee and transferor shall execute any notice, and the signatures of the parties shall be acknowledged before a notary public.  The notice must clearly describe the beneficial interest to be transferred.  No transfer of a partial interest shall be allowed.  All transfers must be of one hundred percent of the transferor's interest in the beneficial trust interest.

H.      Exemption from Transfer Tax:  Under Bankruptcy Code § 1146(c), the issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer under the Plan, may not be taxed under any law imposing a stamp tax or similar tax.

I.      Notices:  Any notice required to be given under this Plan shall be in writing.  Any notice that is allowed or required hereunder except for a notice of change of address shall be considered complete on the earlier of (a) three days following the date the notice is sent by United States mail, postage prepaid, or by overnight courier service, or in the case of mailing to a non-United States address, air mail, postage prepaid, or personally delivered; (b) the date the notice is actually received by the Entities on the Post-Confirmation Service List by facsimile or computer transmission; or (c) three days following the date the notice is sent to those Entities on the Post-Confirmation Service List as it is adopted by the Bankruptcy Court at the Confirmation Hearing and as amended from time to time.

J.      U.S. Trustee Fees:  The Debtors will pay pre-confirmation fees owed to the U.S. Trustee by the Effective Date of the Plan or such other date as agreed upon by the Debtors and the U.S. Trustee.  After confirmation, the Liquidation Trustee will file with the Bankruptcy Court and serve on the U.S. Trustee quarterly financial reports in a format prescribed by the U.S. Trustee, and the Liquidation Trustee will pay post-confirmation quarterly fees to the U.S. Trustee until a Final Decree is entered or the case is converted or dismissed as provided in 28 U.S.C. § 1930(a)(6).

K.      Implementation:  The Liquidation Agent shall be authorized to perform all reasonable, necessary and authorized acts to consummate the terms and conditions of the Plan.

L.      Operations Between the Confirmation Date and the Effective Date:  During the period from the Confirmation Date through and until the Effective Date, the Debtors shall continue to maintain their property as debtors in possession, subject to the oversight of the Bankruptcy Court as provided in the Bankruptcy Code, the Bankruptcy Rules and all orders of the Bankruptcy Court that are then in full force and effect.

M.      No Admissions:  Notwithstanding anything herein to the contrary, nothing contained in the Plan shall be deemed an admission by the Debtors, the Liquidation Trust or any other Entity

with respect to any matter set forth herein, including, without limitation, liability on any Claim or Interest or the propriety of the classification of any Claim or Interest.

N.    Substantial Consummation:   Substantial Consummation of the Plan shall occur on the Effective Date.

O.    Good Faith:   Confirmation of the Plan shall constitute a finding that (i) the Plan has been proposed in good faith and in compliance with the provisions of the Bankruptcy Code and (ii) the solicitation of acceptances or rejections of the Plan by all Entities and the offer, issuance, sale, or purchase of any security offered or sold under the Plan has been in good faith and in compliance with applicable provisions of the Bankruptcy Code.

P.    Final Decree:   On Substantial Consummation, the Liquidation Trustee may request the Bankruptcy Court to enter a Final Decree closing the Chapter 11 Cases and such other orders that may be necessary and appropriate.

Dated:  December 20, 2010

**Debtors and Debtors-In-Possession**

/s/ *Dennis Faulkner*
By:     Dennis Faulkner
Their:  Chief Restructuring Officer

- and -

**HAYNES AND BOONE, LLP**
2323 Victory Avenue
Suite 700
Dallas, Texas 75219
Telephone (214) 651-5000
Facsimile (214) 651-5940

/s/ *Ian T. Peck*
Robert D. Albergotti
State Bar No. 00969800
Ian T. Peck
State Bar No. 24013306
Autumn D. Highsmith
State Bar No. 24048806

**COUNSEL TO THE DEBTORS AND
THE DEBTORS-IN-POSSESSION**

## EXHIBIT "A"
## GLOSSARY OF DEFINED TERMS

1.    <u>Administrative Claim</u>:  A Claim for costs and expenses of administration pursuant to Bankruptcy Code §§ 503(b), 507(a)(2), 507(b), or 1114(e)(2), including: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors (such as wages, salaries, or commissions for services, and payments for goods and other services and leased premises); (b) compensation for legal, financial advisory, accounting, and other services, and reimbursement of expenses Allowed pursuant to Bankruptcy Code §§ 328, 330(a), or 331 or otherwise for the period commencing on the Petition Date and ending on the Effective Date; (c) all fees and charges assessed against the Estates pursuant to chapter 123 of the Judicial Code; and (d) all requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to Bankruptcy Code §§ 503(b)(3), (4), and (5).

2.    <u>Administrative Claim Bar Date</u>:  The first Business Day that is at least forty-five (45) days after the Effective Date or such earlier deadline governing a particular Administrative Claim contained in an order of the Bankruptcy Court entered before the Effective Date.

3.    <u>Administrative Claim Objection Deadline</u>:  The first Business Day that is at least thirty (30) days after the Administrative Claim Bar Date or such earlier deadline governing the objection to a particular Administrative Claim contained in an order of the Bankruptcy Court entered before the Effective Date.

4.    <u>Affiliate Debtor Bank Accounts</u>:  Accounts established at Bank of America in the names of GGVI, GGCI, or GHI pursuant to the Section 345 Order.

5.    <u>Allowance Date</u>:  The date a Claim or Interest is Allowed.

6.    <u>Allowed</u>:  With respect to Claims and Interests: (a) any Claim or Interest, proof of which is timely filed by the applicable bar date (or that by the Bankruptcy Code or Final Order is not or shall not be required to be filed); (b) any Claim or Interest that is listed in the Schedules as of the Effective Date as not disputed, not contingent, and not unliquidated, and for which no Proof of Claim has been timely filed; or (c) any Claim Allowed pursuant to the Plan; <u>provided that</u> with respect to any Claim or Interest described in clauses (a) or (b) above, such Claim or Interest shall be considered Allowed only if and to the extent that (1) no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or (2) such an objection is so interposed and the Claim or Interest shall have been Allowed for distribution purposes only by a Final Order; <u>provided further</u> that the Claims and Interests described in clauses (a) and (b) above shall not include any Claim or Interest on account of an option to purchase an Interest that is not exercised by the Voting Deadline.  Except as otherwise specified in the Plan or an order of the Bankruptcy Court determining that such or that the Holder of such Claim is otherwise entitled to interest and/or attorneys' fees, the amount of an Allowed Claim shall not include interest or attorneys' fees on such Claim from and after the Petition Date.  For purposes of determining the amount of an Allowed Claim, there shall be deducted therefrom an amount equal to the amount of any

Claim that the Debtors may hold against the Holder thereof, to the extent such Claim may be offset, recouped, or otherwise reduced under applicable law.

7.     <u>Allowed Amount</u>:  The amount at which a Claim or Interest is Allowed.

8.     <u>Amended Charter and By-laws</u>:  The amended charter and by-laws of Reorganized GFG in substantially the form included in the Plan Supplement.

9.     <u>Avoidance Actions</u>:  Any causes of action arising under §§ 506, 510, 542, 543, 544, 545, 546, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code.

10.    <u>Ballot</u>:  The form or forms distributed to Holders of Impaired Claims to be used to indicate acceptance or rejection of the Plan.

11.    <u>Bankruptcy Code</u>:  Title 11 of the United States Code, 11 U.S.C. §§ 101-1532.

12.    <u>Bankruptcy Court</u>:  The United States Bankruptcy Court for the Northern District of Texas, Dallas Division.

13.    <u>Bankruptcy Rules</u>:  The Federal Rules of Bankruptcy Procedure, and the general, local, and chambers rules and orders of the Bankruptcy Court.

14.    <u>Business Day</u>:  Any day, other than a Saturday, Sunday, or legal holiday.

15.    <u>Cash</u>:  Cash, cash equivalents, and other readily marketable securities or instruments, including, without limitation, direct obligations of the United States and certificates of deposit issued by federally insured banks.

16.    <u>Chapter 11 Cases</u>:  The Chapter 11 cases filed by the Debtors on the Petition Date in the Bankruptcy Court with case numbers 09-35582-bjh, 09-35583-hdh, 09-33584-bjh, 09-35586-hdh, jointly administered under case number 09-35582-bjh.

17.    <u>Claim</u>:  Any claim against a Debtor as defined in Bankruptcy Code § 101(5).

18.    <u>Claims Investigation Stipulation</u>:  The Stipulation Among the Debtors, the Federal Deposit Insurance Corporation and Wilmington Trust Regarding Establishment of Claims Investigation Procedures [Docket No. 110], approved by the Bankruptcy Court in its Order Granting Motion Pursuant to Sections 105(a), 541(a) and 1123(b)(3) of the Bankruptcy Code for approval of Claims Investigation Procedures Stipulation Between the Debtors, the FDIC and Wilmington Trust [Docket No. 157].

19.    <u>Claims Register</u>:  The official register of Proofs of Claims in the Chapter 11 Cases maintained by the Clerk and available at https://ecf.txnb.uscourts.gov.

20.    <u>Class</u>:  A class of Holders of Claims or Interests as set forth in the Plan.

21.    <u>Clerk</u>:  Clerk of the Bankruptcy Court.

22.     <u>Compass Bank</u>:  Compass Bank, Birmingham Alabama, as purchaser of the deposits and substantially all of the assets of Guaranty Bank.

23.     <u>Confirmation</u>:  The entry of the Confirmation Order.

24.     <u>Confirmation Date</u>:  The date upon which the Confirmation Order is entered by the Bankruptcy Court on its docket, within the meaning of Bankruptcy Rules 5003 and 9021.

25.     <u>Confirmation Hearing</u>:  The hearing at which the Confirmation Order is first considered by the Bankruptcy Court.

26.     <u>Confirmation Order</u>:  The order of the Bankruptcy Court confirming the Plan pursuant to Bankruptcy Code § 1129.

27.     <u>Creditor</u>:  A Holder of a Claim.

28.     <u>CRO Motion</u>:  Application Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code for Authorization to (a) Employ and Retain Lain, Faulkner & Co., P.C. to Provide the Debtors a Chief Restructuring Officer and Additional Personnel, and (b) to Designate Dennis Faulkner as the Chief Restructuring Officer [Docket No. 8].

29.     <u>CRO Order</u>:  Final Order Authorizing the Debtors to (a) Employ and Retain Lain, Faulkner & Co., P.C. to Provide the Debtors a Chief Restructuring Officer and Additional Personnel, and (b) to Designate Dennis Faulkner as the Chief Restructuring Officer for the Debtors Nunc Pro Tunc to the Petition Date [Docket No. 164].

30.     <u>Debtor</u>:  Any one of the Debtors individually.

31.     <u>Debtor Receivership Proofs of Claim</u>:   Claims filed by GFG and GHI in the Receivership.

32.     <u>Debtors</u>:   Guaranty Financial Group Inc., Guaranty Group Ventures Inc., Guaranty Holdings Inc. I, and Guaranty Group Capital Inc.

33.     <u>Debtors' Stay Response</u>:  Response and Objection to Motion of the Federal Deposit Insurance Corporation, as Receiver for Guaranty Bank, for an Order Modifying the Automatic Stay and Granting Setoff by the FDIC-Receiver [Docket No. 200].

34.     <u>Derivative Litigation Claim</u>:  Any claim, cause of action, demand, or any other right to payment derivative of or from the Debtors that are property of their Estates under 11 U.S.C. § 541.

35.     <u>Disallowed</u>:  A Claim, or any portion thereof, that (a) has been disallowed by either a Final Order, pursuant to a settlement, or by operation or law, or (b)(i) is listed in the Schedules at zero or as contingent, disputed or unliquidated and (ii) as to which a bar date has been established but no Proof of Claim has been filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law.

36.    <u>Disclosure Statement</u>:  Disclosure Statement Under 11 U.S.C. § 1125 in Support of the Joint Plan of Liquidation of the Debtors dated December 20, 2010.

37.    <u>Disclosure Statement Approval Date</u>:  The date the Bankruptcy Court enters the Disclosure Statement Approval Order.

38.    <u>Disclosure Statement Approval Order</u>:  The order of the Bankruptcy Court approving the Disclosure Statement and authorizing the solicitation of acceptances of the Plan.

39.    <u>Disclosure Statement Hearing</u>:  The hearing at which the Disclosure Statement is first considered by the Bankruptcy Court.

40.    <u>Disputed</u>:  With respect to any Claim or Interest, any Claim or Interest listed on (a) the Claims Register that is not yet Allowed or (b) the Schedules as disputed.  In the event that any part of a Claim is a Disputed Claim, such Claim in its entirety may be deemed to constitute a Disputed Claim for purposes of Distributions unless the Liquidation Agent and the Holder of such Claim agree otherwise; <u>provided however</u> that nothing in this definition is intended to or does impair the rights of any Holder of a Disputed Claim to pursue its rights under Bankruptcy Code § 502.

41.    <u>Distribution</u>:  The distribution in accordance with this Plan of property required by the Plan to be distributed to the Holders of Allowed Claims, or the property so distributed.

42.    <u>Distribution Date</u>:  The Date when Distributions occur under the Plan.

43.    <u>Distribution Fund</u>:  The fund which shall be established on the Effective Date by the Liquidation Trustee to pay (in the event any payments are to be made to Holders of such Claims) Allowed General Unsecured Claims pursuant to the provisions of the Plan.

44.    <u>D&O Claims</u>:  Any and all Rights of Action the Debtors or their Estate hold against any former officer or director of one or more of the Debtors serving in such capacity before the Petition Date arising out of the individual's employment by one or more of the Debtors or service on one or more of the Debtors' boards of directors, with the exception of Insider and Employee Avoidance Actions.

45.    <u>Document Access Stipulation</u>:  The Stipulation Between Guaranty Financial Group Inc., et al. and the Federal Deposit Insurance Corporation [Docket No. 65], approved by the Bankruptcy Court in its Order Granting Motion Pursuant to Sections 105(a), 107(b), 363(b) and 542(e) of the Bankruptcy Code for Approval of Document Access Stipulation Between the Debtors and the FDIC dated October 16, 2009 [Docket No. 97].

46.    <u>Effective Date</u>:  The date selected by the Debtors that is a Business Day after the Confirmation Date on which the conditions as specified in Article XIV(A) of the Plan have been satisfied or waived.  Unless otherwise specifically provided in the Plan, anything required to be done by the Debtors or the Liquidation Trustee on the Effective Date may be done on the Effective Date or as soon as reasonably practicable thereafter.

47.    <u>Entity</u>:  The meaning assigned to such term by § 101(15) of the Bankruptcy Code.

48.     <u>Estate</u>: Any one of the Estates.

49.     <u>Estates</u>:  The bankruptcy estates of the Debtors created by virtue of Bankruptcy Code §
541 upon the commencement of the Chapter 11 Cases.

