Stephen A. Goodwin
  State Bar No. 08186500
**Carrington Coleman Sloman**
  **& Blumenthal, LLP**
901 Main Street, Suite 5500
Dallas, TX  75202
Telephone: 214.855.3000
Facsimile: 214.855.1333

Gerard S. Catalanello (admitted *pro hac vice*)
James Vincequerra (admitted *pro hac vice*)
Pat Matusky (admitted *pro hac vice*)
**Duane Morris LLP**
1540 Broadway
New York, NY  10036-4086
Telephone: 212.692.1000
Facsimile: 212.692.1020

**ATTORNEYS FOR TRICADIA FINANCIALS**
**RESTRUCTURING PARTNERS, Ltd.**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| GUARANTY FINANCIAL GROUP INC., | § | Case No. 09-35582-bjh |
| *et al.*, | § | (Jointly Administered) |
| | § | |
| Debtors. | § | |

**OBJECTION OF TRICADIA FINANCIALS RESTRUCTURING PARTNERS, LTD
TO DEBTORS' AMENDED JOINT PLAN OF LIQUIDATION UNDER
CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE**

Tricadia Financials Restructuring Partners, Ltd. ("Tricadia"), by and through its undersigned counsel, hereby objects (the "Objection") to the Debtors' *Amended Joint Plan of Liquidation for Guaranty Financial Group Inc., et al., Under Chapter 11 of the United States Bankruptcy Code* (the "Plan")[1], and in support thereof respectfully represents as follows:

**INTRODUCTION**

1.    The Plan is proposed by the Debtors and supported by (a) Wilmington Trust ("Wilmington Trust"), as trustee of the trust preferred securities ("TRPS") that were issued by a trust wholly owned by Debtor Guaranty Financial Group, Inc. ("GFG"), and (b) the FDIC in its

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan, as applicable.

capacity as receiver (the "Receiver") for Guaranty Bank ("Guaranty Bank"), a wholly owned subsidiary of Debtor Guaranty Holdings Inc. I ("GHI"), which served as a holding company for GFG's investment in Guaranty Bank. The Plan rises and falls on a settlement (the "Settlement") by and among the Debtors, Wilmington Trust and the Receiver (collectively, the "Plan Proponents").

2.     Without any meaningful examination of the claims that the Receiver and the Debtors hold against each other, the Plan Proponents bound themselves to a Settlement which distributes all of the Debtors' material assets to the Receiver to the detriment of all other creditors while at the same time gifting a significant post-confirmation role to Wilmington Trust, to the substantial benefit of Wilmington Trust and its professionals. The Settlement was cemented despite the Receiver having asserted its claims only in passing and even after the Debtors and Wilmington Trust revealed the Receiver's lack of any foundation for the Receiver's claims. Remarkably, both the Plan and the Disclosure Statement say precious little regarding the claims and litigation between and among the Debtors, the Receiver and Wilmington Trust, much less the reasons that justify the settlement of these claims on the basis contemplated by the proposed Plan. Certainly, nothing is said on the face of these documents that sustains the Debtors' burden to show that the proposed settlement of such claims is "fair and equitable and in the best interest of the estate." *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortgage Co.)*, 68 F.3d 914, 917 (5th Cir. 1995).

3.     The Court has no evidence before it whatsoever to conclude that the factors which should inform the Court's judgment in determining whether the Settlement is fair and equitable are, in fact, satisfied. In the only pleading before this Court which purports to justify the Settlement, the Disclosure Statement, the Plan Proponents dedicate a mere four brief paragraphs,

spanning a little more than one page, to assert conclusions that the Settlement is in the best interest of the parties. These perfunctory assertions submitted in support of the Settlement are mere platitudes and cannot withstand analysis. Given the scant allegations contained in the Disclosure Statement and the dearth of information concerning the Settlement anywhere else in the record, the Debtors fail to sustain their burden pursuant to Bankruptcy Rule 9019 that the Settlement should be approved. The Court can glean no factual or legal substance to justify the Settlement when measured against the standards of "(1) the probability of success in the litigation, with due consideration for the uncertainty in fact and law, (2) the complexity and likely duration of the litigation and any attendant expense, inconvenience and delay, and (3) all other factors bearing on the wisdom of the compromise." *Id.*

4.      The record does not contain even an inkling of the rationale that underlies the Settlement and the Plan. The claims and litigation that are being compromised by the Settlement are described only with vague generality -- a generality matched only by that of the purported reasons proffered for the Settlement, which are wholly inadequate. On this record, or more accurately, lack thereof, the Debtors have not and cannot carry their burden to secure approval of the Settlement or confirmation of the proposed Plan.

5.      In addition to the Debtors' failure to demonstrate that the Settlement should be approved, the Plan is also unconfirmable because it fails to contain any oversight over the liquidation of the Debtors post-confirmation. Indeed, the post-confirmation liquidation, including the pursuit of any claims and causes of action retained by the estate, are to be conducted by Wilmington Trust without any input of, or involvement by, creditors. Clearly, such a process should not be sanctioned by this Court. For these reasons, all of which are more

DM3\1745765.11
i_1562233v.2

fully discussed below, the Court should deny confirmation of the Plan and immediately convert these cases to cases under chapter 7 of the Bankruptcy Code.

6. The record mandates the involvement of an independent fiduciary who will investigate, analyze and ultimately pursue claims against the Receiver and others or, if appropriate, settle those claims after being fully informed of all of the facts and circumstances.

## **FACTUAL BACKGROUND**

7. On August 27, 2009 (the "Petition Date"), the Debtors filed voluntary petitions under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Texas (the "Court").

8. Prior to the Petition Date, a statutory trust wholly owned by GFG issued TRPS with an outstanding principal amount of $305 million now held by various parties, including Tricadia. Tricadia holds TRPS with an aggregate notional amount of approximately $53 million.

9. On January 28, 2010, the Receiver filed a proof of claim against each of the Debtors (the "Proofs of Claim")[2] in an amount in excess of $1.977 asserting claims with respect to, among other things: (i) alleged capital maintenance commitments by GFG in an aggregate amount of approximately $1.95 billion to a regulatory agency pursuant to 11 U.S.C. § 365(o) for the benefit of Guaranty Bank (the "Capital Maintenance Claims");[3] (ii) tax refunds ("Tax Refunds") in a total amount of at least $1,200,000; (iii) intercompany debts in an amount of at least $241,010; (iv) insurance policy proceeds and premium refunds ("Insurance Premium

---

[2] The Receiver asserts the claims against GFG, but also asserts the identical claims against each of the other Debtors on the ground that the other Debtors may be jointly and severally liable for the alleged obligations.

[3] Pursuant to section 365(o) of the Bankruptcy Code, the trustee shall immediately cure any deficit under any commitment by the debtor to a Federal depository institution's regulatory agency to maintain the capital of an insured depository institution. 11 U.S.C. § 365(o).

4

Refund") in an approximate amount of $1.14 million; (v) deposit funds in an amount of not less than $11.2 million as to GFG and $10.4 million as to its affiliates (the "Deposit Funds"); (vi) fraudulent conveyances ("Fraudulent Conveyances"); and (vii) various other litigation-based claims (collectively, the "Receiver Claims").

10.     The Receiver asserts that portions of the Receiver Claims are entitled to: (i) superiority status pursuant to 12 U.S.C. § 1821(d)(17); (ii) administrative claim status pursuant to 11 U.S.C. 365(o); and/or (iii) priority status pursuant to 11 U.S.C. § 507(a)(9).

11.     On January 28, 2010, the Receiver filed the *Motion for an Order Modifying the Automatic Stay as to Property and Granting Setoff by the FDIC-Receiver* ("Relief Stay Motion") requesting authority to exercise alleged rights of setoff under Bankruptcy Code § 553 against claims the Debtors asserted against the Receiver for cash the Debtors had on deposit at Guaranty Bank.[4]

12.     On February 26, 2010, the Debtors objected to the Relief Stay Motion (the "Stay Relief Objection") on the following grounds: (i) the Receiver has no valid claims against GFG under section 365(o) of the Bankruptcy Code because GFG made ***no*** commitment to a federal depository institution's regulatory agency; (ii) GFG was neither contractually nor statutorily obligated to maintain the capital of Guaranty Bank; (iii) the Receiver lacks standing to pursue the requested relief; (iv) the Receiver has no setoff rights because the Deposit Funds at issue were transferred to Compass Bank prior to the Petition Date; and (v) the Receiver has no valid claims against Affiliate Debtors GHI, GGVI, and GGCI.

---

[4] The Debtors sought to transfer the amounts on deposit at Guaranty Bank to Bank of America, N.A. pursuant to the *Order Implementing the Requirements of § 345(b) of the Bankruptcy Code and the Region VI, Northern District of Texas, Guidelines for Chapter 11 Debtors-in-Possession*.

DM3\1745765.11
i_1562233v.2

13.     Wilmington Trust likewise objected to the Relief Stay Motion (the "Wilmington Trust Opposition").  In the Wilmington Trust Opposition, Wilmington Trust argued that: (i) the Receiver failed to establish that it had a valid claim against the Debtors; (ii) the Receiver Claims lacked mutuality with the claims the Debtor asserted against the Receiver; and (iii) cause did not exist to lift the automatic stay because the Receiver was adequately protected.

