Peter C. Lewis, Esq.
White & Wiggins, L.L.P.
901 Main Street, Suite 6200
Dallas, Texas 75202
Telephone: (214) 665-4150
Facsimile: (214) 665-4160

Steven B. Soll, Esq.
Otterbourg, Steindler, Houston & Rosen, P.C.
230 Park Avenue
New York, New York 10169
Telephone: (212) 661-9100
Facsimile: (212) 682-6104

Attorneys for Federal Deposit Insurance Corporation,
as Receiver for Guaranty Bank

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | Chapter 11 |
| | § | |
| GUARANTY FINANCIAL GROUP INC., | § | CASE NO. 09-35582-bjh |
| *et al.,* | § | (Jointly Administered) |
| | § | |
| Debtors. | § | |
| | § | |

**RESPONSE OF THE FEDERAL DEPOSIT INSURANCE CORPORATION,
AS RECEIVER FOR GUARANTY BANK, TO THE OBJECTION OF
TRICADIA FINANCIALS RESTRUCTURING PARTNERS, LTD. TO
DEBTORS' AMENDED JOINT PLAN OF LIQUIDATION UNDER
CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE**

The Federal Deposit Insurance Corporation, as Receiver for Guaranty Bank (the "FDIC-R"),

by and through its undersigned counsel, hereby respectfully submits this Response ("Response") to

the Objection (the "Objection") by Tricadia Financials Restructuring Partners, Ltd. ("Tricadia") to

the Debtors' *Amended Joint Plan of Liquidation for Guaranty Financial Group Inc., et al., Under Chapter 11 of the United States Bankruptcy Code (the "Plan")* and in support thereof respectfully represents as follows:[1]

## PRELIMINARY STATEMENT

1.     Confirmation of the Plan will represent the culmination of almost two years of litigation, investigation and negotiation among the FDIC-R, the Debtors (who are under the management of Mr. Dennis Faulkner, a well-known, independent and highly respected insolvency professional who is the Debtors' Chief Restructuring Officer ("CRO") pursuant to an order of this Court [Dkt. No. 391]) and Wilmington Trust Company FSB ("Wilmington"), as the Trustee of the TRPS. The Plan is opposed by Tricadia, an eleventh-hour interloper who seeks to delay and obstruct a settlement that was almost two years in the making, at significant expense to the Debtors, the FDIC-R and other TRPS holders who will receive their distribution through Wilmington. Notwithstanding the unfounded and inflammatory characterization by Tricadia in its Objection regarding the conduct and motivation of the CRO and Wilmington, the Settlement embedded in the Plan, and the Plan itself, were negotiated at arm's-length, in good faith, after extensive due diligence and negotiation by the parties.  While the distributions to all constituencies in the case are nominal given the limited asset pool (unsecured creditors, including TRPS holders, are projected in the Disclosure Statement [Dkt. No. 336] to receive recoveries between one and three percent of their claims and the recoveries to the FDIC-R will approximate 0.008% of its claims), the Settlement represents a fair and reasonable allocation of various assets and resolution of complex claims. Confirmation of the Plan will avoid the excessive cost of extended and protracted litigation (likely to

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Objection which, by reference, may include the meanings ascribed to them in the Plan, as applicable.

be in the millions of dollars) of the many complex issues that are the subject of the Settlement, and the uncertainty of the outcome of such litigation.

2.     A significant portion of the Objection is predicated upon Tricadia's assertion that the information set forth in the Disclosure Statement is inadequate. Tricadia propounds that the alleged lack of disclosure was intended to hide what Tricadia asserts is an insufficient basis to proceed with the Settlement, which it opposes. According to Tricadia, the alleged purpose of this non-disclosure, and the Settlement itself, is to permit the CRO and Wilmington to further their own individual economic self interests. Recognizing the very high bar that it must meet to successfully oppose the Settlement, Tricadia apparently feels compelled to create this false and artificial construct to seek to taint the credibility of the Debtors, who are the sole Plan proponents,[2] and Wilmington in order to assert that the Plan has not been proposed in good faith, as required by Section 1129(a)(3) of the Bankruptcy Code. Tricadia seeks to undermine the deference that this Court should give under applicable case law to the reasonable business judgment of the CRO in promoting the Settlement and Plan.

3.     In complaining about what Tricadia asserts is inadequate information, Tricadia disregards the fact that the Disclosure Statement has already been approved by this Court as containing "adequate information" pursuant to the Order Granting Amended Joint Motion for Entry of an Order Approving Disclosure Statement and Setting Hearing on Confirmation of Plan [Dkt No. 391], after notice to *all* of the Debtors' creditors. In addition to this Court's approval of the adequacy of the information contained in the Disclosure Statement, not a single objection to the Disclosure Statement was filed by *any* party, including the Office of the United States Trustee or any creditor, including any of the TRPS holders. Notably, notwithstanding its assertion that it holds

---

[2] Although the FDIC-R and Wilmington negotiated the Plan and support its confirmation, the Debtors are the Plan proponents for purposes of the confirmation requirements of Section 1129 of the Bankruptcy Code.

approximately $53 million of TRPS and its apparent dissatisfaction with the Disclosure Statement and the Settlement under which it asserts it will be a victim, Tricadia failed to object to the Disclosure Statement.

4.     The reason for this is obvious.  While complaining of a lack of disclosure by the Debtors, Tricadia's disclosure to the Court, the Debtors, Wilmington and the FDIC-R is anything but transparent.  Although asserting a $53 million claim, Tricadia has failed to file a Proof of Claim (relying upon the omnibus claim filed by Wilmington) or provide any documentation to the Court to support its ownership of the claim or disclose the date upon which the claim was acquired.[3]

5.     At a minimum, it appears that: First, Tricadia was not a creditor at the time of the Disclosure Statement hearing, or it would have filed an objection to the adequacy of the Disclosure Statement.  Second, Tricadia may not have held its claim on the Record Date for voting purposes since the Record Date was February 16, 2011, the same date as the Disclosure Statement hearing.  Third, Tricadia is not a TRPS holder with similar economic interests or motivations as other TRPS holders since its claim was purchased *after* it became aware of the terms of the very Settlement which it now decries, presumably at a discount from the projected distribution to creditors. *Tellingly, no other holder of TRPS has filed an objection to the Plan*, thereby isolating Tricadia as the lone dissenting party.

6.     The true nature of Tricadia's role in this case does not change the Debtors' burden to satisfy the confirmation requirements of Section 1129 of the Bankruptcy Code or the applicable case law establishing the factors for this Court to consider in approving the Settlement embedded in the Plan.  Nevertheless, it is relevant to this Court's consideration of the motivation behind the aspersions cast against the Debtors and Wilmington in an effort to discredit the Settlement.

---

[3] Based upon communications with the Debtors, the FDIC-R is advised that the Debtors may seek to disallow Tricadia's claim for voting purposes if Tricadia cannot document that it owned its claims on the Record Date.

4

**FACTUAL BACKGROUND**

7.    The factual background applicable to this Response is set forth in the Disclosure Statement, as supplemented by paragraphs 7 through 18 of the Objection, without necessarily admitting every specific reference or characterization set forth in those paragraphs.

**ARGUMENT**

8.    The Debtors have the burden of satisfying the requirements of Section 1129(a) of the Bankruptcy Code and will do so at the Confirmation Hearing. The FDIC-R supports confirmation of the Plan because it represents a fair compromise and settlement of many complex legal issues. Failure to confirm the Plan will likely result in years of protracted litigation, on many issues, in several courts and at great expense. The outcome of such litigation is uncertain.

I.    **The Settlement Incorporated in the Plan Satisfies the Settlement Standard.**

   A.    **Standards for Settlement Approval Pursuant to Bankruptcy Rule 9019.**

9.    Compromises are generally favored in bankruptcy. *See, e.g.,* Myers v. Martin (In re Martin), 91 F.3d 389, 393 (3d Cir. 1996). *See also* this Court's opinion in In re Idearc, 423 B.R. 138 (Bankr. N.D. Texas 2009). A proposed settlement should be approved if it is shown to be fair and equitable and in the "best interests of the estate." Rivercity v. Herpel (In re Jackson Brewing Co.), 624 F.2d 599, 602 (5th Cir. 1980); Conn. Gen. Life Ins. Co. v. United Companies Financial Corp., 68 F.3d 914 (5th Cir. 1995) (citing U.S. v. AWECO (In re AWECO), 725 F.2d 293, 298 (5th Cir.), *cert. denied,* 469 U.S. 880, 105 S. Ct. 244, 83 L. Ed. 2d 182 (1984)). As this Court recognized in its opinions in In re Heritage Orig., L.L.C., 375 B.R. 230 (Bankr. N.D. Tex. 2007) and In re Quality Acceptance Corporation, 2000 Bankr. LEXIS 2093 (Bankr. N.D. Tex. 2000) (Houser, B.J.), the Court must look to Fifth Circuit precedent and apply the following three factors: "(1) The probability of success in the litigation, with due consideration for the uncertainty in fact and law, (2) the complexity and likely duration of the litigation and any attendant expense, inconvenience and

delay, and (3) all other factors bearing on the wisdom of the compromise." <u>Official Committee of Unsecured Creditors v. Cajun Electric Power Cooperative, Inc. (In re Cajun Electric Power Cooperative, Inc.)</u>, 119 F.3d 349, 356 (5th Cir. 1997) ("the extent to which the agreed-upon settlement is truly the product of arm's-length negotiations and not fraud or collusion."); *see also* <u>Conn. Gen. Life Ins. Co.</u>, 68 F.3d at 917.

