Robert D. Albergotti (TX Bar No. 00969800)
Ian T. Peck (TX Bar No. 24013306)
Autumn D. Highsmith (TX Bar No. 24048806)
**HAYNES AND BOONE, LLP**
2323 Victory Ave., Suite 700
Dallas, Texas 75219
Telephone: 214.651.5000
Facsimile: 214.651.5940
robert.albergotti@haynesboone.com
ian.peck@haynesboone.com
autumn.highsmith@haynesboone.com

*Counsel for the Debtors-in-Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| GUARANTY FINANCIAL GROUP INC., | § | CASE NO. 09-35582-bjh |
| *et al.*, | § | (Jointly Administered) |
| | § | |
| Debtors. | § | |

## DEBTORS' RESPONSE TO OBJECTION OF TRICADIA FINANCIALS RESTRUCTURING PARTNERS, LTD. TO DEBTORS' AMENDED JOINT PLAN OF LIQUIDATION UNDER CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE

Guaranty Financial Group Inc. ("*GFG*"), Guaranty Group Ventures Inc. ("*GFG*"), Guaranty Holdings Inc. I ("*GHI*"), and Guaranty Group Capital Inc. ("*GGC*") (collectively, the "*Debtors*"), as debtors-in-possession, hereby file this Response (the "*Response*") to Objection (the "*Objection*") of Tricadia Financials Restructuring Partners, Ltd. ("*Tricadia*") to Debtors' Amended Joint Plan of Liquidation Under Chapter 11 of the United States Bankruptcy Code and respectfully represent as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this Response pursuant to 28 U.S.C. §§ 157 and 1334.  Venue of this proceeding is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## PRELIMINARY STATEMENT

2.      The most noteworthy characteristic of these bankruptcy cases is the complex dispute between the FDIC-R and the Debtors, which encompasses the FDIC-R's alleged multi-billion superpriority administrative expense claims, the FDIC-R's assertion of rights to each and every asset of the Debtors, and the Debtors' claims against the FDIC-R for certain pre-bankruptcy transfers, among other issues.  Recognizing the necessity of a resolution of the FDIC-R dispute for a successful conclusion to these cases, the Debtors conducted a detailed analysis of the FDIC-R's proofs of claim, the FDIC-R's motion for relief from stay, and the Debtors' potential claims against the FDIC-R (collectively, the "***Pending Litigation***") and determined that (i) pursuing the Pending Litigation to conclusion could potentially require the Debtors to incur millions of dollars of professional fees, and (ii) there is substantial risk that the Debtors would not prevail in the Pending Litigation because of (a) the strength of the FDIC-R's argument that GFG committed to fund the capital shortfall of Guaranty Bank; (b) the virtually unlimited resources of the FDIC-R; and (c) the probability that the FDIC-R would pursue all appellate relief in respect of any adverse rulings.

3.      For these reasons, commencing in mid-2010, the Debtors engaged their two largest creditor constituencies, Wilmington Trust, as indenture trustee for over $300 million of bond debt, and the FDIC as receiver for Guaranty Bank, in substantive discussions for a consensual resolution to the Pending Litigation.  For seven months, the parties engaged in extensive analysis and detailed deliberations regarding the Debtors' assets and liabilities, including in-person settlement meetings, numerous meetings by telephone, and the exchange of several written settlement proposals.  At the conclusion of this process, in December 2010, the parties entered into a definitive global settlement agreement of all of the Pending Litigation.

Despite Tricadia's statements to the contrary, the settlement agreement is in the best interest of the Debtors' bankruptcy estates and their creditors. The Settlement Agreement, negotiated at arms' length by the parties, provides a prompt resolution of the Pending Litigation, creates a fair distribution of assets among the FDIC-R and the Debtors' other creditors, and avoids millions of dollars of administrative expenses for the estates.

4. During the first nineteen months of this case, no creditor in these cases voiced a single complaint about the Debtors' actions or expressed any concerns regarding the Debtors' and Wilmington Trust's efforts to reach a global settlement with the FDIC-R, which efforts were described in several pleadings and noted on several occasions in open court. Now, several weeks after approval of the Debtors' disclosure statement and on the eve of plan confirmation, an alleged bondholder[1] has surfaced to express numerous problems with the settlement that its agent and fiduciary, Wilmington Trust, negotiated with the Debtors and the FDIC-R. For the reasons set forth herein, the Court should decline the invitation from a virtual stranger to the case to derail a settlement that is clearly in the best interest of the Debtors' bankruptcy estates. Tricadia's objection should be overruled and the Court should confirm the Debtors' Plan.

## BACKGROUND

5. Prior to the Petition Date, on September 15, 2006, Temple-Inland Financial Services, Inc., the predecessor of Guaranty Financial Group Inc. ("*GFG*") issued trust preferred securities ("*TRPS*") in the amount of $305 million under an Indenture (the "*Trust*"), for which Wilmington Trust FSB acts as indenture trustee ("*Wilmington Trust*").

---

[1] Tricadia purports to hold trust preferred securities in a "notional amount" of approximately $53 million. Prior to the confirmation hearing, the Debtors intend to conduct an investigation into Tricadia's alleged holdings of trust preferred securities.

6. On August 21, 2009, the Office of Thrift Supervision (the "***OTS***") appointed the Federal Deposit Insurance Company as receiver (the "***FDIC-R***") for Guaranty Bank (the "***Receivership***").

7. On August 27, 2009 (the "***Petition Date***"), the Debtors filed individual petitions for relief under Chapter 11 of Title 11 of the United States Code (the "***Bankruptcy Code***") in the United States Bankruptcy Court for the Northern District of Texas (the "***Court***"). The Debtors' Chapter 11 bankruptcy cases are jointly administered.

8. Subsequent to filing the bankruptcy petitions, the members of the board of directors of each of the Debtors resigned and Dennis Faulkner was elected as the sole director of each of the Debtors. Mr. Faulkner also currently serves as the Chief Restructuring Officer of each of the Debtors pursuant to an Order of the Court entered on November 20, 2009.

9. On January 28, 2010, the FDIC-R filed proofs of claim in each of the Debtors' cases (the "***FDIC-R Proofs of Claim***") in an amount in excess of $1.977 billion consisting of the following: (i) alleged capital commitments of GFG made for the benefit of Guaranty Bank to a regulatory agency in an aggregate amount of approximately $1.95 billion pursuant to 11 U.S.C. § 365(o) (the "***Capital Commitment Claim***"); (ii) tax-related claims in an amount not less than $1.2 million (the "***Tax-Related Claims***"); (iii) intercompany claims arising out of intercompany charges in an amount not less than $241,010.00 ("***Intercompany Claims***"); (iv) insurance claims arising out of insurance policy proceeds and premium refunds (the "***Insurance Premium Claims***"); (v) deposit fund claims in an amount not less than $11.264 million as against GFG and in an amount not less than $10.4 million as against GFG's affiliates ("***Deposit Fund Claims***"); (vi) fraudulent conveyance claims (the "***Fraudulent Conveyance Claims***"); and (vii) litigation recovery claims ("***Litigation Claims***," (i) – (vii) collectively, the "***FDIC-R Claims***"). The

FDIC-R asserts certain portions of its claims are entitled to super-priority status pursuant to 12 U.S.C. § 1821(d)(17), administrative expense status pursuant to 11 U.S.C. § 365(o), and/or priority status pursuant to 11 U.S.C. § 507(a)(9).

10.     On January 28, 2010, the FDIC-R filed its Motion for an Order Modifying the Automatic Stay as to Property and Granting Setoff by the FDIC-Receiver (the "***Stay Motion***"). In the Stay Motion, the FDIC-R requested authority from the Court to exercise its alleged setoff rights against the balances held in certain deposit accounts at Guaranty Bank that were in existence on the Petition Date.  The Debtors and Wilmington Trust individually filed objections to the Stay Motion.

