E. Lee Morris (TX Bar. No. 00788079)
**MUNSCH HARDT KOPF & HARR, P.C.**
500 N. Akard Street, Suite 3800
Dallas, Texas 75201-6659
Tel:	(214) 855-7500
Fax:	(214) 855-7584
Email:	lmorris@munsch.com

Douglas E. Spelfogel (admitted *pro hac vice*)
Derek L. Wright
Richard J. Bernard
**FOLEY & LARDNER LLP**
90 Park Ave., 36th Floor
New York, NY 10016
Tel:	(212) 682-7474
Fax:	(212) 687-2329
Email:	dspelfogel@foley.com

**COUNSEL FOR WILMINGTON TRUST
COMPANY, AS INDENTURE TRUSTEE**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | Chapter 11 |
| | § | |
| GUARANTY FINANCIAL GROUP INC., | § | CASE NO. 09-35582-bjh |
| *et al.,* | § | (Jointly Administered) |
| | § | |
| Debtors. | § | |

**WILMINGTON TRUST'S RESPONSE IN OPPOSITION TO THE OBJECTION OF
TRICADIA FINANCIALS RESTRUCTURING PARTNERS, LTD TO DEBTORS'
AMENDED JOINT PLAN OF LIQUIDATION UNDER CHAPTER 11
OF THE UNITED STATES BANKRUPTCY CODE**

Wilmington Trust Company, as Indenture Trustee ("WTC" or the "Trustee") under that certain Indenture Trust dated as of September 15, 2006 (the "Indenture Trust") between Temple-Inland Financial Services, Inc., as Issuer ("Temple-Inland" or the "Issuer")[1] and the

---

[1] Temple-Inland Inc. ("Temple-Inland") formed Guaranty Bank in 1988. On December 28, 2007, Temple-Inland spun off its previously integrated financial services division, forming Guaranty Financial Services, Inc. ("GFG") as a stand-alone public company focused on financial services business. GFG is the parent company of Guaranty Group Ventures Inc. ("GGVI"), Guaranty Group Capital Inc. ("GGCI"), and Guaranty Holdings Inc. I ("GHI"). GHI serves as the holding company for GFG's investment in Guaranty Bank and owns 100% of the common stock of Guaranty Bank.

Trustee, as a party-in-interest on behalf of the largest group of unsecured, non-priority creditors of the above-captioned debtors GFG, GHI, GGVI and GGCI (together, the "Debtors"), by and through its attorneys, respectfully submits this Response (the "Response") to the Objection (the "Objection") of Tricadia Financials Restructuring Partners, Ltd. ("Tricadia") to the Debtors' Amended Joint Plan of Liquidation Under Chapter 11 of the United States Bankruptcy Code (the "Plan"),[2] and respectfully asserts as follows:

## Introduction

The only objecting party to confirmation of the Plan is Tricadia. WTC suspects, upon information and belief, particularly in light of Tricadia's last minute arrival as a party to these Chapter 11 Cases, that Tricadia is a speculator that purchases bondholder positions at steep discounts for its own singular purpose and is not necessarily aligned with creditors at large.[3] Meanwhile, WTC is the Indenture Trustee and fiduciary charged with protecting the interests of **ALL** bondholders, which constitute nearly all of the general unsecured debt in these Chapter 11 Cases, excluding the claims of the FDIC-Receiver and insiders. After no unsecured creditors expressed interest in committing significant time or resources to these Cases, or otherwise appeared in any active way, WTC took on many of the typical fiduciary roles delegated to a creditors' committee. WTC has been in contact with creditors throughout the Chapter 11 Cases and until now, all of the feedback has been supportive. WTC has been active in this role for nearly two years without compensation.[4]

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan.

[3] There also remains significant questions as to proof of Tricadia's holdings and the date and capacity under which it acquired any such position(s).

[4] Under the Indenture Trust, WTC maintains a charging lien for fees and expenses, and has reserved its right to seek reimbursement pursuant to Section 503 of the Bankruptcy Code as provided under the Plan.