50.     <u>Executory Contract</u>:  A contract to which one or more of the Debtors is a party that is
subject to assumption or rejection under Bankruptcy Code § 365.

51.     <u>FDIA</u>:  Federal Deposit Insurance Act

52.     <u>FDIC</u>:  The Federal Deposit Insurance Corporation.

53.     <u>FDIC-Receiver</u>:  The FDIC, in its capacity as receiver for Guaranty Bank.

54.     <u>FDIC-Receiver Claims</u>:  Any Claim held by the FDIC-Receiver against the Debtors in
the Chapter 11 Cases, including any and all Claims asserted in the FDIC-Receiver Proofs of
Claim.

55.     <u>FDIC-Receiver/GIS Causes of Action</u>:  Any and all claims or causes of action the FDIC-
Receiver may have against GIS including, but not limited to, claims asserted in Civil Action No.
3:10-CV-00298-B and Civil Action No. 3:10-CV-00946-B, both of which are now pending in
the United States District Court for the Northern District of Texas.

56.     <u>FDIC-Receiver Litigation</u>:  Lawsuit styled and numbered *Guaranty Financial Group Inc.
et al. v. Federal Deposit Insurance Corporation, in its capacity as receiver for Guaranty Bank*,
Case No. 3:10-cv-00980-K pending in the United States District Court for the Northern District
of Texas.

57.     <u>FDIC-Receiver Motion for Relief from Stay</u>: Motion of the Federal Deposit Insurance
Corporation, as Receiver for Guaranty Bank, for an Order Modifying the Automatic Stay as to
Property and Granting Setoff by the FDIC-Receiver  [Docket No. 177].

58.     <u>FDIC-Receiver Proofs of Claim</u>:  Proof of Claim Number 143 filed in Case Number 09-
35582-bjh, Proof of Claim Number 2 filed in Case Number 09-35586-hdh, Proof of Claim
Number 3 filed in Case Number 09-35583-hdh, and Proof of Claim Number 2 filed in Case
Number 09-35584-bjh, each for an amount in excess of $1,977,849,611.00.

59.     <u>FDIC-Receiver Reservations of Rights</u>:  The Statement and Reservation of Rights of the
Federal Deposit Insurance Corporation, as Receiver, to the Second Interim Application of Lain,
Faulkner & Co., P.C., Chief Restructuring Officer and Additional Personnel for the Debtors for
Allowance of Compensation and Reimbursement of Expenses Advanced [Docket No. 250], the
Statement and Reservation of Rights of the Federal Deposit Insurance Corporation, as Receiver,
to the Second Interim Application of Haynes and Boone, LLP, Counsel for the Debtors, for
Allowance of Compensation and Reimbursement of Expenses Advanced [Docket No. 249], the
Statement and Reservation of Rights of the Federal Deposit Insurance Corporation, as Receiver,
to the First Interim Application of Haynes and Boone, LLP, Counsel for the Debtors, for
Allowance of Compensation and Reimbursement of Expenses Advanced [Docket No. 159], and
the Statement and Reservation of Rights of the Federal Deposit Insurance Corporation, as

Receiver, to the First Interim Application of Dennis Faulkner and Lain, Faulkner & Co., P.C., Chief Restructuring Officer and Additional Personnel for the Debtors, for Allowance of Compensation and Reimbursement of Expenses Advanced [Docket No. 158].

60.     FDIC-Receiver Settlement:  Settlement with the FDIC-Receiver described in Article 7.B of the Disclosure Statement and treated in Class 3 of the Plan.

61.     Final Decree:  The decree or decrees for each of the Chapter 11 Cases contemplated under Bankruptcy Rule 3022.

62.     Final Order:  As applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought.

63.     General Unsecured Claim:  Any Claim that is not an Administrative Claim, Secured Claim, Priority Tax Claim, Priority Non-Tax Claim, or FDIC-Receiver Claim, including, without limitation, (a) any claim arising from the rejection of an Executory Contract or Unexpired Lease and (b) any portion of a Claim to the extent the value of the Holder's interest in property securing such Claim is less than the amount of the Claim, as determined pursuant to § 506(a) of the Bankruptcy Code.

64.     GFG:  Guaranty Financial Group Inc.

65.     GFG Bank Accounts:  Accounts established at Bank of America in the name of GFG pursuant to the Section 345 Order.

66.     GGCI:  Guaranty Group Capital Inc.

67.     GGVI:  Guaranty Group Ventures Inc.

68.     GHI:  Guaranty Holdings Inc. I.

69.     GIS:  JLT and Guaranty Insurance collectively.

70.     Governmental Bar Date:  February 23, 2010, the date established by the Bankruptcy Court for filing Proofs of Claim of Governmental Units in the Order (i) Authorizing the Mailing of Notices; (ii) Establishing a Bar Date for Filing Certain Proofs of Claim; (iii) Establishing Ramifications for Failure to Timely File Claims Therewith; (iv) Approving Consolidated Notice of (a) Case Commencement, (b) Bar Date, (c) First Meeting of Creditors Under 341(a) of the Bankruptcy Code; and (v) Approving Notice Procedures.

71.     Governmental Unit:  The meaning assigned to such term by Bankruptcy Code § 101(27).

72.     Guaranty Insurance:  Guaranty Insurance Services Inc.

73.  <u>Holder</u>:  An Entity holding a Claim or Interest, as applicable.

74.  <u>Impaired</u>:  With respect to any Class of Claims or Interests, impairment within the meaning of Bankruptcy Code § 1124.

75.  <u>Insider and Employee Avoidance Actions</u>:  Avoidance Actions against former Insiders or employees of the Debtors.

76.  <u>Insurance Premium Refund Amounts</u>: Any premium refunds arising with respect to the insurance policies reflected on Exhibit B to the Plan, including any amounts currently held in the Reserve Account.

77.  <u>Intercompany Claim</u>:  Any Claim held by one Debtor against another Debtor.

78.  <u>Interest</u>:  Any: (a) equity security in a Debtor, including all issued, unissued, authorized, or outstanding shares of stock together with any warrants, options, or contractual rights to purchase or acquire such equity securities at any time and all rights arising with respect thereto, or (b) partnership, limited liability company, or similar interest in a Debtor.

79.  <u>Internal Revenue Code</u>:  The Internal Revenue Code of 1986, as amended.

80.  <u>IRS</u>:  The Internal Revenue Service.

81.  <u>JLT</u>:  JLT Insurance Agency Holdings, Inc.

82.  <u>Judicial Code</u>:  Title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

83.  <u>Lien</u>:  With respect to any property or asset, any mortgage, lien, interest pledge, charge, security interest, encumbrance, mechanics' lien, materialman's lien, statutory lien or right, and other consensual or non-consensual lien, whenever granted and including, without limitation, those charges or interests in property within the meaning of "lien" under Bankruptcy Code § 101(37).

84.  <u>Liquidation Agent</u>:  The Debtors, prior to the Effective Date, and the Liquidation Trustee, after the Effective Date.

85.  <u>Liquidation Analysis</u>:  The liquidation analysis provided in the Disclosure Statement.

86.  <u>Liquidation Trust</u>:  Trust created pursuant to Article V of the Plan and the Liquidation Trust Agreement.

87.  <u>Liquidation Trust Agreement</u>:  Agreement for the establishment and operation of the Liquidation Trust substantially in the form attached as Exhibit C to the Plan.

88.  <u>Liquidation Trust Assets</u>:  All assets of the Debtors' Estates with the exception of the Professional Fee Reserve and amounts due to be paid or transferred to, or retained by, the FDIC-Receiver.

89.  <u>Liquidation Trust Interests</u>:  All beneficial interests in the Liquidation Trust.

90.     Liquidation Trustee:  Wilmington Trust or its designee appointed pursuant to the Plan for the purpose of acting as initial trustee of the Liquidation Trust.

91.     NYSE:  New York Stock Exchange

92.     Ordinary Course Liability:   Claims incurred after the Petition Date and prior to the Effective Date in the ordinary course of business of a Debtor, relating to the Debtor's business, consistent with past practices during the pendency of and, as applicable, taking into account, the Chapter 11 Cases.

93.     OTS:  Office of Thrift Supervision

94.     Petition Date:  August 27, 2009.

95.     Plan:  Joint Plan of Liquidation for Guaranty Financial Group Inc., et al., Under Chapter 11 of the United States Bankruptcy Code dated December 20, 2010.

96.     Plan Documents:  The Plan and all exhibits thereto, the Disclosure Statement and all exhibits thereto, and the Plan Supplement.

97.     Plan Objection Deadline:  TBD

98.     Plan Supplement:  The compilation of documents and forms of documents referred to in the Plan and any exhibits thereto, including but not limited to, the Amended Charter and By-laws, to be filed no later than fifteen (15) days prior to the Confirmation Hearing.

99.     Plan Support Agreement:  Agreement dated _____ among the Debtors, the FDIC-Receiver, and Wilmington Trust setting forth the terms of the FDIC-Receiver Settlement and the framework for the Plan.

100.    Pope Shamsie:  Pope, Shamsie & Dooley, LLP

101.    Pope Shamsie Retention Order:  Order Granting Application for Entry of an Order Pursuant to 11 U.S.C. §§ 327(a) and 328(a) Authorizing the Employment and Retention of Pope, Shamsie & Dooley, LLP as Tax Accountants for the Debtors [Docket No. 373].

102.    Post-Confirmation Service List:   The list of those Entities who have notified the Liquidation Agent in writing, at or following the Confirmation Hearing, of their desire to receive notice of all pleadings filed after the Confirmation Date and have provided the e-mail or physical address to which such notices shall be sent.

103.    Post-Petition Tax Claim:  An Administrative Claim or other Claim by a Governmental Unit for taxes (and for interest and/or penalties related to such taxes) for any tax year or period, which accrued or were assessed within the period from and including the Petition Date through and including the Effective Date.

104.    Post-Petition Tax Claim Bar Date:  The first Business Day that is at least the later of (i) forty-five (45) days following the Effective Date and (ii) ninety (90) days following the filing

with the applicable Governmental Unit of the tax return for such taxes for such tax year or period, or by such earlier deadline governing a particular Post-Petition Tax Claim contained in an order of the Bankruptcy Court entered before the Effective Date.

105.   Post-Petition Tax Claim Objection Deadline:  The first Business Day that is at least thirty (30) days after the Post-Petition Tax Claim Bar Date or such earlier deadline governing the objection to a particular Post-Petition Tax Claim contained in an order of the Bankruptcy Court entered before the Effective Date.

106.   Priority Non-Tax Claim:  Any Claim accorded priority in right of payment pursuant to Bankruptcy Code § 507(a), other than a Priority Tax Claim or an Administrative Claim.

107.   Priority Tax Claim:  Any Claim of the kind specified in Bankruptcy Code § 507(a)(8).

108.   Professional:  An Entity retained or to be compensated under Bankruptcy Code §§ 327, 328, 330, 331, 503(b)(3)(D), 503(b)(4), 503(b)(5) or 1103, including, but not limited to the attorneys and accountants engaged by Wilmington Trust to the extent a Claim for the services of such attorneys or accountants is Allowed under Bankruptcy Code §§ 503(b)(3)(D), 503(b)(4), or 503(b)(5).

109.   Professional Fee Claim:  An Administrative Claim of a Professional for compensation for services rendered and/or reimbursement of costs and expenses incurred on and after the Petition Date and prior to and including the Effective Date.

110.   Professional Fee Claim Bar Date:  The first Business Day that is at least forty-five (45) days after the Effective Date or such earlier deadline governing a particular Professional Fee Claim contained in an order of the Bankruptcy Court entered before the Effective Date.

111.   Professional Fee Claim Objection Deadline:  The first Business Day that is at least thirty (30) days after the Professional Fee Claim Bar Date or such earlier deadline governing the objection to a particular Professional Fee Claim contained in an order of the Bankruptcy Court entered before the Effective Date.

112.   Professional Fee Reserve:  The reserve established by the Special Purpose Liquidation Agent on the Effective Date to pay Allowed Professional Fee Claims and expenses of the Special Purpose Liquidation Agent pursuant to Article V.H.3 of the Plan.

113.   Proof of Claim:  Any proof of claim filed with the Bankruptcy Court with request to a Debtor pursuant to Bankruptcy Code § 501 and Bankruptcy Rules 3001 and 3002.

114.   Proof of Claim Bar Date:  December 29, 2009, the date established by the Bankruptcy Court for filing Proofs of Claim, with certain exceptions, in the Order (i) Authorizing the Mailing of Notices; (ii) Establishing a Bar Date for Filing Certain Proofs of Claim; (iii) Establishing Ramifications for Failure to Timely File Claims Therewith; (iv) Approving Consolidated Notice of (a) Case Commencement, (b) Bar Date, (c) First Meeting of Creditors Under 341(a) of the Bankruptcy Code; and (v) Approving Notice Procedures.

115. <u>Pro Rata Share</u>:  As to a particular Holder of a particular Claim, the ratio that the amount of such Claim held by such Claim Holder bears to the aggregate amount of all Claims in the particular Class or category.  Such ratio shall be calculated as if all Claims in the particular Class or category asserted against all Debtors are Allowed Claims as of the Effective Date, unless specifically provided otherwise in the Plan.

116. <u>Receivership</u>:  OTS' appointment of the FDIC-Receiver as receiver for Guaranty Bank on August 21, 2009.

117. <u>Record Date</u>:  TBD

118. <u>Rejection Claim Bar Date</u>:  The first Business Day that is at least thirty (30) days after the Effective Date or such earlier date that may be set by the Bankruptcy Court concerning a particular Executory Contract or Unexpired Lease.

119. <u>Release Parties</u>: Dennis Faulkner, individually and in his capacity as Chief Restructuring Officer and director of the Debtors, the FDIC-Receiver, Guaranty Bank, Compass Bank, Wilmington Trust, and each of their respective shareholders, officers, directors, and professionals, including lawyers, and the Debtors (but not their prepetition shareholders, officers, directors, and professionals not engaged in these Chapter 11 Cases) and their Professionals in these Chapter 11 Cases.

120. <u>Reserve Account</u>:  Account established pursuant to the Reserve Stipulation.

121. <u>Reserve Stipulation</u>:  The Stipulation Between the Debtors and the Federal Deposit Insurance Corporation, as Receiver, Re: Establishment of Reserve Account [Docket No. 64], approved by the Bankruptcy Court in its Order Granting Motion Pursuant to Sections 105(a), 362(a), and 541(a) of the Bankruptcy Code for Approval of a Stipulation Between the Debtors and the Federal Deposit Insurance Corporation, as Receiver, Establishing a Reserve Account [Docket No. 96].

122. <u>Reorganized GFG</u>:  GFG from and after the Effective Date.