14.     GFG and GHI asserted claims in the Receivership of Guaranty Bank by filing proofs of claim on November 25, 2009, and subsequently a complaint, pursuant to the FDIA, on May 14, 2010 (the "Complaint").  The Complaint alleged: (i) claims related to the Receiver's sale of Guaranty Bank's assets to Compass Bank and other parties during the Receivership pursuant to a purchase agreement; (ii) claims for ownership of all or portions of assets claimed by the Receiver, including but not limited to Tax Refunds, Insurance Premium Refunds, or other insurance recoveries (including potential recoveries under officer and director liability policies); (iii) claims related to the conversion of preferred stock of Guaranty Bank's wholly owned subsidiary RWHC, Inc. into shares of preferred stock of Guaranty Bank and other actions and matters related to such conversion ("RWHC Stock Conversion"); and (iv) claims alleging that the Receiver's Capital Maintenance Claims are voidable as fraudulent transfers under section 548(a)(1)(B) of the Bankruptcy Code (collectively, the "Debtor Claims").

15.     On February 10, 2011, the Debtors filed the Plan and related disclosure statement ("Disclosure Statement"), which incorporated the terms of the Settlement between the Debtors, the Receiver, and Wilmington Trust.  The Settlement encompasses a resolution of the Relief Stay Motion, the treatment of the Receiver Claims, the Debtor Claims, and the treatment of general unsecured claims.  (Disclosure Statement, Art. 6.E.5., and Art. 7.B; Plan, Art. IV.C and Art. IV.D.)

DM3\1745765.11
i_1562233v.2

16.     Pursuant to the Settlement, the Receiver shall receive, on account of the Receiver Claims, approximately $11-12 million derived from 85% of GFG's cash and 30% of the cash of the other Debtors, and payment of a certain portion of the Receiver's allowed administrative claims.  The Receiver shall also receive the Tax Refunds which the Debtors estimate at approximately $3.49 million and an Insurance Premium Refund totaling approximately $700,000.

17.     The Receiver shall also own the claims against the directors and officers of the Debtors ("D&O Claims"), will have sole discretion as to whether to commence, settle or dismiss the D&O Claims, and shall retain 100% of any recovery from prosecution of the D&O Claims.

18.     In relation to Wilmington Trust, the Plan provides that Wilmington Trust, as trustee for the TRPS holders, shall have an Allowed General Unsecured Claim in the amount of at least $318,526,546.96.  Holders of Allowed General Unsecured Claims shall receive their *pro rata* share of any cash distribution from a liquidation trust that is to be created by the Plan (the "Liquidation Trust").

19.     The Liquidation Trust shall be administered by none other than Wilmington Trust, which was appointed as the Liquidation Trustee by the Debtors, the Receiver and Wilmington Trust pursuant to the Settlement.

20.     As Liquidation Trustee, Wilmington Trust shall, among other things: (i) make distributions and maintain appropriate reserves; (ii) liquidate the Debtors' assets; (iii) object and resolve claims; (iv) address any Rights of Action transferred to the Liquidation Trust; and (v) retain and pay professionals.

21.     Further, under the terms of the Plan and in accordance with the Settlement, the Liquidation Trustee shall have the right to pursue certain claims against Temple-Inland (from

DM3\1745765.11
i_1562233v.2

which entity GFG was initially spun-off) for the benefit of, among others, the holders of Allowed General Unsecured Claims. However, the Liquidation Trustee shall not have the right to pursue claims against Temple-Inland that are *derivative* of the claims of the Receiver, Guaranty Bank, or its shareholders, which are preserved for the Receiver under the Settlement. (Disclosure Statement, Art. 6.H.1.) Unfortunately, neither the Plan nor the Disclosure Statement provides any discussion of the types of claims that may or may not be *derivative*, thus leaving those issues to be debated or, more likely, litigated in the future.

22. Further, the Liquidation Trustee may pursue the D&O Claims based on various theories, but only if one (1) year after the Effective Date, or every six (6) months thereafter, the Receiver informs the Liquidation Trustee that it has decided not to pursue the D&O Claims.

23. The massive benefits allocated by the Debtors to the Receiver under the Settlement can be summarized as follows:

(a) Eighty-five percent (85%) of the cash in the GFG Accounts;

(b) Thirty percent (30%) of the cash in the GGVI, GGCI and GHI Accounts;

(c) The full amount of any tax refund (net of any tax liability) received by any of the Debtors;

(d) All premium refunds arising with respect to the scheduled insurance policies;

(e) In exchange for a reduction of the amount of cash the Debtors would otherwise be entitled to receive in the amount of $475,000, an assignment of the D&O Claims with the right to retain one hundred percent (100%) of the recoveries it receives on such D&O Claims;

(f) A release from any and all claims in any way arising from or relating to the RWHC, Inc. share transfer;

(g) The right to prosecute claims against Temple-Inland that are a derivative of the claims of the Receiver, Guaranty Bank, or its shareholders against Temple-Inland, and to retain any proceeds recovered by the Receiver with respect to all such claims; and

DM3\1745765.11
i_1562233v.2

(h)     The right to prosecute any claims against JLT Insurance Agency Holdings, Inc. and Guaranty Insurance Service, Inc. and to retain seventy percent (70%) of the recoveries on such claims.

24.     The rewards bestowed upon the Receiver are discussed more fully below.

## **ARGUMENT**

25.     Section 1129(a) of the Bankruptcy Code provides that a court shall confirm a plan of reorganization only if it meets all of the requirements of section 1129. 11 U.S.C. § 1129(a). As the proponent of a chapter 11 plan, the Debtors bear the burden of proving compliance with each of the requirements of section 1129(a). *In re Lakeside Global III, Ltd*., 116 B.R. 499, 505 (Bankr. S.D. Tex. 1989); *In re Future Energy Corp*., 83 B.R. 470, 481 (Bankr. S.D. Ohio 1988); 11 U.S.C. § 1129(a). The Debtors must prove each of the requisite elements of section 1129(a) by the requisite preponderance of the evidence. *In re Kent Terminal C*orp., 166 B.R. 555, 561 & n.9 (Bankr. S.D.N.Y. 1994). When a debtor seeks confirmation pursuant to section 1129(b), it bears the burden of proof by clear and convincing evidence." *In re MCorp Fin., Inc*., 137 B.R. 219, 225 (Bankr. S.D. Tex. 1992). The court has an independent duty to determine whether the debtor has met its evidentiary burden under sections 1129(a) and (b) prior to entering an order confirming a chapter 11 plan. *Matter of Williams*, 850 F.2d 250 (5th Cir. 1988).

26.     As set forth below, the Plan cannot be confirmed for two principal reasons: (1) the Settlement does not meet the Fifth Circuit Court of Appeals' standard for approval of a compromise and settlement under Bankruptcy Rule 9019; and (2) the Plan Proponents failed to propose the Plan in good-faith, as required under section 1129(a)(3) of the Bankruptcy Code, by securing a significant role post-confirmation for themselves and their professionals, which, among other things, will entitle them to significant pre- and post-confirmation compensation.

DM3\1745765.11
i_1562233v.2

## I. The Settlement Incorporated in the Plan Cannot Satisfy the Settlement Standard.

27.     Tricadia acknowledges that the policy behind the Bankruptcy Code fosters negotiations and settlements among parties in interest and that the goal of any chapter 11 case is to obtain consensus. But the "global settlement" reached among the Debtors, the Receiver and Wilmington Trust in this case turns this policy on its head. In order to reach this "global settlement," the Debtors and the Plan Proponents seemingly huddled amongst themselves and agreed that the Receiver would receive on account of the Receiver Claims a share that is grossly disproportionate to the recovery of any other creditors in order to secure "confirmation" of the Plan. In turn, Wilmington Trust secured the role of Liquidation Trustee for itself post-confirmation and the full payment of its administrative claims. In relation to Wilmington Trust at least, this resolution seems driven by self interest—to make sure that Wilmington Trust and its professionals grab all of the value for themselves at the expense of TRPS holders.[5]

### A. Standards for Settlement Approval Pursuant to Rule 9019

28.     The Debtors bear the burden of demonstrating that the proposed "global" Settlement should be approved. A proposed settlement can only be approved if it is shown to be fair and equitable and in the "best interests of the estate." *Conn. Gen. Life Ins. Co.*, 68 F.3d 914 (citing *U.S. v. AWECO (In re AWECO))*, 725 F.2d 293, 298 (5th Cir.), *cert. denied*, 469 U.S. 880, 105 S. Ct. 244, 83 L. Ed. 2d 182 (1984). As noted by the Court of Appeals for the Fifth Circuit, the role of the bankruptcy judge in evaluating a 9019 settlement is to compare the "terms

---

[5] The Debtors too would seem to be motivated at least in part by the self interest of their professionals, the Chief Restructuring Officer ("**CRO**") and his counsel. In the absence of settlement, these professionals would remain exposed to the risk of disgorgement of interim fees already paid, based on the Receiver's continued assertion of its rights of setoff. In fact, each of the Court's orders approving the CRO's and his counsel's interim fee applications contain a reservation subjecting the fees to disgorgement if the Receiver is successful in asserting its alleged rights of setoff.

of the compromise with the likely rewards of litigation." *Rivercity v. Herpel (In re Jackson Brewing Co)*, 624 F.2d 599, 607 (5th Cir. 1980).