10. The Court does not have to be convinced that the settlement is the best possible compromise but only that the settlement falls within a reasonable range of litigation possibilities. <u>In re Coram Healthcare Corp.</u>, 315 B.R. 321, 330 (Bankr. D. Del. 2004) (finding that the proper test to apply in the determination of whether to approve a proposed compromise is if the compromise falls "within the reasonable range of litigation possibilities."). "In evaluating a proposed settlement the Court is not supposed to have a 'mini-trial' on the merits, but rather [should] examine the settlement and determine whether it falls 'below the lowest point in the range of reasonableness.'" <u>In re G-1 Holdings, Inc.</u>, 420 B.R. 216, 256 (Bankr. D.N.J. 2009) (quoting <u>In re W.T. Grant Co.</u>, 699 F.2d 599, 608 (2d Cir. 1983)); <u>In re Idearc Inc.</u>, 423 B.R. 138. A court will generally give deference to a debtor's business judgment in deciding whether to settle a matter. <u>Key3Media Group, Inc. v. Pulver.com, Inc. (In re Key3Media Group, Inc.)</u>, 336 B.R. 87, 93 (Bankr. D. Del. 2005). Notwithstanding Tricadia's effort to eliminate such judicial deference by attempting to besmirch the CRO's integrity, the Debtors are entitled to such deference in connection with the CRO's conclusion that the Settlement is in the best interests of the estate.

**B.      The Settlement Satisfies the Requisite Factors to be Considered by this Court.**

11. It is beyond debate that the Settlement involves the resolution of numerous controversies in bank holding company insolvencies that are playing out with great notoriety, uncertainty, delay and expense in Bankruptcy, District and Appellate Courts throughout the nation. In addition to the extensive litigation in these courts regarding substantive issues under Titles 11 and

12 of the United States Code, litigation also exists in connection with jurisdictional issues and conflicts between the provisions of these Titles.

12.     In the context of the numerous substantive and procedural issues that appear in this case and the limited assets of the estates, it is easy to envision a scenario where a significant portion, if not all, of those assets are exhausted in the prosecution or defense of multiple complex claims, in different jurisdictions, with the possible outcome that no assets remain for any creditor other than the FDIC-R. The compromises reflected in the Settlement take all these factors into account and result in a reasonable and fair conclusion to these cases that is in the best interest of creditors.

13.     Although the Court is not supposed to have a "mini-trial" on the merits of all aspects of this Settlement, it is necessary and appropriate to establish that, absent confirmation of the Plan, litigation of the issues that comprise the Settlement are complex, of likely extended duration with attendant expense and delay, and subject to an uncertain outcome. Thus, the FDIC-R will address the salient components of the Settlement.[4]  Taken as a whole, recognizing the "give and take" of negotiations of a global settlement of distinct but  overlapping issues, the Settlement satisfies the requisite factors to be considered by this Court.

(i)     **The Capital Maintenance Claim.**

14.     Contrary to Tricadia's assertion that the Debtors and Wilmington were motivated by personal economic interests not to aggressively challenge the FDIC-R's claims, Tricadia acknowledges that, upon assertion of the FDIC-R's Capital Maintenance Claim, the Debtors and Wilmington presented "detailed and compelling arguments countering the contentions of the

---

[4] Discussion of the factual and legal considerations regarding various aspects of the Settlement is submitted solely for the purpose of allowing this Court to consider the appropriateness of the Settlement and confirmation of the Plan. The presentation serves the sole purpose of identifying that there are significant and meritorious positions that the FDIC-R would assert in the context of a full trial on each substantive issue. The FDIC-R's submission in this Response in support of confirmation of the Plan does not constitute a consent to the jurisdiction of this Court to adjudicate any specific issue in the event confirmation of the Plan is denied and further litigation ensues. In fact, it is likely that extensive litigation will occur regarding the appropriate jurisdiction for adjudication of some, or all, of such claims.

Receiver. . . ." [Obj. at ¶ 57].  It is apparent, therefore, that both of those parties performed legal and factual due diligence in connection with the filing of pleadings opposing the Relief Stay Motion, which motion was predicated on, among other issues, the existence of the Capital Maintenance Claim.

15.     Consistent with its statutory duties and the professionalism of the CRO and the Debtors' counsel, and Wilmington's counsel, the opposing pleadings represented an appropriate litigation posture by an adversary in a contested matter.  However, the positions articulated in these pleadings are not the "final say" or, necessarily, an accurate analysis of the positions articulated, which is why courts exist and litigation outcomes are uncertain.   Paragraph 68 of the Objection poses the rhetorical question:  "what has changed from the time when the Debtors and Wilmington Trust presented such meritorious opposition to the Capital Maintenance Claims, to the date of the submission of the proposed Plan. . . ?"  In asserting that no answer has been provided by the Debtors or Wilmington, Tricadia alleges that "that failure alone wholly undermines the request for approval of the Settlement and confirmation of the Plan."

16.     In fact, the answer is obvious.  The Debtors and Wilmington recognized that the positions articulated in their pleadings may be distinguished, factually and legally, for numerous reasons including the inapplicability of cited case law, alternative relevant opposing authority, and factual distinctions between those cases and the facts applicable to the Debtors.  The parties also recognize that, even with respect to those cases in other jurisdictions having the strongest factual and legal similarity, the justifiable issues could be decided differently by this Court and courts of appellate jurisdiction in the Fifth Circuit.  These factors all give rise to potential uncertainty in outcome and significant risk for the estates.

17.     At the commencement of the case, when the Relief Stay Motion was filed, the FDIC-R asserted a Capital Maintenance Claim that would receive, alternatively, the benefit of Section 365(o) of the Bankruptcy Code providing for the "deemed" assumption and "immediate cure" of the commitment and any deficit, as well as a priority status for any uncured amount pursuant to Section 507(a)(9) of the Bankruptcy Code.  The FDIC-R also asserted entitlement to setoff against certain bank accounts on the basis of such claims.  Sixteen months after the filing of the Relief Stay Motion, the practical distinctions between the payment of the claim pursuant to Section 365(o), the payment of funds pursuant to setoff and the entitlement of such claims to a priority status under Section 507(a)(9) of the Bankruptcy Code, which would have affected only the timing of payment to the FDIC-R, are now irrelevant for confirmation purposes, since confirmation of the Plan will result in the FDIC-R receiving its portion of the Cash to which it is entitled under the Settlement on the Plan Effective Date.  Upon confirmation, whether the Capital Maintenance Claim is being paid pursuant to Section 365(o) or 507(a)(9), or pursuant to the FDIC-R's setoff rights, is irrelevant.

18.     The reality is that the Debtors and Wilmington proceeded with the negotiation of the Settlement and the compromise of the Capital Maintenance Claim because they recognized that the FDIC-R has strong and compelling arguments in support of its position.  These arguments include well-established precedent for the proposition that a guaranty, an informal stipulation, a resolution or an affidavit that includes a commitment to maintain and infuse capital constitutes a capital maintenance commitment that is enforceable under Section 365(o).  *See, e.g.,* Wolkowitz v. Fed. Deposit Ins. Corp. (In re Imperial Credit Indus., Inc.), 527 F.3d 959, 964 (9th Cir. 2008) (guarantee found to constitute a capital maintenance commitment under Section 365(o)); Office of Thrift Supervision v. Overland Park Fin. Corp. (In re Overland Park Fin. Corp.), 236 F.3d 1246, 1249 (10th Cir. 2001) ("informal" net worth stipulation found to constitute a capital maintenance commitment

under Section 365(o)); Resolution Trust Corp. v. Firstcorp, Inc. (In re Firstcorp, Inc.), 973 F.2d 243, 244 (4th Cir. 1992) (FHLBB resolution found to constitute a capital maintenance commitment under Section 365(o)); Franklin Savings Corp. v. Office of Thrift Supervision, 303 B.R. 488, 491 (D. Kan. 2004) (written affidavit found to constitute a capital maintenance commitment under Section 365(o)). Such caselaw is consistent with the unambiguous language of Sections 365(o) and 507(a)(9) of the Bankruptcy Code which provide for administrative or priority status for "**any commitment** by the debtor to a Federal depository institutions regulatory agency (or a predecessor to such agency) to **maintain the capital** of an insured depository institution . . . ." [Emphasis added].