11.     On May 14, 2010, GFG and GHI filed a complaint against the FDIC-R in the United States District Court for the Northern District of Texas—Dallas Division (the ***"District Court Complaint"***).[2]  In the District Court Complaint, GFG and GHI asserted claims related to the conversion of shared of RWHC, Inc. preferred stock into shares of preferred stock of Guaranty Bank and other actions and matters related to such conversion.  GFG and GHI also asserted (i) claims related to the sale of Guaranty Bank's assets to Compass Bank and other parties during the Receivership, and (ii) a judgment regarding ownership of all or portions of the assets claimed by the FDIC-R including but not limited to tax refunds, insurance premium refunds, or other insurance recoveries (including potential recoveries under officer and director liability policies).

12.     On December 27, 2010, after seven months of negotiations, the Debtors, the FDIC-R, and Wilmington Trust finalized a global settlement.  The settlement resolved (i) the allegations contained in the District Court Complaint; (ii) the dispute surrounding the FDIC-R

---

[2] The District Court Complaint was necessary because the FDIC-R disallowed claims asserted by the Debtors in Guaranty Bank's receivership.

Proofs of Claim; and (iii) the Stay Motion (the "***FDIC-R Settlement***").  The terms of the FDIC-R Settlement are embodied in that certain Plan Support Agreement entered into by and among the Debtors, the FDIC-R, and Wilmington Trust on December 27, 2010 (the "***Settlement Agreement***").

13.    On December 20, 2010, the Debtors filed the Joint Plan of Liquidation for Guaranty Financial Group Inc., *et al*. Under Chapter 11 of the United States Bankruptcy Code (as amended by that certain Amended Joint Plan of Liquidation for Guaranty Financial Group Inc., et al., Under Chapter 11 of the United States Bankruptcy Code on February 10, 2011) (the "***Plan***"), and the Disclosure Statement Under 11 U.S.C. § 1125 in Support of the Joint Plan of Liquidation of Guaranty Financial Group Inc., *et al*. (as amended by that certain Amended Disclosure Statement Under 11 U.S.C. § 1125 in Support of the Amended Joint Plan of Liquidation of Guaranty Financial Group Inc., *et al.* on February 10, 2011) (the "***Disclosure Statement***").  The Disclosure Statement describes the Settlement Agreement in reasonable detail and the Plan incorporates the terms of the Settlement Agreement.

14.    No party-in-interest objected to the Disclosure Statement and the Court approved the Disclosure Statement on February 16, 2011.  The hearing regarding confirmation of the Plan commenced on April 6, 2011 and is currently scheduled to continue either on April 25, 2011, if uncontested, or May 11, 2011, if contested.

## SETTLEMENT AGREEMENT

15.    The Settlement Agreement is described at length in Articles 7.B and 7.E.3. and ***Exhibit A*** of the Disclosure Statement, and a detailed recitation of the terms of the Settlement Agreement is not repeated here.  In sum, the Debtors, the FDIC-R, and Wilmington Trust (the "***Parties***") entered into the Settlement Agreement as the optimal resolution of claims of nearly $2

billion filed by the FDIC-R against the Debtors, as well as the Debtors' claims against the FDIC-R. *See* Settlement Agreement, ¶¶ D-F. The Parties agree that settlement of these claims is in their respective best interests. *See id.* ¶ G. In general, despite the fact that the FDIC-R asserts superpriority administrative expense, secured, and unsecured claims against the Debtors' estates and claims ownership of substantial assets held by the estates, the Settlement Agreement reserves significant assets for distribution to non-FDIC-R creditors, including: (i) approximately 43% of the Debtors' cash; (ii) all Chapter 5 causes of action (including certain insider actions, that absent settlement, would be held by the FDIC-R); (iii) 30% of the net recovery from litigation by the FDIC-R against a third party, JLT Insurance Agency Holdings Inc.; (iv) the Debtors' claims against their former parent, Temple-Inland Inc.; and (v) any claims the Debtors may have against third parties not otherwise released in the Plan.

## RELIEF REQUESTED AND BASIS THEREFOR

### I.      The Plan Complies With 11 U.S.C. § 1129.

16.      Section 1129 sets forth the statutory requirements that must be satisfied in order to confirm a Chapter 11 plan. The Debtors must demonstrate that the Plan satisfies all of the applicable provisions of section 1129 by a preponderance of the evidence.[3] As illustrated below, all of the applicable requirements of section 1129 have been satisfied with respect to the Plan.

17.      While a plan proponent has the burden of proving compliance with section 1129, it need not present evidence of compliance prior to the plan confirmation hearing. *See In re Aegis Specialty Mktg. Inc.*, 68 F.3d 919, 921 (5th Cir. 1995) (concluding that the bankruptcy court is required to hold an evidentiary hearing, at which time the plan proponent must present

---

[3] *See Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd. II (In re Briscoe Enters., Ltd. II)*, 994 F.2d 1160, 1165 (5th Cir. 1993) (holding that the appropriate standard of proof under section 1129 of Bankruptcy Code is preponderance of evidence); 7 COLLIER ON BANKRUPTCY ¶1129.02[4] (15th rev. ed. 2008) ("[T]he proponent bears the burden of both introduction of evidence and persuasion that each subsection of section 1129(a) has been satisfied.").

evidence supporting a finding of compliance with the requirements of section 1129 of the Bankruptcy Code); *see also In re Stuart Glass & Mirror, Inc.*, 71 B.R. 332, 334 (Bankr. S.D. Fla. 1987) (stating the debtor is required to demonstrate compliance with section 1129 of the Bankruptcy Code *at or before* the confirmation hearing). Although Tricadia asserts that the Debtors have submitted "no evidence" related to the fair and equitable nature of the Settlement Agreement, because the confirmation hearing has not yet occurred, the Debtors have not yet been required to present evidence demonstrating compliance with section 1129 of the Bankruptcy Code.[4] The Debtors will produce convincing evidence at the confirmation hearing establishing the Plan's compliance with section 1129 of the Bankruptcy Code.

18. Additionally, under Federal Rule of Bankruptcy Procedure 9019 ("***Rule 9019***"), in assessing the "fair and equitable" nature of the settlement agreement, the Court is not required to pick the settlement apart issue by issue. *In re Mirant Corp.*, 348 B.R. 725, 743-44 (Bankr. N.D. Tex. 2006). Rather, the Court is to look at the settlement agreement as a whole to determine whether it is within the range of reasonableness. *Id.* (citing *In re Pinnacle Brands, Inc.*, 259 B.R. 46, 54 (Bankr. D. Del. 2001)). For the reasons set forth below, whether the Settlement Agreement and Plan are reviewed as a whole, or as Tricadia suggests, in piecemeal fashion, the Plan and Settlement Agreement comply with the requirements contained in Bankruptcy Code section 1129 and Rule 9019 and should be confirmed by the Court.

A. **The Settlement Agreement meets the Fifth Circuit's standard for approval of settlement agreements under Federal Rule of Bankruptcy Procedure 9019.**

19. Tricadia argues the Plan cannot be confirmed because the Settlement Agreement does not meet the Fifth Circuit's standards for approval of settlement agreements under Rule

---

[4] Much of Tricadia's Objection focuses on alleged deficiencies in the Disclosure Statement. The Disclosure Statement was approved by the Court on February 16, 2011 after proper notice and a hearing, and Tricadia did not object, possibly because Tricadia was not a TRPS holder at the time the Disclosure Statement was considered. In any event, an objection to the adequacy of the Disclosure Statement is now inappropriate.