2

In its role as a fiduciary to unsecured creditors, WTC, along with the Debtors, challenged the FDIC-Receiver Proofs of Claim and the FDIC-Receiver Motion for Relief from Stay and engaged in subsequent negotiations that resulted in the global settlement that is memorialized in the Plan (the "Settlement"). The Settlement was the result of extensive, arms-length negotiations between the major constituents in these Chapter 11 Cases—the Debtors, the FDIC and WTC. The negotiations spanned several months and during that time, WTC undertook detailed diligence in analyzing the numerous claims raised by and against the FDIC-Receiver and weighing the various arguments, defenses, costs and uncertainties that would be involved in related litigation. While the Settlement provides substantial, unencumbered assets to the Estates and Liquidation Trust free and clear of the FDIC-Receiver Claims, if the FDIC-Receiver were to prevail on its Claims in the absence of the Settlement, the Estates would have no assets available for distribution to unsecured creditors. In light of this and WTC's extensive diligence, WTC determined that the Settlement is in the best interests of all of the Debtors' unsecured creditors and WTC agreed to support the Debtors' Plan.

Against this backdrop, Tricadia—at the 11th hour—has come in to object to the Plan and challenge the Settlement and Liquidation Trustee process embodied in the Plan. Tricadia also seeks conversion of the Chapter 11 Cases to Chapter 7. Tricadia was not active throughout the Chapter 11 Cases and only stepped in following approval of the Disclosure Statement. For the reasons detailed below, and any additional reasons provided in any response to the Objection filed by the Debtors, WTC submits that Tricadia's Objection is unfounded and should be denied. Specifically, Tricadia (1) mischaracterizes the Settlement which is well-within the standards for approval of such an agreement; (2) ignores the substantial oversight and notice

procedures provided for in the Plan; and (3) fails to establish grounds for conversion and appointment of a Chapter 7 Trustee.

## Argument

### A. The Settlement Is In the Best Interests Of The Estates and Their Creditors And Should Be Approved Through The Plan

#### 1. The Settlement Satisfies The Standard For Approval Under Bankruptcy Rule 9019

At the outset, Tricadia appears to object to the "disclosures" related to the Settlement provided in the Disclosure Statement. *See, e.g.*, Objection, ¶¶ 2, 3, 31, 33-36, 53 and 54. However, the Disclosure Statement was previously approved by Court order dated February 16, 2011 [Dkt. No. 391] and accordingly, any objections to the sufficiency of the Disclosure Statement are untimely.[5]

In addition, WTC is advised that the Debtors are prepared to establish at confirmation the necessary elements to show that the Settlement is based upon their sound business judgment. This is entirely consistent with the plan approval process which does not require that a case be proven at the disclosure stage. *See In re Statepark Bldg. Group,* 2005 WL 6443615, *6 (Bankr. N.D. Tex. 2005) (A disclosure statement is not meant to prove the case—it is meant to "give creditors and interest holders the information they need to decide whether to accept the plan"). Rather, the requirements of section 1129 must be proven at the confirmation hearing. *In re Gulf Coast Oil Corp.*, 404 B.R. 407, 424-25 (Bankr. S.D. Tex. 2009).

---

[5] Contrary to Tricadia's flawed and untimely objections to the Disclosure Statement, the Disclosure Statement detailed the numerous factors considered in entering the Settlement, including (a) the probability of success in litigating the controversies involved, with due consideration for uncertainties in fact and law; (b) the complexity and likely duration of the litigation and related expenses, inconvenience and delay; (c) the difficulties, if any, to be encountered in collecting on any judgment which might be obtained; and (d) the paramount interest of creditors and the estate. As described therein, all of these factors weigh heavily in favor of approving the Settlement. See Disclosure Statement, Article 7, B. 1-4.