123. <u>Rights of Action</u>:  Any and all claims, debts, demands, rights, defenses, actions, causes of action, suits, contracts, agreements, obligations, accounts, defenses, offsets, powers, privileges, licenses, and franchises of any kind or character whatsoever, known or unknown, suspected or unsuspected, whether arising before, on, or after the Petition Date, in contract or in tort, at law or in equity, or under any other theory of law, including (a) rights of setoff, counterclaim, or recoupment, and claims on contracts or for breaches of duties imposed by law; (b) claims pursuant to 11 U.S.C. § 362; (c) such claims and defenses as fraud, mistake, duress, and usury; and (d) all Avoidance Actions.

124. <u>RWHC Preferred Stock</u>:  Preferred stock in RWHC, Inc.

125. <u>Schedules</u>:  The schedules of assets and liabilities and schedules of Executory Contracts and Unexpired Leases, as may be amended from time to time, filed by the Debtors pursuant to Bankruptcy Code § 521, the official bankruptcy forms, and the Bankruptcy Rules.

126.    Section 345 Motion: Motion for Order Implementing the Requirements of Section 345(b) of the Bankruptcy Code and the Region VI, Northern District of Texas Guidelines for Chapter 11 Debtors-in-Possession [Docket No. 7].

127.    Section 345 Order:  The Order Implementing the Requirements of Section 345(b) of the Bankruptcy Code and the Region VI, Northern District of Texas, Guidelines for Chapter 11 Debtors-in-Possession, dated September 3, 2009 [Docket No. 47].

128.    Secured Claim:  A Claim that is (a) secured in whole or part, as of the Petition Date, by a Lien against property of a Debtor that is valid, perfected, and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or applicable nonbankruptcy law or (b) subject to setoff under Bankruptcy Code § 553; provided however, with respect to both (a) and (b), a Claim is a Secured Claim only to the extent of the value, net of any Lien senior to the applicable Lien, of the Estate's interest in the assets or property securing any such Claim or the amount subject to setoff, as the case may be.

129.    Special Purpose Liquidation Agent:  Dennis Faulkner.

130.    Statements of Financial Affairs:  The statement of financial affairs, as may be amended from time to time, filed by the Debtors pursuant to Bankruptcy Code § 521, the official bankruptcy forms, and the Bankruptcy Rules.

131.    Substantial Consummation:  The occurrence of the Effective Date.

132.    Tax Refunds:  All refunds received by the Debtors or Special Purpose Liquidation Agent from any state taxing authority or from the IRS after a determination that the Debtors have no federal or applicable state tax liability.

133.    Temple-Inland:  Temple-Inland, Inc.

134.    TFR:  Thrift Financial Report

135.    TRPS:  Trust preferred securities with an outstanding principal amount of $305 million issued by the TRPS Trust.

136.    TRPS Holders:  Holders of TRPS.

137.    TRPS Related Debt Securities: Debt securities issued to the TRPS Trust by GFG.

138.    TRPS Trust:  Trust that issued TRPS and that holds TRPS Related Debt Securities.

139.    Unexpired Lease:  A lease to which one or more of the Debtors is a party that is subject to assumption or rejection under Bankruptcy Code § 365.

140.    Unimpaired:  With respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of Bankruptcy Code § 1124.

141.    Voting Class:  A Class entitled to vote to accept or reject the Plan.

142.    <u>Voting Deadline</u>:  TBD

143.    <u>Wilmington Trust</u>:  Wilmington Trust Company FSB, as indenture trustee.

144.    <u>Wilmington Trust Proofs of Claim</u>:  Proof of Claim Number 96 filed in Case Number 09-35582-bjh, Proof of Claim Number 1 filed in Case Number 09-35586-hdh, Proof of Claim Number 2 filed in Case Number 09-35583-hdh, and Proof of Claim Number 1 filed in Case Number 09-35584-bjh, each for an amount in excess of $318,526,546.96.

145.    <u>Wilmington Trust Stay Response</u>:  Objection of Wilmington Trust Company as Indenture Trustee to Motion of the Federal Deposit Insurance Corporation, as Receiver for Guaranty Bank, for an Order Modifying the Automatic Stay as to Property and Granting Setoff by the Receiver [Docket No. 201].

146.    <u>Wind-Down Reserve</u>:   The reserve to be established on the Effective Date by the Liquidation Trustee to fund the winding up of the affairs of the Debtors and administering the Plan and Liquidation Trust.

**EXHIBIT "B"**
**INSURANCE POLICIES**

| Type of Policy | Policy Number | Carrier |
|---|---|---|
| Corporate Property Program | RMP2082516819 | CNA Large Property |
| Business Auto Policy | 65UENIX0417 | The Hartford Insurance Co. |
| Commercial Umbrella Binder | QZ09125370 | The Travelers Companies, Inc. |
| Excess Liability Umbrella Policy | ECO(10)54186412 | Ohio Casualty Insurance Co. |
| Employment Practices Liability | B066468326A08 | Lloyds |
| Excess Financial Institution Bond | XS MBB-06-0002 | Lloyds of London |
| Mortgage Bankers Bond | MB-06-00040 | Lloyds of London |
| Blanket Accident Policy | ABL 961990 | Life Ins. Co. of N. America |
| Commercial Property | 8049767 | Unknown |
| Workers Compensation | 65WENO0662 | The Hartford Insurance Co. |
| General Liability Mortgagee in Possession | 23462342 | Lexington Insurance Co. |
| REO & Force Placed Flood Coverage-Property, General Liability & Flood | GF0000776<br>GF0000892<br>GF0001713 | Great Lakes Reinsurance |
| Insurance Agents E&O | 91894256 | AIU Holdings, Inc. |
| Special Extortion (Kidnap and Ransom) | 6472040 | AIG World Source |
| Workers Compensation and Emp. Liability | WC 00 00 00 A | The Hartford Insurance Co. |
| Employment Practices Liability | EPL 0868326A08 | Lloyds of London |

**EXHIBIT "C"**
**LIQUIDATION TRUST AGREEMENT**

# LIQUIDATION TRUST AGREEMENT

This Liquidation Trust Agreement (the "Liquidation Trust Agreement"), is being entered into as of _____ , 2011, by and between Guaranty Financial Group Inc., Guaranty Group Ventures Inc., Guaranty Holdings Inc. I, and Guaranty Group Capital Inc., debtors-in-possession in the Chapter 11 Cases (collectively, the "Debtors," and each individually a "Debtor") in the chapter 11 cases pending in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court"), Case Number 09-35582-bjh (jointly administered) and Wilmington Trust Company FSB, not individually but solely in its capacity as trustee under this Liquidation Trust Agreement (the "Liquidation Trustee").  Capitalized terms not otherwise defined herein shall have the meaning ascribed under the Plan, as defined below. The Debtors' Joint Plan of Liquidation For Guaranty Financial Group Inc., et al., Under Chapter 11 of the United States Bankruptcy Code (the "Plan") was filed on December __, 2010 and provides, *inter alia*, for:

(a) The transfer (the "Transfer") of all right, title and interest of the Debtors in the Liquidation Assets to the Liquidation Trust on the Effective Date for distribution to the holders of Allowed Claims except for the Allowed FDIC-Receiver Claims and the Allowed Professional Fee Claims (the "Beneficiaries") pursuant to and in accordance with this Liquidation Trust Agreement, the Plan and the order confirming the Plan (the "Confirmation Order");

(b) The treatment of the Transfer for federal income tax purposes as a taxable sale or exchange of the Liquidation Trust Assets by the Debtors to the Beneficiaries;

(c) The treatment for all purposes, including federal income tax purposes, of the Beneficiaries as the deemed owners of the Liquidation Trust Assets and as the grantors of the Liquidation Trust;

(d) The treatment of the Liquidation Trust as a grantor trust for federal income tax purposes;

(e) The valuation of the Liquidation Trust Assets by the Liquidation Trustee and the use of such valuations for all federal income tax purposes;

(f) The management of the Liquidation Trust Assets by the Liquidation Trustee; and

(g) The distribution of the Liquidation Trust Assets or the proceeds thereof to the Beneficiaries as set forth in the Plan, the Confirmation Order and this Liquidation Trust Agreement.

Unless the context otherwise requires, all capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Plan.

NOW, THEREFORE, pursuant to the Plan and the Confirmation Order and in consideration of the mutual agreements of the parties contained herein and other good and

valuable consideration, the receipt and sufficiency of which are hereby acknowledged and affirmed, the parties hereby agree as follows:

# ARTICLE I
# DECLARATION OF TRUST

1.1.   <u>Purpose of the Liquidation Trust</u>.  The Debtors and the Liquidation Trustee, pursuant to the Plan and the Confirmation Order and in accordance with the Bankruptcy Code, applicable tax statutes, rules and regulations, to the extent incorporated in this Liquidation Trust Agreement, hereby establish the Liquidation Trust on behalf of and for the sole benefit of the Beneficiaries and for the sole purpose of liquidating the Liquidation Trust Assets and distributing the Liquidation Trust Assets to the Beneficiaries pursuant to the Plan in accordance with Treas. Reg. § 301.7701-4(d).  The Liquidation Trust has no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the sole purpose of the Liquidation Trust.  It shall not be the objective or purpose of this Liquidation Trust to, and the Liquidation Trustee shall have no authority to, conduct a trade or business except as reasonable and necessary to, and consistent with, the liquidation of the Liquidation Trust Assets.  In particular, the Liquidation Trust, through the Liquidation Trustee, will do the following: (a) accept and place all Liquidation Trust Assets into the Liquidation Trust; (b) to the extent feasible, reduce all remaining Liquidation Trust Assets, including, but not limited to, Rights of Action, to Cash; (c) object to and resolve all Disputed Claims; (d) make all Distributions in accordance with the Plan to the extent such Distributions are to be made from the Liquidation Trust Assets; (e) retain professionals and other agents; and (f) take such steps as are reasonable and necessary to accomplish the Liquidation Trust's purpose, all as provided in, and subject to the terms and provisions of, the Plan, the Confirmation Order and this Liquidation Trust Agreement.  The Liquidation Trust Assets shall be held for the exclusive and sole benefit of the Beneficiaries and shall only be used to fund Distributions to such Beneficiaries in accordance with the Plan and to fund payment of costs, fees, and expenses incurred in connection with the administration of the Liquidation Trust or the Plan.

1.2.   <u>Rights of Debtors</u>.  The Debtors shall have no claim to or right or interest in, whether direct, residual, contingent or otherwise, in the Liquidation Trust Assets once such assets have been transferred to the Liquidation Trust.

1.3.   <u>Name of the Liquidation Trust</u>.  The Liquidation Trust established hereby shall be known as the "GFGI Liquidation Trust."  In connection with the exercise of his powers, the Liquidation Trustee may use the name or such variation thereof as he sees fit, and may transact the affairs of the Liquidation Trust in such name.

1.4.   <u>Transfer of Assets to Create Liquidation Trust</u>.  Effective as of the Effective Date, the Debtors hereby grant, release, assign, transfer, convey and deliver to the Liquidation Trustee and his successors, to be held in trust and to be applied as specified in the Plan, the Confirmation Order, and this Liquidation Trust Agreement the Liquidation Trust Assets. Through the transfer of each Estate's assets, and except as otherwise provided herein or in the

2

Plan, such assets are Liquidation Trust Assets and the Liquidation Trust has the sole and exclusive right, title and interest in and possession of the Liquidation Trust Assets.

       1.5.   <u>Acceptance by Liquidation Trustee</u>.  The Liquidation Trustee hereby accepts and confirms the following: (a) the appointment to serve as Liquidation Trustee; (b) the Transfer of the Liquidation Trust Assets, and all right, title and interest therein, to the Liquidation Trust; and (c) the obligations and duties imposed on him by this Liquidation Trust Agreement.  The Liquidation Trustee agrees to receive, hold, administer and distribute the Liquidation Trust Assets and the income derived therefrom, and to reconcile, administer and satisfy all Claims, with the exception of the FDIC-Receiver Claims and Professional Fee Claims, pursuant to the terms of the Plan, the Confirmation Order and this Liquidation Trust Agreement.

## ARTICLE II
## TERMINATION OF TRUST

       2.1.   <u>Maximum Term</u>.  The Liquidation Trust shall terminate no later than the third anniversary of the Effective Date (the "Initial Liquidation Trust Term"); <u>provided</u>, <u>however</u>, that, if necessary to accomplish the Liquidation purpose of the Liquidation Trust, the Liquidation Trustee may extend the term of the Liquidation Trust for up to an additional two years (the "Supplemental Liquidation Trust Term") by (a) filing a notice of his intent to extend the term of the Liquidation Trust with the Bankruptcy Court, (b) serving such notice on the United States Trustee, (c) providing the United States Trustee at least ten (10) days to object to the requested extension prior to the termination of the Initial Liquidation Trust Term, and (d) receiving approval for the Supplemental Liquidation Trust Term from the Bankruptcy Court within six months of the beginning of the Supplemental Liquidation Trust Term.  The Liquidation Trustee may, if the Initial Liquidation Trust Term has expired, seek entry of an order from the Bankruptcy Court providing for a reinstatement and implementation of the Supplemental Liquidation Trust Term.  In addition, notwithstanding anything contained herein to the contrary, the Liquidation Trustee may seek additional extensions beyond the referenced terms from the Bankruptcy Court for good cause show.  That term shall automatically be extended through ninety (90) days after a final determination by the Court that the applicable term has expired.

       2.2.   <u>Winding Up and Discharge of the Liquidation Trustee</u>.  For purposes of winding up the affairs of the Liquidation Trust at its termination, the Liquidation Trustee shall continue to act as Liquidation Trustee until his duties have been fully discharged.  After doing so, the Liquidation Trustee, his agents, professionals and employees, if any, shall have no further duties or obligations hereunder, except as required by this Liquidation Trust Agreement, the Plan, the Confirmation Order or applicable law concerning the termination of a trust.

3

# ARTICLE III
# OBLIGATIONS OF THE LIQUIDATION TRUSTEE

3.1.  <u>Establishment and Maintenance of Accounts, Reserves and Escrows</u>.

3.1.1.  <u>Initial Establishment of Accounts and Reserves</u>.  On the Effective Date or as soon thereafter as practicable, the Liquidation Trustee shall establish the following accounts and reserves:

(a)    <u>Distribution Fund</u>:    One or more general accounts (the "Distribution Fund") into which shall be deposited, to the extent sufficient assets are available, Cash for Distributions to the Beneficiaries pursuant to this Liquidation Trust Agreement and the Plan.

(b)    <u>Disputed Claims Reserve</u>:  An account or accounts, designated as a "Disputed Claims Reserve," as described more fully in Section 3.2 below (the "Disputed Claims Reserve").

(c)    <u>Wind-Down Reserve Account</u>:    An account, designated as a "Wind-Down Reserve Account," as described more fully in Section 3.3 below.

3.1.2.  <u>Subsequent Establishment of Accounts, Reserves and Escrows</u>.  On or after the Effective Date, the Liquidation Trustee (i) shall establish and maintain such additional accounts, reserves and escrows, to the extent sufficient assets are available, as may be required by applicable law or by order of a court of competent jurisdiction, and (ii) may establish and maintain such additional accounts, reserves and escrows as he deems necessary or desirable to carry out the provisions of the Plan and this Liquidation Trust Agreement.