29.    Approval of a settlement pursuant to Rule 9019 is a necessarily fact-intensive analysis because the court must be apprised of all necessary facts in order for it to conclude that the settlement is reasonable. *Cook v. Waldron*, No. H-05-3438, 2006 WL 1007489, at *4 (S.D. Tex. Apr. 18, 2006) (The court "must be informed of all the relevant facts and information in order to make an independent judgment as to whether the settlement is fair and reasonable."). The burden is on the debtor to demonstrate that they have provided the court with an adequate factual record on which to approve the settlement. *See, e.g., In re Nat'l Health & Safety Corp.*, No. 99-18339, 2000 WL 968778, at *2 (Bankr. E.D. Pa. July 5, 2000). A bankruptcy court may approve a compromise and settlement only if it is fair, reasonable and adequate based on the facts and circumstances before the court. *Motorola Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC et. al.)*, 478 F.3d 452, 461-62 (2d. Cir. 2007) (Bankruptcy Rule 9019 "has a 'clear purpose . . . to prevent the making of concealed agreements which are unknown to creditors and unevaluated by the court'").

30.    In deciding whether a settlement is fair and equitable, the court must look at the following three factors: "(1) The probability of success in the litigation, with due consideration for the uncertainty in fact and law, (2) the complexity and likely duration of the litigation and any attendant expense, inconvenience and delay, and (3) all other factors bearing on the wisdom of the compromise." *Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop., Inc. (In re Cajun Elec. Power Coop., Inc.)*, 119 F.3d 349, 356 (5th Cir. 1997); *see also Conn. Gen. Life Ins. Co.*, 68 F.3d at 917. In analyzing the settlement under the third, catch-all prong, courts are to consider, *inter alia*, and as the facts permit: (1) the best interests of the creditors with

DM3\1745765.11
i_1562233v.2

"proper deference to their reasonable views," and (2) the extent to which the agreed-upon settlement is truly the product of arms-length negotiations and not fraud or collusion. *Cajun Elec. Power*, 119 F.3d at 356.

31. The global Settlement fails to comply with the settlement standard as developed under Rule 9019 on two distinct grounds. First, there is a dearth of support for the Settlement contained in the Plan and the Disclosure Statement, or anywhere else for that matter in the pleadings that had been submitted to this Court. Accordingly, the Debtors have failed to apprise the Court of virtually any, much less all, necessary facts in order for the Court to conclude that the Settlement is reasonable. Second, the global Settlement cannot meet the relevant prongs of the settlement analysis, which among other things, expressly requires consideration of success in litigation, including the strengths and weakness of the parties' positions, and deference to the views of other creditors.

**B. The Debtors Fail to Show That a Different Distribution of Cash and Assignment of Interests in Claims to the Receiver Would Cause Litigation or Delay.**

32. The first and second factors require consideration of the potential costs of litigation avoided by the Settlement. The Plan Proponents would have this Court believe that because they have locked arms on the validity of the Receiver Claims and other issues, they have saved the estates the cost and expense of litigation, in compliance with the first two factors. The irony is that the settling parties have actually caused the estates to incur greater litigation costs and expense by the very nature of their actions in the first place. It is the very fact that the parties combined to force this impetuous "settlement," lacking any evidence of diligence by the Debtors, that propels this confirmation dispute in the first place. As a consequence, these factors do not weigh in favor of approval of the global Settlement.

DM3\1745765.11
i_1562233v.2

33.     In an attempt to "demonstrate" that these factors are satisfied, however, the Debtors set forth their purported justification for the Settlement in little more than a page of the Disclosure Statement (pp. 27-28), a page which does nothing more than parrot the applicable legal standards.

34.     At page 27, Article 7.B. 1 through 4 of the Disclosure Statement, the Debtors and Wilmington Trust "submit that the settlement is fair and equitable and in the best interests of the Estates." (Disclosure Statement, Art. 7.B.)  Why that might be so, however, is impossible to discern on the face of the papers.  No factual or legal analysis is (or can be) proffered to support the conclusion.

35.     Continuing in the same conclusory fashion, the Disclosure Statement announces that:

> [T]he Debtors believe that the factors typically considered by a court in determining whether or not to approve a compromise, including (a) the probability of success in litigating the controversies involved, with due consideration for uncertainties in fact and law, (b) the complexity and likely duration of the litigation and related expenses, inconvenience, and delay; (c) the difficulties, if any, to be encountered in collecting on any judgment which might be obtained; and (d) the paramount interest of creditors and the estate, support approval of the compromise and settlement with the Receiver.

(Disclosure Statement, Art. 7.B.)  That may be many words, but they say absolutely nothing about why the claims between the Debtors and the Receiver should be settled on the terms the Plan Proponents propose.  The Debtors' stated subjective belief is not a reasoned factual or legal argument sufficient to justify approval of the Settlement or confirmation of the Plan.

36.     The argument gets no better for the Plan Proponents and the Plan on the only other page of the Disclosure Statement directed to the issue, page 28.  There, creditors are fed such platitudes as the Relief Stay Motion and Receiver Claims involve "complex factual issues" and "inherent legal uncertainty."  The Debtors threaten that "there is a substantial risk that the

13

FDIC-Receiver will prevail in its assertion that the FDIC-Receiver Claims are valid, secured, administrative, and/or priority claims," (Disclosure Statement, Art. 7.B.1), that "the FDIC-Receiver would be entitled to all of the assets of the Estates, either as a secured, administrative, or priority creditor prior to there being any assets available for distribution to General Unsecured Creditors," (*id*.) and that the "estates would be forced to spend both time and money in defending its [sic] position, with a definite possibility that the Court will ultimately agree with the Receiver's arguments and order the transfer of all of the Estate property to the FDIC-Receiver" (*id*., Art. 7.B.2).

37.     These again are a lot of words that say nothing of substance and provide no analysis.  The Debtors offer the self-serving opinion that "[i]t is in the best interests of the creditors and the estate [sic] to settle the disputes with the FDIC-Receiver."  (*Id*., Art.7.B.4.) The Debtors' self-serving summary conclusion supported only by an unsubstantiated parade of horribles is hardly a reasoned analysis.  The conclusion that the Settlement is "in the best interest of the creditors and the estate [sic]," begs the question, "on what terms?"   The laundry list of platitudes the Debtors present provides no concrete factual or legal explanation of the merits of the claims being settled (or those being divvied up) or of the value, if any, that will flow to the creditors, much less the Class 4 unsecured creditors, of which Tricadia is one, by reason of the Settlement and proffered Plan.  Any such value is highly speculative at best.  Neither does it explain why the Stay Relief Objection and the Debtors' defenses to the Receiver Claims pressed therein, which previously were powerfully presented, no longer have any force.

38.     The time-worn, self-serving boilerplate statement about the complexities of contentious litigation hardly provides the factual record necessary for this Court to reach "an intelligent and objective opinion of the probabilities of ultimate success should the claim be

DM3\1745765.11
i_1562233v.2

litigated," and "form an educated estimate of the complexity, expense, and likely duration of such litigation . . . and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise." *Protective Comm. For Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968). Based on the first and second factors alone, the global Settlement must be rejected.

### C. Tricadia Does Not Support The Global Settlement.

39.     The settlement standard also requires consideration of whether other parties in interest support the Settlement.  In particular, courts show deference to the views of non-settling parties whose interests or rights are directly and adversely impacted by the proposed settlement.  Thus, for example, one court declined to approve a settlement over the objection of a class of creditors whose recoveries were limited by the settlement.  *See AWECO, Inc*., 725 F.2d at 298; *see also Eddy v. Nat'l Union Fire Ins. Co. of Pittsburgh (In re Med. Asset Mgmt., Inc.)*, 249 B.R. 659, 665-66 (Bankr. W.D. Pa. 2000) ("Ignoring the effect of a proposed [settlement] upon the rights of third parties 'contravenes a basic notion of fairness.'"  (citation omitted)).  Thus a settlement cannot be approved when it is impossible to make the necessary conclusion that "no one has been set apart for unfair treatment."  *Cullen v. Riley (In re Masters Mates & Pilots Pension Plan & IRAP Litig.)*, 957 F.2d 1020, 1031 (2d Cir. 1992).

40.     The terms of the Settlement are fundamentally unfair to the TRPS holders.  Importantly, the TRPS holders are the main party whose interests will be impacted negatively by the terms of the Settlement because a substantial distribution of the cash and assignment of substantial causes of action to the Receiver dilutes their recoveries under the Plan.  *Cf. Cullen*, 957 F.2d at 1026 ("[I]f third parties complain to a judge that a 'decree will be inequitable because it will harm them unjustly, he cannot just brush their complaints aside.'"  (*quoting*

15

*Donovan v. Robbins*, 752 F.2d 1170, 1176 (7th Cir. 1985))). Where, as here, "the rights of one who is not a party to a settlement are at stake, the fairness of the settlement to the settling parties is not enough to earn the judicial stamp of approval." *Id*.; *see also Comm. of Unsecured Creditors of Interstate Cigar Co. v. Interstate Cigar Distribution, Inc. (In re Interstate Cigar Co.)*, 240 B.R. 816, 825 (Bankr. E.D.N.Y. 1999) (disapproving settlement where there would be more harm to objecting party than there was a benefit to the estate and thus settlement was not within range of reasonableness). This is especially true where, as here, the parties negotiating against the Receiver have a direct financial stake in the outcome of the Settlement.