19.    The FDIC-R asserts that GFG made an unambiguous commitment to maintain the capital of Guaranty Bank. This commitment is reflected by Exhibit "1" to Exhibit "4" to the Relief Stay Motion consisting of the Proofs of Claim filed by the FDIC-R in this case and, more specifically, the resolution of the Board of Directors of GFG dated January 28, 2009 (the "Resolution") in which the Board:

> RESOLVED, that the Company shall serve as a holding company source of strength to Bank and will provide management support to Bank to the extent of Company's ability and will provide capital strength and support to the Bank as prescribed by the Federal Deposit Insurance Act *to the fullest extent of the Company's capacity and Company's own capital*; [emphasis added].

20.    The Relief Stay Motion also included, as exhibits, a copy of the Order to Cease and Desist issued with respect to GFG by the Office of Thrift Supervision (the "OTS"), effective April 6, 2009 (the "GFG C&D Order"), and the Stipulation and Consent to Issuance of Order to Cease and Desist (the "GFG Consent Stipulation") in which GFG consented to the issuance of the GFG C&D Order and agreed to comply with its terms. Those terms included a requirement that GFG "*shall ensure*" Guaranty Bank's compliance with all of the terms of a separate Order to Cease and Desist

against Guaranty Bank of the same date (the "Guaranty Bank C&D Order"). The Guaranty Bank C&D Order is also annexed as an exhibit to the FDIC-R Proof of Claim annexed to the Relief Stay Motion. The Guaranty Bank C&D Order establishes core capital ratios that were required to be maintained by Guaranty Bank and, pursuant to the GFG C&D Order and GFG Consent Stipulation, by GFG. Notwithstanding the extensive efforts made by GFG subsequent to the resolution, the GFG C&D Order and the GFG Consent Stipulation to fulfill its commitment, it is undisputed that Guaranty Bank failed to achieve the requisite capital requirements.

21.     GFG's commitment was more than a "best efforts" or "aspiration" as suggested by Tricadia. The word "shall" is "used in laws, regulations, or directives to express what is mandatory" Miriam-Webster's Collegiate Dictionary, 1143 (17th Ed. 2008); *see* United States v. Monsanto, 491 U.S. 600, 607 (1989) (By using the word "shall" in a forfeiture statute "Congress could not have chosen stronger words to express its intent that forfeiture be mandatory. . . ."). The word "ensure" means to make sure, certain, or safe:  GUARANTEE" Miriam-Webster's Collegiate Dictionary, 416. "Ensure may imply a virtual guarantee." Id. It is clear that based upon the relevant documentation in this case, the FDIC-R has a compelling Capital Maintenance Claim.

22.     Rulings regarding the enforceability of a capital maintenance claim in other bank holding company cases in other jurisdictions, involving different facts and documentation, are neither controlling nor, necessarily, persuasive. Nevertheless, Tricadia's reference to issues or authorities raised by the Debtors and Wilmington in their objections to the Relief Stay Motion does not undermine the existence of persuasive and significant arguments in support of the FDIC-R's Capital Maintenance Claim against GFG.

23.     Tricadia asserts that any obligation GFG had to maintain the capital of Guaranty Bank terminated on the date of the receivership when GFG lost control of the Bank. Tricadia relies upon

Franklin Savings Corporation v. Office of Thrift Supervision, 303 B.R. 488 (D. Kan. 2004), in support of this position. Tricadia fails to mention that the applicable resolution upon which that capital maintenance commitment was based *expressly limited* the duration of the holding company's commitment as long as the holding company controlled the bank. Given this specific limitation, the Court found that the appointment of the Resolution Trust Corporation ("RTC"), as a conservator, divested the holding company of its "control" over the bank and, therefore, consistent with the express terms of the resolution, the holding company was no longer liable for the deficiency arising from its capital maintenance commitment. Nevertheless, the Court did not find that the conservatorship terminated the commitment altogether. Rather, the Franklin court stated that its holding was *consistent* with Resolution Trust Corporation v. Firstcorp, Inc. (In re Firstcorp, Inc.), 973 F.2d 243 (4th Cir. 1992), involving a similar federal home loan bank board net worth stipulation. In In re Firstcorp, Inc., the Fourth Circuit explained that the termination of the capital commitment "operated only to absolve [the holding company] of any obligation to *continue* maintaining [the bank's] capital and thereby cleared it of any liability arising from further *deterioration* of [the bank's] capital occurring *after* [the date of receivership]." 973 F.2d at 251 (emphasis added). The Court refused to absolve the parent of its capital commitment because of the appointment of a receiver; ("absolving Firstcorp of its liability under that obligation because FF-Raleigh is now in receivership would reward the very conduct that made the receivership necessary and leave the federal deposit insurance system - and ultimately the federal taxpayers - to pick up the tab."). Id. at 249. Thus, consistent with the FDIC-R's assertion against GFG, the capital deficiency that existed on the Petition Date was not extinguished by the appointment of the FDIC-R as receiver.

24.     Tricadia also refers to the Debtors' assertion that Section 365(o) should only apply to an executory contract and that, given the appointment of the FDIC-R before the Petition Date, and

the argument that such appointment terminated any commitment, there was no executory contract to which assumption pursuant to Section 365(o) could apply. For the reasons stated above, the issues of "deemed assumed" and immediate cure required by Section 365(o) are no longer relevant and do not apply to the FDIC-R's entitlement to a priority claim pursuant to Section 507(a)(9), nor would they be applicable to setoff. Nevertheless, it is clear that the Debtors' initial assertion would not likely be enforced. The Tenth Circuit in <u>In re Overland Park Fin. Corp</u>, expressly held that a capital maintenance commitment under Section 365(o) need not be executory and stated that the plain language of that section, as compared to other subsections of Section 365, demonstrates Congress' intent that a commitment under Section 365(o) need not be contractual, executory, or formal. Indeed, "Congress indisputably knew how to include 'executory' or other limiting language, but Congress did not do so in Section 365(o).'" <u>In re Overland Park Fin. Corp.</u>, 236 F.3d at 1252.

25.     Tricadia also refers to the Debtors' assertion that the FDIC-R would not be entitled to assert such a claim on behalf of Guaranty Bank and that the only party entitled to assert the claim is a governmental regulatory body. Moreover, Tricadia asserts that the FDIC-R does not have standing to assert a private cause of action against GFG to fund the capital requirements of Guaranty Bank. With respect to the alleged requirement that only the particular government regulatory body is entitled to assert the claim, the Debtors would be attempting to write additional restrictions into Section 365(o) or 507(a)(9) that do not exist since neither section contains the suggested limitation, nor would such limitation make sense in the applicable regulatory scheme because it is the FDIC-R, and not the OTS, that has been damaged by GFG's failure to satisfy its capital maintenance commitment. The OTS has no claim, administrative, priority or otherwise, against GFG's estate, notwithstanding GFG's breach of its capital maintenance commitment.

26.      The District Court in <u>Overland Park</u>, 232 B.R. 215, 228 (D. Kan. 1999), expressed this view when it stated that it was actually the RTC, as conservator, rather than the OTS, that had standing to enforce a net worth stipulation made by a holding company to the Federal Savings Loan Insurance Corporation since the obligation was intended to maintain the net worth of the bank. Similarly, although the Fourth Circuit in <u>In re Firstcorp, Inc.</u> did not expressly address this issue, it permitted the RTC, as receiver, standing to enforce a commitment made with a Federal Home Loan Bank Board pursuant to a net worth resolution.

27.      The FDIC-R may also assert claims, as successor to Guaranty Bank, as an intended third party beneficiary of the commitment as it was clearly and expressly stated as the party who would be entitled to receive, and benefit from, GFG's capital maintenance commitment. *See* <u>Klamath Water Users Protective Assn'n v. Patterson</u>, 204 F.3d 1206, 1211 (9th Cir. 1999); <u>County of Santa Clara v. Astra USA, Inc.</u>, 588 F.3d 1237, 1244 (9th Cir. 2009); and <u>Doe v. Pa. Board of Probation and Parole</u>, 513 F.3d 95, 106 (3d Cir. 2008) (stating that there are two tests for determining third party beneficiary status: one requiring a reference to the third party directly in the contract and one requiring circumstances compelling recognition of such a status in order to effectuate the intention of the parties).