9019.  Rule 9019(a) empowers bankruptcy courts to approve compromises and settlements if they are "fair and equitable and in the best interest of the estate."  *In re Cajun Elec. Power Coop., Inc.*, 119 F.3d 349, 355 (5th Cir. 1997) (*quoting In re Foster Mortgage Corp.*, 68 F.3d 914, 917 (5th Cir. 1995) (citation omitted)); *see also In re Zale Corp.*, 62 F.3d 746, 754 (5th Cir. 1995) (stating that "the 'fair and equitable' determination does not give the bankruptcy court jurisdiction over settlement conditions that do not bear on the court's duties to preserve the estate and protect creditors.").   As this Court is well aware, "'Compromises are favored in bankruptcy'" because they minimize the costs of litigation and further the parties' interest in expediting administration of the bankruptcy estate.  *In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996) (*quoting* 9 COLLIER ON BANKRUPTCY ¶ 9019.03[1] (15th ed. Rev. 1993)).

20.     For a settlement to be approved, it need not result in the best possible outcome for the debtor, but must not "'fall beneath the lowest point in the range of reasonableness.'" *In re Drexel Burnham Lambert Group, Inc.,* 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991) (quoting *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983)).  Basic to the process of evaluating proposed settlements then, "is the need to compare the terms of the compromise with the likely rewards of litigation."  *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 425 (1968).

21.     The Settlement Agreement should be approved because each of the factors established by *Cajun Elec. Power* clearly weigh in favor of approval.  The Debtors' decision to enter into the Settlement Agreement is a result of extensive analysis of (i) the uncertain outcome of the Pending Litigation and (ii) the time and expense associated therewith; weighed against the potential benefits to the bankruptcy estates and their creditors derived from the Settlement Agreement.  The Settlement Agreement is in the best interest of the bankruptcy estates and their

creditors not only because further prosecution of the Pending Litigation would result in increased costs to the estates without a predictable outcome, but also because continued litigation would delay the final administration and closing of the bankruptcy cases for, potentially, several years.

22.     The Fifth Circuit has developed the following factors to consider when determining whether a settlement is fair and equitable: (i) the probability of success in the litigation, with due consideration for uncertainty in fact and law; (ii) the complexity and likely duration of the litigation and any attendant expense, inconvenience, and delay; and (iii) all other factors bearing on the wisdom of the compromise.  *See Cajun Elec. Power*, 119 F.3d at 356 (citations omitted).

### 1.     Probability of success in litigation.

23.     In assessing the probability of success in litigation, courts look to the history of the conflict, the issues involved, and the likelihood of appeal.  *See Mirant*, 348 B.R. at 740 (finding approval of a settlement agreement was in the best interest of the estate and its creditors due to the complicated history of the parties' conflict, the questions of first impression raised in the conflict, and the likelihood of numerous costly appeals).  In this case, the probability of success on the merits of the Pending Litigation rests primarily upon the Court's ruling in connection with the Capital Commitment Claim.

### a.     The FDIC-R's Capital Commitment Claim.

24.     In the Stay Motion and the FDIC-R Proofs of Claim, the FDIC-R asserts that GFG made a clear commitment to maintain the capital of Guaranty Bank that created a superpriority administrative expense claim in favor of the FDIC-R pursuant to Bankruptcy Code section 365(o).  Bankruptcy Code section 365(o) provides:

> In a case under chapter 11 of this title, the trustee shall be deemed to have assumed (consistent with the debtor's other obligations under section 507), and

> shall immediately cure any deficit under, any commitment by the debtor to a Federal depository institutions regulatory agency (or predecessor to such agency) to maintain the capital of an insured depository institution, and any claim for a subsequent breach of the obligations thereunder shall be entitled to priority under section 507. This subsection shall not extend any commitment that would otherwise be terminated by any act of such an agency.

11 U.S.C. § 365(o). Similarly, the FDIC-R asserts a claim under Bankruptcy Code section 507(a)(9), which creates a ninth-level priority claim for claims "based upon any commitment by the debtor to a Federal depository institutions regulatory agency (or predecessor to such agency) to maintain the capital of an insured depository institution." 11 U.S.C. § 507(a)(9). The determination of the FDIC-R's alleged Capital Commitment Claim is critical to these bankruptcy cases because a ruling in favor of the FDIC-R would (i) require that all assets of GFG are used to satisfy the section 365(o) cure obligation; (ii) arguably create setoff rights in favor of the FDIC-R against a significant portion or all of the Debtors' cash; (iii) create a priority claim for the FDIC-R under Bankruptcy Code section 507(a)(9); and (iv) potentially result in no distribution for general unsecured creditors as virtually all estate assets would be distributed to the FDIC-R pursuant to section 365(o), the FDIC-R's alleged setoff rights, or the section 507(a)(9) claim.[5]

25.     To support its Capital Commitment Claim, the FDIC-R cites entry of the April 6, 2009 Order to Cease and Desist, in which GFG committed to provide the Office of Thrift Supervision with a detailed plan to increase the capital of GFG and Guaranty Bank "*to ensure that [Guaranty Bank] meets and maintains, at a minimum, a core capital ratio equal to or greater than 8.00 percent and a total risk-based capital ratio equal to or greater than 11.00 percent.*" OFFICE OF THRIFT SUPERVISION, ORDER TO CEASE AND DESIST AGAINST GUARANTY FINANCIAL

---

[5] This is true even if the Court only allowed the FDIC-R Proofs of Claim against GFG and disallowed the FDIC-R Proofs of Claim against GHI, GGC, and GGV. GHI, GGC, and GGV are wholly owned subsidiaries of GFG, and there are no valid claims against the non-GFG Debtors. Therefore, any assets of the GHI, GGC, and GGV would be distributed to GFG as equity holder, and, if allowed, the FDIC-R Proofs of Claim would entitle the FDIC-R to an administrative or priority claim that would swallow the available assets.

GROUP INC., Order No. WN-09-02 § 2.a (issued April 6, 2009) (emphasis added). GFG also agreed that it "*shall ensure*" Guaranty Bank's compliance with a similar Cease and Desist Order issued by the OTS to Guaranty Bank. OFFICE OF THRIFT SUPERVISION, ORDER TO CEASE AND DESIST AGAINST GUARANTY FINANCIAL GROUP INC., Order No. WN-09-02 (issued April 6, 2009); OFFICE OF THRIFT SUPERVISION, STIPULATION AND CONSENT TO ISSUANCE OF ORDER TO CEASE AND DESIST AGAINST GUARANTY FINANCIAL GROUP INC., Order No. WN-09-01 (issued April 6, 2009). Despite GFG's intense efforts to raise capital for Guaranty Bank, it is undisputed that Guaranty Bank was unable to meet or maintain the capital ratios specified in the either of the cease and desist orders, ultimately leading to the appointment of the FDIC as receiver and the filing of these bankruptcy cases.

26.    Further support for the FDIC-R's Capital Commitment Claim is found in a January 27, 2009 resolution of GFG's Board of Directors titled "Source of Strength Resolution" (the "*Source of Strength Resolution*"). The Source of Strength Resolution states that GFG "shall serve as a holding company source of strength to Bank and will provide . . . capital strength and support to the Bank as prescribed by the Federal Deposit Insurance Act *to the fullest extent of [GFG]'s capacity and [GFG]'s own capital*."[6]

27.    Few published opinions have addressed what is required to rise to the level of a commitment by the debtor to a Federal depository institutions regulatory agency to maintain capital pursuant to Bankruptcy Code section 365(o), and the available authorities rely heavily on the facts and circumstances of each case. *See, e.g., Wolkowitz v. Fed. Deposit Ins. Corp. (In re*

---

[6] Source of Strength Resolution, Guaranty Financial Group Inc. Board of Directors (January 28, 2009) (emphasis added). The term "Source of Strength" is a term of art generally understood to mean the use of a holding company's assets to fund a capital shortfall of a bank subsidiary. *See* BANK HOLDING COMPANIES AND CHANGE IN BANK CONTROL (REGULATION Y), 12 C.F.R. § 225.4(a)(1) ("bank holding company shall serve as a source of financial and managerial strength to it subsidiary banks."); 12 C.F.R. pt. 261 (April 30, 1987) ("[I]n serving as a *source of strength* to its subsidiary banks, a bank holding company should . . . provide adequate capital funds to its subsidiary banks during periods of financial stress.") (emphasis added); *see also Board of Governors of the Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 34 (1991).