4

As the Debtors have and will further demonstrate at the confirmation hearing, the Settlement is well within the applicable standards for approval under Federal Rule of Bankruptcy Procedure 9019 ("Rule 9019"). The decision to accept or reject a compromise or settlement does not require the Court to decide the numerous questions of law and fact raised, but to canvass the issues and determine whether the proposed settlement falls below the lowest point in the range of reasonableness. *In re Duncan*, 2007 WL 2872411, *7 (E.D. Tex. 2007) (citing *In re Imperial Tooling and Mfg., Inc*., 314 B.R. 340, 342 (Bankr. N.D. Tex. 2004); *In re Pinnacle Brands, Inc*., 259 B.R. 46, 54 (Bankr. D. Del. 2001)). Similarly, it is unnecessary for the Court to conduct a mini-trial to determine the probable outcome of any claims waived in a settlement; the Judge need only apprise herself of the relevant facts and law so that she can make an informed and intelligent decision. *Official Committee of Unsecured Creditors v. Cajun Electric Power Cooperative, Inc. (In re Cajun Elec. Power Co-op., Inc.)*, 119 F.3d 349, 356 (5th Cir. 1997).

As Tricadia acknowledges, to determine whether a settlement is fair and equitable, this Court should consider and evaluate the following three factors: "(1) The probability of success in the litigation, with due consideration for the uncertainty in fact and law, (2) the complexity and likely duration of the litigation and any attendant expense, inconvenience and delay, and (3) all other factors bearing on the wisdom of the compromise." *Id.* Indeed, these are among the factors the Debtors considered in determining that the Settlement was in the best interests of the Debtors' Estates and their creditors. *See* Disclosure Statement, Article 7, B. 1-4. In particular, and as described in more detail below, the Debtors along with WTC gave due consideration to the uncertainty of the outcome of any litigation and the fact that were the FDIC-Receiver to prevail, it would be entitled to *all* of the Debtors' assets. In addition, the Debtors had to consider the duration and attendant expense associated with that litigation. Given the

5

complex nature of the issues raised by the FDIC-Receiver Claims and the time and resources that would be required to litigate, these factors weighed heavily in favor of settlement. *See, e.g., In re MCorp Financial, Inc.*, 160 B.R. 941, 951 (S.D. Tex. 1993) (Recognizing the increased costs and expenses in litigation with the FDIC given its vast resources).

Moreover, the fact that Tricadia, as one purported creditor, objects to the Settlement, is not enough to deem the Settlement unreasonable under Rule 9019. The "desires of the creditors are not binding" because the test is what is in the best interests of the creditor body as a whole, taking into account their reasonable views. *In re Cajun Elec. Power Co-op., Inc.,* 119 F.3d at 358 (approving a settlement even though a numerical majority of creditors opposed the settlement, where it was determined that the overall interests of the creditors were well-served by the settlement). As discussed above, Tricadia represents only the singular view of one creditor, not the creditor body as a whole. This dictates against granting substantial deference to Tricadia's Objection, as Tricadia argues. Meanwhile, WTC as Indenture Trustee is charged with representing all of the bondholders under the Indenture Trust, the largest group of non-insider and non-FDIC unsecured creditors in these Chapter 11 Cases. WTC, consistent with its obligations as Trustee under the Indenture Trust, has assumed the role of a fiduciary for all unsecured creditors and has acted in that role for nearly two years. WTC participated in the extensive negotiations leading to the Settlement involving the Debtors, the Debtors' Chief Restructuring Officer, the FDIC-Receiver and its representatives and undertook extensive diligence in examining the claims at issue. As part of its diligence, WTC, among other things, reviewed documents, legal research and operative case law in support and defense of the various claims. As such, WTC is far better suited than Tricadia to weigh in on the best interests of creditors in these Chapter 11 Cases.

## 2. The Settlement Provides Substantial Benefits To The Debtors' Estates And Their Creditors

Through its Objection, Tricadia mischaracterizes the Settlement as benefitting only the FDIC-Receiver and WTC. To the contrary, the Settlement includes numerous concessions by the FDIC-Receiver and provides substantial assets that will go directly to the Liquidation Trust free and clear of the FDIC-Receiver Claims, which if left unresolved, could claim all of the Debtors' assets leaving *nothing* for unsecured creditors or result in a severe dilution of the available assets to be distributed to general creditors by virtue of the FDIC-Receiver's $2 billion claim. Among the numerous benefits the Settlement provides the Estates and Liquidation Trust are the following:

(i) The majority of the costs incurred by the Debtors' in administering the Chapter 11 Cases through January, 31, 2010 shall be paid from the FDIC's share of the Settlement.