3.1.3.  <u>Amounts Deposited in Reserves</u>.  The amounts to be initially deposited in the reserves shall be established by the Liquidation Trustee consistent with the terms of the Plan.  Changes in the amounts maintained in the reserves may be made at any time thereafter in the discretion of the Liquidation Trustee.

3.2.  <u>Disputed Claims Reserve</u>.

3.2.1.  Prior to making each of the Distributions under the Plan, the Liquidation Trustee shall create and fund, to the extent that sufficient assets are available, one or more, as appropriate, Disputed Claims reserves (the "Disputed Claims Reserves") with an amount of Cash equal to the Distributions to which holders of Disputed Claims would be entitled under the Plan as of such date if such Disputed Claims were Allowed Claims; <u>provided</u>, <u>however</u>, that the Liquidation Trustee may at any time file a motion(s) pursuant to section 502(c) of the Bankruptcy Code for an order(s) estimating and limiting the amount of Cash which shall be deposited in any Disputed Claims Reserve in respect of any Disputed Claims, with notice and an opportunity to be heard to the affected holders of such Disputed Claims.

4

3.2.2.   After a Final Order has been entered or other final resolution has been reached with respect to any Disputed Claim for which Cash was reserved in a Disputed Claims Reserve, the balance, if any, of Cash remaining in such Disputed Claims Reserve on account of such Claim, after making the Distribution, if any, to which the holder of such Claims became entitled by virtue of such Final Order or other final resolution, shall be transferred to the Distribution Fund.

3.3.   <u>Wind-Down Reserve Account</u>.

3.3.1.   On the Effective Date (or as soon thereafter as practicable), the Liquidation Trustee shall, pursuant to and consistent with the provisions of the Plan, establish the Wind-Down Reserve Account, which shall be funded with such amounts as the Liquidation Trustee determines in its discretion are necessary and appropriate to cover the estimated costs of the Liquidation Trustee in connection with its duties and obligations under the Liquidation Trust Agreement and the Plan, Plan administration costs, costs of holding and liquidation any non-Cash property, and prosecution of any and all Rights of Action and other litigation consistent with this Liquidation Trust Agreement and the Plan, including, but not limited to, taxes and professional fees, and sufficient reserves to cover such costs going forward, provided that the Wind Down Reserve Account shall maintain a minimum funding balance of not less than $[_____] and administered pursuant to the Plan and this Liquidation Trust Agreement for purposes of providing funds necessary to cover the ordinary and reasonable costs, expenses and obligations to be incurred in administering the Liquidation Trust and the Plan as provided for hereunder and under the Plan.

3.3.2.   In connection with making a Distribution of Cash or other assets under the Plan, if the Liquidation Trustee determines, in his sole discretion, that any excess Cash is available from the Wind-Down Reserve Account (the "Excess Wind-Down Reserve Amount"), the Liquidation Trustee may transfer the Excess Wind-Down Reserve Amount to the Distribution Fund for subsequent Distribution to the Beneficiaries pursuant to the terms of the Plan.

3.4.   <u>Use of Assets</u>.  All Cash or other property held or collected by the Liquidation Trustee shall be used solely for the purposes contemplated by the Plan or this Liquidation Trust Agreement.

3.5.   <u>Distributions</u>.  The Liquidation Trustee will distribute at least annually to the Beneficiaries any net income of the Liquidation Trust plus all net proceeds from the liquidation of the Liquidation Trust Assets provided that the Wind Down Reserve Account shall maintain such minimum funds as provided for in Section 3.3.1 of this Liquidation Trust Agreement and such distributions hereunder shall be in excess of the amounts reasonably necessary to maintain the value of the Liquidation Trust Assets or to meet claims or contingent liabilities (including Disputed Claims).

## ARTICLE IV
## POWERS AND DUTIES OF THE LIQUIDATION TRUSTEE

4.1.    <u>Duties of Liquidation Trustee</u>.  The Liquidation Trustee shall have such duties and responsibilities as are specified in the Plan, the Confirmation Order and this Liquidation Trust Agreement.

4.2.    <u>Authority of Liquidation Trustee</u>.  The Liquidation Trust and the Liquidation Trustee, as the representative of each Estate, shall be vested with the property, rights, interests, and powers of the Debtors as specified hereunder, in the Plan or the Confirmation Order.  The Liquidation Trustee shall make continuing efforts to dispose of the Liquidation Trust Assets, make timely distributions and not unduly prolong the duration of the Liquidation Trust.  The Liquidation Trustee's rights and authority include, without limitation, all of the following:

4.2.1.  exercise all power and authority that may be or could have been exercised, commence all proceedings that may be or could have been commenced and take all actions that may be or could have been taken by any officer, director or shareholder of the Debtors with like effect as if authorized, exercised and taken by unanimous action of such officers, directors and shareholders; including, without limitation, amendment of the certificates of incorporation and by-laws of the Debtors, merger of any Debtor into another Debtor and the dissolution of any Debtor;

4.2.2.  maintain escrows and other accounts, make Distributions and take other actions consistent with the Plan and the implementation hereof, including the establishment, re-evaluation, adjustment and maintenance of appropriate reserves, in the name of the Debtors or the Liquidation Trustee, even in the event of the dissolution of the Debtors;

4.2.3.  collect, receive, control, manage and dispose of all Liquidation Trust Assets pursuant to the Plan for the benefit of the Beneficiaries who may receive Distributions under the Plan and administer the winding-up of the affairs of the Debtors including, but not limited to, closing the Chapter 11 Cases;

4.2.4.  act as custodian of the Liquidation Trust Assets and liquidate and reduce such assets to Cash at such time as the Liquidation Trustee deems appropriate to accomplish the purpose of the Liquidation Trust, in accordance with the terms of the Plan and the Liquidation Trust Agreement;

4.2.5.  calculate and pay all Distributions required or permitted to be made under the Plan, this Liquidation Trust Agreement and/or orders of the Bankruptcy Court;

4.2.6.  employ, supervise and compensate attorneys, accountants, financial advisors and other professionals or other persons retained to represent the interests of and serve on behalf of the Liquidation Trust (the "Trust Professionals"), and waive any conflicts of interest as deemed necessary or appropriate in his discretion.  The Liquidation Trustee may commit the

6

Liquidation Trust to and shall pay such Trust Professionals reasonable compensation for services rendered and expenses incurred. A law firm or other professional shall not be disqualified from being employed by the Liquidation Trustee solely because of its current or prior retention as counsel or professional to the Debtors in the Chapter 11 Cases;

4.2.7. file such tax returns as may be required by federal, state or local taxing authorities and consistent with the treatment of the Liquidation Trust as a grantor trust for federal income tax purposes;

4.2.8. object to or seek to recharacterize, reclassify or subordinate Claims filed against any of the Debtors or their Estates, excluding the FDIC-Receiver Claims and the Professional Fee Claims, on any basis, and, to defend, compromise and/or settle any Claims without the necessity of approval of the Bankruptcy Court, and/or to seek Court approval for any Claims settlements, to the extent thought appropriate by the Litigation Trustee or to the extent such approval is required by prior order of the Bankruptcy Court;

4.2.9. seek estimation of contingent or unliquidated Claims, excluding the FDIC-Receiver Claims and the Professional Fee Claims, under section 502(c) of the Bankruptcy Code;

4.2.10. seek determination of tax liability under section 505 of the Bankruptcy Code except to the extent such right has been assigned to the FDIC-Receiver under the Plan;

4.2.11. prosecute, settle, dismiss, abandon or otherwise dispose of turnover actions under sections 542 and 543 of the Bankruptcy Code;

4.2.12. prosecute, settle, dismiss, abandon or otherwise dispose of any and all Rights of Action or any and all other matters of the Debtors or their Estates that it retains pursuant to Article X of the Plan, including, without limitation, all Rights of Action arising under sections 510(c), 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code in accordance with section 1123(b)(3)(B) of the Bankruptcy Code;

4.2.13. invest Cash in accordance with § 345 of the Bankruptcy Code or as otherwise permitted by a Final Order of the Bankruptcy Court and as deemed appropriate by the Liquidation Trustee;

4.2.14. collect any accounts receivable or other claims and assets of the Debtors or the Estates not otherwise disposed of pursuant to the Plan;

4.2.15. enter into any agreement or execute any document required by or consistent with the Plan and perform all of the obligations of the Debtors or the Liquidation Trustee thereunder;

7

4.2.16. pay all expenses and make other necessary payments relating to the Liquidation Trust Assets;

4.2.17. utilize trust assets to purchase or create and carry all appropriate insurance policies and pay all insurance premiums and costs it deems necessary or advisable to insure the acts and omissions of the Liquidation Trustee;

4.2.18. seek the examination of any entity under Bankruptcy Rule 2004;

4.2.19. perform any and all acts necessary or appropriate for the conservation and protection of the Liquidation Trust Assets;

4.2.20. maintain appropriate books and records (including financial books and records);

4.2.21. Such other actions as may be reasonably required in furtherance of the Liquidation Trustee's duties and responsibilities under this Liquidation Trust Agreement and the Plan.

4.2.22. pay fees incurred pursuant to 28 U.S.C. § 1930(a)(6) and to file with the Bankruptcy Court and serve on the United States Trustee monthly financial reports until such time as such reports are no longer required, a Final Decree is entered closing these Cases or the Cases are converted or dismissed, or the Bankruptcy Court orders otherwise;

4.2.23. file with the Bankruptcy Court and serve upon the Post-Confirmation Service List, within 25 days after the end of each month, a monthly report setting forth (i) the receipt and disposition by the Liquidation Trustee of property of the Estates or the Debtors during the prior month, including the disposition of funds in the Liquidation Trust, the Wind-down Reserve and Distribution Fund; (ii) all Disputed Claims resolved by the Liquidation Trustee during such period and all remaining Disputed Claims; (iii) all known material Liquidation Trust Assets remaining to be disposed of; (iv) the status of Rights of Action and other causes of action; (v) an itemization of all expenses the Liquidation Trustee anticipates will become due and payable within the subsequent three months; and (vi) the Liquidation Trustee's forecast of cash receipts and expenses for the subsequent three months; and take any and all other actions necessary or appropriate to implement or consummate the Plan and the provisions of this Liquidation Trust Agreement.

4.3.    Limitations on the Liquidation Trustee.  Notwithstanding anything in this Liquidation Trust Agreement to the contrary, the Liquidation Trustee, in his capacity as such, shall not do or undertake any of the following:  (i) guaranty any debt; (ii) loan Liquidation Trust Assets; (iii) purchase Liquidation Trust Assets from the Liquidation Trust; (iv) transfer Liquidation Trust Assets to another trust with respect to which the Liquidation Trustee serves as trustee; or (v) except as otherwise reasonably necessary to maintain the value of the Liquidation Trust Assets and to further the Liquidation purpose of the Liquidation Trust, invest Liquidation Trust Assets other than in short-term, liquid investments, such as bank

demand and time deposits, short-term bank or saving institution certificates of deposit or Treasury Bills.

4.4.   <u>Liquidation Trustee and Conflicts of Interest</u>.   If the Liquidation Trustee determines, in the exercise of his reasonable discretion, that he has a material conflict of interest with respect to the settlement of a Claim, the resolution or prosecution of a Right of Action or any other matter, the Liquidation Trustee may select a designee to act on behalf of the Liquidation Trust solely with respect to such matter (the "Designee"), with such Designee's authority to act on behalf of the Liquidation Trust to terminate upon the matter's conclusion.   If the Designee files a pleading, motion or other filing with a court or tribunal on behalf of the Liquidation Trust, it shall do so in its own name as "Designee of the GFGI Liquidation Trust."

4.5.   <u>Register of Beneficiaries</u>.   The Liquidation Trustee shall obtain the Claims Register as of the initial Distribution Date from the Clerk and shall use the Claims Register to identify the names, addresses, and amounts of Claims of the Beneficiaries (the "Liquidation Register").   The Liquidation Trustee shall maintain the Liquidation Register , and shall add thereto information regarding whether each Claim of each Beneficiary is Allowed or Disallowed , and any informational changes  to the Liquidation Register will be made upon notification proper under this Liquidation Trust Agreement submitted to the Liquidation Trustee.   The Liquidation Trustee shall not be liable for relying on the accuracy of the Liquidation Register, provided that he has properly maintained the Register in accordance with this Liquidation Trust Agreement.

4.6.   <u>Books and Records</u>.   The Liquidation Trustee also shall maintain in respect of the Liquidation Trust and the Beneficiaries, books and records relating to the Liquidation Trust Assets and income realized therefrom and the payment of expenses of and claims against or assumed by the Liquidation Trust in such detail and for such period of time as may be necessary to enable him to make full and proper reports in respect thereof.   Such books and records shall be maintained in a manner consistent with the Plan and this Liquidation Trust Agreement.   Except as expressly provided in this Liquidation Trust Agreement, the Plan or the Confirmation Order, nothing in the Liquidation Trust Agreement is intended to require the Liquidation Trustee to file any accounting or seek approval of any court with respect to the administration of the Liquidation Trust, or as a condition for making any payment or distribution out of the Liquidation Trust Assets.

4.7.   <u>Tax Returns</u>.   The Liquidation Trustee shall file such tax returns as may be required by federal, state or local taxing authorities and consistent with the treatment of the Liquidation Trust as a grantor trust for federal income tax purposes.   The Liquidation Trustee shall file federal income tax returns consistent with and pursuant to §1.671-4(a) of the Income Tax Regulations.

4.8.   <u>Final Accounting of Liquidation Trustee</u>.   The Liquidation Trustee shall within ninety days after the termination of the Liquidation Trust or his resignation, removal, liquidation or death (in which case, the obligation contained in this Section shall pass to the Liquidation Trustee's estate), render a final accounting containing at least the following information:

9

4.8.1.   A description of the Liquidation Trust Assets and their disposition;

4.8.2.   A summarized accounting in sufficient detail of all gains, losses, receipts, disbursements and other transactions in connection with the Liquidation Trust and the Liquidation Trust Assets during the Liquidation Trustee's term of service, including their source and nature;

4.8.3.   Separate entries for all receipts of principal and income;

4.8.4.   The ending balance of all Liquidation Trust Assets as of the date of the Liquidation Trustee's accounting, including the Cash balance on hand and the name and location of the depository where it is kept;

4.8.5.   All known liabilities owed by the Liquidation Trust; and

4.8.6.   The then current Register of Allowed and Disputed Claims.

The final accounting shall be filed with the Bankruptcy Court.

## ARTICLE V
## LIABILITY OF LIQUIDATION TRUSTEE

5.1.   <u>Appointment</u>.   The Liquidation Trustee is Wilmington Trust Company FSB, solely in its capacity as Liquidation Trustee of the GFGI Liquidation Trust and not otherwise.