41. These cases underscore the deference that should be granted to Tricadia's opposition to the Plan's global settlement. Given that the Receiver, who is receiving a substantial payment on its claims, and Wilmington Trust, which is receiving a substantial post-confirmation role (in addition to payment of its fees and expenses incurred during these cases), do not contest the Plan, the TRPS holders are the only constituents who stand to be prejudiced by the deal reached among the Plan Proponents. Accordingly, the TRPS holders' interests should be the primary concern of the Court when considering approval of the Settlement.

### D. The Global Settlement Is Not a Product of Arms-Length Negotiation.

42. The Settlement appointing Wilmington Trust as the Liquidation Trustee is not a product of arms-length negotiation. The Plan gives the Liquidation Trustee the discretion to appoint professionals and to pay them with absolutely no oversight. This will not benefit the TRPS holders in any way. Instead, it is designed to benefit only Wilmington Trust and its professionals.

43. Throughout the Debtors' proceedings, the Debtors, the Receiver, and Wilmington Trust entered into numerous agreements: the Document Access Stipulation, Reserve Stipulation,

CRO Order, and Claims Investigation Stipulation. Through these agreements, the parties developed a relationship that appears to have moved beyond a framework that focused on the interests of each of their constituents. Instead, the relationship morphed into one where the ultimate compromise revolved around a benefit flowing solely to Wilmington Trust rather than its constituents, the TRPS holders. *See Conn. Gen. Life Ins. Co.*, 68 F.3d at 917 (citing *In re Drexel Burnham Lambert Group, Inc.,* 134 Bankr. 493, 498 (Bankr. S.D.N.Y. 1991) (a debtor's settlement of a claim without participation of creditors should be carefully scrutinized). Not only did Wilmington Trust secure a significant role for itself as the Liquidation Trustee post-confirmation, but in resolving the Receiver Claims on the proposed terms, Wilmington Trust was able to ensure that its administrative claims will be satisfied in full. For this reason as well, the Settlement should not be approved.

 **E.**  **Cash Payments and Assignment of Actions Overwhelmingly Benefit the Receiver.**

 44. Pursuant to the terms of the global Settlement, the Debtors have agreed to make various cash payments that inure overwhelmingly to the benefit of the Receiver. First, the Debtors have agreed to pay the Receiver, on account of the Receiver Claims, approximately $11-12 million derived from 85% of GFG's cash and 30% of the cash of the other Debtors, and payment of a certain portion of the Receiver's allowed administrative claims. Second, the Receiver shall also receive Tax Refunds which the Debtors estimate at approximately $3.49 million and an Insurance Premium Refund totaling approximately $700,000. Third, the Receiver shall also have an interest in the D&O Claims, sole discretion as to whether to commence, settle or dismiss the D&O Claims, and shall retain 100% of any recovery from prosecution of the D&O Claims. None of these settlements should be approved pursuant to Rule 9019 and, as set forth above, all such payments fail to satisfy the standard set forth in *AWECO*.

45.     With respect to the division of cash and assignment of certain causes of action to the Receiver on account of the Receiver Claims, there is no justification for the Debtors' decision to settle the Receiver Claims.

**(1)     The Debtors Intend to Settle Unsupported and Uninvestigated Claims.**

46.     First, the extent and bases of the Receiver Claims were qualified by the Receiver itself in the Proofs of Claim.   Specifically, in the Receiver's own words, "The bases for the FDIC-Receiver's Claim, to the extent that they have been determined, are detailed herein *to the extent that the FDIC-Receiver at this time has sufficient information* to assert in this Proof of Claim."   (Proofs of Claim ¶ 3) (emphasis added).   With respect to the Capital Maintenance Claims, the Receiver acknowledged that it was *still investigating* the information submitted to regulators regarding the actual value of Guaranty Bank's assets and investments and amount of potential losses, GFG's compliance with capital maintenance requirements and agreements, and GFG's accounting and reserving for anticipated losses. (Proofs of Claim ¶ 9-11) (emphasis added).   In addition, the Receiver acknowledged that the claims for Deposit Funds, Fraudulent Conveyances and litigation recovery that were included in the Receiver Claims were *undetermined*.   (Proofs of Claim p.4, "Summary of FDIC-Receiver's Claim") (emphasis added). Indeed, the Receiver asserted that it was *still investigating* its claims regarding the Deposit Funds (Proofs of Claim ¶ 28) (emphasis added), and claims it may have against directors or officers of the Debtors for breaches of fiduciary duty (Proofs of Claim ¶ 35).   Further, the Receiver made only vague and general assertions as to its claim regarding the sale of assets of Guaranty Bank to Compass Bank (Proof of Claim ¶ 34).   The Receiver did not amend the Proofs of Claim to include supporting documents, describe the Receiver Claims in greater detail or provide further results of the investigation that was mentioned in passing in the Proofs of Claim.

18

47.     Instead, the Receiver filed the Relief Stay Motion, which simply refers to the Receiver Claims again.  In the Relief Stay Motion, the Receiver asserted a right to setoff the Receiver Claims against the amounts the Debtors had on deposit.  Once again, however, as in the Proofs of Claim, the Receiver did no more than scratch the surface regarding the asserted validity of the Receiver Claims.  The description of the Receiver Claims set forth in the Relief Stay Motion merely regurgitated the summary provided in the Proofs of Claim and failed to include even cursory support for the Receiver Claims.  (Relief Stay Motion ¶¶ 12, 13.)

48.     Wilmington Trust and the Debtors fully recognized this deficiency.  Wilmington Trust's Opposition argued at the outset that the Receiver Claims are "uncertain at best," and on numerous occasions throughout the pleading, pointed out that the Receiver failed to "specify the precise basis for," or "indicate the applicable provisions or explain why the provisions give rise to," or "set forth any facts underlying" the various claims comprising the Receiver Claims. (Wilmington Trust Opposition 5-6.)

49.     Further, in their Stay Relief Objection, the Debtors asserted that the Receiver Claims, other than the Capital Maintenance Claims, "are either too vague to determine their validity, premature given the nature of the claim, or unsupported by applicable law."  (Stay Relief Objection ¶ 3.)  The Debtors further stated that "without further investigation and discovery, the Debtors are unable to determine the validity or extent of these claims.  While the Debtors can generally articulate their objections and defenses to these alleged claims…, the Debtors will more fully articulate their position as . . .  if and when the facts and law governing such claims are further demonstrated by the [Receiver]."  (*Id.*)

50.     Moreover, in the Complaint the Debtors filed in the United States District Court for the Northern District of Texas in which they asserted the Debtor Claims against the Receiver,

DM3\1745765.11
i_1562233v.2

the Debtors admit that because they were engaged in negotiations to settle the Receiver Claims, the Relief Stay Motion and the Debtor Claims, "neither party has engaged in significant discovery regarding these issues." (Complaint ¶ 10.)

51. The Debtors acknowledged not only that they did not conduct an investigation into the Receiver Claims, but also did not conduct such an investigation into the strengths or weaknesses of their own Debtor Claims (to then compare against the Receiver Claims). Indeed, the Debtors asserted that they have been "*unable to complete an exhaustive investigation* of claims or causes of action against the [Receiver]" (Complaint ¶12) (emphasis added), and that they have "*yet to conduct the type of exhaustive discovery, research, and analysis necessary to identify and support with sufficient documentation* all of their Claims" (Complaint ¶ 16) (emphasis added). The Debtors averred their claims against the Receiver, which are substantially the same matters that comprise the Receiver Claims, in a very vague manner. The Complaint is replete with evidence that the Debtors have not reviewed the strength of their claims regarding the RWHC Stock Conversion, Tax Refunds, and Insurance Premiums. (Complaint ¶ 17 ("Plaintiffs *are investigating* the circumstances behind the conversion of the RWHC Preferred Stock and may have claims against the FDIC-Receiver in respect of the conversion") (emphasis added); Complaint ¶ 18 ("There *may be* intercompany tax payables that are owed by Guaranty Bank to either or both of the Plaintiffs [GHI and or GFG]") (emphasis added); Complaint ¶20 ("[other claims] *may include* claims for the return of insurance premiums refunds") (emphasis added).

52. There is no record evidence, apart from a passing reference in the Disclosure Statement regarding the length of the negotiations between the Plan Proponents, that the Debtors or Wilmington Trust eventually delved into the Receiver Claims or even the Debtor Claims, or

DM3\1745765.11
i_1562233v.2

were able to determine the validity or extent of such claims to now enable them to adequately weigh the strengths and weaknesses of settling such claims. Simply put, none of the Plan Proponents has submitted any evidence that they actually informed themselves of the facts and circumstances necessary to enable them to justify the Settlement for their respective constituents.

53. With their minimal assertions in the Disclosure Statement, the Debtors have failed to make an affirmative showing that they exercised even the most basic diligence and "pushed back" on the Receiver Claims at all prior to settling. Indeed, there is no evidence anywhere that the Debtors considered the strengths and weakness of the Receiver Claims. This is not surprising since all the Receiver presented were Proofs of Claim which repeatedly conceded that the claims were still under investigation.

54. The Debtors cannot now attempt to shore-up evidence to support the global Settlement. Such information, particularly when a settlement is at the heart of a plan, must be included in the Disclosure Statement or the Plan as those are the documents presented to the Court for its analysis regarding the approval of the Plan, and to creditors when deciding to vote for or against the Plan. Here, there is a dearth of supporting arguments from which the Court can compare the "terms of the compromise with the likely rewards of litigation." *Rivecity,* 624 F.2d at 607.