28.      Tricadia also refers to the assertion by the Debtors and Wilmington that the capital maintenance commitment made by GFG is voidable pursuant to Section 548(a)(1)(B) of the Bankruptcy Code. While the Debtors cited <u>Wolkowitz v. FDIC (In re Imperial Credit Industries, Inc.)</u>, 527 F.3d 959, 974 (9th Cir. 2008), in its objection to the Relief Stay Motion to support the argument that a performance guaranty executed by a debtor may constitute a fraudulent conveyance, <u>Wolkowitz</u> did not hold that such guaranty constituted a fraudulent conveyance.   Rather, it addressed the issue of whether a fraudulent conveyance claim against the FDIC, in its capacity as a

receiver, is barred by 12 U.S.C. §1828(u) which prohibits claims against the FDIC, as receiver, for the return of assets of an affiliate or controlling shareholder of the bank if, at the time of such transfer, the bank is subject to a directive by a Federal banking agency to increase its capital. Although the Wolkowitz court did not establish a statutory bar to the commencement of litigation to avoid the assumption of an *obligation*, as compared to the transfer of an *asset*, in which case 12 U.S.C. § 1828(u) is an absolute bar, the determination of whether a fraudulent conveyance has occurred in connection with GFG's capital maintenance commitment will depend upon numerous factors, including whether the Wolkowitz ruling would be followed in the Fifth Circuit, the solvency of the parent at the time of transfer and whether reasonably equivalent value was exchanged.

29.     It is the FDIC-R's position that GFG received reasonably equivalent value in exchange for the capital maintenance commitment when the benefit conferred in exchange for the transfer of an asset or the incurrence of an obligation is the possibility of a future gain, that gain need not be certain, or even probable, to constitute reasonably equivalent value. "So long as there is some chance that a contemplated investment will generate a positive return at the time of the disputed transfer. . . value has been conferred." In re R.M.L., Inc., 92 F.3d 139 (3d Cir. 1996). Because GFG's survival depended upon the adequate capitalization of Guaranty Bank, GFG received reasonable consideration in exchange for its commitment to maintain Guaranty Bank's capital because this commitment promoted the survival of both entities. *See* In re Royal Crown Bottlers of North Alabama, Inc., 23 B.R. 28, 30 (Bankr. N.D. Ala. 1982) ("the passing to a subsidiary of the consideration for a transfer by debtor-parent may be presumed to be substantial because the subsidiary corporation is an asset of the parent corporation and what benefits the assets will ordinarily accrue to the benefit of its owner"). As GFG's principal operating subsidiary, Guaranty Bank shared a clear identity of interest with it so the benefit of an adequately capitalized

Guaranty Bank conveyed a substantial benefit to its parent, GFG. Without the Resolution, the GFG C&D Order and the GFG Consent Stipulation, GFG would not have been able to seek approval of a capital restoration plan that allowed it time to seek to preserve the survival of its primary income producing operating subsidiary.

30. Finally, Tricadia relies upon a ruling in <u>In re Colonial Bank Group</u>, 2011 Bankr. LEXIS 2772 (Bankr. M.D. Ala. September 1, 2010) which, under the specific language contained in the cease and desist orders considered by the United States Bankruptcy Court for the Middle District of Alabama, held that the undertakings applicable in that case did not constitute a capital maintenance commitment.

31. As the language referred to in paragraph 63 of the Objection reflects, the holding company in <u>Colonial</u> pledged to "assist its subsidiary bank in addressing weaknesses . . . and achieving/maintaining compliance with its . . . Memorandum of Understanding;" and to "tak[e] steps designed to ensure that the Bank complies with the Memorandum of Understanding;" and to "take appropriate steps to ensure that the Bank complies with the Order to Cease and Desist." <u>Colonial</u>, 2011 Bankr. LEXIS 2772, at **41-42. Tricadia asserts that the Bankruptcy Court concluded that the alleged commitments were no more than promises to assist or to attempt to ensure that the Bank met its obligations under the Memorandum of Understanding and Cease and Desist Orders. Tricadia further asserts that, by including the words "assist," and "take appropriate steps", the language of the agreements disclaimed any commitment to actually obtain a specific result.

32. The FDIC-R disagrees with the Bankruptcy Court ruling in <u>Colonial</u> and has appealed that ruling which, under any circumstances, is not controlling authority in this jurisdiction. Regardless of whether the decision is reversed on appeal, the specific language in the GFG C&D Order is different and compels a different conclusion. It is difficult to see how GFG could make a

clearer commitment than by declaring that it "*shall ensure*" that the requisite capital ratios shall be met. On this basis alone, <u>Colonial</u> is distinguishable and inapplicable here,

**(ii)     The Effect of the FDIC-R Prevailing With Respect to Its Capital Maintenance Claim Would be That There Would be No Assets Available for Any Unsecured Creditors of the Estates.**

33.     Regardless of whether the Debtors or Wilmington ultimately agreed with or conceded some or all of the positions that would be asserted by the FDIC-R, were this matter to be fully litigated, the strength of the FDIC-R's assertions and the complexity of the issues no doubt formed the basis for the Debtors' and Wilmington's belief that prosecution of these claims through judgment and appeal would be quite lengthy and expensive, and would lead to uncertain results. Therefore, it is patently obvious that the best solution for the estate is a compromise of these claims. The compromise memorialized in the Settlement provides direct tangible and substantial benefits for the Debtors' estates.

34.     Because the FDIC-R's Capital Maintenance Claim would exceed $1.97 billion, its administrative or priority claim would absorb all assets, of any kind or nature, that the estates might recover before any distribution would be made to unsecured creditors, including the holders of the TRPS. In contrast to this potentially untenable result for the estates, the Settlement provides the following significant benefits to the estates:

(a)     The Debtors will receive approximately $8.8 million, representing approximately 44% of the Cash that was subject to the Relief Stay Motion, that would otherwise have been paid to the FDIC-R pursuant to its Capital Maintenance Claim;[5]

---

[5] Although a portion of the Cash is held by Debtors other than GFG, those Debtors have no significant unsecured creditors and, as wholly-owned subsidiaries of GFG, that Cash would become part of the GFG estate. Therefore, these funds would become subject to distribution to GFG creditors pursuant to Section 507 of the Bankruptcy Code in the GFG bankruptcy proceeding. The result would be that the FDIC-R would obtain those funds pursuant to its Section 507(a)(9) priority claim.

(b)     In addition to recovering the remaining portion of the Cash, the general unsecured creditors will receive the benefit of recoveries against third parties and insiders for voidable transfers that would otherwise be paid to the FDIC-R's on its priority claim. A schedule of the transfers that are subject to possible disgorgement is set forth as Exhibit "3" to the Disclosure Statement and aggregate approximately $7.7 million, net of intercompany transfers and other transfers that are released pursuant to the Plan.

(c)     The general unsecured creditors will receive and retain the benefit of other Avoidance Actions or causes of action, to the extent set forth in the Settlement, rather than the FDIC-R being the beneficiary of any such recoveries as a result of its Capital Maintenance;

(d)     The Debtors will also retain the claims, if any, that they have against Temple-Inland Inc., the owner of GFG until December 28, 2007, as more specifically set forth in the Settlement. Absent the Settlement, any recoveries might otherwise inure to the benefit of the FDIC-R; and

(e)     As additional consideration to the Debtors, which would not otherwise be available to them under any circumstances, the FDIC-R has agreed to assign to the Liquidation Trust a 30% interest in net recoveries from counterclaims asserted by the FDIC-R, as successor to Guaranty Bank, against JLT Insurance Agency Holdings, Inc. ("JLT") and Guaranty Insurance Service, Inc. ("GISI") arising from, among other items, disputes regarding purchase price adjustments to the contract of sale pursuant to which the business of GISI was sold to entities related to JLT. GISI was a subsidiary of Guaranty Bank, not GFG, and the Debtors concede that they have no legal basis to assert *any* entitlement to these proceeds. Nevertheless, as additional consideration to the Debtors, the FDIC-R, at no economic risk to the Debtors' estates for litigation costs or otherwise, has agreed to assign a portion of any litigation proceeds to the Debtors' estates. Counter-

claims asserted against the Plaintiffs by the FDIC-R in the action approximate $6 million.