*Imperial Credit Indus., Inc.*), 527 F.3d 959, 964 (9th Cir. 2008) (finding a guarantee constituted a capital maintenance commitment under section 365(o)); *Office of Thrift Supervision v. Overland Park Fin. Corp.* (*In re Overland Park Fin. Corp.*), 236 F.3d 1246, 1249 (10th Cir. 2001) (finding an "informal" net worth stipulation constituted a capital maintenance commitment under section 365(o)); *Resolution Trust Corp. v. Firstcorp, Inc.* (*In re Firstcorp, Inc.*), 973 F.2d 243, 244 (4th Cir. 1992) (finding a FHLBB resolution constituted a capital maintenance commitment under section 365(o)); *Franklin Sav. Corp. v. Office of Thrift Supervision*, 303 B.R. 488, 491 (D. Kan. 2004) (finding a written affidavit constituted a capital maintenance commitment under section 365(o)).

28.     Citing these authorities, the FDIC-R asserts that (i) the language in the two cease and desist orders creates a clear and unambiguous commitment to guarantee the obligations owing from Guaranty Bank to its regulators, and (ii) the Source of Strength Resolution obligated GFG to devote all of its assets to fund the capital shortfall of Guaranty Bank, both resulting in a superpriority administrative expense claim under Bankruptcy Code section 365(o) or, at a minimum, a ninth-level unsecured priority claim under section 507(a)(9).[7] Tricadia's reliance on *In re Colonial BancGroup, Inc*, 436 B.R. 713 (Bankr. M.D. Ala. 2010) to support an attack on the FDIC-R's Capital Commitment Claim should be assessed in light of the language of Colonial's commitment when compared to the language in the GFG cease and desist orders and the Source of Strength Resolution.  The Colonial language places different obligations upon

---

[7] In addition to the order to cease and desist, the FDIC-R would find further evidence in support of FDIC's Capital Commitment Claim in (i) GFG's June 29, 2009 8-K filing, in which GFG noted, "The Board of Directors and management of [GFG] believe that the only remaining means by which [GFG] might possibly raise sufficient capital for *it . . . to comply with the Orders to Cease and Desist* issued by the Office of Thrift Supervision ("OTS") . . ." and (ii) GFG's July 23, 2009 8-K filing in which GFG noted, "[GFG] no longer believes that it will be possible *for [GFG] or the Bank to raise sufficient capital to comply with the Orders to Cease and Desist* . . ."  Guaranty Financial Group Inc., Current Report (Form 8-K), at 8.01 (June 29, 2009) (emphasis added); Guaranty Financial Group Inc., Current Report (Form 8-K), at 2.06 (July 23, 2009) (emphasis added).

Colonial than those placed upon GFG and Guaranty Bank. More specifically, Colonial only agreed to "assist its subsidiary bank in addressing weaknesses . . . and achieving/maintaining compliance with its . . . Memorandum of Understanding"; to "tak[e] steps designed to ensure that [its bank] complies with the Memorandum of Understanding"; and "take appropriate steps to ensure that [its bank] complies with the Order to Cease and Desist." *Colonial*, 436 B.R. at 730. Colonial's commitments fall well short of the level of commitment contained in GFG's and Guaranty Bank's cease and desist orders. Furthermore, on information and belief, Colonial did not pass a resolution similar to the Source of Strength Resolution that arguably created an express commitment to use all of its resources to fund the capital shortfall of its subsidiary bank. Given the importance of this issue to the FDIC-R and the ramifications of a loss on the language contained in the GFG cease and desist orders, the Debtors expect the FDIC-R will exhaust all appeals in connection therewith.

29. In asserting that the settlement contained in the Plan falls below the minimum threshold applied by courts within the Fifth Circuit to evaluate compromises, Tricadia relies heavily on the arguments contained in the Debtors' Response and Objection to Motion of the Federal Deposit Insurance Corporation, as Receiver for Guaranty Bank, for an Order Modifying the Automatic Stay as to Property and Granting Setoff By the FDIC-Receiver (the "***Debtors' Stay Response***"). Obviously, as with all pleadings filed in litigation, the Debtors structured the Debtors' Stay Response in a manner designed to focus on the positive aspects of the Debtors' case and to minimize the impact of the FDIC-R's potential counterarguments. Despite the Debtors' strong stance in the Debtors' Stay Response, from the inception of the dispute with the FDIC-R, the Debtors have acknowledged that the language contained in the GFG and Guaranty

Bank cease and desist orders and the Source of Strength Resolution could support a summary disposition in favor of the FDIC-R.

### b.    The FDIC-R's remaining arguments.

30.    Even if the Court determined that the FDIC-R had no claim under section 365(o) or section 507(a)(9), the Debtors would still be faced with the FDIC-R's argument that they own a number of the Debtors' assets, including (i) tax refunds that appear attributable solely to the operations of Guaranty Bank; (ii) refunds from insurance policies that Guaranty Bank funded and that solely applied to potential losses in connection with operations of Guaranty Bank; and (iii) D&O policy proceeds, which, in large part, cover claims that are derivate of Guaranty Bank and therefore unavailable to the Debtors pursuant to 12 U.S.C. § 1821(d)(2)(A)(i).  As described in more detail below, the Debtors face an uphill battle on each of these arguments as well.

31.    Put simply, the road to victory is littered with substantial obstacles, and the FDIC-R has indicated a willingness to exhaust all appeals from any adverse ruling.  Taking the fight through trial and all appeals would cost the estates millions of dollars.  Additionally, a loss on section 365(o) and the resulting superpriority administrative expense claim in favor of the FDIC-R would render the estates completely without funds to satisfy litigation costs, much less fund a distribution to unsecured creditors.  While Tricadia suggests in footnote five of its Objection that consideration of a complete lack of funds to satisfy administrative expenses is somehow inappropriate, the Debtors submit that sound business judgment mandates that the Debtors take into account the fact that they may be unable to satisfy the millions of dollars of litigation expenses that Tricadia would have the Debtors incur.  When the Court balances the risk of failure in the Pending Litigation and the cost associated with its pursuit against the benefits derived from the Settlement Agreement, it should conclude that the Settlement Agreement is

within the zone of reasonableness and that the Settlement Agreement and the Plan are fair and equitable.

## **2.    Complexity, likely duration of the litigation, and expense.**

32.    In analyzing the complexity, likely duration and expense of the litigation, the Court need only "form an educated estimate." *In re Heritage Org., LLC*, 375 B.R. 230, 280 (Bankr. N.D. Tex. 2007) (citing *Anderson*, 390 U.S. at 428). An "educated estimate" means an analysis of "the likelihood of complex and protracted litigation, with its attendant expenses, inconvenience and delay." *Id.* (citing *In re Iridium Operating, LLC*, 478 F.3d 452, 462 (2d Cir. 2007)). This Court approved the proposed settlement in *Heritage* based, in part, on the Court's conclusion that (i) the litigation would go on for years and not be easily resolved; (ii) there was a high likelihood of discovery problems; and (iii) there was a high likelihood of extensive appeals and possible re-trials. *See Heritage*, 375 B.R. at 278-80. The CRO of the Debtors, who also served as the trustee in *Heritage*, will testify at confirmation that many of the facts in *Heritage* that supported the Court's approval of the settlement there are present in the instant case.