(ii) The Estates retain 15% of the cash in GFG's accounts and 70% of the cash in GGVI, GGCI and GHI accounts aggregating approximately $9 million, free and clear of the FDIC's claims. The foregoing would result in the Estates retaining approximately 45% of the cash assets.[6]

(iii) The Estates retain (and are assigned any rights of the FDIC), for prosecution by the Liquidation Trust, all claims against former insiders and employees relating to recovery of funds transferred by the Debtors, whether in the capacity as holding company or bank, free and clear of the FDIC-Receiver Claims. While Tricadia does not mention the retention of any additional claims by the Estates, according to the spreadsheet annexed to the Disclosure Statement there are approximately $7-8 million in such funds transferred to insiders and employees.

(iv) The Estates retain, for prosecution by the Liquidation Trust, more traditional preferences and related Chapter 5 claims, totaling approximately $300,000 free and clear of FDIC claims.

(v) The Estates retain, for prosecution by the Liquidation Trust, any and all claims held by the Debtors against Temple Inland free and clear of any

---

[6] The amount of potential recoveries by the Estates are estimates and subject to final review.

(v) claims of the FDIC to share in such recoveries. The FDIC retains claims of Guaranty Bank, if any.

(vi) The Estates retain, for prosecution by the Liquidation Trust, any other claims the Estates may have except claims against the FDIC-Receiver, Guaranty Bank and Compass Bank.

(vii) The Liquidation Trust shall receive 30% of any recoveries by the FDIC in connection with certain pending litigation against Guaranty Insurance Services. While the foregoing is subject to the outcome of the litigation, such claims may be worth one to two million dollars, subject to contingency.

(viii) While ultimately unnecessary, the Settlement Agreement also provided for the FDIC to assume responsibility for up to $2 million in tax obligations with respect to the IRS' $25 million priority claim. The claim was subsequently settled and withdrawn.

Accordingly, including potential litigation claims and cash, there are approximately $20 million in potential assets, excluding any additional recoveries from Temple Inland, that could be available depending upon the success of third party litigation under the Settlement. The Settlement with the FDIC-Receiver also means that any and all recoveries from such litigations and the cash assets retained by the Liquidation Trust are free and clear of the uncertainties and costs of litigation with the FDIC-Receiver over not only ownership of the subject assets and priority of treatment of claims, but potential for dilution of recoveries given the sheer magnitude of the nearly $2 billion claim of the FDIC-Receiver. At the same time, as discussed below, the title to property retained by the FDIC-Receiver under the Settlement is subject to significant dispute.

3. **The Settlement Represents A Compromise That Maximizes Benefit While Minimizing Risk For The Debtors' Estates And Their Creditors**

Tricadia argues that prior pleadings submitted by both WTC and the Debtors disputing the validity of the FDIC-Receiver Claims, contradict the terms of the Settlement. In so arguing, however, Tricadia ignores the fact that any settlement necessarily involves the

8

acquiescence of parties to contrary positions in order to minimize their risks while maximizing their benefit in light of those risks. In reaching the Settlement, WTC by no means conceded its prior arguments, but rather, after weighing the various arguments, defenses, costs and uncertainties, determined that the Settlement is in the best interests of the creditors it represents. *See In re MCorp Financial, Inc*. 160 B.R. at 951 (flatly rejecting an objection based on bad faith merely because the debtors originally opposed settlement).