5.2.   <u>Resignation</u>.   The Liquidation Trustee may resign by giving not less than thirty (30) days' prior written notice thereof to the Post-Confirmation Service List; <u>provided, however</u>, that such resignation shall not become effective until the appointment and Bankruptcy Court approval of a successor Liquidation Trustee in accordance with Section 5.4 hereof.   If a Liquidation Trustee resigns from its position hereunder, subject to a final accounting, such Liquidation Trustee, including its professionals, attorneys, and advisors, shall be entitled to all accrued but unpaid fees, expenses, and other compensation to the extent incurred, arising or relating to events occurring before such resignation, and any out-of-pocket expenses reasonably incurred in connection with the transfer of all powers and duties to the successor Liquidation Trustee.

5.3.   <u>Removal</u>.   At any time upon the request of a party-in-interest through a motion filed in the Bankruptcy Court, the Bankruptcy Court may remove the Liquidation Trustee for cause.   For purposes of this Section 5.3, "cause" shall mean:   (a) an act of fraud, embezzlement, or theft in connection with the Liquidation Trustee's duties or in the course of his employment in such capacity, (b) the intentional wrongful damage to the Liquidation Trust Assets, (c) the intentional wrongful disclosure of confidential information of the Liquidation Trust resulting in material harm to the Liquidation Trust, or (d) gross negligence by the Liquidation Trustee in connection with the performance of his duties under this Liquidation Trust Agreement.   Unless the Bankruptcy Court orders immediate removal, the Liquidation Trustee shall continue to serve until a successor Liquidation Trustee is appointed, and such

d-1919232

appointment becomes effective, in accordance with Section 5.4 hereof.  If the Liquidation Trustee is removed for cause, such Liquidation Trustee shall not be entitled to any accrued but unpaid fees, expenses or other compensation under this Liquidation Trust Agreement or otherwise.  If the Liquidation Trustee is unwilling or unable to serve (i) by virtue of his inability to perform his duties under this Liquidation Trust Agreement due to death, illness, or other physical or mental disability, or (ii) for any other reason whatsoever other than for "cause," subject to a final accounting, such Liquidation Trustee shall be entitled to all accrued but unpaid fees, expenses, and other compensation, to the extent incurred, arising or relating to events occurring before his removal or resignation, and to any out-of-pocket expenses reasonably incurred in connection with the transfer of all powers and duties and all rights to any successor Liquidation Trustee.

5.4.     Appointment of Successor Liquidation Trustee.  In the event of a vacancy by reason of resignation of the Liquidation Trustee, Wilmington Trust shall designate the successor Liquidating Trustee, without further order of the Court, by providing 30 days written notice to the Post-Confirmation Service List provided that the successor Liquidation Trustee is appointed pursuant to the Liquidation Trust Agreement.   In the event of vacancy for any other reason, including, the death or immediate removal of the Liquidation Trustee or prospective vacancy by reason of removal, Wilmington Trust shall have the right to designate the successor Liquidation Trustee, but the Bankruptcy Court shall be vested with final authority to appoint the successor Liquidation Trustee consistent with the best interests of the Beneficiaries of the Liquidation Trust.  No successor Liquidation Trustee shall in any event have any liability or responsibility for the acts or omissions of any of his or her predecessors. Every successor Liquidation Trustee shall execute, acknowledge and file with the Bankruptcy Court and deliver to the Post-Confirmation Service List an instrument in writing accepting such appointment hereunder, and thereupon such successor Liquidation Trustee, without any further act, shall become fully vested with all of the rights, powers, duties and obligations of his or her predecessor.

5.5.     Continuity.  The death, resignation or removal of the Liquidation Trustee shall not terminate the Liquidation Trust or revoke any existing agency (other than any agency of such Liquidation Trustee as a Liquidation Trustee) created pursuant to the Liquidation Trust Agreement or invalidate any action theretofore taken by the Liquidation Trustee, and the successor Liquidation Trustee agrees that the provisions of the Liquidation Trust Agreement shall be binding on and inure to the benefit of each successor Liquidation Trustee and all his heirs and legal and personal representatives, successors or assigns.  In the event of the resignation or removal of the Liquidation Trustee, such Liquidation Trustee shall (a) execute and deliver by the effective date of his resignation or removal such documents, instruments and other writings as may be reasonably required to effect the termination of such Liquidation Trustee's capacity under this Liquidation Trust Agreement and (b) assist and cooperate in effecting the assumption of such Liquidation Trustee's obligations and functions by the successor Liquidation Trustee. If, for any reason, the Liquidation Trustee fails to execute the documents described in clause (a) of the preceding sentence, the Bankruptcy Court may enter such orders as are necessary to effect termination of such Liquidation Trustee's capacity under this Liquidation Trust Agreement.

5.6.   <u>Compensation</u>.  The Liquidation Trustee shall be compensated on an hourly basis based on his normal and customary rates for such services and shall be entitled to reimbursement of expenses incurred.  Any Trust Professionals or agents retained or utilized by the Liquidation Trustee shall be entitled to reasonable compensation for services rendered and reimbursement of expenses incurred.  Compensation of the Liquidation Trustee and the Trust Professionals shall be paid out of the Wind-Down Reserve.  After the Effective Date, the payment of the fees and expenses of the Liquidation Trustee and his agents, financial advisors, attorneys, consultants, independent contractors, representatives and other Trust Professionals shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court.  Any successor Liquidation Trustee shall receive such reasonable compensation and reimbursement of expenses in the same manner as the initial Liquidation Trustee.

5.7.   <u>Exculpation</u>.  From and after the Effective Date, the Liquidation Trustee and the Trust Professionals shall be exculpated by the Estates and all Holders of Claims or Interests from any and all claims or causes of action and assertions of liability arising out of their performance of the duties conferred upon them by the Plan, the Liquidation Trust Agreement, or any orders of the Bankruptcy Court, except to the extent an act constitutes bad faith, gross negligence, willful misconduct, or actual fraud.  No holder of a Claim or Interest or representative thereof shall have or pursue any claim or cause of action against the Liquidation Trustee or its professionals for taking any action in accordance with the Plan, the Liquidation Trust Agreement, or to implement the provisions of the Plan or any order of the Bankruptcy Court.  Nothing in this provision shall be deemed to alter the provisions of the Liquidation Trust Agreement.

5.8.   <u>Indemnification</u>.  The Liquidation Trust shall indemnify and hold harmless (i) the Liquidation Trustee and (ii) the Trust Professionals (collectively, the "Indemnified Parties"), from and against and with respect to any and all liabilities, losses, damages, claims, costs and expenses, including, but not limited to, attorneys' fees, arising out of or due to their actions or omissions, or consequences of such actions or omissions, with respect to the Liquidation Trust Agreement, the Estates or the implementation or administration of the Plan, if the Indemnified Parties acted in good faith and in a manner reasonably believed to be in or not opposed to the best interests of the Beneficiaries, and, with respect to any criminal action or proceeding, had no reasonable cause to believe its conduct was unlawful.  To the extent the Liquidation Trust indemnifies and holds harmless the Indemnified Parties as provided above, the legal fees and related costs incurred by counsel to the Liquidation Trustee in monitoring and participating in the defense of the claims giving rise to the right of indemnification shall be paid from the Liquidation Trust Assets.

5.9.   <u>Insurance</u>.  The Liquidation Trustee shall be authorized to obtain all reasonably necessary insurance coverage for himself and the Trust Professionals, including, but not limited to, coverage with respect to (i) any property that is or may in the future become the property of the Liquidation Trust, and (ii) the liabilities, duties and obligations of the Liquidation Trustee and the Trust Professionals (in the form of an errors and omissions policy or otherwise), the latter of which insurance coverage may, at the sole option of the Liquidation Trustee, remain in effect for a reasonable period after the conclusion of the Liquidation Trustee's service.

d-1919232

5.10.   <u>Reliance by Liquidation Trustee</u>.  The Liquidation Trustee may rely, and shall be fully protected in acting or refraining from acting if he relies, upon any resolution, statement, certificate, instrument, opinion, report, notice, request, consent, order, or other instrument or document that the Liquidation Trustee reasonably believes to be genuine and to have been signed or presented by the proper party or parties or, in the case of cables, telecopies, e-mails and telexes, to have been sent by the proper party or parties, and the Liquidation Trustee may conclusively rely as to the truth of the statements and correctness of the opinions expressed therein.  The Liquidation Trustee may consult with counsel and other professionals with respect to matters in their area of expertise, and any opinion of counsel shall be full and complete authorization and protection in respect of any action taken or not taken by the Liquidation Trustee.  The Liquidation Trustee shall be entitled to rely upon the advice of such professionals in acting or failing to act, and shall not be liable for any act taken or not taken in reliance thereon.  The Liquidation Trustee shall have the right at any time to seek and rely upon instructions from the Bankruptcy Court concerning this Liquidation Trust Agreement, the Plan, the Confirmation Order or any other document executed in connection therewith, and the Liquidation Trustee shall be entitled to rely upon such instructions in acting or failing to act and shall not be liable for any act taken or not taken in reliance thereon.  The Liquidation Trustee may rely upon the Debtors' filed schedules and statements of financial affairs and all other information provided by the Debtors or their representatives to the Liquidation Trustee concerning Claims filed against the Debtors, and their reconciliation and documents supporting such reconciliation.

5.11.   <u>Reliance by Persons Dealing with the Liquidation Trustee</u>.  In the absence of actual knowledge to the contrary, any person dealing with the Liquidation Trustee shall be entitled to rely on the authority of the Liquidation Trustee to act on behalf of the Liquidation Trust and shall have no obligation to inquire into the existence of such authority.

**ARTICLE VI**
**BENEFICIARIES**

6.1.   <u>Interest Beneficial Only</u>.  The ownership of a beneficial interest in the Liquidation Trust shall not entitle any Beneficiary under the Liquidation Trust to any title in or to the Liquidation Trust Assets or to any right to call for a partition or division of the Liquidation Trust Assets or to require an accounting, except as specifically provided by this Liquidation Trust Agreement.

6.2.   <u>Evidence of Beneficial Interest</u>.  Ownership of a beneficial interest in the Liquidation Trust Assets shall not be evidenced by any certificate, security or receipt or in any other form or manner whatsoever, except as maintained on the books and records of the Liquidation Trust by the Liquidation Trustee.

6.3.   <u>Registration of Beneficial Interest</u>.  The Liquidation Trustee shall cause the Register to be kept at his office or at such other place or places as may be designated by the Liquidation Trustee from time to time.  The Register shall reflect the ownership of the beneficial interests of the Beneficiaries.

13

6.4.    <u>Absolute Owners</u>.   The Liquidation Trustee may deem and treat the Beneficiaries reflected as the owner of a beneficial interest on the Register as the absolute owner thereof for the purposes of receiving Distributions and payments on account thereof for federal and state income tax purposes and for all other purposes whatsoever.

6.5.    <u>Standing of Beneficiary</u>.  Except as expressly provided in the Liquidation Trust Agreement, the Plan or the Confirmation Order, a Beneficiary does not have standing to direct the Liquidation Trustee to do or not to do any act or to institute any action or proceeding at law or in equity against any party (other than the Liquidation Trustee) upon or with respect to the Liquidation Trust Assets.

6.6.    <u>Non-Transferability</u>.  Beneficial interests in the Liquidation Trust shall not be subject to assignment or alienation, either voluntary or involuntary, other than by operation of law.  A Beneficiary shall not be entitled to sell, assign, exchange, pledge or otherwise transfer or convey its beneficial interest in the Liquidation Trust or any right or interest therein.

# ARTICLE VII
## TAXES

7.1.    <u>Income Tax Status</u>.  Consistent with the Revenue Procedure 94-45, 1994-28 I.E. 124, the Liquidation Trust shall be treated as a Liquidation trust pursuant to the Treasury Regulation Section 301.7701-4(d) and as a grantor trust pursuant to Sections 671-677 of the Internal Revenue Code.  As such, the Beneficiaries will be treated as the grantors of the Liquidation Trust and the deemed owners of the Liquidation Trust Assets.  All items of income, deductions and credit loss of the Liquidation Trust shall be allocated for federal income tax purposes to the Beneficiaries based on their respective interests in the Liquidation Trust, including Beneficiaries holding Disputed Claims, in such manner as the Liquidation Trustee deems reasonable and appropriate.  The Liquidation Trustee will consistently value the Liquidation Trust Assets and such valuation will be used for all federal income tax purposes by the Liquidation Trust and the Beneficiaries.

7.2.    <u>Tax Returns</u>.  The Liquidation Trustee shall make such timely filing with the Internal Revenue Service, other taxing authorities, and the Beneficiaries as required under Treas. Reg. § 1.671.4 or other applicable law.

7.3.    <u>Withholding of Taxes Related to Liquidation Trust Operations</u>.  To the extent that the operation of the Liquidation Trust or the liquidation of the Liquidation Trust Assets creates a tax liability in excess of applicable net operating losses, the Liquidation Trust shall promptly pay such tax liability and any such payment shall be considered a cost and expense of the operation of the Liquidation Trust payable from the Liquidation Trust Assets.  The Liquidation Trustee may reserve a sum, the amount of which shall be determined by the Liquidation Trustee in his sole discretion, sufficient to pay any accrued or potential tax liability of the Liquidation Trust.  In the exercise of his discretion and judgment, the Liquidation Trustee may enter into agreements with taxing authorities or other governmental units settling, compromising, or otherwise establishing the amount of any tax liability of the Liquidation Trust.  The foregoing notwithstanding, consistent with its status as a grantor trust,

14

the Beneficiaries shall be responsible for the payment of federal income taxes on their allocable portion of any taxable income of the Liquidation Trust.

# ARTICLE VIII
## MISCELLANEOUS PROVISIONS

8.1.   <u>Descriptive Headings</u>.   The headings contained in this Liquidation Trust Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Liquidation Trust Agreement.

8.2.   <u>Amendment</u>.   This Liquidation Trust Agreement may not be amended except by an instrument executed by the Liquidation Trustee with the approval of the Bankruptcy Court following the Effective Date.

8.3.   <u>Governing Law</u>.   This Liquidation Trust Agreement shall be governed by and construed in accordance with the laws of the State of Texas without regard to the rules of conflict of laws of the State of Texas or any other jurisdiction.

8.4.   <u>Counterparts; Effectiveness</u>.   This Liquidation Trust Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original but all of which shall constitute one and the same agreement.   This Liquidation Trust Agreement shall become effective when each party hereto shall have received counterparts thereof signed by all the other parties hereto.

8.5.   <u>Severability; Validity</u>.   If any provision of this Liquidation Trust Agreement or the application thereof to any person or circumstance is held invalid or unenforceable, the remainder of this Liquidation Trust Agreement, and the application of such provision to other persons or circumstances, shall not be affected thereby, and to such end, the provisions of this Liquidation Trust Agreement are agreed to be severable.