### (2) The Debtors Are Not Obligated for the Receiver Claims.

### (i) The Capital Maintenance Claims

55. The Receiver insisted on the Settlement payments resolving, among other parts of the Receiver Claim, the Capital Maintenance Claim in the approximate amount of $1.95 billion, which makes up the bulk of the Receiver Claims. The Capital Maintenance Claim arises from GFG's alleged failure to cure the deficit under its commitment to a Federal regulatory agency to

maintain the capital of Guaranty Bank as required under section 365 of the Bankruptcy Code. The alleged obligation to maintain certain capital levels of Guaranty Bank in turn are said to arise from various statutory and regulatory provisions and commitments of GFG in relation to the Source of Strength Agreement, a resolution approved by the board of directors of GFG, and the Order to Cease and Desist issued by the OTS. Further, the Receiver asserted that the Capital Maintenance Claims are subject to (a) administrative status with respect to GFG's failure to comply with 11 U.S.C. § 365 (o), or alternatively, (b) priority under 11 U.S.C. § 507(a)(9) as the result of GFG's breach of its commitment to maintain the required capital levels.

56.     The Debtors fail to provide any support for the settlement of the Capital Maintenance Claim. Those claims are entirely inconsistent with the case law and the circumstances.

57.     Indeed, in opposition to the Relief Stay Motion, both the Debtors and Wilmington Trust presented detailed and compelling arguments countering the contentions of the Receiver, arguments demonstrating that the Capital Maintenance Claims are not valid. For example, Wilmington Trust asserted several reasons to support its conclusion that the Receiver cannot establish a statutory or contractual right supporting the alleged obligation of GFG to maintain the appropriate capital levels of Guaranty Bank. Wilmington Trust demonstrated that:

•       The Receiver cannot establish that any statutory provision creates a private right of action in favor of Guaranty Bank or the Receiver to enforce any alleged capital maintenance obligation. Courts have uniformly held that such a private right of action does not exist. *See, e.g., Resolution Trust Corp ("RTC") v. Tetco*, *Inc.* 758 F. Supp. 1159, 1164-65 (W.D. Tex. 1990) (holding that no private right of action existed to enforce a regulatory net worth maintenance condition or any other condition under the Bank Holding Company Act or the Change of Control Act), *vacated by settlement*, No. 91-5612, 1992 WL 437650 (5th Cir. Apr. 22, 1992); *Fed. Sav. And Loan Ins. Corp. v. Savers, Inc*., No. 89-529, 1990 WL 290314, at *1 (Bankr. E.D. Ark. June 12, 1990) (same).

•       The Receiver failed to attach to its Proofs of Claim the "Source of Strength Agreement" upon which it relies on for its contractual claims. The Source of Strength Agreement was

allegedly a condition of GFG's receipt of funds under the Treasury Department's Troubled Assets Relief Program and yet the Receiver did not produce this document in support of its claim.

- The Source of Strength Agreement, in any event, does not support the Receiver's Capital Maintenance Claims because the Receiver cannot establish that it creates a contractual right in favor of Guaranty Bank or the Receiver. Numerous courts have held that a capital maintenance commitment given by a bank holding company does not constitute a valid contract, because there was no offer, acceptance, or meeting of the minds; rather, a capital maintenance commitment is simply a statement setting forth a regulatory condition with which the holding company is allegedly required to comply. *See, e.g., Tetco*, 758 F. Supp. at 1162-64; *Fed. Deposit Ins. Corp. ("FDIC") v. Butler (In re Conner Corp.)*, 127 B.R. 775, 780 (E.D.N.C. 1991); *RTC v. Savers, Inc.*, No. 89-529, 1989 WL 248120, at *1 (E.D. Ark. Dec. 13, 1989).

- Any Source of Strength Agreement runs between GFG and the Office of Thrift Supervision, not the Receiver. Thus, even if such an agreement were somehow deemed an enforceable contract, neither Guaranty Bank nor the Receiver is a party to the contract and thus both lack standing to assert claims pursuant to that agreement. Further, the Receiver has failed to demonstrate that it was a third-party beneficiary or otherwise entitled to enforce the agreement.

- Contrary to the Receiver's assertion that its Capital Maintenance Claims are entitled to administrative priority status under 11 U.S.C. § 365(o), several courts have held that section 365(o) does not create an administrative expense priority for a capital maintenance claim. *Wolkowitz v. FDIC (In re Imperial Credit Indus., Inc.)*, 527 F.3d 959, 974 (9th Cir. 2008); *Franklin Sav. Corp. v. Office of Thrift Supervision ("OTS")*, 303 B.R. 488, 501-03 (D. Kan. 2004).

58.     The Debtors likewise demonstrated that the Receiver did not establish a valid claim based upon any alleged obligation on the part of GFG to make capital contributions to Guaranty Bank. In perhaps even greater detail than Wilmington Trust, the Debtors showed that the Receiver had failed to demonstrate a statutory or contractual obligation to fund Guaranty Bank's capital shortfall and that the Receiver was not entitled to relief under 11 U.S.C. § 365(o). The Debtors further established that even if GFG were required to contribute capital to Guaranty Bank, the Receiver lacked standing to assert any such capital maintenance claim or that the Receiver, acting on behalf of Guaranty Bank, was the proper owner of any such claims.

DM3\1745765.11
i_1562233v.2

59. Specifically, in addition to the arguments raised by Wilmington Trust, the Debtors demonstrated that GFG is not obligated to assume and cure any capital maintenance obligation under Bankruptcy Code § 365(o) because, for several reasons, that section does not apply to this case:

- First, any obligation GFG allegedly had to maintain the capital of Guaranty Bank terminated on the date of the Receivership, which is the date that GFG lost control of Guaranty Bank. *See Franklin Sav. Corp.*, 303 B.R. at 498 (explaining that after a receivership, a holding company no longer had "good, legal, or rightful title to stock" as a result of the succession of the receiver to all rights, titles, powers, and privileges of any stockholder). "The appointment of a conservator, by its very nature, results in the conservator taking control of the entity." *Id.* at 500 (citing cases holding the same).

- Second, by its terms, Bankruptcy Code § 365(o) does not extend "any commitment that would otherwise be terminated by an act" of a Federal depository institution's regulatory agency. The appointment of the Receiver is just such termination. Moreover, Bankruptcy Code § 365(o) should only apply to an executory contract. The underlying requirement for the assumption of a contract under Bankruptcy Code § 365 is that the contract be executory. Since the Receiver took control before the Petition Date, there was no executory contact to which § 365(o) could apply.

- Third, even assuming that Bankruptcy Code § 365(o) applied in this case, the Receiver would not be entitled to assert such a claim on behalf of Guaranty Bank. The only capital commitments that must be assumed and cured under Bankruptcy Code § 365(o) are commitments made "to a Federal depository institutions [sic] regulatory agency." 11 U.S.C. § 365(o). Therefore, the only party entitled to assert a claim for assumption and cure under this section is a government regulatory body, not the Receiver acting on behalf of Guaranty Bank.

60. The Debtors also established the following meritorious points in opposition to the Receiver's Capital Maintenance Claims:

- The Receiver does not have standing to assert a private cause of action against GFG to fund the capital requirements of Guaranty Bank. Any alleged commitment to do so, whether based on contract, statute or regulation, was made to and at the behest of the OTS, as a federal regulatory body, not Guaranty Bank. In submitting the Proofs of Claim, the Receiver acted solely in its capacity as receiver, a capacity separate and distinct from its corporate capacity. Because the Receiver is proceeding in the stead of Guaranty Bank, a private litigant, it must demonstrate that a private right of action provides it with the right to assert claims for alleged failures to contribute capital. No such private right of action exists. *See Tetco,* 758 F. Supp. at 1164 -65. A subsidiary savings and loan does not have a private right of action against its parent for failure to

DM3\1745765.11
i_1562233v.2

contribute capital under the applicable statutory or regulatory scheme. *Id*. at 1165-66. And the Receiver does not identify any private enforcement mechanism for a capital maintenance obligation outside of the OTS' enforcement powers in 12 U.S.C. § 1818. *Id*. at 1165; *see also RTC v. Savers*, 1989 WL 248120, at *1.

- The Receiver fails to establish that GFG was contractually obligated to maintain the capital of Guaranty Bank. The Receiver's contract argument is based primarily on a resolution of GFG's Board of Directors. A board resolution alone does not constitute a contract. *Alabama Lime & Stone Co. v. Adams*, 218 Ala. 647, 654 (Ala. 1929). Rather, to be contractually binding, the resolution must satisfy basic contract law requirements. *Id*. Corporate statements similar to those relied upon by the Receiver in the Relief Stay Motion are not enforceable as contractual commitments to maintain the capital or net worth of a subsidiary financial institution. *See, e.g Tetco,* 758 F. Supp. at 1161-62 (letter issued by a savings and loan holding company committing to maintain the net worth of its subsidiary savings and loan at levels required by the Federal Home Loan Bank Board (the "<u>FHLBB</u>") was not a contract upon which damages could be awarded); *In re Conner Corp.*, No. 87-01697, 1990 WL 124052, at *4 (commitment to maintain the net worth of a subsidiary savings and loan provided to satisfy the requirements of the FHLBB could give rise to a regulatory action by the FHLBB, but was too vague to give rise to a contract between the parties), *aff'd, Butler*, 127 B.R. 775; *RTC v. Savers, Inc.*, 1989 WL 248120, at *1.