35.     Based upon the allocation of Cash and the other significant concessions made by the FDIC-R under the Settlement, it is clear that the Debtors will receive tangible, direct and substantial benefits by proceeding with the Settlement and have satisfied the <u>Conn. Gen. Life Ins. Company</u> and <u>Cajun Electric Power</u> factors necessary to obtain approval of the Settlement.

### (iii)     The Tax Refunds.

36.     As part of the give and take of the negotiations, the Settlement recognizes the entitlement of the FDIC-R to receive Federal and State Tax Refunds which the Debtors anticipate will approximate $3.49 million; *see* Disclosure Statement at p. 35. Prior to agreeing to this treatment as part of the Settlement, the Debtors retained the tax accounting firm of Pope Shamsie & Dooley, LLP to assist in the preparation of the tax returns on behalf of the Debtors' estate. Pope Shamsie & Dooley served as tax accountants for the Debtors prior to the Petition Date and was familiar with tax matters involving the Debtors and their affiliates. The Debtors acknowledged the FDIC-R's right to receive these refunds after verifying, among other things, that all of the refunds were sourced by monies paid by Guaranty Bank as well as, in this instance, derived from losses generated by Guaranty Bank. The Debtors also reviewed the GFG Tax Allocation Policy dated December 29, 2007 (the "Tax Allocation Policy") which unambiguously provides that the respective member of the consolidated tax group producing a net tax benefit shall receive such benefit.

37.     The Tax Allocation Policy further states that, with respect to Guaranty Bank, the Tax Allocation Policy is intended to comply with the Interagency Policy Statement on Income Tax Allocation in a Holding Company Structure (the "Policy Statement"), 63 Fed. Reg. 64757 (November, 1998). The Policy Statement provides, among other things, that (i) a thrift holding company "that receives a tax refund from a taxing authority obtains these funds as agent for the consolidated group on behalf of the group members;" (ii) that "[a]n institution incurring a loss for

tax purposes should . . . receive a refund from its parent;" and (iii) that the refund should be "in an amount no less than the amount the institution would have been entitled to receive as a separate entity . . . regardless of whether the consolidated group is receiving a refund."

38.     The Tax Allocation Policy also provides that: "Should a conflict arise between this tax allocation policy and the INTERAGENCY POLICY regarding a member regulated by OTS, the INTERAGENCY POLICY will be followed".  This provision is applicable in this case to any conflict because Guaranty Bank was regulated by the OTS.  Additionally, as the CRO has independently confirmed with Pope Shamsie & Dooley, the treatment of the Tax Refunds under the Settlement is consistent with the manner in which GFG and its consolidated subsidiaries historically implemented the Tax Allocation Policy.

39.     The treatment of the Tax Refunds under the Settlement is also consistent with the substantial body of case law, including case authority in the Fifth Circuit.  Guaranty Bank and its subsidiaries funded all of the tax payments made by the consolidated group for the tax years at issue that generated the Tax Refunds.  For this reason, among others, the FDIC-R believes that it is the owner of the Tax Refunds as the statutory successor to the failed bank.  12 U.S.C. § 1821(d)(2)(a); see, e.g., Capital Bancshares v. F.D.I.C., 957 F.2d 203, 208 (5th Cir. 1992) (FDIC was entitled to the tax refund where the bank generated the losses and the bank paid to the parent company a sum greater in aggregate than the disputed refund for its annual tax contribution); Western Dealer Mgmt., Inc. v. England (In re Bob Richards Chrysler-Plymouth Corp.), 473 F.2d 262 (9th Cir. 1973), cert. denied sub. nom. Western Dealer Mgmt. v. England, 412 U.S. 919 (1973).

40.     The Tax Allocation Policy does not contain any language purporting to transfer ownership of the Tax Refunds from Guaranty Bank--whose earnings history generated the Tax Refunds--to the Debtor.  See In re Bob Richards Chrysler-Plymouth Corp., 473 F.2d at 265 (a tax

refund belonging to a subsidiary cannot become part of the parent's bankruptcy estate unless the parties have agreed that the parent "ha[s] any right to keep the refund."). Therefore, the Debtor "act[s] as a trustee of a specific trust and [is] under a duty to return the tax refund to the [subsidiary]." Bob Richards, 473 F.2d at 265; *see also* Jump v. Manchester Life & Cas. Mgmt. Corp., 438 F. Supp. 185, 189 (E.D. Mo. 1977), *aff'd* 579 F.2d 449 (8th Cir. 1978) (a refund "is not a debt owed by [parent] to [subsidiary], but rather, a fund which [parent] holds in a specific trust for [subsidiary]").

41.     Here, unlike other cases in which a bank holding company parent and bank subsidiary may have both executed a tax allocation agreement, the Tax Allocation Policy relevant to the Tax Refunds in this matter represents a policy issued unilaterally by GFG, to which Guaranty Bank was not intended to, and did not become, a signatory. Although the FDIC-R asserts that the provisions of the Tax Allocation Policy and the relevant Policy Statement are consistent with the FDIC-R's position regarding ownership of the Tax Refunds, it will be difficult for the Debtors to argue, in light of the general rule established in Capital Bancshares and Bob Richards, that an agreement that is not executed by Guaranty Bank could be construed to transfer the bank's entitlement to a tax refund to the parent when such an agreement would be unenforceable against the FDIC-R to deprive the receivership estate of an asset of the insured depository institution under 12 U.S.C. § 1823(e). Section 1823(e) provides that:

> [n]o agreement which tends to diminish or defeat the interest of the [FDIC-R] in any asset acquired by it . . . as receiver of any insured depository institution, shall be valid against the [FDIC-R] unless such agreement . . . is in writing, was executed . . . , was approved by the board of directors of the depository institution . . . , which approval shall be reflected in the minutes of said board . . . , and has been . . . an official record of the depository institution.

42.     GFG cannot satisfy the requirements of 12 U.S.C. § 1823(e) and thus the Tax

Allocation Policy, to the extent it might be construed to defeat the FDIC-R's interest in the Tax Refunds, is not enforceable against the FDIC-R. Because the Tax Allocation Policy is unenforceable to divest the FDIC-R of its rights to this asset, the FDIC-R believes that a court will follow the Capital Bankshares and Bob Richards line of cases and hold that the FDIC-R is entitled to the Tax Refunds should this controversy become the subject of litigation in a court of competent jurisdiction.

43.     Even if the language of the Tax Allocation Policy was inconsistent with the case authority in support of the FDIC-R's entitlement to the Tax Refunds and binding on the FDIC-R, which it is not, the recent decision by the U.S. District Court for the District of Georgia, confirms that the language in the policy would "not override the presumptive principle-agent relationship" between a holding company and its subsidiary bank with respect to tax refunds. Lubin v. FDIC, as Receiver for Integrity Bank, Civil Action No. 10-00874, at 12 (N.D. Ga. Mar. 2, 2011) (holding that entire tax refund belongs to the FDIC because the terms of the tax allocation agreement did not override the presumptive rule that a "parent corporation holds the money owing to the subsidiaries in trust for them."). Therefore, the Tax Allocation Policy does not create a debtor/creditor relationship and cannot be construed to transfer ownership of the Tax Refunds from Guaranty Bank to GFG.

44.     Moreover, to interpret the Tax Allocation Policy to create a debtor/creditor relationship or an unsecured loan, as Tricadia has asserted, would violate federal law. Specifically, 12 U.S.C. § 371c(1)(a) prohibits members of the Federal Reserve System from extending credit to their affiliates unless the loan is secured by collateral valued at 100 percent or more of the amount of the loan (depending on the type of security). This statute sweeps broadly to prevent the misuse of bank resources in financial transactions between the bank and its affiliates. See Northwest Nat'l Bank v. OCC, 917 F.2d 1111, 1118 (8th Cir. 1990). Therefore, any interpretation of the agreement providing GFG with ownership of the Tax Refunds would be unlawful. Paladino v. Avnet Computer

Technologies, Inc., 134 F.3d 1054, 1058 (11th Cir. 1998) (Under well-settled principles of contract interpretation, courts generally should prefer an interpretation that makes the contract lawful to one that renders it unlawful.).

45.     Assuming for the sake of argument, however, that the Debtors could overcome all of the substantial problems with the tax refund argument propounded by Tricadia, even Tricadia has admitted in its Objection that its argument, if successful, would give rise to a substantial general unsecured claim in favor of the FDIC-R in an amount equal to the refunds at issue. Of course, if the FDIC-R prevailed on its Capital Maintenance Claim, even if its direct ownership claim was rejected, it would nevertheless receive all Tax Refunds because the Capital Maintenance Claim has priority over general unsecured claims.