33.    The Pending Litigation involves fact-intensive disputes regarding the FDIC-R Proofs of Claim and the rights of the FDIC-R to the property of the Debtors. If the Pending Litigation continues, after an initial battle to determine whether this Court or federal district court has jurisdiction over the various issues,[8] the trial court would be required to make determinations regarding the validity of the Capital Commitment Claim, the ownership of the tax refunds, the ownership of the insurance premiums, the ownership of certain funds on deposit, the validity of Intercompany Claims, whether certain pre-petition transfers were fraudulent, and

---

[8] On information and belief, absent a settlement agreement, the FDIC-R will likely attempt to withdraw the reference for all disputed matters, including the Stay Motion, to the United States District Court for the Northern District of Texas.

whether certain other general litigation claims have a legitimate basis. Resolution of these disputes would require discovery, including substantial document production and significant depositions, and one or more trials. Additionally, even after trial court rulings on the Pending Litigation, the FDIC-R has indicated that it would exhaust all appeals from any adverse ruling. The Debtors anticipate that taking the Pending Litigation to conclusion could take years and consume millions of dollars of assets otherwise available for creditors. The Debtors also acknowledge that if a trial resulted in complete victory for the FDIC-R on certain of its theories, including its section 365(o) and setoff arguments, the Debtors would have no cash available to satisfy the multi-million dollars in professional fees incurred during the litigation process.[9]

34. Confirmation of the Debtors' concerns about cost can be found in two other noteworthy bank holding company bankruptcies (*In re AmFin Financial Corp.*[10] and *In re Colonial BancGroup, Inc.*[11]), where the debtors have engaged the FDIC in protracted litigation regarding the allowance of the FDIC's Capital Maintenance Claim. In *AmFin Financial*, the Debtors incurred $1.95 million in attorneys' fees through November 2010 in their litigation with the FDIC, and, after more than a year of litigation, the matter is only now proceeding to trial. In *Colonial BancGroup*, the debtors have been litigating with the FDIC for approximately 19 months, the creditors' committee alone has racked up over $1.7 million in legal fees in such

---

[9] Despite the baseless statement in footnote five of Tricadia's Objection, the Debtors' CRO and professionals are fully aware of their fiduciary responsibilities and take exception to any implication to the contrary.

[10] *In re Amfin Financial Corporation, et al.*, Case No. 09-21323 (Bankr. N.D. Ohio 2009).

[11] *In re Colonial Bancgroup, Inc,*. Case No. 09-32303 (Bankr. M.D. Ala. 2009).

litigation, and the appeal of the summary judgment ruling in favor of the debtors has only progressed to the federal district court.[12]

35.     Perhaps more importantly, both the AmFin and Colonial bankruptcy estates have one significant potential asset that is likely unavailable to the Debtors in this case.  Specifically, AmFin is seeking to recover $190 million federal tax refunds,[13] while the refunds at stake in Colonial exceed $250 million.[14]  By contrast, the instant Debtors' entire pool of liquidated assets, including tax refunds, totals less than $25 million.  Clearly, the stakes for AmFin and Colonial to litigate with the FDIC are much higher than the potential upside of the Debtors' fight with the FDIC-R.

36.     The Debtors believe that the estates and creditors are best served by the Settlement Agreement.  The Settlement Agreement resolves all disputes surrounding the Pending Litigation without expenditure of considerable resources of the estates.  The complexity, likely duration of the litigation and expense, therefore, favor approval of the Settlement Agreement.

### 3.     Other factors weigh in favor of approving the Settlement Agreement.

37.     When looking to this third factor in analyzing the "fair and equitable" nature of settlement agreements, courts consider: (i) the best interests of the creditors with "proper deference to their reasonable views"; and (ii) the extent to which the agreed-upon settlement is truly the product of arms-length negotiations and not fraud or collusion.  *Cajun Elec. Power*, 119

---

[12] As the FDIC recently noted in its motion to convert the Colonial case to Chapter 7, the Debtor paid professional fees in excess of $7.35 million during the case.  Monthly Operating Report for Month of February 2011, *In re Colonial BancGroup, Inc.*, Case No. 09-32303 [Docket No. 1160] (Bankr. M.D. Ala. 2009).

[13] Disclosure Statement in Support of AmFin Financial Corporation, et al., Joint Plan of Reorganization, P. 17, *In re AmFin Fin. Corp.*, Case No. 09-21323 [Docket No. 865] (Bankr. N.D. Ohio 2009).

[14] Third Amended Disclosure Statement Accompanying Second Amended Chapter 11 Plan of Liquidation of the Colonial BancGroup, Inc., P. 32-33, *In re Colonial BancGroup, Inc.*, Case No. 09-21323 [Docket No. 1111-1] (Bankr. M.D. Ala. 2009).

F.3d at 356.  In analyzing these factors, the Court should look at the Settlement Agreement as a whole, rather than pick apart the settlement piece-by-piece.  *Pinnacle Brands*, 259 B.R. at 54.

a.    **The Settlement Agreement is in the best interests of the creditors.**

38.    First, the Settlement Agreement is in the best interests of creditors with "proper deference to their reasonable views."  *Cajun Elec. Power*, 119 F.3d at 356.  It is the responsibility of the bankruptcy judge to determine whether a settlement agreement falls below the *lowest point* in the range of reasonableness.  *Pinnacle Brands*, 259 B.R. at 54 (citing *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972)).

39.    Tricadia argues that because Tricadia does not support the Settlement Agreement, it should not be approved.  *See* Objection, ¶ 39.  In *Cajun Elec. Power*, the Fifth Circuit emphasized that "the test is not the desires of the majority as such, but the best interests of the creditors, taking into account their reasonable views."  119 F.3d at 358.  In other words, the fact that certain creditors object to a settlement is not in itself a fact that necessarily weighs heavily in a court's determination on whether to approve a settlement.  *Cajun Elec. Power* stands for the proposition that when creditors do object, the court may take into account their reasonable views on whether a settlement is in the best interest of the entire creditor body, not whether a settlement is in the best interest of that particular creditor.

40.    It should also be noted that several of the cases cited by Tricadia in their Objection are not bankruptcy cases, do not involve a Rule 9019 bankruptcy settlement, or are factually distinguishable.  *Cullen v. Riley* (*In re Masters Mates & Pilots Pension Plan & IRAP Litig.*), 957 F.2d 1020 (2d Cir. 1992) is factually distinguishable from this case because it arose in the context of a class action settlement.  The standards and requirements for approving a class action settlement are different than the standards for approving a settlement under Rule 9019.

*See id.* at 1025 (finding that for class actions, courts focus on fairness, reasonableness, and adequacy for the plaintiff class).  Further, unlike the facts in this case, the objecting party in *In re Masters* was a non-settling defendant that, because of the terms of the settlement, was potentially exposed to increased liability under the settlement in contravention of law.  In the current case, to the extent Tricadia actually owns TRPS, Tricadia is treated in the same manner as all other holders and not singled out for harm.  In fact, Tricadia's interests were protected to a much greater degree that those of general unsecured creditors because Tricadia's interests were represented during the entirety of the negotiation of the Settlement Agreement by Tricadia's agent and fiduciary, Wilmington Trust.

41.     The cases cited by Tricadia arising in a bankruptcy context are also factually distinguishable.  None of the cases address a situation where an objecting party's interests were represented during settlement negotiations by a trustee or other party with fiduciary obligations.  *See e.g. U.S. v. AWECO, Inc.* (*In re AWECO, Inc.*), 725 F.2d 293, 298-300 (5th Cir. 1984) (overturning a settlement agreement between the debtor and a junior creditor where a senior creditor objected to the settlement on the basis that the bankruptcy court did not make a finding that the priority of payment would be respected with regard to the senior creditor's claim); *In re Med. Asset Mgmt., Inc.*, 249 B.R. 659, 265-67 (Bankr. W.D. Pa. 2000) (disapproving a settlement agreement between the debtor and an insurance company, because the settlement enjoined certain unsecured creditors from pursuing the insurance company without providing reasonable compensation for foregoing their claim against the debtor).

42.     Here, Tricadia is not subjected to increased liability or enjoined from pursuing actions that it holds.  Rather, Tricadia simply disagrees with the judgment of its agent and fiduciary, Wilmington Trust.  Pursuant to the terms of the Settlement Agreement, the Trust, and

therefore Tricadia, are compensated.  The Settlement Agreement provides that TRPS holders will share in the pro rata distribution from the Liquidation Trust.  If the Pending Litigation was continued and the FDIC-R prevailed, TRPS holders would receive nothing.