Indeed, Tricadia's assertion that WTC either did not consider the strengths and weaknesses of the FDIC-Receiver Claims prior to agreeing to the Settlement or otherwise acted in its own self-interest, is entirely baseless, and belies the extensive negotiation process which lasted several months and yielded the Settlement which includes substantial benefits to the Debtors' Estates and their creditors while minimizing the costs and risks involved in continued, protracted litigation. If the FDIC-Receiver Claims are litigated, in addition to seven figure legal fees in fact-intensive litigation, if the Debtors lose, there would be no unencumbered assets for creditors, *an irresponsible risk to take given the amounts provided for under the Settlement*. Contrary to what Tricadia would have this Court believe, there is substantial uncertainty as to the outcome of any litigation over the FDIC-Receiver Claims to the following assets:

**(a)** **Tax And Insurance Refunds**

While not inconsequential, potential tax refunds are limited here as most of the tax attributes were retained by Temple-Inland as part of the spin off agreement. And in any case, applicable authority holds that a tax refund inures to the benefit of the entity that actually paid the taxes and incurred the loss giving rise to the refund. *See, e.g., Capital Bancshares, Inc. v. F.D.I.C.*, 957 F.2d 203, 210 (5th Cir. 1992) ("[t]he refund is the property of the [subsidiary], which could have generated the refund on its own had it filed with the IRS as a separate entity"

9

and therefore the FDIC as receiver of the subsidiary was entitled to the tax refunds attributable to the losses of the subsidiary). Here, the FDIC-Receiver strongly asserts that the amounts at controversy were paid by the Bank, not the Debtor holding company, and accordingly, under applicable law, such refunds would typically be due to the payor, in this case the FDIC-Receiver for the Bank, and not the Debtors.

Moreover, the arguments that support control over refunds by the Debtors, require a tax sharing agreement so providing. *See* Objection, ¶¶ 71-72. However, the tax policy adopted by the Debtors appears to track the majority law holding that the refund inures to the benefit of the entity that paid the taxes. Insurance refunds track a similar argument as with respect to the tax refunds and in both cases (with respect to tax and insurance refunds) were taken into account when the parties negotiated a division of tangible assets (cash and refunds).

### (b) D&O Claims

Under the Financial Institutions, Reform, Recovery and Enforcement Act ("FIRREA")[7], the FDIC-Receiver has the right to bring causes of action against the bank in receivership that are derivative in nature. Direct causes of action against the bank in receivership would, generally, belong to the trustee. While there is some authority that arguably could support a direct claim here, the majority of the decisions out of the 5th Circuit provide that claims against officers and directors of a company for breach of fiduciary duty or corporate mismanagement are considered derivative in nature. *See, e.g., Stevens v. Lowder,* 643 F.2d 1078, 1080 (5th Cir. 1981). Given that the claims against officers and directors in these Cases are predominately breach of fiduciary duty/mismanagement claims, the FDIC-Receiver's position

---

[7] 12 U.S.C. §1821(d)(2)(A)(i).

has consistently been that the claims are derivative claims and thus within the FDIC Receiver's sole authority to prosecute pursuant to the majority view in this Circuit.

In addition, as part of the Settlement Agreement, the FDIC-Receiver agreed to waive any of its claims against officers and directors relating to the avoidance and recovery of transfers to such officers and directors, provides for the assignment to the Liquidation Trust of any of the FDIC-Receiver's rights (including as to claims by the Bank) against the officers and directors relating to such transfers, and provides an additional cash payment in the amount of $450,000. The Settlement also provides for the assignment of the D&O claims otherwise retained by the FDIC-Receiver, in the event that the FDIC does not prosecute such claims as detailed more fully in the Plan. These concessions, in particular, where the D&O claims relinquished are derivative in nature, provide substantial benefit to the Estates in exchange for relinquishing claims that are unlikely to be sustained after trial. The foregoing must also be viewed in connection with the global Settlement, the totality of the consideration provided to the Estates, and the agreement of the FDIC-Receiver to relinquish its rights to share in property and litigation recoveries retained by the Estates.

**(c)** **Capital Maintenance Claims**

Under the Settlement Agreement, the parties have agreed to a division of the cash assets roughly 45% retained by the Estates and 55% retained by the FDIC-Receiver. Tricadia objects to this division, and instead intimates that the Estates should retain all of the cash because, in Tricadia's view, no capital maintenance claim can be sustained, and consequently, with no such requirement, any claim by the FDIC-Receiver for the cash assets must fail.