8.6.   <u>No Waiver by Liquidation Trustee</u>.   No failure by the Liquidation Trustee to exercise or delay in exercising any right, power or privilege hereunder shall operate as a waiver, nor shall any single or partial exercise of any right, power or privilege hereunder preclude any further exercise thereof, or of any other right, power or privilege.

8.7.   <u>Preservation of Privilege and Defenses</u>.   In connection with the rights, claims, and Rights of Action and any objections to Disputed Claims prosecuted or resolved by the Liquidation Trustee in accordance with the Plan (including, without limitation, all defenses, counterclaims, setoffs and recoupments belonging to the Debtors), any applicable privilege or immunity of the Debtors, including, without limitation, any attorney-client privilege or work-product privilege attaching to any documents or communications (whether written or oral) shall vest in the Liquidation Trust.

8.8.   <u>Prevailing Party</u>.   If the Liquidation Trust is the prevailing party in a dispute regarding the provisions of this Liquidation Trust Agreement or the enforcement thereof, the Liquidation Trust shall be entitled to collect any and all costs, expenses and fees, including

attorneys' fees, from the non-prevailing party incurred in connection with such dispute or enforcement action.

8.9.  No Bond.  Notwithstanding any state law to the contrary, the Liquidation Trustee (including any successor Liquidation Trustee) shall be exempt from giving any bond or other security in any jurisdiction.

8.10.  Notices.  Any notice or other communication hereunder shall be in writing and shall be deemed given upon (a) confirmation of receipt of a facsimile transmission, (b) confirmed delivery by a standard overnight carrier or when delivered by hand, or (c) the expiration of five (5) Business Days after the day when mailed by registered or certified mail (postage prepaid, return receipt requested), addressed to the respective parties at the following addresses (or such other address for a party as shall be specified by like notice):

> *If the Liquidation Trustee, to:*
>
> Wilmington Trust Company FSB
> Rodney Square North
> 1100 North Market Street
> Wilmington, DE 19890
> Attn: Steven M. Cimalore, authorized agent
>
> With a copy to:
>
> Douglas A. Spelfogel, Esq..
> Foley & Lardner LLP
> 90 Park Avenue
> New York, NY 10016-1314

and

> If to a Beneficiary:
>
> To the name and address set forth in the Register or on the service list used for service of the Plan.

8.11.  Irrevocability. The Liquidation Trust is irrevocable.

8.12.  Relationship to Plan.  The Liquidation Trustee shall have full power and authority to take any action consistent with the purposes and provisions of the Plan.  However, in the event that the provisions of this Liquidation Trust Agreement are found to be inconsistent with the provisions of the Plan, the provisions of the Plan shall control.

8.13.  Retention of Jurisdiction.  As provided in Article XII of the Plan, the Bankruptcy Court shall retain jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Plan, including, but not limited to, interpreting and implementing the provisions of this Liquidation Trust Agreement.

d-1919232

8.14.  <u>Successors or Assigns</u>.  The terms of the Liquidation Trust Agreement shall be binding upon, and shall inure to the benefit of the parties hereto and their respective successors and assigns.

**IN WITNESS WHEREOF**, the parties hereto have either executed and acknowledged this Liquidation Trust Agreement, or caused it to be executed and acknowledged on their behalf by their duly authorized representatives all as of the date first above written.

GUARANTY FINANCIAL GROUP INC.,
(on its own behalf and on behalf of all Debtors)

By: _____
Dennis Faulkner
Chief Restructuring Officer for the Debtors


WILMINGTON TRUST COMPANY FSB,
SOLELY IN ITS CAPACITY AS
LIQUIDATION TRUSTEE OF THE GFGI
LIQUIDATION TRUST

By:_____
Steven M. Cimalore
Authorized Agent

17

**EXHIBIT "2"**
**ORGANIZATIONAL STRUCTURE**

**Guaranty**
FINANCIAL GROUP INC.

**Guaranty Financial Group Inc.**
*Delaware*
74-2421034

**Guaranty Group Capital Inc.**
*Delaware*
74-2555146

**Guaranty Holdings Inc. I**
*Delaware*
75-2244180

**Guaranty Group Ventures Inc.**
*Delaware*
74-2366105

**Guaranty Bank**
*Federally Chartered Savings Bank*
74-2511478

**Guaranty Plus Holding Company**
*Nevada*
20-0349464

**RWHC, Inc.**
*Nevada*
74-2829168

**TMF Holding Inc.**
*Delaware*
75-2816428

**Guaranty Business Credit Corporation**
*Delaware*
75-2820595

**GFIS Holdings Inc.**
*Texas*
26-2202529

**American Finance Group, Inc.**
*Delaware*
94-3226128

**Guaranty Financial Insurance Solutions Inc.**
*Delaware*
26-2203343

**Guaranty Plus Properties Inc. - I**
*Delaware*
20-0349556

**Guaranty Plus Properties LLC - 2**
*Texas*
26-2484538

**Guaranty Plus Properties LLC - 3**
*Texas*
26-2484678

**Guaranty Plus Properties LLC - 4**
*Texas*
26-2484865

**Guaranty Plus Properties LLC - 5**
*Texas*
26-2484908

**Guaranty Plus Properties LLC - 6**
*Texas*

**Guaranty Plus Properties LLC - 7**
*Texas*

**Guaranty Plus Properties LLC - 8**
*Texas*

**Guaranty Plus Properties LLC - 9**
*Texas*

All subsidiaries are wholly owned. Non-affiliated entities are shown on the next page.

GFG Organization Chart as of 1/14/2009

**EXHIBIT "3"**
**PREFERENTIAL TRANSFERS**

# EXHIBIT 3

**Summary of Payments to Creditors Within 90 Days Prior to Petition Date**

| Payee | Address | Payment Date | Amount |
|-------|---------|--------------|--------|
| Computershare Inc. | 250 Royall St. Canton, MA 02021 | 06/10/09 07/08/09 08/10/09 | $1,864.65 $1,879.59 <u>$3,355.26</u> $7,099.50 |
| Davis Polk & Wardwell | 1600 El Camino Real Menlo Park, CA 94025 | 06/12/09 07/24/09 08/12/09 08/21/09 | $36,360.52 $20,196.00 $59,267.94 <u>$70,115.81</u> $185,940.27 |
| Delaware Secretary of State | Division of Corporations PO Box 11728 Newark, NJ 07101-4728 | 06/17/09 | <u>$66,990.00</u> $66,990.00 |
| Ebe & Associates | 114 W. 7th Street, Suite 800 Austin, TX 78701 | 08/21/09 | <u>$5,638.00</u> $5,638.00 |
| Fulbright & Jaworski LLP | 2200 Ross Avenue, Suite 2800 Dallas, TX 75201-2784 | 06/11/09 07/23/09 07/28/09 | $35,376.53 $8,902.55 <u>$18,635.00</u> $62,914.08 |
| Haynes and Boone, LLP * | 2323 Victory Avenue, Suite 700 Dallas, TX 75219 | 08/13/09 08/18/09 08/21/09 08/24/09 | $53,730.05 $25,000.00 $81,414.57 <u>$51,474.76</u> $211,619.38 |

| Payee | Address | Payment Date | Amount |
|---|---|---|---|
| McAfee & Taft | 211 N. Robinson, Suite 1000<br>Oklahoma City, OK 73102-7103 | 08/11/09 | $7,539.75<br>$7,539.75 |
| Sneed Vine & Perry | PO Box 1409<br>Austin, TX 78767 | 06/25/09 | $19,666.66<br>$19,666.66 |
| Thomson Financial | PO Box 5136<br>Carol Stream, IL 60197-5136 | 07/27/09 | $14,231.14<br>$14,231.14 |
| Wilmington Trust SP Services * | PO Box 8985<br>Wilmington, DE 19801 | 08/04/09 | $5,750.00<br>$5,750.00 |

* This entity is receiving a full release pursuant to the terms of the Plan

**Summary of Transfers to Insiders Within One Year Prior to Petition Date**

| Name of Recipient<br>Relationship to Debtor | Date & Purpose of Withdrawal | Amount of Money or<br>Description & Value<br>of Property |
|---|---|---|
| Scott Almy<br>Senior Executive Vice President; Chief Legal & Governance<br>Officer; General Counsel & Secretary | 2008 Base Pay<br>2008 Bonus<br>2008 Physicals<br>2009 Base Pay | $56,762.49<br>$33,250.00<br>$950.00<br><u>$37,707.70</u><br>$128,670.19 |
| Michael Calcote<br>Officer | 2008 Base Pay<br>2008 Bonus<br>2008 Physicals<br>2008 Relocation<br>2009 Base Pay<br>2009 Severance | $8,221.15<br>$22,065.93<br>$150.00<br>$1,329.14<br>$1,738.36<br><u>$550,000.00</u><br>$583,504.57 |
| Gloria Calcote<br>Officer | 2008 Base Pay<br>2008 Bonus<br>2009 Base Pay | $24,092.54<br>$1,425.00<br><u>$15,711.54</u><br>$41,229.08 |
| Bernard Crawford | 2009 Severance | <u>$102,800.00</u><br>$102,800.00 |
| Kenneth Dubuque<br>Director/Officer | 2009 Severance | <u>$1,300,000.00</u><br>$1,300,000.00 |

| Name of Recipient<br>Relationship to Debtor | Date & Purpose of Withdrawal | Amount of Money or<br>Description & Value<br>of Property |
|---|---|---|
| Craig Gifford<br>Officer | 2008 Base Pay<br>2008 Bonus | $9,858.51<br>$4,000.00<br>$13,858.51 |
| Robert Greenwood<br>Officer | 2009 Severance | $850,000.00<br>$850,000.00 |
| Karen Hartnett<br>Officer | 2008 Base Pay<br>2008 Bonus<br>2009 Base Pay<br>2009 Severance | $54,239.05<br>$33,250.00<br>$1,937.43<br>$550,000.00<br>$639,426.48 |
| Jerry Hickenbottom<br>Officer | 2009 Severance | $550,000.00<br>$550,000.00 |
| Rusty LaForge<br>Senior Vice President, Investor Relations | 2008 Base Pay<br>2009 Base Pay | $175,000.01<br>$107,692.31<br>$282,692.32 |
| Prince McKnight<br>Senior Vice President; Chief Compliance Officer & Chief Privacy Officer | 2008 Base Pay<br>2009 Base Pay | $22,310.77<br>$14,381.54<br>$36,692.31 |
| Gail Moseley<br>Assistant Secretary | 2008 Base Pay<br>2008 Bonus<br>2009 Base Pay | $17,366.75<br>$460.00<br>$10,912.60<br>$28,739.35 |

| Name of Recipient<br>Relationship to Debtor | Date & Purpose of Withdrawal | Amount of Money or<br>Description & Value<br>of Property |
|---|---|---|
| Christian Otteson<br>Officer | 2008 Base Pay<br>2008 Bonus<br>2009 Base Pay | $34,163.47<br>$5,700.00<br><u>$15,029.37</u><br>$54,892.84 |
| Janie Perelman<br>Officer | 2008 Base Pay<br>2008 Bonus<br>2009 Base Pay | $35,555.57<br>$1,425.00<br><u>$12,367.13</u><br>$49,347.69 |
| Stephen Raffaele<br>Senior Executive Vice President; Chief Financial Officer | 2008 Base Pay<br>2008 Physicals<br>2009 Base Pay | $7,776.92<br>$150.00<br><u>$4,800.00</u><br>$12,726.92 |
| Sarah Roberts<br>Assistant Secretary | 2008 Base Pay<br>2008 Bonus<br>2009 Base Pay | $12,879.02<br>$1,520.00<br><u>$7,950.76</u><br>$22,349.78 |
| Harold Shults | 2008 Severance | <u>$460,000.00</u><br>$460,000.00 |
| Richard Stephens<br>Assistant Secretary | 2008 Base Pay<br>2009 Base Pay | $16,090.27<br><u>$10,190.77</u><br>$26,281.03 |

| Payee | Address | Payment Date | Amount |
|---|---|---|---|
| Bill Walker | 7 Treemont<br>Austin, TX 78746 | 08/29/08 | <u>$49,504.24</u><br>$49,504.24 |
| Dr. Leigh McAlister | 1609 Manana St.<br>Austin, TX 78730 | 08/29/08 | <u>$25,504.16</u><br>$25,504.16 |
| Guaranty Insurance<br>Services, Inc. | 3721 Executive Center Drive<br>Austin, TX 78731 | 01/08/09<br>01/08/09<br>01/08/09<br>01/08/09<br>01/12/09 | $432,000.00<br>$432,000.00<br>$970,000.00<br>$110,000.00<br><u>$77,108.85</u><br>$2,021,108.85 |
| Kenneth M. Jastrow II | 1242 Pt Ranch Rd.<br>Round Mountain, TX 78663 | 08/29/08 | <u>$23,123.88</u><br>$23,123.88 |
| Raul Romero | 1600 Colonial Hills Dr.<br>McLean, VA 22102 | 08/29/08 | <u>$27,754.16</u><br>$27,754.16 |
| Guaranty Bank * | 1300 S. Mopac Expressway<br>Austin, TX 78746 | 08/29/08<br>09/15/08<br>09/29/08<br>09/29/08<br>10/20/08<br>10/20/08<br>11/14/08<br>11/20/08<br>11/20/08<br>12/22/08<br>12/22/08<br>12/30/08<br>12/31/08<br>01/20/09<br>01/20/09<br>02/20/09<br>02/20/09 | $25,098.46<br>$450,000.00<br>$5,211.68<br>$18,148.77<br>$16,308.85<br>$1,811.83<br>$1,552.60<br>$18,482.23<br>$3,347.20<br>$17,336.72<br>$2,932.01<br>$29,693.63<br>$1,100,773.35<br>$15,361.42<br>$18,174.58<br>$21,976.60<br>$1,847.47 |

| Payee | Address | Payment Date | Amount |
|-------|---------|--------------|--------|
| | | 03/16/09 | $3,953.00 |
| | | 03/20/09 | $19,615.85 |
| | | 03/20/09 | $2,318.08 |
| | | 03/31/09 | $3,829,192.33 |
| | | 04/20/09 | $26,546.95 |
| | | 04/20/09 | $3,717.66 |
| | | 05/14/09 | $29,729,953.00 |
| | | 05/15/09 | $1,150,000.00 |
| | | 05/20/09 | $26,728.68 |
| | | 06/19/09 | $34,415.21 |
| | | 06/19/09 | $1,535.04 |
| | | 06/30/09 | $935,815.07 |
| | | 06/30/09 | $7,338.67 |
| | | 07/17/09 | $26,396.70 |
| | | 07/17/09 | $1,649.47 |
| | | 07/20/09 | $494.41 |
| | | 07/31/09 | $28,056.80 |
| | | 07/31/09 | $2,886.17 |
| | | 08/19/09 | <u>$1,393.33</u> |
| | | | $37,580,064.82 |
| Guaranty Business Credit Corporation | 1300 S. Mopac Expressway Austin, TX 78746 | 05/14/09 | <u>$1,837,929.00</u> |
| | | | $1,837,929.00 |
| Guaranty Capital Corporation | 1300 S. Mopac Expressway Austin, TX 78746 | 05/14/09 | <u>$1,718,003.00</u> |
| | | | $1,718,003.00 |
| Guaranty Plus Holding Company | 1300 S. Mopac Expressway Austin, TX 78746 | 09/15/08 | $88,000.00 |
| | | 05/14/09 | <u>$251,243.00</u> |
| | | | $339,243.00 |
| Guaranty Plus Properties, LLC-2 | 1300 S. Mopac Expressway Austin, TX 78746 | 09/15/08 | $496,000.00 |
| | | 05/14/09 | <u>$1,693,733.00</u> |
| | | | $2,189,733.00 |
| RWHC, Inc. | 101 Convention Center Drive Suite 850 | 05/14/09 | <u>$78,615.00</u> |
| | | | $78,615.00 |

| Payee | Address | Payment Date | Amount |
|-------|---------|--------------|--------|
| | Las Vegas, NV 89109 | | |
| Temple-Inland Financial Services, Inc. | 1300 S. Mopac Expressway Austin, TX 78746 | 09/22/08 | $1,832,544.00 $1,832,544.00 |
| TMF Holding, Inc. | 1300 S. Mopac Expressway Austin, TX 78746 | 09/15/08 | $6,000.00 $6,000.00 |