- To the extent GFG undertook an otherwise enforceable obligation to fund the capital shortfall of Guaranty Bank, GFG (i) did so at a time when GFG was likely insolvent, and (ii) did not receive reasonably equivalent value for such obligation. Therefore, any agreement by GFG to make capital contributions to Guaranty Bank is avoidable pursuant to 11 U.S.C. § 548(a)(1)(B). *See generally Wolkowitz*, 527 F.3d 959 (holding that a performance guaranty executed by a debtor may represent a fraudulent conveyance that could be avoided under 11 U.S.C. § 548).

- For mutuality purposes, the Receiver is a separate and distinct entity from the OTS. *See FDIC v. Roldan Fonseca*, 795 F.2d 1102, 1109 (1st Cir. 1986) (citing *Jones v. FDIC*, 748 F.2d 1400, 1402 (10th Cir. 1984)) (" 'Corporate' FDIC and 'Receiver' FDIC are separate and distinct legal entities"); *Wash. Mut., Inc. v. FDIC*, No. 09-533, 2009 WL 3273880, at *2 (D.D.C. Oct. 13, 2009) ("[The FDIC as Receiver] merely stands in the shoes of the failed bank"). As a result of its failure to establish standing to bring claims for capital contributions, the Receiver lacks the mutuality required to establish any right of setoff. Mutuality requires that the: (1) claim and debt exist between the same parties; (2) the parties owe each other something in the same capacity, i.e., not as fiduciary; and (3) obligations are owed in the same right. In general, courts have held that the requirement of mutuality should be strictly construed. *See Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 18 (1995); *U.S. Aeroteam, Inc. v. Delphi Auto. Sys., LLC (In re U.S. Aeroteam, Inc.)*, 327 B.R. 852, 864 (Bankr. S.D. Ohio 2005).

DM3\1745765.11
i_1562233v.2

61.     As Wilmington Trust and the Debtors previously pointed out, there is *no* basis for the Capital Maintenance Claims.  Whether an obligation to commit capital existed is a fact-intensive analysis which requires an in depth investigation beyond mere assertions.    Title 11 does not specify any particular form that a "commitment to maintain the capital of an insured depository institution" must take, or otherwise provide any guidance as to how to determine whether such a commitment has been made.  According to the legislative history of this statute, Congress enacted section 365(o) "to prevent institution-affiliated parties from using bankruptcy to evade commitments to maintain capital reserve requirements of a Federally insured depository institution." H.R. Rep. No. 681(I), 101st Cong., 2d Sess. 179 (1990), *reprinted in* 1990 U.S.S.C.A.N. 6472, 6585.

62.     Courts have found that a commitment to maintain capital existed where agreements specifically promised either to "infuse sufficient additional equity capital" into a subsidiary bank, or "absolutely, unconditionally and irrevocably guarantee... the performance" of a subsidiary bank. *See Wolkowitz*, 527 F.3d at 973 (9th Cir. 2008); *OTS v. Overland Park Fin. Corp.*, 236 F.3d 1246, 1252 (10th Cir. 2001); *RTC v. Firstcorp, Inc.,* 973 F.2d 243 (4th Cir. 1992); *Franklin Sav. Corp.*, 303 B.R. 488.

63.     On the other hand, where the commitment is not clear, courts will not permit the institution to leap-frog over other creditors.  For example, the court *In re Colonial Bancgroup*, 436 B.R. 713 (Bankr. M.D. Ala. Sept. 1, 2010), found that, based on the language used by the holding company in the various documents, no such commitment to contribute capital was made. There, the holding company pledged to "assist its subsidiary bank in addressing weaknesses. . . and achieving/maintaining compliance with its . . . Memorandum of Understanding;" to "tak[e] steps designed to ensure that the Bank complies with the Memorandum of Understanding;" and,

DM3\1745765.11
i_1562233v.2

to "take appropriate steps to ensure that the Bank complies with the Order to Cease and Desist." 436 B.R. at 731. The court concluded that the alleged commitments in that case were no more than <u>promises</u> to assist or to attempt, through the implementation of "appropriate steps," to ensure that the bank met its obligations under its Memorandum of Understanding and Cease and Desist Orders. *Id.* By including the words "assist," and "take appropriate steps," the language of the agreements explicitly disclaimed any commitment to actually obtain a specific result. *Id.*

64. The United States District Court for the Northern District of Ohio also recognized in its recent decision in *FDIC v. Amtrust Financial Corporation*, Case No. 10-1298, 2011 U.S. Dist. LEXIS 8963 (N.D. Ohio Jan. 13, 2011), the substantial burden that an institution must meet in order to successfully establish that a firm commitment to infuse capital was made. There, the court first assessed the case law that addressed language in documents containing alleged commitments to maintain capital. The court went on to analyze the particular documents before it and determined that the cases were of little guidance in helping the court determine whether the documents were ambiguous or unambiguous with regard to creation of a commitment. In attempting to review the plain language and the context of the documents, the court recognized that there was support for both parties' positions within the four corners of the documents. The court ultimately concluded that it could not determine as a matter of law that the documents evidenced an unambiguous commitment to maintain the capital of the bank based on the language creating the alleged commitments and the context of the documents. The FDIC receiver's motion for summary judgment was therefore denied.

65. Given the difficulty of establishing a firm commitment to infuse funds, the Receiver would be hard pressed to bank on successfully asserting the Capital Maintenance Claims, particularly since the language at issue in this case does not explicitly state that GFG

DM3\1745765.11
i_1562233v.2

will "infuse" capital or "absolutely, unconditionally and irrevocably guarantee" the performance of Guaranty Bank. Rather, the language at issue in this case is similar to the language in th*e* *Colonial* case, a mere promise of a vague level of assistance, or a pledge to take unspecified "appropriate steps" toward the achievement of a particular outcome – far short of the firm commitment required by the statute.

66. Likewise, the Receiver's ability to setoff the Receiver Claims against the Debtors' cash on deposit, as advanced in the Relief Stay Motion, is highly speculative given the requirements contained section 553 of the Bankruptcy Code. In this regard, the recent decision by the United States Bankruptcy Court for the Middle District of Alabama in *In re Colonial Bancgroup, Inc*., No. 09-32303, 2011 WL 239201 (Bankr. M.D. Ala. Jan. 24, 2011), illustrates the importance of establishing mutuality of the debts sought to be setoff. In that case, an FDIC receiver asserted that it had a right to satisfy claims it pressed against a debtor by setoff against balances in the debtor's accounts. *Id*. at *8. The debtor argued that the FDIC receiver did not have such a right of setoff because the receiver was not liable to the debtor for the deposits since the successor bank that had assumed the deposits was liable on the accounts. *Id*. The court agreed and concluded that, with respect to the deposits, the debts between the FDIC receiver and the debtor were not mutual and could not serve as the basis of a setoff under section 553. *Id*. at *9. This, of course, is the same situation as the case at hand, where Compass Bank assumed the deposits under its purchase documents.

67. If it were determined that the Capital Maintenance Claims had no validity or no priority, the Plan would no doubt look very different from its present form and unsecured creditors other than the Receiver would be entitled to a much greater recovery. The Debtors themselves acknowledge that there is no significant senior debt currently outstanding to which

the TRPS are subordinate. (Disclosure Statement, Art. 4.C.) Yet, despite the detailed, specific, and compelling arguments previously raised by Wilmington Trust and the Debtors, arguments which would effectively undermine the Capital Maintenance Claims and the Plan itself, the Disclosure Statement and the Plan make absolutely no mention of these arguments and make no effort to justify the Settlement or the Plan in light of these arguments.

68.     The Court might ask the question, "what has changed from the time when the Debtors and Wilmington Trust presented such meritorious opposition to the Capital Maintenance Claims, to the date of the submission of the proposed Plan which literally capitulates to Receiver?" Yet, no answer is provided. That failure alone wholly undermines the request for approval of the Settlement and confirmation of the Plan.

### (ii)     Tax Refunds

69.     The Receiver claims entitlement to possible future Tax Refunds. It asserts that such refunds are the property of the FDIC and not property of the Debtors. Significantly, however, the Receiver offers no legal basis for its alleged entitlement to these funds. That very point was made by Wilmington Trust in its opposition to the Receiver's Relief Stay Motion. In that opposition, Wilmington Trust showed that there existed uncertainty both as to whether the Tax Refunds are the property of the Debtors or the property of the Receiver, and the actual dollar amount that may be owing to each. The Receiver grounded its allegations of entitlement to refunds in unspecified and uncertain amounts merely on its stated belief that its own allegations of ownership were true. Wilmington Trust, however, demonstrated that rather than allow the Receiver to avoid a challenge to its claims, "a more prudent course would be to postpone setoff until such time as the disputes, contingencies, and liquidation issues surrounding the FDIC's

claims can be resolved appropriately." (Wilmington Trust Opposition 11). Again, the moving papers give no indication that that more prudent course was followed.

70.     In opposition to the Receiver Claims and Relief Stay Motion, the Debtors established, as the Receiver conceded, that any entitlement to any Tax Refunds was unknown at the time, and the relief sought by the Receiver was premature.