46.     Therefore, while the FDIC-R believes that it would prevail if it were to litigate this dispute with the Debtors, it is clear, that there are complex issues that would be costly for the Debtors to litigate, with great uncertainty that the estate would succeed. Accordingly, the treatment of the Tax Refunds in the Settlement, as part of the global negotiations and as a component of the concessions made by all parties, is fair and reasonable.

### (iv)     Insurance Premium Refunds.

47.     The Settlement further recognizes the FDIC-R's entitlement to certain Insurance Premium Refunds aggregating approximately $700,000. A schedule of the insurance policies that generated the refunds is annexed to the Plan as Exhibit "B". Although Wilmington may have stated at the early stage of these cases, (in its Opposition to the Stay Relief Motion) that there was "no basis" for a finding that the FDIC-R was entitled to these funds, subsequent investigations by the Debtors and Wilmington confirmed support for the FDIC-R's position. As is reflected on Exhibit "B" to the Plan, each of the referenced policies pertain to coverage that is solely for the operating business conducted by Guaranty Bank and would not be applicable to a non-operating holding

company. Moreover, financial information reviewed by the CRO confirmed that Guaranty Bank made the premium payments relating to these policies.

48.     The Debtors' agreed to recognize the FDIC-R's rights with respect to the Tax Refunds and Insurance Premium Refunds in order to obtain the other significant benefits of the Settlement. They did so after conducting appropriate and reasonable due diligence. Thus, Tricadia is wrong when it asserts that the Debtors and Wilmington "are now capitulating" to the FDIC-R. Instead, the Settlement represents the CRO's independent business judgment that the Debtors need not litigate every possible issue when the factual and legal basis for the FDIC-R's position is compelling and that a consensual resolution of these issues is in the best interest of creditors.

### (v)     RWHC's Stock Conversion.

49.     The Settlement also provides for releases from the Release Parties of claims against the FDIC-R and Compass Bank arising from the conversion of GFG's 100% ownership of preferred stock of RWHC, Inc. having a face value of $305 million ("RWHC Preferred Stock"), a wholly owned subsidiary of Guaranty Bank, into preferred stock of Guaranty Bank shortly prior to the Petition Date. The basis for conversion of the RWHC Preferred Stock was that approval by the OTS and the FDIC for the formation of RWHC (and the acceptance of its assets as Tier One Capital of the bank itself), was predicated upon a mandatory conversion of the RWHC Preferred Stock to preferred stock of Guaranty Bank in the event Guaranty Bank was deemed undercapitalized by the OTS. Although the Debtors believed that the preferred stock of Guaranty Bank had no value at the time of the exchange, no specific value has been ascribed to the RWHC Preferred Stock.

50.     Faced with a deadline for the submission of claims by GFG in the receivership proceeding, GFG filed a claim against the FDIC-R to preserve its rights with respect to certain items, including a reservation of rights with respect to the possible avoidance of the RWHC Preferred Stock conversion as a fraudulent transfer pursuant to Section 548(a)(1)(B) of the Bankruptcy Code.

51.     Upon the FDIC-R's disallowance of the GFG's claim, GFG filed its Complaint in the United States District Court for the Northern District of Texas (Case Number 3:10-cb-00980K), as it was required to do pursuant to 12 U.S.C. § 1821(d)(6), which provides that the District Court has exclusive jurisdiction over claims asserted against a receivership estate.

52.     The release of such claims, in the context of the benefit to be realized by the Debtors under the Settlement, is reasonable and appropriate.  In addition to the RWHC Preferred Stock being subject from the inception to the approved conditions, 12 U.S.C. § 1828(u) provides an *absolute bar* to the assertion of such claim.  Section 1828(u) provides, in pertinent part, as follows:

(1)  In general

No person may bring a claim against any Federal banking agency (including in its capacity as conservator or receiver) *for the return of assets* of an affiliate or controlling shareholder of the insured depository institution transferred to, or for the benefit of, an insured depository institution by such affiliate or controlling shareholder of the insured depository institution, or a claim against such Federal banking agency for monetary damages or other legal or equitable relief in connection with such transfer, if at the time of the transfer--

(A)  the insured depository institution is subject to any direction issued in writing by a Federal banking agency to increase its capital; and

(B)  for that portion of the transfer that is made by an entity covered by section 1844 (g) of this title or section 1831v of this title, the Federal banking agency has followed the procedure set forth in such section.

53.     At the time of the transfer, Guaranty Bank was subject to a written direction from federal banking regulators to increase its capital, as set forth in the GFG C&D Order.  As a result, 12 U.S.C. § 1828(u) bars any action that seeks to avoid this claim.

54.     Because no avoidance claim can be asserted, no claim for recovery of the value of the RWHC Preferred Stock can be asserted under section 550(a) of the Bankruptcy Code against *any*

party. *See* 11 U.S.C. § 550(a) (avoidance a prerequisite to recovery); <u>3V Capital Master Fund v.</u> <u>Official Committee of Unsecured Creditors of Tousa (In re Tousa, Inc.)</u>, 2011 WL 522008 at *29 (S.D. Fla. Feb. 11, 2011) (language of section 550(a) "means that, if a transfer is *not* avoided, the trustee may not recover under Section 550") (emphasis in original) (citing <u>IBT Int'l Inc. v. Northern</u> <u>(In re Int'l Admin. Servs, Inc.</u>, 408 F.3d 689, 703 (11th Cir. 2005)).

55. Even if Section 1828(u) did not apply, which it unquestionably does, no avoidance claim may exist, if reasonable value was exchanged. In addition to being subject to the exchange provisions, substantially all of the assets of RWHC were pledged to the Federal Home Loan Bank of Dallas (the "FHLBD") pursuant to an Affiliate Collateral Pledge and Security Agreement, dated as of June 3, 2008, (the "Pledge Agreement") to secure indebtedness of Guaranty Bank to the FHLBD. At the time of the exchange, the indebtedness due the FHLBD of approximately $1,000,000,000 exceeded RWHC's assets, which were encumbered by the Pledge Agreement. Accordingly, the RWHC Preferred Stock that was exchanged for preferred stock of Guaranty Bank may, itself, have had no value since the lien on RWHC's assets is senior in priority to GFG's interest as the holder of the RWHC Preferred Stock.

56. Finally, even if the Debtors were able to succeed on their claims against the FDIC-R with respect to the exchange, the FDIC-R would be entitled to reimbursement from the Debtors. To the extent that such avoidance may be predicated upon assertions that the RWHC Preferred Stock was not properly documented, GFG would be in further violation of its commitment to maintain the capital of Guaranty Bank, thereby increasing the amount of the FDIC-R's Capital Maintenance Claim, which even at the current $1.97 billion would absorb any recovery that might be realized from the pursuit of litigation regarding the preferred stock exchange.

57. It is clear that the FDIC-R has a compelling, statutory, legal and factual basis to

defeat any fraudulent conveyance claim relating to RWHC. In the context of the application of the appropriate standard for judicial review of the Settlement, it is clear that litigation of these issues would be protracted and expensive and the outcome would be unpredictable. As a result, the release of such claims in the context of the aggregate benefits to be realized by the Debtors under the Settlement is fair and reasonable.

### (vi)    Temple-Inland Spin-off.

58.    Surprisingly, Tricadia objects to the treatment in the Settlement of potential claims against Temple-Inland, GFG's former parent. The provision of the Settlement that relates to such claims does not represent a concession or a compromise by either the Debtors or the FDIC-R. Rather, the Settlement reserves the rights of the Debtors and the FDIC-R, as successor to the claims of Guaranty Bank and any derivative claims of the bank held by certain parties including the banks shareholders. *See* 11 U.S.C. § 1821(d)(2)(A)(i); *See also* <u>Pareto v. FDIC</u>, 139 F.3d 696 (9th Cir. 1998); <u>In re Southeast Banking Corporation</u>, 827 F. Supp. 742 (S.D. Fla. 1993).

59.    It is difficult to see how a reservation of each party's rights is objectionable.

### (vii)    D&O Claims.

60.    12 U.S.C. §1821(d)(2)(A)(i) grants the FDIC-R the exclusive right to pursue claims of Guaranty Bank or that might otherwise be available to the bank's shareholders as derivative of the bank's claims. Only non-derivative claims of GFG, as Guaranty Bank's shareholder, would not be subject to the exclusive right to the FDIC-R to pursue. Recognizing that disagreements may exist with respect to whether a claim is derivative or not, the Settlement Agreement provides that, in exchange for a payment of $475,000 from the FDIC-R to the Debtors, the Debtors will assign their interest in the "sliver" of non-derivative claims that they might theoretically have.