43.     Because the Settlement Agreement is in the best interests of creditors and does not fall below the lowest point in the range of reasonableness, this factor also weighs in favor of approving the Settlement Agreement.

**b.      The Settlement Agreement is the product of arms-length negotiations and not fraud or collusion.**

44.     Despite Tricadia's unsubstantiated and conclusory statements to the contrary, the Settlement Agreement is the product of arms-length negotiations.  In making a determination regarding whether the agreement was negotiated at arms-length, the Court need not resolve numerous questions of law and fact or conduct a mini-trial on the merits, as suggested by Tricadia in its Objection, but instead, canvass the settlement to determine whether it falls within the range of reasonableness.  *In re Idearc, Inc.*, 423 B.R. 138, 182-83 (Bankr. N.D. Tex. 2009) (citing *W.T. Grant Co.*, 699 F.2d at 608; *Nellis v. Shugrue*, 165 B.R. 115, 123 (S.D.N.Y. 1999)). The court may also give weight to the "informed judgments of the … debtor-in-possession and their counsel that a compromise is fair and equitable, and consider the competency and experience of counsel who support the compromise." *Idearc*, 423 B.R. at 183 (citing *Drexel Burnham Lambert Group*, 134 B.R. at 505).

45.     Tricadia argues the Settlement Agreement is not the product of arms-length negotiations because the "[Settlement Agreement] [was] designed to benefit only Wilmington Trust and its professionals."  *See* Objection, ¶ 42.  Tricadia notes that throughout the Debtors' proceedings, Wilmington Trust focused on the ultimate benefit flowing solely to Wilmington Trust rather than its constituents.  *See* Objection, ¶ 43.  Tricadia's analysis omits the fact that

despite the FDIC-R's assertion that it is entitled to 100% of the Debtors' assets, the Debtors and Wilmington Trust negotiated a resolution that reserves, among other benefits, (i) approximately 43% of the Debtors' cash; (ii) all Chapter 5 causes of action (including certain insider actions, that absent settlement, would be held by the FDIC-R); (iii) 30% of the net recovery from litigation by the FDIC-R against a third party, JLT Insurance Agency Holdings Inc.; (iv) the Debtors' claims against their former parent, Temple-Inland Inc.; and (v) any claims the Debtors may have against third parties not otherwise released in the Plan. The involvement of Wilmington Trust in a post-petition role does not render the Settlement Agreement outside the realm of reasonableness. To the contrary, Wilmington Trust is in the perfect position to pursue this role given it is in a fiduciary position with regard to the TRPS holders.

46. Tricadia also argues the Settlement Agreement was not the product of arms-length negotiations because (i) cash payments and assignment of actions overwhelmingly benefit the FDIC-R; (ii) the Debtors intend to settle unsupported and uninvestigated claims; and (iii) the Debtors are not obligated for the FDIC-R Claims (the Capital Commitment Claim, the Tax-Related Claims, the Intercompany Claims, the Insurance Premium Claims, the Deposit Fund Claims, the Fraudulent Conveyance Claims, and the Litigation Claims). Tricadia sets forth arguments as to why settlement of each of these claims benefit everyone other than Tricadia. The Court, however, is not required to make a determination on the factual merits of each of these claims. *Idearc*, 423 B.R. at 182 (citing *W.T. Grant Co.*, 699 F.2d at 608). Rather, the Court is to assess the reasonableness of the settlement as a whole. *Id.* at 183.[15]

47. The Settlement Agreement is the product of substantial hours of analysis and good faith negotiations among the Parties. The Parties' settlement discussions took place over a

---

[15] While the Court is not required to conduct a mini-trial on the merits of the Pending Litigation or parse through each and every element of the Settlement Agreement, the Debtors are prepared to support each and every provision of the Settlement Agreement with evidence at the confirmation hearing.

period in excess of seven months and included a document production, in-person settlement conferences with both clients and lawyers, numerous written proposals and counterproposals, and numerous telephone conferences. The lawyers representing the Parties during the negotiation progress have extensive Chapter 11 bankruptcy experience, and their reputations, as well as Mr. Faulkner's extensive experience as a bankruptcy professional and frequent service as a fiduciary should be considered by the Court. The Settlement Agreement, when analyzed as a whole, does not fall below the lowest point in the range of reasonableness and this final factor, therefore, weighs in favor of approval of the Settlement Agreement.

**B.      The various individual elements of the Settlement Agreement are fair and equitable and in the best interest of the creditors.**

48.      As established above, the Court need not conduct a "mini-trial" on each of the disputed issues in the Pending Litigation. The Debtors, however, carefully considered the likelihood of success on each of the disputed issues when negotiating the terms of the Settlement Agreement and the Settlement Agreement reflects the Debtors' determination with regard to each disputed issue. Although unnecessary, the Debtors respond to Tricadia's assertion that the disputed issues were not adequately considered by the Debtors during settlement negotiations as follows:

- **Tax-Related Claims**:   Both before and after the Petition Date, GFG filed tax returns for its consolidated tax group, which encompassed GFG and all of its subsidiaries, including Guaranty Bank. The allocation of tax liabilities and tax benefits among the consolidated tax group are governed by a tax allocation policy (the "***Tax Policy***"). Regarding tax benefits, the Tax Policy provides, "In the event that any member of the consolidated group shall incur net federal or state income tax losses or net federal or state income tax credits which shall result in a net tax benefit (or tax savings) to the consolidated group as a whole, the respective member producing such net tax benefit shall receive such net tax benefit." Tax Policy, § 2. In other words, the member of the tax group that created the benefit will receive the benefit.[16]

---

[16] The Tax Policy is consistent with Fifth Circuit authority on the subject. *Capital Bancshares, Inc. v. F.D.I.C.*, 957 F.2d 203, 210 (5th Cir. 1992) (determining that a tax refund for a consolidated group is the property of the

Consistent with the Tax Policy, upon a determination that the Debtors were entitled to certain tax refunds, including approximately $1.3 million from the IRS for tax years 2007 and 2008, the Debtors consulted with their Court-approved tax accountants, Pope Shamsie & Dooley, LLP ("**Pope Shamsie**"), to determine which member(s) of the tax group actually incurred these tax benefits. Pope Shamsie advised the Debtors that Guaranty Bank was responsible for incurring the benefits and generating the refund due from the IRS. The Debtors anticipate that the FDIC-R would assert legal title to amounts received by the Debtors with respect to tax refunds and that such amounts would be held by the Debtors in constructive trust for the FDIC-R. *See, e.g., In re Quality Holstein Leasing*, 752 F.2d 1009 (5th Cir. 1985). The Debtors, therefore, determined they could not mount a substantial legal challenge to the FDIC-R's argument for retaining the tax refund, and, as part of the overall settlement with the FDIC-R, agreed to remit the tax refunds to the FDIC-R.

- **Insurance Premium Claims**: The Debtors analyzed each insurance policy to determine whether it was applicable to the Debtors or to Guaranty Bank. For the premiums to be transferred to the FDIC-R pursuant to the Plan, the Debtors determined that the coverage of the policies applied to Guaranty Bank rather than the Debtors,[17] and that Guaranty Bank funded the payment of the premiums. The Debtors anticipate that the FDIC-R would assert legal title to amounts received by the Debtors with respect to the insurance policy proceeds and premium refunds and that such amounts would be held by the Debtors in constructive trust for the FDIC-R. *See, e.g., In re Quality Holstein Leasing*, 752 F.2d 1009 (5th Cir. 1985). It would, therefore, be extremely difficult for the Debtors to convince the Court that they, rather than Guaranty Bank, are the proper owner of the refunds under the various insurance policies. The terms related to the Insurance Premium Claims contained in the Settlement Agreement are, therefore, in the best interest of the estates and their creditors.