However, Tricadia cites to non-binding case law from outside the Circuit as support for its position on capital maintenance. Indeed, as Tricadia acknowledges under the case

11

law it cites to, whether an obligation to commit capital existed is a fact-intensive analysis which requires an in depth investigation beyond mere assertions. In addition, courts have found that a commitment to maintain capital existed where agreements specifically promised either to "infuse sufficient additional equity capital" into a subsidiary bank, or "absolutely, unconditionally and irrevocably guarantee... the performance" of a subsidiary bank. *See Wolkowitz v. Fed. Deposit Ins. Corp.,* 527 F.3d 959, 973 (9th Cir. 2008); *Office of Thrift Supervision v. Overland Park Fin. Corp.*, 236 F.3d 1246, 1252 (10th Cir. 2001); *Resolution Trust Corp. v. Firstcorp, Inc.,* 973 F.2d 243 (4th Cir. 1992); *Franklin Savings Corp. v. Office of Thrift Supervision*, 303 B.R. 488, 491 (D. Kan 2004). Therefore, not only is the outcome of litigation on any capital maintenance claim uncertain, but in any case, the expenses required to litigate would be extensive. The sheer size of the FDIC-Receiver's alleged capital maintenance claim alone heightens any risk in litigation and magnifies the attendant costs. These are all significant factors weighed by WTC in favor of the Settlement, in particular, where the cash at issue is limited to a specific fund and under the agreement the Estates are retaining approximately 45% of the total fund.

For all of the foregoing reasons, WTC supports the Debtors' analysis, that the Settlement provides substantial benefit to the Debtors' Estates and their creditors while minimizing the inherent risks of litigation that could leave the Debtors' creditors with nothing.

B. **The Plan Provides Significant Safeguards For The Administration Of The Liquidation Trust**

1. **The Plan Provides Detailed Mechanisms For Notice And Court Oversight**

While Tricadia contends that the Plan lacks oversight over the Liquidation Trust process, a careful reading of the Plan reveals just the opposite. In particular, under the Plan and Liquidation Trust Agreement, the Liquidation Trustee is required to file with the Bankruptcy

12

Court and serve upon the United States Trustee and Post-Confirmation Service List monthly reports setting forth:

  (i)  Detailed information as to receipts and disbursements of property of the Debtors and their estates for the month including the disposition of funds in the Liquidating Trust, the Wind-down Reserve and Distribution Fund;

  (ii)  All Disputed Claims resolved and remaining;

  (iii)  All known material non-cash assets remaining to be disposed of;

  (iv)  Status of any and all Rights of Action;

  (v)  Itemization of all expenses the Liquidation Trustee anticipates will become due and payable in the next three months; and

  (vi)  Forecasts of all receipts and expenses for the next three months.

<u>See</u> Plan, Article V, Section H.5.(r) and (s); Trust, Article IV, Section 4.2.23.

  Moreover, under Article V, Section H.5 (e), the Liquidation Trustee is required to file any notice of compromise and settlement of any Rights of Action with the Bankruptcy Court, with notice and opportunity for objection and hearing in the event that any settlement or comprise is subject to objection. Similarly, the Bankruptcy Court retains jurisdiction to hear and determine all claims, controversies, suits, and disputes relating to the Liquidation Trustee and to decide and determine all motions, adversary proceedings, contested or litigated matters, and any other matters involving the Liquidation Trustee. *See*, Plan, Article XII, A.4 and 7.