* This entity is receiving a full release pursuant to the terms of the Plan

**EXHIBIT "4"**
**PLAN SUPPORT AGREEMENT**

## PLAN SUPPORT AGREEMENT

This Plan Support Agreement (the "Agreement") is made and executed as of December

__, 2010 among GUARANTY FINANCIAL GROUP INC. ("GFG"), GUARANTY GROUP

VENTURES INC. ("GGVI"), GUARANTY HOLDINGS INC. I ("GHI"), and GUARANTY

GROUP CAPITAL INC. ("GGCI") (collectively, the "Debtors"); WILMINGTON TRUST

COMPANY FSB, as indenture trustee ("WTC") and FEDERAL DEPOSIT INSURANCE

CORPORATION, IN ITS CAPACITY AS RECEIVER FOR GUARANTY BANK (the "FDIC-

Receiver") (the Debtors, WTC and the FDIC-Receiver are referred herein individually as a

"Party" and referred to herein collectively as the "Parties").

### RECITALS

A.     On August 21, 2009 (the "Receivership Date"), the Director of the Office of

Thrift Supervision appointed FDIC-Receiver as receiver for Guaranty Bank and advised that

FDIC-Receiver was to immediately take possession of Guaranty Bank (the "Receivership").

B.     On August 27, 2009, the Debtors filed voluntary petitions for relief under Chapter

11 of the Bankruptcy Code (the "Bankruptcy Case") in the Bankruptcy Court for the Northern

District of Texas, Dallas Division (the "Bankruptcy Court").

C.     Subsequent to the filing of the bankruptcy petitions, the members of the Board of

Directors of each of the Debtors resigned, and Dennis Faulkner was elected as the sole director

of each of the Debtors.  On November 10, 2009, the Bankruptcy Court authorized the Debtors to

employ Lain Faulkner & Co., P.C. and appointed Dennis Faulkner as Chief Restructuring Officer

of the Debtors.

D.     During the Bankruptcy Case, the FDIC-Receiver filed proofs of claim against

each of the Debtors (the "FDIC-Receiver Proofs of Claim") and filed the FDIC-Receiver's

Motion of the Federal Deposit Insurance Corporation, as Receiver for Guaranty Bank, for an Order Modifying the Automatic Stay as to Property and Granting Setoff By the FDIC-Receiver, *In re Guaranty Financial Group, Inc.*, Case No. 09-35582-bjh (Bankr. N.D. Tex. Jan. 28, 2010) [Docket No. 177] (the "Motion for Relief from Stay").  The Debtors and WTC oppose the relief requested in the Motion for Relief from Stay.

      E.     During the Receivership, GFG and GHI filed a claim in the Receivership, which the FDIC-Receiver subsequently disallowed.  Thereafter, GFG and GHI filed a complaint against the FDIC-Receiver in the United States District Court for the Northern District of Texas, Dallas Division, Civil Action No. 3:10-CV-00980-K in order to prosecute their claims in the Receivership (the "GFG/GHI Complaint").  The FDIC-Receiver opposes the relief sought in the GFG/GHI Complaint.

      F.     After lengthy negotiations, the Parties have reached an agreed resolution of the FDIC-Receiver Proofs of Claim, the Motion for Relief from Stay, the GFG/GHI Complaint, and certain issues related to the proposed plan treatment of the FDIC-Receiver and other creditors. The general terms of the agreement are set forth in the term sheet attached hereto as **Exhibit A** (the "Term Sheet").

      G.     The Parties have determined that it is in their respective best interests that the resolution described in the Term Sheet be formalized and approved through a plan of liquidation in the Bankruptcy Case (the "Plan").  The Plan shall contain the terms set forth in the Term Sheet and such other provisions as approved by the FDIC-Receiver and WTC.

      H.     Each of the Parties has been provided a copy of and has reviewed the Term Sheet. The Parties desire to memorialize their respective undertakings in regard to the Bankruptcy Cases and the Plan.

NOW, THEREFORE, in consideration of the foregoing, the Parties agree as follows:

1.      So long as no Termination Event (defined below) has occurred, the FDIC-Receiver agrees: (a) to vote its claims in the Bankruptcy Cases to accept the Plan upon the Bankruptcy Court's approval of the disclosure statement pursuant to section 1125 of the Bankruptcy Code; (b) not to object to or otherwise commence any proceeding to oppose confirmation of the Plan; (c) not to support or vote to accept any other plan; and (d) to cooperate with the Debtors in connection with facilitating confirmation of the Plan described in Section 3. In addition, the FDIC-Receiver hereto agrees that, so long as no Termination Event has occurred, it will not sell or transfer any claims held by it to any person or entity.

2.      So long as no Termination Event (defined below) has occurred, WTC agrees: (a) to prepare a letter to be included in the solicitation materials accompanying the Plan encouraging general unsecured creditors, including the holders of the trust preferred securities of GFG, to vote to accept the Plan upon the Bankruptcy Court's approval of the disclosure statement pursuant to section 1125 of the Bankruptcy Code; (b) not to object to or otherwise commence any proceeding to oppose confirmation of the Plan; (c) not to support any other plan; and (d) to cooperate with the Debtors in connection with facilitating confirmation of the Plan described in Section 3.

3.      The Debtors covenant and agree that so long as no Termination Event (defined below) has occurred, they will (a) use their commercially reasonable efforts to promptly, but no later than **January 1, 2011,** file the Plan and accompanying Disclosure Statement; (b) use commercially reasonable efforts promptly to prosecute confirmation of the Plan; (c) not seek confirmation of and will oppose any plan other than the Plan; (d) not seek to amend or modify the Plan in any material respect without the consent of the FDIC-Receiver and WTC, and will

oppose any effort by any person to seek modification or amendment of the Plan in any such material respect; and (e) take all actions and file all motions and seek the entry of all appropriate orders that in their reasonable judgment are incident to carrying out the purposes and intent of this Agreement and the Plan.

4.      The Parties agree that all deadlines in connection with the Motion for Relief from Stay and the GFG/GHI Complaint shall be stayed and no further discovery or other action taken pending further agreement of the Parties or Order of the appropriate court.

5.      The obligations of the Parties as set forth in <u>Sections 1 through 4</u> above shall cease immediately, at the option of a non-breaching party, upon the occurrence of a Termination Event.  A "<u>Termination Event</u>" shall occur if any one or more of the following events shall have occurred:

(a)      Any Party shall have breached, or failed to diligently perform, any of its obligations as set forth in Sections 1-4 above;

(b)      the Court shall not confirm the Plan by April 30, 2011, and it shall not have been implemented and become effective prior to or on **June 31, 2011** or such later dates as agreed to by the Parties; or

(c)      a trustee or examiner with expanded powers is appointed in the Bankruptcy Cases, the Bankruptcy Cases are converted to a Chapter 7 Case or the Bankruptcy Cases are dismissed.

Anything herein to the contrary notwithstanding, no Party hereto shall be responsible for any delays hereunder caused by any third parties or by circumstances that are not within the control of the relevant Party.

6.      In the case of a Termination Event pursuant to section 5(c) above, other than as a result of the dismissal of the Bankruptcy Cases, the FDIC-Receiver and WTC shall seek to enforce the provisions of the Term Sheet through the submission of an appropriate motion to the Bankruptcy Court.

7.      This Agreement shall be governed by and construed in accordance with the Bankruptcy Code and the laws of the State of Texas, without regard to its conflict of law provisions.

8.      No modification or amendment to the terms of this Agreement shall be valid unless such modification or amendment is in writing and has been signed by each of the Parties hereto.

9.      This Agreement may be executed by facsimile signature transmission in one or more counterparts, any one of which need not contain the signature of more than one Party, and all of which taken together shall constitute one and the same Agreement.

10.     Subject to the receipt of the requisite internal approval by the FDIC-Receiver, this Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, assigns, heirs, executors, administrators, and representatives.

*[Remainder of page intentionally left blank.  Signature pages follow.]*

DATED as of the date first above stated.

**GUARANTY FINANCIAL GROUP INC.**


By: _____

Name: _____

Title: _____


**GUARANTY GROUP VENTURES INC.**


By: _____

Name: _____

Title: _____


**GUARANTY HOLDINGS INC. I**


By: _____

Name: _____

Title: _____


**GUARANTY GROUP CAPITAL INC.**


By: _____

Name: _____

Title: _____

**FEDERAL DEPOSIT INSURANCE CORPORATION,
AS RECEIVER**

By: _____

Name: _____

Title: _____


**WILMINGTON TRUST COMPANY,
as indenture trustee and not individually**

By: _____

Name: _____

Title: _____

<u>**EXHIBIT A**</u>

**Summary of Terms and Conditions for
Guaranty Financial Group Inc., Guaranty Group Ventures Inc.,
Guaranty Holdings Inc. I, and Guaranty Group Capital Inc.'s
Plan of Liquidation**

*This Summary of Terms and Conditions is an outline only and does not purport to summarize all of the conditions, terms, covenants, representations, warranties and other provisions which would be contained in definitive legal documentation for the Plan of Liquidation contemplated hereby (the "Plan"). This Summary of Terms and Conditions is a result of negotiations among the Federal Deposit Insurance Corporation, as Receiver ("FDIC-R") and Guaranty Financial Group ("GFG"), Guaranty Group Ventures Inc. ("GGVI"), Guaranty Holdings Inc. I ("GHI"), and Guaranty Group Capital Inc. ("GGCI") (collectively, the "Debtors") and is further supported by the largest, non-priority unsecured creditor in the Debtors' bankruptcy case, Wilmington Trust Company ("WTC"), as indenture trustee herein.*

1.      **Treatment of Cash on Hand**

    (a)      <u>Cash in GFG Accounts</u>.  Eighty-five percent (85%) of the cash will be distributed to the FDIC-R.  The remaining fifteen percent (15%) of the cash will be retained by the Debtors and used to satisfy allowed administrative expenses and professionals fees and costs incurred/to be incurred (including the estimated costs) for administration and liquidation of the estates by the Liquidation Trust, as defined below, and then to fund the Liquidation Trust for payment to creditors other than the FDIC-R as agreed by the Debtor and WTC. Any funds ultimately available for distribution by the Liquidation Trust will satisfy non-FDIC-R claimants.

    (b)      <u>Cash in GGVI, GGCI, and GHI Accounts</u>.  Thirty percent (30%) of the cash will be distributed to the FDIC-R.  The remaining seventy percent (70%) of the cash will be retained by the Debtors and used to satisfy administrative expenses and professional fees and costs incurred/to be incurred (including the estimated costs) for administration and liquidation of the estates by the Liquidation Trust and then to fund the Liquidation Trust for payment to creditors other than the FDIC-R as agreed by the Debtor and WTC. Any funds ultimately available for distribution by the Liquidation Trust will satisfy non-FDIC-R claimants.

    (c)      <u>Fees and Expenses</u>.  Administrative expenses incurred after January 31, 2010, including reasonable fees and expenses of the Debtors' professionals (except for the fees of Pope, Shamsie & Dooley ("Pope Shamsie") as explained below), shall be satisfied by the Debtors from the cash to be retained by the Debtors under 1.(a) and 1.(b) above.  All fees paid from GFG accounts for professional services rendered prior to February 1, 2010 shall be deemed to be fees incurred for the benefit of GFG and shall not be allocated among the other Debtors.  Upon the effective date of the Plan, the FDIC-R will withdraw its previously-filed reservation of rights in connection with the interim fee applications filed by the Debtors' professionals and agrees not to reserve such rights in connection with future interim fee applications.  All fees and expenses of Pope Shamsie regardless of when incurred shall be satisfied from the cash in the GFG accounts such that Pope Shamsie's fees and expenses will be allocated fifty percent (50%) to funds distributable

to the FDIC-R and fifty percent (50%) to funds distributable to the Debtors. The FDIC-R shall not object to the fees and expenses of WTC as an expense of administration provided that such fees and expenses are paid by the Debtors from the cash to be retained by the Debtors under 1.(a) and 1.(b) above.

**2.       Treatment of Tax Refunds**

The Debtors shall remit the full amount of any tax refund (net of any tax liability) received by any of them to the FDIC-R on the later of the effective date of a Plan or within ten days after GFG's receipt of such refund. To clarify, a refund will only be paid after a determination that the Debtors have no federal tax liability.

**3.       Treatment of Insurance Premium Refunds**

All premium refunds arising with respect to the insurance policies reflected on Schedule 1 hereto will be paid by the Debtors to the FDIC-R on the later of the effective date of a Plan or within ten days after GFG's receipt of such refund.

**4.       Causes of Action**

(a)       <u>D & O Claims</u>. In exchange for payment of an additional four hundred seventy-five thousand dollars ($475,000.00) to the Debtors to be effectuated by a reduction of the amount of cash that would otherwise be distributed to the FDIC-R pursuant to 1(b) above, the Debtors shall assign to the FDIC-R any rights or interests that they may have in any and all claims, causes of action, demands, debts, suits in contract, and suits in equity against any former officer or director of the Debtors arising out of the individual's employment by one or more of the Debtors or service on one or more of the Debtors' boards of directors (the "D&O Claims"). The FDIC-R shall have the sole right and responsibility for the prosecution of such claims and complete discretion as to whether to commence, settle or dismiss such claims. In the event the FDIC-R determines to prosecute such claims, the FDIC-R shall retain one hundred percent (100%) of the recoveries of all D&O Claims. The D&O Claims shall not include claims, causes of action, demands, debts, suits in contract, or suits in equity against any former officers or director of any of the Debtors arising under chapter 5 of Title 11 of the United States Code (the "Bankruptcy Code").