71.     Moreover, two recent court decisions have held that tax refunds belong to debtor holding companies rather than the FDIC. In *Zucker v. FDIC (In re Netbank, Inc.)*, No. 08-00346, slip op. (Bankr. M.D. Fl. Sept. 30, 2010), a receiver for a bank asserted its right to a tax refund based on a tax sharing agreement which the debtor holding company opposed. The court concluded that the tax sharing agreement was not specific so as to provide that the debtor held any portion of the tax refund in trust for the bank or restrictions on how the money might be used. Further, under the tax sharing agreement the debtor was obligated to pay the bank an amount of benefits to which the bank would have been entitled based on its tax attributes if the bank had filed separate tax returns. The obligation was not conditioned upon the receipt by the debtor of a refund but rather an independent contractual commitment. Accordingly, the court concluded that based on the debtor-creditor relationship established between the debtor and the bank under the tax sharing agreement, the right to the tax refunds belonged to the debtor rather than the FDIC. *See also Team Fin. Inc, et al., v. FDIC (In re Team Fin. Inc., et al.)*, No. 09-5084, slip op. (Bankr. D. Kan. Apr. 27, 2010) (denying FDIC summary judgment as the tax sharing agreement created ordinary contractual obligations with respect to tax liability and refunds akin to that of a debtor and creditor which allowed claims against the estate but that the tax refunds were property of the debtor holding company's estate).

DM3\1745765.11
i_1562233v.2

72.     Despite the recognized lack of certainty as to whether the Receiver in fact possessed an ownership interests the Tax Refunds, and if so, a further lack of certainty as to the amount of that interest, combined with recent case law favoring the Debtors' asserted interest in the Tax Refunds, the Debtors and Wilmington Trust now capitulate to a proposed settlement where the full amount of any tax refund (net of tax liability) received by any of the Debtors will be paid to the Receiver.  How the ambiguities came to be resolved against the Debtors and in favor of the Receiver have not and cannot be explained.

### (iii)     Insurance Premium Refunds

73.     The Receiver also claimed entitlement to the Insurance Premium Refunds.  As was the case with its claim to the Tax Refunds, however, the Receiver offered no legal basis to support this claim, merely stating that it was still looking into its allegations.

74.     In opposition to the Insurance Premium Refunds claims, Wilmington Trust demonstrated that the Receiver had indeed provided no basis for a finding that it was entitled to any such monies.

75.     As with the Tax Refunds, however, the Debtors and Wilmington Trust are now capitulating to the Receiver, proposing a settlement whereby all Insurance Premium Refunds will be paid by the Debtors to the Receiver.  Once again, why this is a fair and equitable resolution is not and cannot be explained.

### (iv)     RWHC Stock Conversion

76.     Prior to the Receivership, GFG owned 100% of the preferred stock of RWHC. From information provided in the Disclosure Statement, it appears that the RWHC preferred stock had a face value of $305 million.  It is generally accepted that the preferred stock of Guaranty Bank has no value.

DM3\1745765.11
i_1562233v.2

77. During the Receivership, and shortly before the Petition Date, the Receiver converted the preferred stock to preferred stock of Guaranty Bank. There does not appear to have been any monetary consideration for this conversion. The alleged basis for the conversion was an alleged representation by GFG that this would occur in the event that Guaranty Bank was deemed undercapitalized by the OTS. This requirement, however, was not included in the RWHC corporate formation documents.

78. GHI and GFG raised the RWHC Stock Conversion in the Complaint seeking to set aside the conversion/transfer, or to obtain money damages from the Receiver, as an avoidable fraudulent transfer pursuant to 11 U.S.C. § 548(a)(1)(B).

79. The proposed plan provides for the Debtors to release any and all claims against the Receiver and Compass Bank in connection with the RWHC Stock Conversion. No justification is proffered for the giving of such releases.

(v) **Temple-Inland Spin-Off**

80. On February 25, 2007, Temple-Inland's board of directors preliminarily approved a plan to separate Temple-Inland into three, stand-alone public companies. On November 29, 2007, Temple-Inland announced that its board of directors had approved the distribution to its stockholders of all the shares of common stock of GFG. On December 28, 2007, the distribution was completed and GFG became a stand-alone, public company.

81. It is unclear whether GFG had independent legal advice in connection with this agreement and arrangement.

82. During 2008, only months following the spin-off, the Debtors began to encounter severe financial difficulties. Guaranty Bank was eventually deemed critically undercapitalized as of March 31, 2009, only fifteen months after the spin-off.

DM3\1745765.11
i_1562233v.2

83. As set forth in the Disclosure Statement, "[t]he Debtors and Wilmington Trust have begun, but not yet completed, a review of the facts and circumstances leading to the spin-off from Temple-Inland and the subsequent failure of Guaranty Bank and insolvency of Debtors." It is not apparent from the Disclosure Statement or the proposed Plan that such a review was ever completed or, if so, what conclusions if any were reached.

84. Without any adequate discovery or investigation, the Plan provides that the Liquidation Trustee can pursue claims against Temple-Inland on behalf of the beneficiaries of the Trust. But there is a significant reservation, which is not fully explained. The Liquidation Trustee can only pursue such claims against Temple-Inland that are not deemed *derivative* of the claims that the Receiver, Guaranty Bank, or its shareholders may have, as those are reserved solely for the Receiver.

85. That reservation would seem to prevent the Liquidation Trustee from pursuing the principal claims against Temple-Inland, the current and former officers and directors of Temple-Inland, and the professional firms that advised them, with regard to the spin-off. Those claims are purportedly reserved for the Receiver. It is not at all apparent what, if any, benefit or value will flow to the Liquidation Trust by reason of a right to pursue a limited set of undescribed, uninvestigated, and unevaluated claims relating to Temple-Inland. The "carve-out" for derivative claims is, in and of itself, fertile ground for future litigation with the Receiver for years post-confirmation.

**(vi)  D&O Claims**

86. Further, the Debtors may have claims against the officers and directors of the Debtors arising out of the individual's employment by one or more of the Debtors and/or service on one of more of the boards of directors of those entities. The D&O Claims would be based

upon possible acts, omissions, errors, negligence, breaches of duty and the like that occurred during service to one or more of the Debtors. There has evidently been no discovery or investigation of any of this activity.

87. According to the Disclosure Statement, the aggregate limit of liability under the D&O insurance coverage is $35 million.

88. Under the Plan, the exclusive right to assert any of these claims, which are stated to be derivative of Guaranty Bank, belong to the Receiver. To the extent that the Debtors may have an interest in any D&O Claims, the Plan provides that any such interest is transferred to the Receiver, in exchange for a reduction of the cash otherwise to be received by the Receiver of $475,000. Only if the Receiver elects not to pursue such claims can the Liquidation Trustee do so, but there is no criteria nor time limit for the Receiver to make that decision. Thus, here also, whatever value may inhere in the D&O Claims will, under the terms of this unfair Settlement, be given to the Receiver.

89. This same limitation applies to claims that the Liquidation Trustee may wish to pursue against other individuals or entities identified in the course of investigating claims. Anything derivative of claims against Guaranty Bank, or its shareholders, is reserved for the Receiver.

(**vii**) **Preference Payments to Insiders or Creditors**

90. The payments within 90 days prior to the Petition Date total only $587,388.78. The vast majority of those payments appear to be to professionals.

91. While the transfers to Insiders within one year prior to the Petition Date total $52,912,338.18, the bulk of that amount, $45,770,696.67 (86.5%) were payments to GFG or its subsidiaries as shown on the Organizational Structure, Exhibit "2" of the Disclosure Statement.

DM3\1745765.11
i_1562233v.2

92. Nothing in the documents submitted to the Court to date has shown, with any specific chart of figures, the assets that will be distributed to the Receiver compared to the minimal assets that would be left for any other creditor.

93. Thus, while attempting to paint a picture that the Liquidation Trustee will have assets to pursue for the benefit of General Unsecured Claims, a careful analysis of the Plan fails to demonstrate that anything of value will be available for this class of creditors.

**(vii)    Other Claims of GFG and GHI Against Receiver**

94. The Debtors' Complaint, in addition to litigating some of the issues outlined above, also raised claims against the Receiver related to the sale of Guaranty Bank's assets to Compass Bank and other parties during the Receivership.   As part of the Complaint, GFG and GHI further reserved their rights to assert that certain Capital Maintenance Claims that the Receiver alleges were incurred by GFG and GHI prior to the Receivership are voidable as fraudulent transfers.

95. Now, apparently without discovery, additional investigation and, more pointedly, without explanation as to why, the Debtors, the Receiver and Wilmington Trust have conducted private settlement discussions and the Debtors have agreed to walk away from all of these claims as part of the Plan for which they now seek (but should not receive) this Court's approval.

96. The defenses the Debtors and Wilmington Trust proffered to the claims of the Receiver were cogent and well grounded.  So also were the Debtor Claims.  The positions the Debtors and Wilmington Trust previously took stand in sharp contrast to the discussion the Debtors have presented in an effort to justify the inadequate settlement with the Receiver upon which the unfair Plan is based.

DM3\1745765.11
i_1562233v.2

97. The potential consideration to flow to the other creditors of the Debtors under this Settlement pales in comparison to the consideration flowing to the Receiver as described above. The Disclosure Statement admits that the recovery to the holders of general unsecured claims is anticipated to be only in the range of 1% to 3%. But even this scant assertion is not based on any reasoned analysis. The unsecured creditors of the Debtors receive, at best, a speculative, future interest in possible recoveries on claims that are left largely undescribed and completely unquantified, and in instances have not even to date been investigated.

98. Such a one-sided Settlement should not be approved and the unfair and inequitable Plan which is based upon it should not be confirmed.