61.    Prior to agreeing to this assignment, GFG considered whether, in fact, it had any such claims but was unable to articulate the existence of a single derivative claim. Nevertheless, both the

FDIC-R but GFG provided timely notice of potential claims to the applicable officer and director insurance carriers. GFG's notice essentially piggybacked on the notices issued by the FDIC-R, since GFG was unable to articulate separate specific claims. The FDIC-R's notice of circumstance was accepted by the carrier and GFG's notice was rejected.

62.     In the absence of believing that it has any independent claims that would satisfy the applicable standard as being non-derivative, GFG agreed to assign its rights to any such claims to avoid any confusion or controversy in the future should an officer or director raise this issue in any litigation that may be commenced by the FDIC-R in pursuit of its statutory duties. Ultimately, the FDIC-R agreed to a $475,000 payment to the estate for any claims that GFG may have, as part of the give and take of the negotiation of the Settlement so as to increase the benefit realized by the Debtors. Tricadia's position that this provision of the Settlement is somehow detrimental to the Debtors' estate is devoid of merit.

## II.     Post Effective Date Oversight Over the Liquidation Trustee.

63.     As part of Tricadia's argument that the Plan is not proposed in good faith, Tricadia asserts that there are insufficient safeguards to oversee the conduct of the Liquidation Trustee regarding the administration of the Liquidation Trust. The FDIC-R is not a party to, or a beneficiary of, the Liquidation Trust and the issues regarding post Effective Date oversight do not impact the FDIC-R. Nevertheless, it appears that Tricadia, throughout the Objection, cast aspersions regarding Wilmington's motivation with respect to the Plan's failure to provide for a post confirmation oversight committee. What Tricadia ignores is the fact that, in finalizing the Plan and the Liquidation Trust, the Debtors and Wilmington recognized that no holder of TRPS volunteered to serve on an unsecured creditors' committee after the commencement of these cases. Wilmington's agreement to serve in a role similar to that of an unsecured creditors' committee, and as Liquidation Trustee, when no other creditors would, should be commended and not criticized. By failing to

object to the Plan, no holder of a claim, other than Tricadia, after it eleventh-hour claim purchase, opposes the mechanism established in the Plan or the performance by Wilmington of these duties.

## III.    The Plan Should be Confirmed Because it is Proposed in Good Faith.

64.    The Objection refers to general case law for the proposition that the Debtors have the burden of satisfying the good faith requirements of § 1129(a)(3) of the Bankruptcy Code. The FDIC-R does not dispute this proposition. The Objection asserts that the Debtors do not satisfy this requirement. Tricadia asserts that the Debtors did not propose the Plan in good faith since the Plan "served solely to benefit the [FDIC-R] and Wilmington Trust at the expense of the holders of the TRPS." [Obj. at ¶ 105]

65.    As Tricadia asserts, the relevant inquiry is the Plan itself and whether the Plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code. The FDIC-R asserts, as the Debtors will demonstrate, that the Plan has been proposed in good faith. The Settlement, which forms the cornerstone of the Plan, more than satisfies the settlement standards set forth above. Similarly, consummating a fair settlement, derived from concessions by the FDIC-R and the Debtors, which will allow a prompt distribution (at about the time of the two-year anniversary of the commencement of the cases) to the creditor constituencies, which includes the FDIC-R which is entitled to all the rights and considerations afforded to any other creditor in a bankruptcy case, is without question, consistent with the objectives and purposes of the Bankruptcy Code. Fostering litigation in numerous courts, for many years, with the attendant cost of millions of dollars, with uncertain results, does not. Therefore, the FDIC-R submits that the Debtors have satisfied their burden of establishing that the Plan has been proposed in good faith.

## IV.    Tricadia's Request for Conversion Should be Denied.

66.    Tricadia's Objection contains a request for conversion of the cases pursuant to Section 1112(b) of the Bankruptcy Code so that an independent fiduciary may be appointed. In this

case, the movant is an eleventh-hour interloper, who has refused to disclose when it purchased its claim or what its actual economic interests are, and who seeks to act solely as a "spoiler" of a complicated arm's length settlement negotiated among the parties over the last eighteen months. Tricadia ignores the fact that the CRO is, in fact, an independent fiduciary. Since Tricadia does not like the decisions made by this fiduciary, it seeks the appointment of another fiduciary, not necessarily an "independent" fiduciary but, rather, one which it can vote in and control. Even this issue will give rise to future litigation, as the FDIC-R may vote its claim in connection with the election of a permanent trustee pursuant to Section 702 of the Bankruptcy Code.

67.     Tricadia's request should be denied for several reasons. First, Tricadia did not provide notice as required by 11 U.S.C. §1112(b)(1) and Local Bankruptcy Rule 2002-1(a)(4). Second, Tricadia has not established good cause for the conversion. Third, usual circumstances exist which establish that the requested conversion is not in the best interests of creditors and the estate.

**(i)      Tricadia Did Not Provide Notice as Required by 11 U.S.C. § 1112(b)(1) and Local Bankruptcy Rule 2002-1(a)(4).**

68.     Section 1112(b)(1) of the Bankruptcy Code states that a court may only grant a conversion "after notice and a hearing." "[A]fter notice and a hearing" is defined under 11 U.S.C. § 102(1)(A) to mean "such notice as is appropriate in the particular circumstances, and such opportunity for a hearing as is appropriate in the particular circumstances." 11 U.S.C. § 102(1)(A). However, Local Bankruptcy Rule 2002-1(a)(4) entitled "Twenty One Day Notices to Parties in Interest" states that "[i]n a chapter 11 reorganization, notice of a hearing on the dismissal or conversion of a case to another chapter shall be served by the movant."

69.     In the present case, Tricadia's request for conversion is tacked onto the end of its Objection and there is no evidence in the title of the Objection that it even contains a request for conversion. Moreover, Tricadia appears to have served its Objection on only the Debtor, the FDIC-

R, Wilmington, and the Limited Service List. Tricadia failed to provide notice to all creditors and parties in interest. Thus, given Tricadia's failure to adhere to the notice requirements of §1112 (b)(1) and Local Bankruptcy Rule 2002-1(a)(4), proceeding on Tricadia's request for conversion would be inappropriate on this basis alone. The FDIC-R asks that the Court deny Tricadia's request and require, in the event the Plan is not confirmed, that Tricadia comply with the requisite notice requirements.

> **(ii)** **Assuming, *Arguendo,* that Notice is Adequate, Tricadia is Unable to Establish "Cause" for Conversion.**

70. Section 1112(b)(1) provides in relevant part:

> absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, if the movant establishes cause.

71. The initial burden to establish "cause" lies with the movant. In re Briggs-Cockerham, L.L.C., 2010 WL 4866874, at *3 (Bankr. N.D.Tex. Nov. 23, 2010). If the movant establishes cause, then the burden shifts to the debtor to establish the "unusual circumstances" to prevent conversion. *Id.*

72. A determination of whether cause exists rests in the discretion of the bankruptcy court. Sullivan Cent. Plaza I, Ltd. v. Bancboston Real Estate Capital Corp. (Sullivan Cent. Plaza I, Ltd.), 935 F.2d 723, 728 (5th Cir. 1991). The court's inquiry is case-specific. In re Timbers of Inwood Forest Assocs., 808 F.2d 363, 371-72 (5th Cir. 1987), aff'd 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed. 2d 740 (1988). For purposes of a conversion motion, § 1112(b)(4) of the Bankruptcy Code lists sixteen grounds which constitute "cause". 11 U.S.C. § 1112(b)(4). Tricadia cites the following three grounds as the basis of its request for conversion: (1) a continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation, (2) gross mismanagement of the

estate, and (3) an inability to effectuate a substantial consummation of a confirmed plan. [Obj. ¶ 108].

73.    Tricadia's "request" fails to satisfy its burden to establish cause and should be denied. Neither the facts, nor applicable law substantiate Tricadia's claims with respect to conversion, because:

(i)     There has been no substantial or continuing loss or diminution to the estate because the Debtors are nonoperating companies. The Debtors are current on all post Petition Date obligations;

(ii)    There has been no gross mismanagement of the estate because the Debtors are managed by the CRO, a person known to and respected by the Courts in this district and nationally; and

(iii)   For the reasons set forth in this Response, the FDIC-R submits that the Debtors are able to effectuate substantial consummation of the Plan and that the Plan is in the best interests of this estate.

## V. The Plan Satisfies Section 1129 of the Bankruptcy Code and Should be Confirmed.

74.    For all of the reasons set forth above, the FDIC-R submits that the Debtors will satisfy each element of Section 1129 of the Bankruptcy Code. As a result, the FDIC-R respectfully submits that an order be entered confirming the Plan.