- **D&O Claims**: The Debtors analyzed potential claims they could bring against their directors and officers and determined that most of such claims were derivative of Guaranty Bank and therefore likely unavailable to the Debtors pursuant to 12 U.S.C. § 1821(d)(2)(A)(i). Furthermore, the Debtors believe it would be extremely difficult to establish liability under the facts and circumstances of this case. Additionally, the insurance company that issued the director and officer liability insurance policy rejected the Debtors' notice of circumstance, indicating that litigation would be required in order to establish coverage. Further, during the entirety of the settlement discussions, the FDIC-R made it clear to the Debtors that the FDIC-R would not accept any settlement that left D&O Claims with the Debtors. Because of the Debtors' analysis of the D&O Claims and the FDIC-R's unyielding stance regarding the Debtors' right to pursue such

---

subsidiary that generated the refund and that the FDIC as receiver of the subsidiary was entitled to the tax refunds attributable to the subsidiary's losses).

[17] For example, one of the policies in question covered automobiles solely used by Guaranty Bank employees.

claims, the Debtors ultimately agreed to leave the D&O Claims with the FDIC-R and instead focused on obtaining better treatment in other areas of the settlement.[18]

- **RWHC**:  In agreeing to release claims related to the conversion of the RWHC preferred stock, the Debtors noted, among other issues, that (i) the conversion of the RWHC preferred stock to preferred stock of Guaranty Bank upon the financial distress of Guaranty Bank was a condition to the original purchase of the RWHC preferred stock required by the OTS in order for the RWHC preferred stock to serve as Tier One bank capital, rendering any fraudulent transfer argument difficult; (ii) any fraudulent transfer claim against the FDIC-R based on the RWHC transfer may be completely barred by operation of 12 U.S.C. § 1821(u); (iii) all of the assets of RWHC were pledged to Guaranty Bank's secured lender, the Federal Home Loan Bank of Dallas; (iv) victory on any fraudulent transfer theory may only result in an unsecured claim in the Guaranty Bank receivership; and (v) the avoidance of the transfer would result in an even greater capital shortfall at the bank level, and any allowed Capital Maintenance Claim would increase by the amount recovered by the Debtors.  On these facts, the Debtors' release of such claims is entirely appropriate.

- **Temple-Inland Spin Off**: The agreement reached with regard to this dispute is an acceptable outcome for the Debtors' creditors.  Pursuant to the Settlement Agreement and Article X.A. of the Plan, the Debtors retain any rights they may have with respect to claims against Temple-Inland Inc. with the exception of claims that are derivative of Guaranty Bank.[19]  Tricadia has no legitimate basis for complaint with this element of the Settlement Agreement.

- **Preference Payments to Insiders or Creditors**: The Debtors retained all Chapter 5 causes of action for the benefit of non-FDIC-R creditors and obtained a transfer of avoidance claims against insiders that would otherwise belong to the FDIC-R, leaving Tricadia without any reasonable basis for complaint.  As noted on Exhibit 3 to the Disclosure Statement, the Debtors identified over $53 million of transfers subject to potential avoidance, and at least $7 million of such transfers were made to parties other than affiliated companies and parties that are released pursuant to the Plan.

## II.    The Plan was Proposed in Good Faith.

49.    Consistent with its "kitchen sink" litigation approach, Tricadia throws in an argument that the Debtors have not proposed the Plan in good faith.  The alleged basis for this argument is that the Debtors entered into the Settlement Agreement with the FDIC-R and

---

[18] In return for foregoing D&O Claims, the Debtors negotiated cash consideration from the FDIC-R totaling $475,000, among other concessions.

[19] Only non-derivative claims are available to the Debtors pursuant to 12 U.S.C. § 1821(d)(2)(A)(i).

Wilmington Trust at the expense of the holders of the TRPS.  Again, Tricadia's allegations in this regard are completely unsupported by the facts.

50.     The Bankruptcy Code requires that a Plan be "proposed in good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3).  Although the Bankruptcy Code does not provide a definition for "good faith," courts have found good faith requires that: "(1) the plan be consistent with the objectives of the Bankruptcy Code; (2) the plan be proposed with honesty and good faith intentions and with a basis for expecting that reorganization can be achieved; or (3) there was fundamental fairness in dealing with the creditors."  *Stonington Partners, Inc. v. Official Comm. of Unsecured Creditors* (*In re Lernout & Hauspie Speech Prods., N.V.*), 308 B.R. 672, 675 (Bankr. D. Del. 2004).  When examining each of these factors in the context of the Plan, Tricadia's Objection to the Debtors' lack of good faith must be summarily dismissed.

**A.     The Plan is consistent with the objectives of the Bankruptcy Code.**

51.     The Debtors have proposed a Plan that provides a meaningful recovery for all creditors, which is entirely consistent with the objectives of the Bankruptcy Code.  The Settlement Agreement embodied in the Plan preserves significant assets for the unsecured creditors (*i.e.*, the holders of the TRPS), which may otherwise be unavailable if the Debtors were forced to continue the Pending Litigation.  As fiduciaries for the bankruptcy estates, the Debtors are keenly focused on providing a recovery not just for the FDIC-R and administrative claimants, but for general unsecured creditors as well.  By consummating the Settlement Agreement, the Debtors will achieve this objective—not consummating the Settlement Agreement places any recovery for unsecured creditors in significant jeopardy.

**1. The Debtors propose the Plan with honest and good faith intentions.**

52. Tricadia has not and cannot point to any facts or circumstances that would undermine the notion that the Plan has been proposed honestly and in good faith. The Settlement Agreement was reached after lengthy negotiation by and among the Debtors, the FDIC-R, and Tricadia's fiduciary, Wilmington Trust. The Debtors fully disclosed the nature and breadth of the Settlement Agreement in their Court-approved Disclosure Statement, and the underlying dispute among the Parties has been the subject of numerous pleadings filed with this Court and several discussions on the record in open court. In connection with the approval of the Disclosure Statement, no other creditor or party-in-interest suggested that the Debtors were not acting as honest brokers in the best interest of their various constituents. Quite the contrary, the Settlement Agreement is supported by Wilmington Trust who acts on behalf of all TRPS holders.

53. An accusation of nothing more than a passing reference that the Settlement Agreement unfairly benefits Wilmington Trust is entirely insufficient to establish that the Debtors failed to act in good faith. The alleged unfair benefit provided to Wilmington Trust is apparently the appointment of Wilmington Trust as the Liquidating Trustee under the Plan. Rather than a basis for a bad faith claim, the appointment of Wilmington Trust as Liquidating Trustee is another example of the Debtors' *good faith*. By appointing an existing creditor fiduciary as the party who will be responsible for administering, liquidating, and distributing assets to the unsecured creditors, the Plan preserves the benefits of Wilmington Trust's knowledge and expertise in respect to the assets that will be liquidated. Wilmington Trust is well suited to serve in this capacity and, by doing so, the Plan places the Plan distributions to the TRPS holders in the hands of the party that is already serving in a fiduciary capacity on their

behalf.[20]   Furthermore, the Debtors are unaware of any complaint by any TRPS holder (other than Tricadia) regarding Wilmington Trust's service as a fiduciary.

> ### 2. The Debtors have demonstrated fundamental fairness in dealing with their creditors.