  Accordingly, notwithstanding Tricadia's flawed arguments, not only would WTC serve in a fiduciary capacity as Liquidation Trustee, but would be required to file detailed reports and accountings with the United States Trustee and Bankruptcy Court and serve the same on creditors, and remains subject to a process for objection and court adjudication in the event that any settlement, expenditures or other actions are challenged. Moreover, the payment of fees to

13

and the prosecution of any causes of action by WTC as Liquidation Trustee, are subject to a detailed process for review, objection, and oversight. *Id.*

### 2. WTC Is Qualified To Act As Liquidation Trustee

In light of the substantial notice and oversight process provided for in the Plan and Liquidation Trust Agreement, Tricadia's assertion that a "third party" is needed to audit the assets and treatment of creditors is nonsensical. An accounting will be provided on a monthly basis as required under the Plan and if an accounting is needed to certify the financial records of the Liquidation Trustee, the same can be provided separately. Under these circumstances, Tricadia's challenge to WTC—an independent party serving in a fiduciary capacity with no pecuniary interest—is entirely baseless.

Moreover, Tricadia's suggestion that a new "fiduciary" is needed in these cases, ignores the substantial involvement, "learning curve", and efforts of WTC and its professionals in actively participating in these Chapter 11 Cases from inception, as well as the significant additional costs in bringing in a new layer of parties and professionals. At the outset, it should be noted, that while creditors have been in contact with WTC throughout the Chapter 11 Cases, no bondholder or other significant creditor appeared through the approval of the Disclosure Statement, nor otherwise took any active interest or involvement in these Chapter 11 Cases. However, WTC has been in contact with creditors during the Chapter 11 Cases and until now, all of the feedback has been positive. WTC agreed to serve as the Liquidation Trustee to minimize costs where no other creditors took an interest in participation in the process. Indeed, WTC has been actively involved in the Chapter 11 Cases for the past 21 months, and as such, along with its professionals, is fully familiar with the background, facts and issues necessary to move forward promptly with third party actions given the fast approaching statute of limitations on

Chapter 5 causes of action, amongst other things. Moreover, WTC is a bank and independent fiduciary, with no pecuniary interest in these cases, and with specific expertise and reserves to manage hundreds of millions in assets, without the risk of dissipation or prejudice.

Indeed, contrary to Tricadia's intimation, for these same reasons, it is quite common for a party who was active in a debtor's chapter 11 case to assume the role of liquidating trustee, post-confirmation. *See, e.g., In Circuit City, Inc.,* Case No. 08-35653, Dkt. No. 8555 (Bankr. E.D. Va. Sept. 14, 2010) (approving the appointment of the debtor's chief restructuring officer as liquidating trustee); *In re BearingPoint*, *Inc.*, Case No. 09-10691, Dkt. No. 1550 (Bankr. S.D.N.Y. Dec. 22, 2009) (approving the appointment of debtor's executive vice president and chief legal officer as a liquidating trustee). It is also common for the liquidating trustee to retain professionals active in the bankruptcy case. *See In re Sun Communications, Inc*., 280 B.R. 573 (Bankr. D. Del. 2002) (holding there was no conflict where the same attorneys who represented the unsecured creditors committee would also represent the liquidating trustee). As a result, Tricadia's attempt to impugn WTC's ability to administer the Liquidation Trust assets is flawed and entirely baseless.

Finally, notwithstanding the substantial safeguards already in place under the Plan, to further allay any legitimate concerns Tricadia may have, WTC has advised Tricadia that it is not adverse to forming a representative committee to oversee settlements and other post-confirmation matters. In point of fact, there was no interest in forming any committee of any kind earlier in these Chapter 11 Cases, and limited creditor interest today, in cases facing a $25 million priority tax claim (subsequently settled and withdrawn) and a nearly $2 billion claim by the FDIC-Receiver.