On or about the twelve (12) month anniversary of the effective date of the Plan, and every six (6) months thereafter as necessary, the Liquidation Trust may make written inquiry to the FDIC-R to determine if the FDIC-R has decided whether to pursue the D&O Claims. The FDIC-R will respond to such requests as soon as practical. Upon written response by the FDIC-R to the Liquidation Trust that the FDIC-R has determined not to pursue the D&O Claims, such claims will be deemed to be assigned to the estates and thereafter may be pursued by the Liquidating Trustee, as defined below, on behalf of the estates.

(b)       <u>RWHC, Inc. Share Transfer</u>. On the effective date of the Plan, the Debtor/Liquidation Trust, each of the estates and WTC will release any claims and causes of action against the FDIC-R and BBVA Compass, Birmingham, Alabama ("Compass") in any way arising from or relating to the RWHC, Inc. share transfer.

(c)     <u>Temple-Inland Inc</u>.  The Liquidation Trust will investigate and, if appropriate, pursue any claims that the Debtors' estates may have against Temple-Inland Inc. ("Temple-Inland"), owner of GFG until December 28, 2007, on behalf of the estate, it being acknowledged and agreed that such claims do not include claims that are derivative of the claims of the FDIC-R, Guaranty Bank ("GB") or its shareholders against Temple-Inland.   Any proceeds recovered by the Liquidation Trust will first be used to satisfy professional fees and costs incurred by the Liquidation Trust and then for distribution to creditors other than the FDIC-R.  The Liquidation Trust shall have the sole right and responsibility for the prosecution of such claims and complete discretion as to whether to commence, settle, or dismiss such claims.  The FDIC-R will investigate and, at its sole discretion, pursue any claims that the FDIC-R may have against Temple-Inland on behalf of the receivership estate.   The FDIC-R shall have the sole right and responsibility for the prosecution of such claims and complete discretion as to whether to commence, settle, or dismiss such claims.  Any proceeds recovered by the FDIC-R shall be retained by the FDIC-R and the Debtors shall not be entitled to receive any of these recoveries.  Neither party shall take any action to bar the other from pursuing claims against Temple-Inland owned by the other party; however, to the extent a dispute arises between the parties regarding the ownership of any claim against Temple-Inland, both parties reserve all rights and remedies in connection with such dispute.

(d)     <u>Guaranty Insurance Services</u>.  The FDIC-R shall retain the sole right and responsibility for the prosecution of any claims that it may have against JLT Insurance Agency Holdings, Inc. and Guaranty Insurance Service Inc. (collectively, "GIS") including, but not limited to, claims asserted in Civil Action No. 3:10-CV-00298-B and Civil Action No. 3:10-CV-00946-B, both of which are now pending in the United States District Court for the Northern District of Texas (the "District Court Litigation") and complete discretion as to whether to continue to prosecute, settle or dismiss such claims, however, the Liquidating Trustee shall have the right to make inquiry of the FDIC-R as to the prosecution and settlement of such claims and the FDIC-R shall respond to such inquiry provided, however, that the FDIC-R shall have no duty to disclose privileged or confidential information to the Liquidating Trustee.  The FDIC-R shall retain seventy percent (70%) of the net recoveries and distribute thirty percent (30%) to the Liquidation Trust.  The Liquidation Trust's receipt of thirty percent (30%) of the net recoveries will be used for distribution to creditors other than the FDIC-R.

(e)     <u>Insider and Employee Avoidance Actions</u>.  The FDIC-R shall assign any rights or interests that it may have in such claims to the Debtors for prosecution by the Liquidation Trust.  The Liquidation Trust will investigate and, if appropriate, pursue this litigation under Chapter 5 of the Bankruptcy Code or applicable law on behalf of the estate.  Proceeds will first be used to satisfy professional fees and costs incurred by the Liquidation Trust and then for distribution to creditors.  The Liquidation Trust shall be entitled to one hundred percent (100%) of the net litigation proceeds for distribution to non FDIC-R claimants.  Any D&O Claims that may arise with respect to the approval and effectuation of payments by officers or directors of GB or any of the Debtors that give rise to Chapter 5 claims described in this subsection (e) shall be retained by or assigned to the FDIC-R, as set forth in Section 4.(a) above, provided however, that nothing herein shall limit the Liquidation Trust's rights and claims to avoid and/or recover property transferred to or for the  benefit of  any third party hereunder.   The Liquidation Trust shall have the sole right and responsibility for the prosecution of its Chapter 5 claims hereunder and complete discretion as to whether to commence, settle, or dismiss such claims.

(f)    <u>Other Avoidance Actions</u>.  The Liquidation Trust will investigate, and if appropriate, pursue this litigation under Chapter 5 of the Bankruptcy Code on behalf of the estate against any entity other than the FDIC-R, GB or Compass.  Proceeds will first be used to satisfy professional fees and costs incurred by the Liquidation Trust and then one hundred percent (100%) of the net litigation proceeds will be available for distribution to non FDIC-R claimants.  Any D&O Claims that may arise with respect to the decision making relating to approval and effectuation of payments by officers or directors of GB or any of the Debtors that give rise to Chapter 5 claims shall be retained by or assigned to the FDIC-R, as set forth in Sections 4.(a) above, provided however, that nothing herein shall limit the Liquidation Trust's rights and claims to avoid and/or recover property transferred to or for the  benefit of  any third party hereunder.  The Liquidation Trust shall have the sole right and responsibility for the prosecution of its Chapter 5 claims hereunder and complete discretion as to whether to commence, settle, or dismiss such claims.

(g)    <u>Other Causes of Action</u>.  Other than set forth herein, the Liquidation Trust will investigate and, if appropriate, pursue on behalf of the Debtors' estates any claims that the Debtors' estates may have except claims against the FDIC-R, GB or Compass.  It is acknowledged and agreed that the Debtors' claims do not include claims that are derivative of the claims of the FDIC-R, GB, or its shareholders and the FDIC-R's claims do not include claims that are derivative of any of the Debtors (except to the extent such claims arise from any Debtor's status as a shareholder of GB).  Any proceeds recovered by the Liquidation Trust will first be used to satisfy professional fees and costs incurred by the Liquidation Trust and then for distribution to creditors other than the FDIC-R.  The Liquidation Trust shall have the sole right and responsibility for the prosecution of such claims and complete discretion as to whether to commence, settle, or dismiss such claims.  The FDIC-R will investigate and, at its sole discretion, pursue any claims that the FDIC-R may have against third parties on behalf of the receivership estate.  Any proceeds recovered by the FDIC-R shall be retained by the FDIC-R and the Debtors shall not be entitled to receive any of these recoveries.  The FDIC-R shall have the sole right and responsibility for prosecution of such claims and complete discretion as to whether to commence, settle, or dismiss such claims.

<u>For the avoidance of any doubt, it is the intention of the parties that the FDIC-R will receive distributions from the cash and other assets designated for payment to the FDIC-R hereunder, and that the remaining claimants will be paid from the non-FDIC-R cash and other assets free and clear of any liens and claims, if any, of the FDIC-R.</u>

**5.    Plan of Liquidation**

(a)    <u>Terms of Settlement.</u>  The resolution described herein will be embodied in and submitted to the court as part of a Plan to be drafted by the Debtors and approved by the FDIC-R and WTC prior to filing.  The resolution described herein is contingent upon court approval of the Plan.  The parties agree that the resolution contained herein is also contingent upon either (i) the disallowance of any and all claims filed by the Internal Revenue Service ("IRS") against the Debtors (the "IRS Claims") or (ii) the reduction of the IRS Claims to an aggregate allowed amount of four million dollars ($4,000,000.00) or less, in which case the parties agree that the allowed IRS Claims will be satisfied fifty percent (50%) by the Debtors and fifty percent (50%) by the FDIC-R from the cash divided pursuant to Section 1. above.  The contingency described in the preceding

sentence may be waived by agreement of the parties. Nothing herein shall be construed to be an admission that any amounts are owed on account of the IRS Claims. The resolution described herein shall also be conditioned upon the approval of the Board of Directors of the FDIC or such other internal FDIC approval as the FDIC deems necessary, in its sole and absolute discretion. The FDIC-Receiver will use its reasonable best efforts to obtain the requisite internal approvals.

(b)     <u>Timing</u>.  The Plan will be filed promptly upon acquisition of necessary information regarding causes of action for disclosure statement purposes. The Plan will be drafted by the Debtors and circulated for approval by the FDIC-R and WTC prior to filing. The objective of the parties is to file the Plan prior to January 1, 2011.

(c)     <u>Liquidation Trust</u>.  The Liquidation Trust will be established for all typical post-confirmation administrative and litigation purposes, including appropriate limitations of liability for the Liquidation Trustee and its professionals.

(d)     <u>Liquidating Trustee</u>.  WTC or its designees in WTC's sole discretion.

(e)     <u>Discovery Protocols</u>. Discovery protocols previously agreed upon to continue, subject to any agreed adjustments pursuant to the Plan.

(f)     <u>Releases</u>.  The Plan shall contain broad general releases among the Debtors, Dennis Faulkner (in all capacities), WTC, the FDIC-R, and all of their professionals relating to GB and the Debtors provided, however, that such releases shall not include a release of claims against any Debtor, or officers or directors of such Debtor or GB, that are to be retained by the FDIC-R or a Debtor as set forth above. GFG and GHI shall dismiss the district court action pending against the FDIC-R in the United States District Court for the Northern District of Texas, Dallas Division, with prejudice.

## SCHEDULE 1

| Type of Policy | Policy Number | Carrier |
|---|---|---|
| Corporate Property Program | RMP2082516819 | CNA Large Property |
| Business Auto Policy | 65UENIX0417 | The Hartford Insurance Co. |
| Commercial Umbrella Binder | QZ09125370 | The Travelers Companies, Inc. |
| Excess Liability Umbrella Policy | ECO(10)54186412 | Ohio Casualty Insurance Co. |
| Employment Practices Liability | B066468326A08 | Lloyds |
| Excess Financial Institution Bond | XS MBB-06-0002 | Lloyds of London |
| Mortgage Bankers Bond | MB-06-00040 | Lloyds of London |
| Blanket Accident Policy | ABL 961990 | Life Ins. Co. of N. America |
| Commercial Property | 8049767 | Unknown |
| Workers Compensation | 65WENO0662 | The Hartford Insurance Co. |
| General Liability Mortgagee in Possession | 23462342 | Lexington Insurance Co. |
| REO & Force Placed Flood Coverage-Property, General Liability & Flood | GF0000776 GF0000892 GF0001713 | Great Lakes Reinsurance |
| Insurance Agents E&O | 91894256 | AIU Holdings, Inc. |
| Special Extortion (Kidnap and Ransom) | 6472040 | AIG World Source |
| Workers Compensation and Emp. Liability | WC 00 00 00 A | The Hartford Insurance Co. |
| Employment Practices Liability | EPL 0868326A08 | Lloyds of London |

**EXHIBIT "5"**
**WILMINGTON TRUST SUPPORT LETTER**

**FORM OF SUPPORT LETTER
SUBJECT TO COURT APPROVAL**

ATTORNEYS AT LAW

90 PARK AVENUE
NEW YORK, NY  10016-1314
212.682.7474 TEL
212.687.2329 FAX
foley.com

WRITER'S DIRECT LINE
212.338.3566
dspelfogel@foley.com EMAIL

CLIENT/MATTER NUMBER
096572-0102

_____, 2011

TO:     GENERAL UNSECURED CREDITORS
        OF GUARANTY FINANCIAL GROUP
        INC., GUARANTY GROUP VENTURES
        INC., GUARANTY HOLDINGS INC.
        AND GUARANTY GROUP CAPITAL
        INC. (the "Debtors")

Dear Creditors:

This firm is counsel to Wilmington Trust FSB, as indenture trustee for certain bondholders of Guaranty Financial Group Inc., the largest general unsecured creditor in the pending bankruptcy proceedings of the above-referenced Debtors. We write to briefly advise you of the negotiation process that has led to the plan of reorganization ("Plan") being presented to you today. We urge you to carefully review this letter, the Plan, and the Disclosure Statement and vote in favor of the Plan.

The Debtors filed Chapter 11 cases on August 27, 2009. After the Filing Date, the FDIC, in its capacity as receiver for Guaranty Bank, filed a motion to lift stay and a claim for in excess of $2 billion. The Debtors and Wilmington Trust, in its capacity as indenture trustee, interposed opposition to the Motion. Thereafter, the Debtors, FDIC and Wilmington Trust entered into discussions to resolve the contested matters and claims asserted against the estates. The negotiations culminated in the parties' agreement to enter into a plan support agreement that provides for the global settlement of all of the FDIC's claims against the Debtors, together with the objections and counterarguments asserted by the Debtors and Wilmington Trust. The plan support agreement formed the basis for the framework of the Plan and provides for the treatment of the FDIC's and General Unsecured Creditors' claims as detailed more fully in the Plan.

We believe that the Plan is in the best interest of unsecured creditors and that creditors' acceptance of the Plan will ensure a maximum recovery for Class 4 general unsecured creditors. Accordingly, Wilmington Trust recommends that each Class 4 general unsecured creditor vote in favor of the Plan by executing each of the four ballots (for each of the four Debtors) received with the Plan and disclosure statement and returning them pursuant to the instructions provided in the Disclosure Statement.

Before casting your ballot, please review both the Plan and Disclosure Statement in their entirety. This letter does not take the place of the foregoing, and the ultimate decision to vote for or against the Plan should be made based upon your review of the Plan and Disclosure Statement and your own independent determination. We also encourage you to consult with counsel or other experts in this regard. The hearing to consider confirmation of the Plan is scheduled for _____, 2011 at _____ a.m. before the Honorable Barbara J. Houser, Chief United

BOSTON          JACKSONVILLE      MILWAUKEE        SAN DIEGO            SILICON VALLEY
BRUSSELS        LOS ANGELES       NEW YORK         SAN DIEGO/DEL MAR    TALLAHASSEE
CHICAGO         MADISON           ORLANDO          SAN FRANCISCO        TAMPA
DETROIT         MIAMI             SACRAMENTO       SHANGHAI             TOKYO
                                                                       WASHINGTON, D.C.

NYC_993421.1

**:FOLEY**

FOLEY & LARDNER LLP

General Unsecured Creditors
_____, 2011
Page 2

States Bankruptcy Judge for the Northern District of Texas, United States Bankruptcy Court, 1100 Commerce Street, 14th Floor, Dallas, Texas 75242.

Considering the alternatives, we believe that the parties have negotiated the best result for general unsecured creditors that could possibly be achieved.

Cordially,

Douglas E. Spelfogel, as counsel for
Wilmington Trust FSB, as indenture trustee
and not individually

DES:bmj

NYC_993421.1