## II. There Must Be Oversight Over the Liquidating Trust.

99. Sufficient safeguards are not in place to oversee the Liquidation Trust's administration, particularly the management of assets, the retention and the payment of professionals by the Liquidation Trustee, the prosecution of Rights of Action and the objection to and resolution of claims. Indeed, the Liquidation Trust appears to be structured to insulate the Liquidation Trustee (Wilmington Trust) and Trust professionals from oversight by the Court, the United States Trustee, and creditors.

100. The Liquidation Trustee has the broad authority to, among other things: (i) make distributions and maintain appropriate reserves; (ii) liquidate the Debtors' assets; (iii) object to and resolve claims; (iv) address certain Rights of Action; and (v) retain and pay professionals.

101. Further, under the terms of the Settlement as incorporated into the Plan, the Liquidation Trustee shall have the right to pursue certain claims against Temple-Inland for the benefit of, among others, unsecured creditors, to the extent they are not derivative of the claims of the Receiver, Guaranty Bank, or its shareholders. (Disclosure Statement, Art. 6.H.1.)

DM3\1745765.11
i_1562233v.2

102. All of these actions can be taken by the Liquidation Trustee in its sole discretion without any supervision. It is clear that there will be no oversight by creditors, or any other body, over the Liquidation Trust. Neither the Plan nor the Liquidation Trust Agreement contain express protections for overseeing such actions and accounting for the assets transferred to the Liquidation Trust. The Plan contains no requirement for an independent third-party audit of assets or documentation of equitable treatment among unsecured creditors or causes of action pursued. Neither the Plan nor the Liquidation Trust Agreement directly addresses the institutional or other controls that would operate as a check on the Liquidation Trustee's powers. Such controls are prudent in order to protect the assets and ensure maximum recovery in the Rights of Action.

103. The terms must provide meaningful and independent oversight for the Liquidation Trustee. This lack of oversight and input by the creditors (for whose primary benefit this liquidating plan is being effectuated) on the Liquidation Trustee's handling of claims and litigation, if any, is disturbing, as the proposed Liquidation Trustee is the same entity who is benefitting from the Settlement.

## III. The Plan Cannot be Confirmed Because It Was Not Proposed in Good Faith.

104. A plan may be confirmed only if it "has been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). The burden of proposing a plan that satisfies the Bankruptcy Code's requirements, including section 1129(a)(3), always falls on the plan proponent, "but it falls particularly heavily on the debtor-in-possession or trustee since they stand in a fiduciary relationship to the estate's creditors." *Everett v. Perez (In re Perez)*, 30 F.3d 1209, 1214 n.5 (9th Cir. 1994); *see also In re Bush Indus., Inc.*, 315 B.R. 292, 304 (Bankr.

DM3\1745765.11
i_1562233v.2

W.D.N.Y. 2004) ("Although a debtor may in good faith negotiate a lock-up agreement, *the particular terms of any resulting plan must themselves be proposed in good faith . . . .*" (emphasis added)). "To be proposed in good faith, a plan must *fairly* achieve a result consistent with the Code." *In re Block Shim Dev. Co.-Irving*, 939 F.2d 289, 292 (5th Cir. 1991) (emphasis added). Even when negotiating plan provisions with creditors, the Debtors' officers and directors owe a duty of good faith to shareholders. *Bush Indus.*, 315 B.R. at 306. To assess the "fundamental fairness" of the plan, the Court scrutinizes the "totality of circumstances surrounding [the] plan." *In re Coram Healthcare Corp.*, 271 B.R. 228, 234 (Bankr. D. Del. 2001) (citing *In re Am. Family Enters.*, 256 B.R. 377, 401 (D.N.J. 2000)); *In re Madison Hotel Assocs.*, 749 F.2d 410, 425 (7th Cir. 1984).

105. Here, the Debtors did not propose the Plan in good faith because they bound themselves to an agreement which served solely to benefit the Receiver and Wilmington Trust at the expense of holders of the TRPS. By ignoring the effect of the agreement on the holders of the TRPS and instead focusing on the benefit to the Receiver and Wilmington Trust, the Debtors violated their duty to propose a Plan in good faith. *See In re PWS Holding, Corp.*, 228 F.3d 224, 242 (3d Cir. 2000) ("For purposes of determining good faith under section 1129(a)(3) . . . the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code." (alteration in original) (citation omitted)).

## IV. Conversion Of These Cases To Chapter 7 Is Appropriate.

106. For the reasons stated above, these chapter 11 cases should not proceed for the sole and exclusive benefit of the Receiver and Wilmington Trust. If the Plan Proponents refuse to address the fatal deficiencies in the Settlement, Tricadia requests that the Debtors' chapter 11

DM3\1745765.11
i_1562233v.2

cases be converted to cases under chapter 7 of the Bankruptcy Code such that an independent fiduciary be appointed to investigate, analyze and pursue all claims and causes of action for the benefit of creditors.

107.    Under Section 1112(b) of the Bankruptcy Code, as amended by the 2005 amendments, a court shall convert a chapter 11 case to a chapter 7 case "for cause" upon the request of a party in interest. 11 U.S.C. § 1112(b). Section 1112(b) states, in pertinent part:

> ...on request of a party in interest, and after notice and hearing, absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate, *the court shall convert a case under this chapter to a case under chapter 7* or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, if the movant establishes cause …

11 U.S.C. § 1112(b) (emphasis added).    A determination of cause is made by the court on a case-by-case basis. *See In re AdBrite Corp.*, 290 B.R. 209, 218 (Bankr. S.D.N.Y. 2003).  Section 1112(b) provides a nonexclusive list of 16 grounds for which constitute cause for conversion. 11 U.S.C.§ 1112(b)(4)(A)-(P); *see In re Broad Creek Edgewater, LP*, 371 B.R. 752, at n.8 (Bankr. D.S.C. July 18, 2007).[6]

---

[6] Section 1112(b)(4) states that "cause" includes—

| | |
|---|---|
| (A) | substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation; |
| (B) | gross mismanagement of the estate; |
| (C) | failure to maintain appropriate insurance that poses a risk to the estate or the public; |
| (D) | unauthorized use of cash collateral substantially harmful to 1 or more creditors; |
| (E) | failure to comply with an order of the court; |
| (F) | unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any  rule applicable to a case under this chapter; |
| (G) | failure to attend the meeting of creditors convened under section 341(a) or an examination ordered under rule 2004 of the Federal Rules of Bankruptcy Procedure without good cause shown by the debtor; |
| (H) | failure to timely provide information or attend meetings reasonably requested by the United States Trustee (or the bankruptcy administrator, if any); |
| (I) | failure to pay taxes owed after the date of the order for relief or to file tax returns due after the date of the order for relief; |
| (J) | failure to file a disclosure statement, or to file or confirm a plan, within the time fixed by this title or by order of the court; |
| (K) | failure to pay any fees or charges required under chapter 123 of title 28; |
| (L) | revocation of an order of confirmation under section 1144; |

DM3\1745765.11
i_1562233v.2

108.     Three such separate and independent grounds include where there is either: (1) a continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation, (2) gross mismanagement of the estate, and (3) an inability to effectuate a substantial consummation of a confirmed plan. 11 U.S.C. §§1112(b)(4).  Here, the Court should convert the Debtors' chapter 11 cases to chapter 7 because Tricadia has established that these three grounds exist in these proceedings.  The Debtors have no intention to reorganize or rehabilitate and have proposed a liquidation that benefits solely the Receiver and Wilmington Trust and its professionals, the bedrock of which is the Settlement that cannot be approved under Bankruptcy Rule 9019.  As there have been numerous claims asserted by and against the Debtors, a chapter 7 trustee should be appointed to thoroughly examine these claims and to pursue and/or defend them on behalf of all creditors of the Debtors.

---

| (M) | inability to effectuate substantial consummation of a confirmed plan; |
|-----|----------------------------------------------------------------------|
| (N) | material default by the debtor with respect to a confirmed plan; |
| (O) | termination of a confirmed plan by reason of the occurrence of a condition specified in the plan; and |
| (P) | failure of the debtor to pay any domestic support obligation that first becomes payable after the date of the filing of the petition. |

See 11 U.S.C. §1112(b)(4)(A)-(P).

DM3\1745765.11
i_1562233v.2

## CONCLUSION

Tricadia respectfully requests that confirmation of the Plan be denied and that the Court grant such other relief it deems necessary and proper.

Dated: April 18, 2011.

Respectfully submitted,

_/s/ Stephen A. Goodwin_

Stephen A. Goodwin
  State Bar No. 08186500
**Carrington Coleman Sloman
  & Blumenthal, LLP**
901 Main Street, Suite 5500
Dallas, TX 75202
Telephone: 214.855.3000
Facsimile: 214.855.1333

*And*

Gerard S. Catalanello, Esq.
James J. Vincequerra, Esq.
Pat Matusky, Esq.
**Duane Morris**
1540 Broadway
New York, NY 10036-4086
Telephone: 212.692.1000
Facsimile: 212.692.1020

*Counsel for Tricadia Financials Restructuring
Partners LTD*

## CERTIFICATE OF SERVICE

The undersigned does hereby certify that, on this 18th day of April, 2011, a true and correct copy of the foregoing was served on all parties listed on the Limited Service List (as of March 21, 2011) via ECF-Notice and/or U.S. First Class Mail.

_/s/ Stephen A. Goodwin_
Stephen A. Goodwin

DM3\1745765.11
i_1562233v.2