Dated: April 20, 2011

Respectfully submitted,

WHITE & WIGGINS, L.L.P.

By:   /s/ Peter C. Lewis

Peter C. Lewis
Texas State Bar No. 12302100
Bank of America Plaza
901 Main Street, Suite 6200
Dallas, Texas  75202
Telephone:  214-665-4150
Facsimile:  214-665-4160

-and-

OTTERBOURG, STEINDLER, HOUSTON
& ROSEN, P.C.

By: s/*Steven B. Soll*

Steven B. Soll
(Admitted *Pro Hac Vice*)
230 Park Avenue
New York, New York 10169
Telephone:  212-661-9100
Facsimile:  212-682-6104

Attorneys for the
Federal Deposit Insurance Corporation, as
Receiver for Guaranty Bank
Kathryn Norcross, Esq.
Dennis J. Early, Esq.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing motion was served by first-class mail, postage prepaid, telecopy, certified mail, return receipt requested and/or by electronic notification to (i) the Office of the United States Trustee for the Northern District of Texas, (ii) counsel for the Debtors, (iii) counsel for Wilmington Trust Company, (iv) counsel for BBVA Compass, (v) counsel for Tricadia Financials Restructuring Partners, Ltd.,(vi) those parties who have filed in this chapter 11 case a request for notice and (vii) the persons and/or entities registered with CM/ECF, on this the 20th day of April, 2011.

/s/ Peter C. Lewis
**PETER C. LEWIS, ESQ.**

Guaranty Financial Group Inc., et al.
c/o Dennis Faulkner, CRO
Lain, Faulkner & Co., P.C.
400 N. St. Paul, Suite 600
Dallas, TX 75201

Wilmington Trust Company
Attn: Steven M. Cimalore
Rodney Square North
1100 North Market St.
Wilmington, DE 19890-0001

Harold L. Shults, Jr.
1380 Patterson Rd.
Austin, TX 78733

Robert S. LeBlanc
5709 River Rock Lane
Plano, TX 75093

Mark A. Crawford
3200 Cedar Ridge
Flower Mound, TX 75022

Kelli Glass
3768 Montevallo Rd.
Mountain Brook, AL 35213

B. Lee Crawford
1529 Barton Springs Rd.
Unit 2
Austin, TX 78704

Office of Thrift Supervision
225 East John Carpenter Freeway
Suite 500
Irving, TX 75062-2326

Office of the Attorney General
1412 Main Street, Suite 810
Dallas, TX 75202

John Mart Stern
Assistant Attorney General
Bankruptcy & Collections Division
P O Box 12548
Austin, TX 78711-2548

Haynes and Boone, LLP
Ian T. Peck
Autumn Highsmith
2323 Victory Avenue, Suite 700
Dallas. TX 75219

Kenneth R. Dubuque
124 E. 84th St., Apt 7B
New York, NY 10028

Robert B. Greenwood
4687 Fairfax Ave.
Dallas, TX 75209

Ken A. Clark
4000 Sigma Road #6204
Farmers Branch, X 75244

Morris Knight
357 River Meadows Dr.
Woodbridge, CA 95258

James L. Johnson
5721 Clarendon Drive
Plano, TX 75093

John P. Halliburton
1008 Wimberly Court
Allen, TX 75013

Federal Deposit Insurance Corporation
Attn: Donald McKinley
1601 Bryan Street, PAC-04024
Dallas, TX 75201

Office of the Attorney General
Main Justice Building, Room 5111
10th Street & Constitution Avenue, N.W.
Washington, DC 20530

Texas Comptroller of Public Accounts
Lyndon B. Johnson State Office Building
111 East 17th Street
Austin, Texas 78774

George F. McElreath
Office of the United States Trustee
1100 Commerce Street, Room 976
Dallas, TX 75242

City of San Antonio
100 Military Plaza
San Antonio, TX 78205

Ronald D. Murff
88 Abbey Woods Lane
Dallas, TX 75248

Jerry W. Hickenbottom
8603 Bryer Creek Trail
Austin, TX 78717

Deborah M. Laycock
3920 Bryn Mawr
Dallas, TX 75225

Rusty Charlton
1803 Chincoteague Way
Round Rock, TX 78681

Michael D. Calcote
2341 Folkstone Way
Bedford, TX 76021

Internal Revenue Service
Special Procedures – Insolvency
P O Box 21126
Philadelphia, PA 19114

Office of the United States Attorney
1100 Commerce Street, 3rd Floor
Dallas, TX 75242

Texas Comptroller of Public Accounts
Revenue Accounting Division –
Bankruptcy Section
P O Box 13528
Austin, TX 78711

Texas Secretary of State
James E. Rudder Bldg.
1019 Brazos St.
Austin, Texas 78701

California Secretary of State
1500 11th Street
Sacramento, CA 95814

State Treasurer of California
Bill Lockyer
P.O. Box 942809
915 Capitol Mall C-15
Sacramento, CA 94209-0001

Office of the Attorney General
1300 "I" Street, Suite 1740
Sacramento, CA 95814

Securities & Exchange Commission
Rose L. Romero, Regional Director
Burnett Plaza, Suite 1900
801 Cherry Street, Unit 18
Fort Worth, TX 76102

Securities & Exchange Commission
Office of the General Counsel
100 F. Street, NE
Washington, DC 20549

Delaware Department of State
Division of Corporations
John G. Townsend Bldg.
401 Federal St., Suite 4
Dover, DE 19901

Nevada Secretary of State
Nevada State Capitol Building
101 North Carson Street, Suite 3
Carson City, NV 89701

BBVA Compass Bank
Attn: Shane Clanton, Deputy General
Counsel
15 South 20th Street
Birmingham, AL 35233

William M. Kelly
Davis Polk & Wardwell LLP
1600 El Camino Real
Menlo Park, CA 94025

The Bank of New York Mellon
Attn: Joe Christianson
601 Travis Street, 16th Floor
Houston, TX 77002

Steven B. Soll
Otterbourg, Steindler, Houston & Rosen,
P.C.
230 Park Avenue
New York, NY 10169

Elizabeth Banda Calvo
Perdue, Brandon, Fielder, Collins & Mott,
L.L.P.
P.O. Box 13430
Arlington, TX 76094-0430

John T. Banks
Perdue, Brandon, Fielder, Collins & Mott,
L.L.P.
3301 Northland Drive, Suite 505
Austin, TX 78731

Elizabeth Weller
Linebarger Goggan Blair & Sampson LLP
2323 Bryan Street, Suite 1600
Dallas, TX 75201

Pamela Gale Johnson
Baker & Hostetler LLP
1000 Louisiana Street, Suite 2000
Houston, TX 77002

Douglas E. Spelfogel
Olya Petukhova
Foley & Lardner LLP
90 Park Avenue
New York, NY 10016

E. Lee Morris
Munsch Hardt Kopf & Harr, P.C.
3800 Luncoln Plaza
500 N. Akard
Dallas, TX 75201-6659

B. Scot Pierce
Brackett & Ellis, P.C.
100 Main Street
Fort Worth, TX 76102-3090

Sonia Chae
Securities and Exchange Commission
175 West Jackson Blvd.
Suite 900
Chicago, IL 60604

E. P. Keiffer
Wright Ginsberg Brusilow P.C.
1401 Elm Street, Suite 4750
Dallas, TX 75202

W. Clark Watson
Balch & Bingham LLP
1901 Sixth Avenue North, Suite 1500
Birmingham, AL 35203-4642

GE Money Bank
c/o Recovery Management Systems Corp.
Attn: Ramesh Singh
25 SE 2nd Avenue, Suite 1120
Miami, FL 33131-1605

Los Angeles County Treasurer and Tax
Collector
Attn: Man-Ling Kuo
PO Box 54110
Los Angeles, CA 90054-0110

Don W. Duran
PO Box 757
Lufkin, TX 75902-0757

J. Michael Tibbals
Snell Wylie & Tibbals
8150 N. Central Expressway, Suite 1800
Dallas, TX 75206

Joe N. Petet
502 Konstanty Circle
Austin, TX 78746

Elke E. Franklin
Special Assistant U.S. Attorney
Internal Revenue Service (SB/SE)
4050 Alpha Road, 13th Floor
MC: 2000NDAL
Dallas, Texas 75244-4203

Stephen A. Goodwin
Carrington, Coleman, Sloman &
Blumenthal, LLP
901 Main Street, Suite 5500
Dallas, Texas 75202

Gerard S. Catalanello
Duane Morris, LLP
1540 Broadway
New York, New York 10036-4086

Patrick Matusky
Duane Morris, LLP
1940 Route 70 East, Suite 200
Cherry Hill, NJ 08003