54.      At all times, the Debtors have negotiated the Plan with the goal of providing a recovery for all of their creditors, and the Settlement Agreement provides the mechanism for achieving this goal.   Absent such compromise, the Debtors' assets could all be consumed in litigation with the FDIC-R, leaving a situation where no assets are available for distribution to the Debtors' unsecured creditors.   Recognizing this possibility and the TRPS holders' vital stake in the outcome of these cases, from day one of the negotiations with the FDIC-R, the Debtors included the party that is contractually empowered to speak on behalf of the holders of the TRPS—Wilmington Trust.   The negotiations leading to the Settlement Agreement were tri-party by and among the Debtors, the FDIC-R, and Wilmington Trust.   Because Wilmington Trust acts as a fiduciary on behalf of the holders of the TRPS and is contractually appointed as the party to negotiate on their behalf, the Debtors are confident that the holders of the TRPS have been zealously represented in these negotiations.   Not only was it impractical for the Debtors to individually engage each holder of a TRPS (indeed this is the very reason a trustee, such as Wilmington Trust, negotiates on behalf of beneficial holders to eliminate the potential quagmire caused by one-off negotiations with individual beneficial holders), no holder of a TRPS actually inserted itself into these negotiations until Tricadia surfaced in the last few weeks (assuming that Tricadia actually holds TRPS).   As such, the Debtors conducted negotiations with Wilmington

---

[20] Beyond Wilmington Trust's noted qualifications to serve in this role, the unique nature of these cases has presented a situation where there is not another suitable candidate to serve as Liquidating Trustee active in these cases, and retaining a third party to serve as Liquidating Trustee would only tax the estates further with the fees that a third party would charge to administer the Liquidating Trust.

Trust, the proper party-in-interest with respect to the holders of TRPS, and thereby secured a recovery for unsecured creditors.[21]

### III.   The Bankruptcy Cases Should Not Be Converted to Cases under Chapter 7 of the Bankruptcy Code.

55.    The inclusion of a request to convert these cases to Chapter 7 in Tricadia's Objection demonstrates a complete disregard for the procedures of the Bankruptcy Code and the rules of this Court.  If Tricadia seriously believes conversion of these cases to Chapter 7 is warranted, Tricadia should comply with basic pleading requirements and set this matter for hearing after proper notice.  11 U.S.C. § 1112(b); N.D. Tex. Local Bankr. R. 2002-1(a)(4). Assuming *arguendo* Tricadia met the pleading and notice requirements of this Court, section 1112(b)(1) of the Bankruptcy Code provides that, absent certain circumstances, upon request by an interested party, the court shall convert a case under Chapter 11 to a case under Chapter 7 only for "cause."  11 U.S.C. § 1112(b)(1).  The movant has the initial burden of establishing "cause."  *In re Briggs-Cockerham, L.L.C.*, 2010 WL 4866874, at *3 (Bankr. N.D. Tex. Nov. 23, 2010).  Once the movant establishes cause, the burden shifts to the debtor to establish that "unusual circumstances" exist to prevent conversion.  *Id.*  A court's inquiry into whether "cause" exists is case-specific.  *In re Timbers of Inwood Forest Assocs.*, 808 F.2d 363, 371-72 (5th Cir. 1987), *aff'd* 484 U.S. 365 (1988).

56.    Section 1112(b)(4) of the Bankruptcy Code identifies several non-exclusive examples of "cause."  11 U.S.C. § 1112(b)(4); *In re Hampton Hotel Investors, L.P.*, 270 B.R. 346, 358 (Bankr. S.D.N.Y. 2001).  Tricadia asserts it has established "cause" by showing there is: (i) a continuing loss to or a diminution of the estate and the absence of a reasonable likelihood of rehabilitation; (ii) gross mismanagement of the estate; and (iii) an inability to effectuate a

---

[21] If individual holders of TRPS take issue with Wilmington Trust's actions as trustee, then those holders are free to take appropriate action against Wilmington Trust outside of the plan confirmation context.

substantial consummation of a confirmed plan.  *See* Objection, ¶ 108.  In fact, Tricadia has not established a single one of these occurrences.  First, there is not a continuing loss to or diminution of the estate or an absence of a reasonable likelihood of rehabilitation.  In fact, by focusing on settlement with the FDIC-R, the Debtors have avoided millions of dollars in professional fees and have saved the bankruptcy estates considerable resources for the benefit of creditors.  Next, Tricadia offers no evidence regarding gross mismanagement of the estates on the part of the Debtors.  The Debtors would consider such allegation insulting if it were supported with even a single shred of supporting evidence.  However, as it is entirely unsubstantiated the Debtors will not further waste the Court's time in defending their CRO, a well respected turnaround professional who has appeared as a professional and trustee in countless matters in this jurisdiction and beyond. Finally, Tricadia has not established an inability to effectuate a substantial consummation of a confirmed plan, as the Plan is the Debtors' first attempt at Plan consummation with only one obstacle interposed by a virtual stranger to these cases.

### IV.    The Plan's Post-Confirmation Oversight Structure is Appropriate.

57.    In its Objection, Tricadia asserts that it is inappropriate to permit the Liquidation Trustee to conduct post-confirmation administration without creditor oversight.  The Bankruptcy Code contains no requirement that a post-confirmation administrator report to a committee, and the Debtors are confident that the Court can properly monitor the conduct of the Liquidation Trustee in connection with the monthly reporting required under Article 5.H.5.s. of the Plan and the other safeguards set forth in Plan Article 5.H.5. and the Liquidation Trust Agreement attached to the Plan as ***Exhibit C***.  In addition, in the present case, imposing formal creditor oversight seems unnecessary since the Liquidation Trustee, Wilmington Trust, is well qualified

to serve in a fiduciary capacity and, in fact, already serves in a fiduciary capacity to the TRPS holders. Moreover, no other party in interest has expressed a willingness and capability to serve in such role.

## CONCLUSION

58. For the reasons discussed above and given the substantial benefits to the Debtors, their estates, and their creditors under the Plan and incorporated Settlement Agreement, the Debtors believe that the Objection should be overruled and the Plan should be confirmed.

**WHEREFORE**, the Debtors respectfully request this Court enter an order (i) overruling the Objection; (ii) confirming the Plan; and (iii) granting such other and further relief to the Debtors as the Court deems just and proper.

Dated: April 20, 2011.

**HAYNES AND BOONE, LLP**

*/s/ Ian T. Peck*
Robert D. Albergotti (TX Bar No. 00969800)
Ian T. Peck (TX Bar No. 24013306)
Autumn D. Highsmith (TX Bar No. 24048806)
2323 Victory Avenue, Suite 700
Dallas, Texas 75219
Telephone: 214.651.5000
Facsimile: 214.651.5940
robert.albergotti@haynesboone.com
ian.peck@haynesboone.com
autumn.highsmith@haynesboone.com

***Counsel for the Debtors-in-Possession***

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 20, 2011, a true and correct copy of the foregoing document was served (i) upon the parties listed below via United States first class mail, postage pre-paid, (ii) upon all parties on the Limited Service List Docket No. 426 via email (if available as indicated thereon) or United States first class mail, postage pre-paid, and (iii) via email upon the parties that receive electronic notice in these cases pursuant to the Court's ECF filing system.

*/s/ Ian T. Peck*
Ian T. Peck

<u>**SERVICE LIST**</u>

B. Lee Crawford, Jr.
1529 Barton Springs Road
Unit 2
Austin, TX 78704
Email: [lcrawford4@austin.rr.com](mailto:lcrawford4@austin.rr.com)

Stephen A. Goodwin
Carrington, Coleman, Sloman & Blumenthal, L.L.P.
901 Main Street, Suite 5500
Dallas, TX 75202
Fax:    214.855.1333
Email:  [sgoodwin@ccsb.com](mailto:sgoodwin@ccsb.com)

Gerard S. Catalanello
James J. Vincequerra
Duane Morris LLP
1540 Broadway
New York, NY 10036-4086
Fax:    212.692.1020
Email: [gcatalanello@duanemorris.com](mailto:gcatalanello@duanemorris.com)
Email: [jvincequerra@duanemorris.com](mailto:jvincequerra@duanemorris.com)

Patrick Matusky
Duane Morris LLP
1940 Route 70 East, Suite 200
Cherry Hill, NJ 08003
Fax:    215.405.2966
Email: [pmatusky@duanemorris.com](mailto:pmatusky@duanemorris.com)