15
NYC_1121556.4

## C. Conversion Of These Cases To Chapter 7 Is Inappropriate And Will Negatively Impact The Estates And Their Creditors

For all of the reasons stated above, Tricadia's request that these Chapter 11 Cases be converted to Chapter 7 and that an independent fiduciary be appointed to pursue all claims and causes of action on behalf of creditors is entirely baseless. At the outset, Tricadia has failed to move by proper motion on notice as required under the Bankruptcy Code and Rules. Moreover, Tricadia has failed to establish that conversion is warranted under applicable authority as none of the factors Tricadia relies on in its Objection exist here. First, there is no evidence of any mismanagement by the Debtors' Chief Restructuring Officer who is an independent fiduciary appointed in these Cases after notice and a hearing. Moreover, the conversion of the cases would create an added lawyer of administration costs. Under the settlement agreement, the FDIC-Receiver is assuming responsibility for a significant portion of the costs of administration absent which the Cases will likely be left in a "free fall", resulting in significant litigation at substantial costs to the Estates. Nor is this a case where a plan has been confirmed but not consummated. Rather, as described herein, the Plan was proposed by the Debtors in good faith and remains subject to this Court's approval. Herein, the Plan embodies the Settlement that was reached after months of arms-length negotiations by the main constituencies in these Cases.

Lastly, bringing in new a new fiduciary to start an investigation from scratch while the statute of limitations is fast-approaching would be severely detrimental to the Estates. As described above, WTC is intimately familiar with the matters and claims at issue and would be prepared to move forward with the third party claims in a timely fashion. Moreover, absent the Settlement with the FDIC-Receiver, significant risk remains that any recoveries would be subject to claims by the FDIC-Receiver that the assets belong to it, or that any recovery would be

so far diluted that the benefit to the Debtors' Estates of continued, protracted litigation, if any, would be severely undermined, if not vitiated.

WHEREFORE, Wilmington Trust respectfully requests that the Court (1) deny the Objection; (2) enter the Proposed Order confirming the Debtors' Chapter 11 Plan; and (3) grant Wilmington Trust such other and further relief as is just and proper.

DATED:  April 20, 2011          **FOLEY & LARDNER LLP**
90 Park Ave., 36th Floor
New York, NY 10016
Tel:	(212) 682-7474
Fax:	(212) 687-2329

By: /s/ Douglas E. Spelfogel
    Douglas E. Spelfogel (admitted *pro hac vice*)
    Derek L. Wright
    Richard J. Bernard
    Email: dspelfogel@foley.com
    Email: opetukhova@foley.com

E. Lee Morris (TX Bar No. 00788079)
**MUNSCH HARDT KOPF & HARR, P.C**.
500 N. Akard Street, Suite 3800
Dallas, Texas 75201-6659
Tel:	(214) 855-7500
Fax:	(214) 855-7584
Email: lmorris@munsch.com

**COUNSEL FOR WILMINGTON TRUST COMPANY, AS INDENTURE TRUSTEE**

**CERTIFICATE OF SERVICE**

This is to certify that on the 20th day of April, 2011, a true and correct copy of the foregoing pleading was served by ECF transmission on all parties registered to receive notice through ECF in this case, and also by U.S. first class mail, postage prepaid, on the following parties:

Tricadia Fianncials Restructuring Partners, Ltd.
c/o Duane Morris LLP
Attn: Gerard S. Catalanello, James Vincequerra and
Pat Matusky
1540 Braodway
New York, NY 10036-4086
- and -
c/o Carrington Coleman Sloman & Blumenthal, LLP
Attn: Stephen A. Goodwin
901 Main Street, Suite 5500
Dallas, TX 75202

Debtors
Guaranty Financial Group Inc., et al.
c/o Dennis Faulkner, CRO
Lain, Faulkner & Co., P.C.
400 N. St. Paul, Suite 600
Dallas, Texas 75201

Debtors' Counsel
Haynes and Boone LLP
Attn: Robert D. Albergotti, Stephen M. Pezanosky,
Ian T. Peck and Autumn Highsmith
2323 Victory Avenue, Suite 700
Dallas, Texas 75219

Federal Deposit Insurance Corporation
c/o Otterbourg, Steindler, Houston & Rosen, P.C.
Attn: Steven B. Soll, Melanie L. Cyganowski and
Jeffrey K. Cymbler
230 Park Avenue
New York, New York 10169

United States Trustee
c/o George F. McElreath
Office of United States Trustee
1100 Commerce Street, Room 976
Dallas, Texas 75242

                                                /s/ E. Lee Morris
                                                E. Lee Morris